**UNITED STATES v. MORGAN et al.**

Civ. A. No. 43–757.

United States District Court,
S. D. New York.

Oct. 14, 1953.

Victor H. Kramer, Washington, D. C., Richard B. O'Donnell, New York City, Walter K. Bennett, Margaret H. Brass, Washington, D. C., Harry G. Sklarsky, Francis E. Dugan and Herman Gelfand, New York City, for plaintiff.

Breed, Abbott & Morgan, New York City, for defendant Eastman, Dillon & Co.; Herman A. Heydt, Jr., New York City, of counsel.

Cahill, Gordon, Zachry & Reindel, New York City, for defendants Dillon, Read

& Co., Inc. and Stone & Webster Securities Corporation; Mathias F. Correa, R. Graham Heiner, Loftus E. Becker, David Ingraham and Lawrence W. Keepnews, New York City, of counsel.

Covington & Burling, Washington, D. C., for defendant Smith, Barney & Co.; W. Graham Claytor, Jr. and William Stanley, Jr., Washington, D. C., of counsel.

Cravath, Swaine & Moore, New York City, for defendants Kuhn, Loeb & Co. and Union Securities Corporation; Wm. Dwight Whitney, Geo. Stephen Leonard and Henry R. Nolte, Jr., New York City, of counsel.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for defendants Morgan Stanley & Co. and Harriman Ripley & Co., Incorporated; John W. Davis, Ralph M. Carson, Leighton H. Coleman, Edward R. Wardwell, Francis W. Phillips, George Edward Cotter and Warren W. Eginton, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendant Harris, Hall & Company (Incorporated); Roy W. McDonald, Thomas K. Fisher, New York City, Douglas V. Lewis, Rockville Center, N. Y., John J. O'Connell, Jr., and John F. Seiberling, Jr., New York City, of counsel.

Drinker, Biddle & Reath, Philadelphia, Pa., and Emmet, Marvin & Martin, New York City, for defendant Drexel & Co.; Henry S. Drinker and John G. Williams, Philadelphia, Pa., of counsel.

Shearman & Sterling & Wright, New York City, for defendant White, Weld & Co.; Walter K. Earle and Lauretta D. Robinson, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendants Blyth & Co., Inc., Glore, Forgan & Co., Goldman, Sachs & Co. and Lehman Brothers; Arthur H. Dean, Edward H. Green, Eustace Seligman, John F. Dooling, Jr., William Piel, Jr., Roy H. Steyer, Francis E. Barkman, Robert Lockwood, William H. Buchanan, Jr., Roderick J. Kirkpatrick, John R. Miller, Anthony Chandler, and Marvin S. Sloman, New York City, of counsel.

Sullivan & Cromwell, New York City, and Choate, Hall & Stewart, Boston, Mass., for defendant The First Boston Corporation; Arthur H. Dean, William Piel, Jr., Roy H. Steyer and Robert T. Quittmeyer, of Sullivan & Cromwell, New York City, and Robert Proctor and Brinley Hall, of Choate, Hall & Stewart, Boston, Mass., of counsel.

Webster, Sheffield & Chrystie, New York City, for defendant Kidder, Peabody & Co.; Bethuel M. Webster, Edward L. Rea and Bancroft G. Davis, New York City, of counsel.

## TOPICAL ARRANGEMENT OF OPINION

Introduction.

The Offense as Charged in the Complaint.

Certain Alleged Unifying Elements Abandoned or Disproved.

The Applicable Law Relative to Conspiracy.

PART I:

The Investment Banking Business.
 I. Prior to the First World War.
 II. Between World War I and the Securities Act of 1933.
 III. Further Developments 1933–1949.
 IV. How the Investment Banker Functions.

PART II:

The Seventeen Defendant Investment Banking Firms.
 1. Morgan Stanley & Co.
 2. Kuhn Loeb & Co.
 3. Smith Barney & Co.
 4. Lehman Brothers.
 5. Glore Forgan & Co.
 6. Kidder Peabody & Co.
 7. Goldman Sachs & Co.
 8. White Weld & Co.
 9. Eastman Dillon & Co.
 10. Drexel & Co.
 11. The First Boston Corporation.

12. Dillon Read & Co. Inc.
13. Blyth & Co., Inc.
14. Harriman Ripley & Co., Incorporated.
15. Stone & Webster Securities Corporation.
16. Harris Hall & Company (Incorporated).
17. Union Securities Corporation

PART III:

The Syndicate System.
 I. Did the Seventeen Defendant Investment Banking Firms Use the Syndicate System as a Conspiratorial Device in Connection with Any Integrated Over-all Combination?
 II. Alternate Claims Belatedly Attempted to Be Asserted against the Investment Banking Industry as a Whole.
 A. The Rule of Reason.
 B. The Securities Act of 1933, the Securities Exchange Act of 1934, and the Amendments Thereto; the Rules, Interpretations and Releases of the SEC Thereunder; and the Organization and Functioning of the NASD.
 C. The Opinion of the SEC in the Public Service Company of Indiana Case.
 Some Interim Observations.

PART IV:

Did the Seventeen Defendant Investment Banking Firms Combine for the Purpose of Dominating and Controlling and Did They in Fact Dominate and Control the Financial Affairs of Issuers by Directorships and Solicitation of Proxies?
 Proxies.
 Burlington Mills.
 Jewel Tea.

The Evidence Generally Applicable to Directorships Discloses No Conspiratorial Pattern but Rather the Contrary.
First Boston.
 Addinsell and Phillips Petroleum.
Harriman Ripley.
 United Air Lines.
Union Securities.
Directorship Evidence against Goldman Sachs, Lehman Brothers, Kuhn Loeb, Dillon Read and Blyth.
Goldman Sachs.
Lehman Brothers.
 Cluett Peabody.
 Food Fair.
 Allied Stores.
 Aviation Corporation.
 Sears Roebuck.
 Cleveland Cliffs Iron Co.
Kuhn Loeb.
 Franklin Simon.
 Miscellanea.
Dillon Read.
 National Cash Register.
 Amerada Petroleum.
 Outlet Company.
 Beneficial Industrial Loan.
 Union Oil.
 Commercial Investment Trust.
 Rheem.
Blyth.
 Rayonier.
 Pan American Airways.
 Anaconda Copper.
 Iron Fireman.
Some Further Interim Observations.

PART V:

The "Triple Concept".
Semantics.
"Historical Position".
Chicago Union Station.
The Alleged "Practice" of "Traditional Banker" and "Successorships".
 1. Morgan Stanley.
 The "Master Mind".
 The Telephone Business.
 Consumers Power.

The Alleged "Caretaker" Situations.
Dayton Power & Light.
Atlantic Coast Line, Toledo & Ohio Central, Chicago & Western Indiana, Nypano (New York, Pennsylvania & Ohio) and Dominion of Canada.

2. Kuhn Loeb.
The Otto H. Kahn "Show Window".
Bulgaria.
Commonwealth of Australia.
Armstrong Cork.
Bethlehem Steel.
R. H. Macy & Co.
Crucible Steel.
General Cable.

3. Smith Barney (Edward B. Smith & Co.).
What Is Now Taking Shape Is Not a Static "Mosaic" of Conspiracy but a Constantly Changing Panorama of Competition Among the Seventeen Defendant Firms.
Wilson & Co.
Rochester Gas & Electric.
A. E. Staley Manufacturing Co.
Aluminum Koppers, Jones & Laughlin, Lone Star Gas, Gulf Oil.
Southern Pacific.
Standard Oil of New Jersey.

4. Lehman Brothers.
Crown Zellerbach.
Giannini Interests.
The So-Called "Treaties" Between Lehman Brothers and Goldman Sachs.
National Dairy Products.
Butler Bros., Associated Gas & Electric, Indianapolis Power & Light and Tidewater Associated Oil.

5. Glore Forgan.
Indianapolis Power & Light.

6. Kidder Peabody.
Pennsylvania Power & Light.

7. Goldman Sachs.
Pillsbury.

8. White Weld.

9. Eastman Dillon.

10. Drexel.

11. First Boston.
Province of Cordoba, Androscoggin Electric Corp., and Central Maine Power.

12. Dillon Read.
Scovill Manufacturing Co., Scripps, Porto Rican American Tobacco Co., Argentine Government, American Radiator and Grand Trunk Western.
United Drug.
Shell Union Oil.

13. Blyth.
Pacific Gas & Electric.
Competition for Leadership 1934–1936.
The Alleged Overly-Large Syndicate Formed By Blyth in Connection with the $80,000,000 Issue of March 27, 1945.
The Sale in 1945 of 700,000 Shares of Common Stock of Pacific Gas & Electric Held by North American.

14. Harriman Ripley.
Scandinavian Financings.

15, 16 and 17. Stone & Webster, Harris Hall and Union Securities.

PART VI:

Alleged Conspiratorial Opposition of the Seventeen Defendant Banking Firms to "Shopping Around," and to the Campaign for Compulsory Public Sealed Bidding; and the Alleged Adoption of Devices to Sabotage SEC Rule U-50 and Compulsory Public Sealed Bidding in General.

General Views on Competitive Bidding and the Advantages to Issuers Arising Out of Continuing Banker Relationships.

The Eaton—Young—Halsey Stuart Campaign.

Responses to Requests from SEC to Express Views Relative to Proposed Rule U-50 and Further Amendments to Rule U-12F-2.

Alleged Overly-Large Syndicates and Other "Devices" to Sabotage Public Sealed Bidding.

PART VII:

The "Insurance Agreement," Alleged to Have Been Made on December 5, 1941, and "Approved" on May 5, 1942.

PART VIII:

Conclusion.
Administrative Features and Statistics of the Trial
Summary, Rulings on Motions and Dismissal.

APPENDIX:

Summary Description of Statistical Compilations, Tables and Charts.

MEDINA, Circuit Judge.

### Introduction

This is a civil action in equity to restrain the continuance of certain alleged violations of Sections 1 and 2 of the Sherman Act, Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, 15 U.S.C. §§ 1, 2, 4. It is charged that defendants entered into a combination, conspiracy and agreement to restrain and monopolize the securities business of the United States and that such business was thereby unreasonably restrained and in part monopolized.

The "securities business" which is the subject of these charges is defined in the complaint in terms that are uncertain and in part contradictory. In the clarifying process of pretrial hearings and trial, however, counsel for plaintiff receded in part from the allegations of the complaint. As finally re-defined, plaintiff's position is that the "security issues" to which the charges of the complaint should be understood to relate are intended to include new issues, and secondary offerings registered with the Securities and Exchange Commission under the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., of securities of domestic and foreign business corporations and foreign governmental units and foreign municipalities, offered to or placed with investors in the United States, but to exclude domestic railroad equipment trust certificates, all notes and serial notes representing term loans by commercial banks, all general and revenue obligations of domestic governmental units and domestic municipalities, and all unregistered secondary offerings of any securities.

The combination, conspiracy and agreement to restrain and to monopolize and the actual restraint effected thereby are claimed to have embraced every method and type of transaction by which issues of the above-defined securities have been transferred from the issuers (or from sellers of blocks of such securities in registered secondary offerings) to the hands of investors, whether underwritten by investment bankers or non-underwritten, whether privately placed or publicly offered to existing security-holders or the general public, and whether in negotiated transactions or at public sealed bidding, with the exception, however, of direct offerings by issuers to their security-holders in which investment bankers are not employed as agents or underwriters. The part of the securities business which is charged to have been monopolized by the defendants in the course of and through the operation of the conspiracy is claimed to have consisted of all new issues of the above-defined securities, and all registered secondary offerings thereof, which have been underwritten by investment bankers in negotiated transactions and publicly offered to existing security-holders or to the general public.

### The Offense as Charged in the Complaint

The complaint charges an integrated, over-all conspiracy and combination formed "in or about 1915" and in continuous operation thereafter, by which the defendants as a group "developed a system" to eliminate competition and monopolize "the cream of the business" of investment banking. The prolixity of the complaint and its various involutions are such that it will be convenient to summarize and paraphrase its contents, as was done in the trial brief submitted at the opening of the trial by counsel for the government. The mortar to cement together the various parts of this extraordinary document is provided by a series of definitions, many of which bear little resemblance to the meaning of the various words or phrases used in the business.

The central theme is what has been referred to throughout the case as "the triple concept" of "traditional banker," "historical position" and "reciprocity." To quote from the brief above referred to:

"Under the traditional banker concept that banker who first manages an underwriting for a particular issuer is deemed entitled to manage in the future all additional security issues offered by such issuer. * * * Under the concept of historical position once a banker participates as a member of a buying group in the purchase of the securities of a particular issuer, such banker is deemed entitled to participate on substantially the same terms as a member of the buying group in all future issues offered by such issuer. Under the concept of reciprocity the defendant banking firms recognize a mutual obligation to exchange participations with one another in the buying groups which they respectively manage."

In this connection the complaint specifically charges that:

"Each defendant banking firm keeps a reciprocity record to show the business it has given to each of the other defendant banking firms and the business it has received from each of such firms."

And that:

"Over a period of time, the amount of gross spreads which one of such firms enables another to earn by selecting it for participation in buying groups is substantially equivalent (with due allowance for differentials in prestige and underwriting strength) to the amount of gross spreads it has earned in the same period of time as a participant in buying groups formed and managed by such other firm."

As it is evident that no such parcelling out of the investment banking business could function so long as the management of issuers was free to choose and deal with any investment banking house it wished, there is alleged in the complaint as one of the terms agreed upon by the defendants, and as part of the conspiracy and combination, that there should be a species of control over issuers so as to "preserve and enhance their control over the business of merchandising securities:"

"(1) by securing control over the financial and business affairs of issuers, by giving free financial advice to issuers, by infiltrating the boards of directors of issuers, by selecting officers of issuers who were friendly to them, by utilizing their influence with commercial banks with whom issuers do business."

One of the terms of the agreement said to have been made by the members of the combination and conspiracy is that when a "representative" of one of the 17 defendant banking houses becomes a director of an issuer, this is understood by all the rest to be the equivalent of "raising a red flag," and thus warning the others to keep off.

As a measure of combined control over issuers and the several hundred other investment banking houses

against whom the conspiracy was to operate, it is charged in the complaint that in 1915 "the modern syndicate method of distributing securities was invented by defendant banking firms and their predecessors," and that defendants agreed that with certain modifications this method should be utilized by defendants to stabilize the business "by fixing and controlling the prices, terms, and conditions of purchase, sale and resale of securities." This "device" is said to be manipulated by defendants in various ways, all as part of the general plan or scheme. For example, it is alleged that defendants as managers of such syndicates not only further the ends of the combination or conspiracy by dealings among themselves, but that they sometimes exclude other firms from participations or selling group positions, and sometimes include such firms "which might otherwise attempt to compete with defendant banking firms;" and that by means of this "device" defendants "agree among themselves upon a uniform, non-competitive price" which, having thus been "fixed" by them, is foisted upon issuers, by what can only euphemistically be called "negotiation," in view of the domination and control exercised or attempted to be exercised over the issuers by defendants. It is worthy of note that the allegations with reference to the syndicate system and its so-called price-fixing features are made solely in reference to the charge of the integrated, over-all combination and conspiracy.

Certain statutory and regulatory provisions of great significance, which became effective in 1934, 1941 and 1944 are reflected in other phases of the combination and conspiracy as charged.

In 1933 the Congress passed the Glass-Steagall Act,[1] pursuant to the terms of which commercial banks and their security affiliates were required to go out of the investment banking business, if the banks desired to continue taking deposits and performing their other banking functions. The deadline was June 16, 1934. The affiliates were accordingly dissolved; and such banking houses as had bond departments or otherwise engaged directly in the investment banking business, with very few exceptions, elected to continue their banking functions and restricted their operations in the field of securities to governmental and other issues specifically exempted from the operation of the new law. Thousands of employees of these institutions were forced to make new connections, and many joined the staffs of some of the 17 defendant investment banking houses.

It is the theory of the complaint that the pre-existing and flourishing combination and conspiracy met this situation by a further agreement among the conspirators to the effect that certain of the defendant firms should succeed to or "inherit" the conspiratorial "rights" theretofore parcelled out to the commercial banks and their affiliates by the operation of "the triple concept" above described, and that the combination or conspiracy should accordingly, and it is alleged did, continue to operate as before. This is the predecessor-successor phase of the case in a nutshell. The complaint originally read as though certain firms became and were the real successors of others in a legal sense whereas what was intended to be pleaded, as disclosed by an amendment of the complaint made in the course of pre-trial conferences, is that the "successors" were such only in the sense that the alleged conspirators so agreed as part of the operation of their integrated, over-all combination and conspiracy.

In 1941 the Securities and Exchange Commission promulgated a rule requiring securities of companies, affected by the provisions of the Public Utility Holding Company Act of 1935, 15 U.S. C.A. § 79, et seq., to be sold by compulsory public sealed bidding, and similar action, relative to debt securities of railroads, was adopted by the Interstate

---

1. See infra, p. 646.

Commerce Commission in 1944. In this connection and in very comprehensive terms the complaint charges that these 17 defendants as part of the same integrated, over-all combination and conspiracy agreed to discredit the use of competitive bidding, private placements and agency sales as methods of disposing of security issues. The competitive bidding phase of the charge is divided roughly into three parts: (1) Opposition to campaigns which resulted in the adoption of the rules above referred to. (2) Refusal to submit sealed competitive bids and the adoption of a great variety of "devices" for the purpose of sabotaging the new rules and hence defeating the purposes of the two governmental agencies which had made public sealed bidding compulsory with respect to a not inconsiderable area of security issues. Such "devices" were alleged to have included: the organization of overly-large syndicates, the grant of participations equal to those of the manager, the reduction of management fees and the merger of accounts. (3) After certain insurance companies had bid in a large issue of securities of the American Telephone & Telegraph Company in the fall of 1941, it is charged that a certain agreement was made on December 5, 1941 and "approved" on May 5, 1942, by virtue of which the insurance companies were to be eliminated as direct bidders for security issues.

According to the complaint the means adopted by the conspirators to accomplish their ends were many and various. They seem to include, under the heading of "customs and practices," said to have been agreed upon to effectuate the design of the conspirators, many of the alleged abuses which over the years have been charged against investment banking houses in general, but which have not as yet been affected by specific legislation.

This in brief is the framework and the essence of the charge against these 17 defendant investment banking firms. Much of the detail is omitted for the moment in the interest of clarity. Many of the charges against defendants were from time to time abandoned and removed from the case and no further reference will be made to them.

Thus "the substantial terms" of the "continuing agreement and concert of action" originally alleged against the group of 17 in paragraph 44 of the complaint included: (1) an agreement to cement their relationships with issuers by securing clearances from such issuers before making their investment banking facilities available to competing business enterprises and by refusing to act as advisers or underwriters for small business concerns; (2) an agreement to utilize their domination and control to encourage and promote consolidations, mergers, expansions, refinancings and debt refundings to increase their investment banking business; and (3) an agreement to concentrate the business of purchasing and distributing security issues in a single market. These were all withdrawn by counsel for the government.

The following "customs and practices," alleged in paragraph 45 to have been "formulated and adopted" by agreement of the group of 17 were originally included but later dropped: (1) the formation of "standby accounts" for all security issues of a particular issuer to prevent the assembling of competing groups and thus discourage issuers from disposing of issues at competitive bidding; (2) in the event of insolvency or reorganization of issuers with whom a "traditional banker" relationship existed with a member of the group, to cause a partner, officer or other nominee to be appointed to influence protective committees for the benefit of such "traditional bankers"; and (3) subsequent to the divorcements required by the Investment Companies Act of 1940, 15 U. S.C.A. § 80a–1 et seq., continuing to influence managing investment companies or trusts in which capital had been "strategically invested" so that voting powers would be exercised "in the interests of defendant banking firms."

Such other issues as were removed from the case by consent need not be specified, except as they may be hereinafter referred to.

The complaint bears every evidence of careful and prolonged preparation, its articulation is close and compact, every word is carefully chosen and fitted exactly in its proper place. Thus it is the 17 defendant banking houses, arrayed against the balance of the investment banking industry, and alleged to be acting in combination to monopolize "the cream of the business," and divide it up among themselves, by excluding those investment banking houses which are not part of the conspiracy. If the charge is true the restraints are ingeniously devised to create a controlled rather than a free market at every level. The operation of "the triple concept" prevents competition as between defendants themselves; the domination and control over issuers and the "fixing" of the price to be paid issuers for their security issues deprives issuers of a free market in which to raise the money they need; non-defendant firms are deprived of an opportunity to compete for the business; the trading operations of dealers and brokers are restricted during the period of the continuance of syndicates formed for the distribution of new security issues; and investors are deprived of an opportunity to purchase securities in a free market.

And all this is said to have gone on for almost forty years, in the midst of a plethora of congressional investigations, through two wars of great magnitude, and under the very noses of the Securities and Exchange Commission and the Interstate Commerce Commission, without leaving any direct documentary or testimonial proof of the formation or continuance of the combination and conspiracy. The government case depends entirely upon circumstantial evidence.

## Certain Alleged Unifying Elements Abandoned or Disproved

During the prolonged and extensive pre-trial conferences, there was much discussion of the method to be pursued by the government in attempting to prove that these 17 defendant investment banking houses had formed a combination and were acting jointly as a group. As pointed out in my memorandum of April 9, 1951, filed with Pre-trial Order No. 3, United States v. Morgan, D.C., 11 F.R.D. 445, 454–455, the unifying elements of the alleged conspiracy were obscure, as no industry-wide uniformity was charged, there was no powerful group such as the "Big Three" operating against independents in the American Tobacco Co.[1] case, no letter or series of agreements presenting a definite plan to which others might consciously adhere as in the Interstate Circuit[2] and Masonite Corp.[3] cases and there appeared to be many non-defendant investment banking firms which were larger, had more capital and did more business than some of the defendants herein. Certain aspects of the present case, however, which have since been abandoned or disproved seemed to have relevance to this important phase of the case.

The first of these was the fact that it was claimed that defendants and their "predecessors" had invented the syndicate system to further their plan or scheme. This charge, which was evidently the basis for the allegation that the conspiracy was formed "in or about 1915," has been conclusively disproved and has been virtually abandoned.

The second such possible unifying element was the Investment Bankers Association, originally joined and for many months of the trial continued as a defendant and alleged co-conspirator. Each of the defendant firms was and

1. American Tobacco Co. v. United States, 1946, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575.

2. Interstate Circuit v. United States,

1939, 306 U.S. 208, 59 S.Ct. 467, 83 L. Ed. 610.

3. United States v. Masonite Corp., 1942, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461.

had for many years been a member of this Association, particularly during the period when the Association, through its officers and committees took a strong position against the adoption of rules and regulations requiring compulsory public sealed bidding for certain types of new security issues. On motion of the government, however, the Investment Bankers Association was, with my approval, eliminated as a defendant and the charge that it was a co-conspirator was withdrawn. The name of its president Emmett F. Connely, was, however, continued in the list of alleged co-conspirators, evidently because he had made a speech on October 7, 1941 criticizing the purchase of the American Telephone & Telegraph bonds by a group of certain large insurance companies at public sealed bidding and one or two men connected with some of the defendant firms had in one form or another expressed their approval of the speech.

Perhaps the most impressive indication of joint action by the defendants lies in the detailed and explicit allegation of the complaint relative to reciprocity. Not only is it charged that each defendant banking firm keeps a reciprocity record to show the business it has given to each of the other defendant banking firms and the business received from them; but also that over a period of time the profits from such participations are substantially equivalent, with due allowance for differentials in prestige and underwriting strength. If substantiated, these allegations would indicate some systematic and continuous arrangement between the defendants to pay one another off in return for the alleged agreement to defer to one another as "traditional bankers."

Here again, however, there was not merely a failure of proof but an affirmative demonstration that the allegations are without foundation in fact.

No evidence of any kind, whether by way of alleged reciprocity records, deposition proof or documents, was produced on this phase of the case against Dillon Read, Drexel, Glore Forgan, Morgan Stanley, Smith Barney, Union Securities and White Weld; nor were any alleged reciprocity records introduced against Harriman Ripley and Kuhn Loeb. Such records as were received in evidence were of the most disparate character. They covered different periods of time, included non-defendant firms as well as defendant firms, and were so fragmentary and different in character one from the other as to make it clear that they had not been prepared as the result of any joint action whatever. No calculations of reciprocal obligations, such as would have been required by the operation of the conspiracy as alleged, could possibly have been made from these miscellaneous and incomplete loose leaf books and cards.

A careful scrutiny of the documents received in evidence on this part of the case, taken in connection with the so-called reciprocity records and such testimony as was taken by deposition, indicate that a few individual defendant firms, motivated by various considerations of a purely business character, and acting separately and not in combination, did no more than is often found done by business men generally. In the course of a business relationship it is a natural and normal thing for those in the same industry occasionally to seek business on the basis of business given. Were there some uniformity or some common pattern the case would be different. As it is, there is a pattern of no pattern; and I find that, considering all the evidence in the record, including the stipulated statistical data, the reciprocity charge has been disproved.

### The Applicable Law Relative to Conspiracy

The Sherman Act is not an open door through which any court or judge may pass at will in order to shape or mould the affairs of business men according to his own individual notions of sound economic policy. Nor was it ever intended by the Congress that judges should determine such policy questions as: the desirability of compulsory

sealed bidding for new security issues; the propriety of officers or partners of investment banking firms accepting directorships on the boards of issuers; the good or bad effects of the solicitation of proxies by investment bankers; and whether investment bankers should be permitted to advise issuers concerning their financial affairs, the formulation of long range plans for expansion and refunding, the setting up of specific security issues and kindred subjects and also perform services and assume risks in connection with the registration and distribution of such security issues. The regulation of such matters is a legislative function and the series of statutes which have become law since the great depression of 1929 and the following years bear ample testimony to the fact that the Congress is mindful of its power to regulate such matters, by reason of their connection with interstate commerce.

What the Sherman Act does is to declare illegal "every contract, combination * * * or conspiracy" in restraint of trade or commerce and to make guilty of a misdemeanor "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce" among the states or with foreign nations. The task of the judge is to determine whether the conduct challenged in the litigation contravenes the prohibitions of the statute. This is no mandate to the judiciary to decide anti-trust cases according to individual ideas of expediency, which may change according to the personal philosophy or even the political affiliation of the judge. It is the combination or joint action of the many which is the essence of the offense. Unless there is some agreement, combination or conspiracy the Sherman Act is not applicable.

But it is supposed by some that the requirement of combination is a mere empty phrase to which one must indeed do lipservice, but which may easily be got around by finding agreement, com-bination or conspiracy when in truth and in fact no agreement, combination or conspiracy exists, provided the result obtained seems desirable and in the public interest. This is not the law but only another aspect of the false but seductive doctrine that the end justifies the means which, so far as I know, has never taken lodgment in American jurisprudence; and I hope it never will.

True it is that conspiracies whether by business men or others engaged in unlawful schemes are often hard to detect. No direct proof of agreement between the wrongdoers is necessary; circumstantial evidence of the illegal combination is here as elsewhere often most convincing and satisfactory. But, when all is said and done, it is the true and ultimate fact which must prevail. Either there is some agreement, combination or conspiracy or there is not. The answer must not be found in some crystal ball or vaguely sensed by some process of intuition, based upon a chance phrase used here or there, but in the evidence adduced in the record of the case which must be carefully sifted, weighed and considered in its every aspect. This is an arduous but necessary task.

■ Especially is this true in a case such as the present one where the great bulk of the documentary evidence is initially received against a particular defendant and only subject to connection against the others in the event that the combination or conspiracy is proved. According to well established precedents such documents may be used circumstantially against all; but this works both ways as the probative force of such proof, when considered circumstantially may not tend to support the factual conclusion that the combination or conspiracy existed but rather the contrary. In any event it is well settled that statements contained in such documents, received subject to such connection, may not be used to establish the truth of their contents, except as against the particular defendant against whom such documents are received generally. And it is well that this is so for much that

is contained in casual memoranda and even in messages, reports, teletypes and diary entries is mere rumor and gossip, which frequently turns out to be unreliable hearsay. Once the conspiracy is established, however, all such statements become those of agents of the group, to be considered against all the defendants as part of the proofs in the case generally.

## PART I

### The Investment Banking Business

It would be difficult to exaggerate the importance of investment banking to the national economy. The vast industrial growth of the past fifty years has covered the United States with a network of manufacturing, processing, sales and distributing plants, the smooth functioning of which is vital to our welfare as a nation. They vary from huge corporate structures such as the great steel and automobile companies, railroads and airlines, producers of commodities and merchandise of all kinds, oil companies and public utilities, down to comparatively small manufacturing plants and stores. The variety and usefulness of these myriad enterprises defy description. They are the result of American ingenuity and the will to work unceasingly and to improve our standard of living. But adequate financing for their needs is the life blood without which many if not most of these parts of the great machine of busines would cease to function in a healthy, normal fashion.

The initial inquiry in any anti-trust case must be into the character and background of the industry involved. In a case such as this, which covers so long a period of time and a multiplicity of issues and which is largely documentary in character, it is not too much to say that it is impossible to pass upon questions of credibility of witnesses and to understand and interpret the thousands of miscellaneous exhibits, including memoranda, letters, diary entries, teletype inter-office messages and so on without some fairly adequate understanding of the way in which the business is and

has been conducted. Thus we turn to the evolution and growth of the investment banking business and the way it functions in the modern American scheme of financial affairs.

By way of prefatory comment and to facilitate orientation, it may be helpful first to describe some of the major factors. The central thought, as in every anti-trust case, must be the character and scope of competitive effort or the lack of competitive effort.

The principal factors which one must constantly bear in mind are: (1) the evolution of the syndicate system from its inception prior to the turn of the century, and its function in the issuance and distribution of securities; (2) the impact on the investment banking business of economic forces and a series of acts of Congress including the Banking Act of 1933, the Securities Act of 1933, the Securities Exchange Act of 1934 and the Public Utility Holding Company Act of 1935, and the various amendments to these statutes, supplemented by rulings and regulations of the Securities and Exchange Commission and the Interstate Commerce Commission; and (3) the complete and comprehensive static and statistical data which show the details of every relevant security issue in the period from January 1, 1935, to December 31, 1949.

While the complaint alleges that the syndicate system was invented at or about the time of the Anglo-French Loan in 1915 by the defendants and their "predecessors," it has been conclusively established, as already stated, that the syndicate system as a means of issuing and distributing security issues was in use at least as early as the 1890's; and in this early period price maintenance was to some extent used, as it was appreciated even in those days that the problem of placing upon the market a large bulk of new securities required careful management and planning lest the very quantity involved should depress the price and make distribution within a reasonable time difficult if not impossible.

The present method for issuing and distributing new security issues thus has its roots in the latter part of the nineteenth century. It is the product of a gradual evolution to meet specific economic problems created by demands for capital, which arose as the result of the increasing industrialization of the country and the growth of a widely dispersed investor class. It was born in large part because of, and gradually adapted itself to, conditions and needs which are peculiar to the business of raising capital.

## I. Prior to the First World War

Prior to the year 1900, the large majority of industrial and business units which existed in this country were small in size and their capital needs were small; use of the corporate form was not widespread. There was no substantial and widely scattered class of persons with surplus savings who sought promising investment opportunities. A large part of the capital needed came from abroad. Securities sales operations were conducted principally by selling agents who sold on a commission basis, and more often than not it was the issuer who bore the risk of how successfully and how quickly the required funds would be obtained.

The evolution of the investment banking industry in the United States is illustrated by the early phases of the development of two of the defendant investment banking firms, Goldman, Sachs & Co. and Lehman Brothers.

Goldman, Sachs & Co. traces its origin back to the year 1869, when Marcus Goldman started a small business buying and selling commercial paper. In the year 1882, he was joined in that business by Samuel Sachs, and at that time the firm, which had been known as Marcus Goldman, became M. Goldman & Sachs. In the year 1885, when additional partners joined the firm, the firm became Goldman, Sachs & Co., and has continued as such from then on to today. At that time, it was very difficult for small manufacturers and merchants to get capital with which to operate, so Goldman, Sachs & Co. developed the business of buying their short-term promissory notes, thus furnishing them with needed capital, and selling these notes to banks or other investors. This commercial paper business prospered and continued to expand in the 1880's and 1890's, and, by the time of the year 1906, when the opportunity first arose for Goldman, Sachs & Co. to underwrite some financing for United Cigar Manufacturers, now known as the General Cigar Company, the firm had established many contacts all over the country with merchants and manufacturers. During this period, also, partners of Goldman, Sachs & Co. took frequent trips to Europe, because at that time it was difficult to raise capital for American enterprises in the financial markets of this country, and they entered into arrangements with European bankers, whereby they would lend money in this country for their account.

Likewise, the firm of Lehman Brothers traces its ancestry back to about 1850. Since then, a series of partnerships, formed from time to time upon the withdrawal or death of partners or the addition of new ones, has conducted business under the name of Lehman Brothers. The firm had prospered greatly as "cotton bankers," and, years before the turn of the century, it had established its headquarters in New York City.

In the late 1890's and the early 1900's, the prime securities were railroad bonds and real estate mortgages. The public utilities business had not as yet achieved great importance, and, consequently, public utility securities were generally looked upon with disfavor. Railroad and public utility financing was handled by a small number of firms. The railroad financing was done to a considerable extent by Kuhn, Loeb & Co., J. P. Morgan & Co., Vermilye & Co. and August Belmont; and a large percentage of the capital was furnished by French and German underwriters. The public utility financing was done to a large extent by Harris, Forbes & Co., which had become a specialist in the securities of companies providing power and light. Harris,

Forbes & Co. was becoming known as an underwriter which understood and knew how to solve the problems of those companies, and had the knack of raising capital for the growing industry. There was an open field in certain light industrial and retail store financing which had been neglected or overlooked.

After the beginning of this century, as family corporations grew larger and needed more capital for expansion, or when the head of a family died and money was needed to pay inheritance taxes, it became increasingly apparent that commercial paper, which was short-term money, was insufficient to meet the capital requirements of those small enterprises. At about this time, Goldman, Sachs & Co., desirous of entering the business of underwriting securities, conceived the idea of inducing privately owned business enterprises to incorporate and to launch public offerings of securities. In the early 1900's it was considered undignified to peddle retail store securities, but Goldman, Sachs & Co. believed that, with the growth in size of family corporations and other privately owned business enterprises, there would be a market on a national basis for their security issues. The problems involved in offering securities to the public, where no securities were previously outstanding in the hands of the public, were new and difficult of solution, and different from the problems involved in the underwriting of bonds of a well known railroad. The sale of retail or department store securities required a different market.

When the opportunity arose in the year 1906 for Goldman, Sachs & Co. to underwrite the financing of United Cigar Manufacturers, it was unable to undertake the entire commitment alone, and could not get the additional funds which it needed to underwrite from commercial banks or other underwriters, as they would not at that time underwrite this type of securities. Henry Goldman prevailed upon his friend Philip Lehman of Lehman Brothers to divert some of his capital from the commodity business and to take a share in the underwriting. The result was that the two firms, Goldman, Sachs & Co. and Lehman Brothers, became partners in the underwriting of the financing of United Cigar Manufacturers. When the opportunity arose in that same year for Goldman, Sachs & Co. to underwrite the financing of Sears, Roebuck & Co., it was perfectly natural for it again to turn to Lehman Brothers for assistance, and the two firms became partners in that enterprise. Thus it was through this oral arrangement between two friends, Henry Goldman and Philip Lehman, through this informal partnership, that Goldman, Sachs & Co. was able to obtain the capital which it needed to underwrite these two security issues in the year 1906. Without such capital, it would have been unable to enter the business of underwriting securities. The events which occurred in the year 1906 set the pattern for subsequent financings which Goldman, Sachs & Co. underwrote prior to the First World War. In the period from the year 1906 to the year 1917, although Goldman, Sachs & Co. occasionally underwrote financings with other partners, notably Kleinwort Sons & Co., merchant bankers of London, its principal partner was Lehman Brothers.

These two firms, as partners or joint adventurers, continued to act together thereafter underwriting securities of clothing manufacturers, cigar manufacturers, department stores and merchants, and the kind of businesses that most investment bankers, who were interested only in the securities of heavy industrials, railroads and to some extent public utilities, would not touch. The two firms began to cultivate acquaintances and build up relationships with securities dealers in other parts of the country who could market in their respective cities or towns the type of securities in which the two firms were particularly interested; and, as their reputations grew, they began to underwrite securities in the industrial field. They added to their staffs persons who were experts on merchandising and retail store methods, and they developed the business of selling

their services to family and other privately owned enterprises.

While the evidence is not explicit on the point it would seem reasonable to assume that, prior to World War I, the firms interested in the securities of railroads, public utilities and heavy industries were establishing similar contacts, building up similar staffs of experts in their particular fields and otherwise doing whatever they could to enhance their reputations in their own specialities.

In the period from the year 1906 to the year 1917, Goldman, Sachs & Co. and Lehman Brothers together underwrote the financings of many enterprises which had a small and humble beginning, but which later grew to very great size, among them being United Cigar Manufacturers, Sears, Roebuck & Co., B. F. Goodrich Company, May Department Stores Company and F. W. Woolworth Company. Many of the business concerns whose securities were underwritten by Goldman, Sachs & Co. and Lehman Brothers during this period were houses with which Goldman, Sachs & Co. had previously had commercial paper transactions. As Goldman, Sachs & Co. and Lehman Brothers were better known at the time than many of the business enterprises whose securities they underwrote, investors bought the securities to some extent in reliance on their reputation.

There thus grew up between these two firms an informal, oral arrangement whereby they, as partners or joint adventurers, purchased security issues directly from issuers, and divided equally the profit which was realized from their sale.

There was then no network of securities dealers throughout the country, such as there is at the present time. In or about the year 1905 or 1906, there were only about five investment banking houses which had a national distribution system for securities: Lee Higginson & Co.; N. W. Harris & Co.; N. W. Halsey & Co.; Kidder, Peabody & Co.; and William Salomon & Co. Investment banking houses such as J. P. Morgan & Co., Kuhn, Loeb & Co., and William A. Read & Co. were underwriters of securities primarily in the New York market. Up to about the year 1912 or 1915, there were approximately only two hundred and fifty securities dealers in the entire United States, most of whom were concentrated in the eastern and middle eastern parts of the country. It was not until the time of the launching of the Liberty Loan in the year 1917 that we find a large number of independent dealers engaged in the business of distributing securities throughout the country.

As there was no network of securities dealers on a nation wide scale, the underwriters sold as many securities as they could directly to individual investors, and the sale of security issues generally was not completed rapidly. For example, it took Goldman, Sachs & Co. and Lehman Brothers three months to sell the Sears, Roebuck & Co. security issue which they underwrote in the year 1906, and, in many other instances, it took the underwriters much longer to complete the distribution of security issues. The personnel of the distributing organizations was small, and their operations were concentrated in the eastern and northeastern parts of the country. The purchase and banking groups were characteristically organized to last for a period of one year, and the manager had broad powers to extend the period. This power to extend was frequently exercised by the manager; there are records of such groups continuing from two to five years or longer. Investment banking firms kept lists of investors, and, whenever they underwrote a security issue, they would go directly to the investors and try to sell them that particular security.

This method of distribution was adequate for the sale of a limited number of security issues to a limited investing public; it was wholly inadequate for a later time when new security issues were to follow each other in rapid succession, since the slowness of distribution of a greatly increased volume of securities required excessively large capital re-

sources on the part of the originating banker and the purchase and banking groups for the purpose of carrying the securities. Accordingly, it is interesting to observe that, as an incident of the long periods of distribution, the investment banker's "spread," that is, the difference between the price paid to the issuer for the security and the price received for it from the investing public, was larger during this period than in later years.

Prior to World War I, the United States was a debtor and not a creditor nation. Investment banking firms in this country turned to Europe to find wealthy individuals and other investment bankers who would be willing to share the risk and underwrite the security issues of business enterprises in the United States. European investment banking firms also sold to investors in Europe the securities of American business enterprises. Among some of the European investment banking firms to which Goldman, Sachs & Co. and Lehman Brothers turned to during this period were Kleinwort Sons & Company, Helbert, Wagg & Russell and S. Japhet & Company, all of London, Labouchere Oyens & Company, of Amsterdam, and others in Berlin and Zurich. Goldman, Sachs & Co. had established business relationships with all of these investment banking firms prior to the year 1906, when it was anxious to enter the international banking business in order to be able to furnish its American clients with letters of credit and foreign exchange. All of these contacts became very useful when Goldman, Sachs & Co. entered the investment banking business.

With this background, it is easy to see that many of the issuers, especially those whose securities were not well known to the public, leaned heavily upon the sponsorship of the investment banking firms under whose auspices the securities were sold. Issuers invited partners or officers of investment banking firms to serve on their boards of directors, in order to interest investors in their securities. Some of the prospectuses, which in those early days were little more than notices, stated that a partner or officer of a particular investment banking firm would go on the board of directors of the issuer whose securities were being offered to the public for sale. Investment bankers sometimes asked to be put on the boards of directors of issuers in order to know how they were managed and to protect the interests of the investors to whom they had sold the issuer's securities. Since the investment bankers sponsored the securities and lent their names to their sale, they felt a certain obligation to the investors to whom they sold the securities to see to it that the issuers did not adopt any policies or engage in any practices which would impair the value of those securities. This was especially important in connection with foreign investors.

Another development which was to have repercussions later on arose out of the difficulty of obtaining underwriters to share the risk. Thus it was that, prior to World War I, it was not unusual to find officers, directors and shareholders of issuers made participants on original terms in the underwriting of security issues; and investment bankers approached wealthy friends and other moneyed individuals, who were willing to take the risks involved, and asked them to participate. Commercial banks also took participations in substantial amounts.

In the period under discussion, it was common for an investment banker to purchase an entire issue directly from the issuer at a stated price, and that banker alone would sign the purchase contract with the issuer. Generally, the investment banker's agreement to purchase represented a firm obligation. This investment banker would then immediately organize a larger group, composed of a limited number of investment banking firms, which was sometimes called a "purchase syndicate," whereby he would, in effect, sub-underwrite his risk by selling the securities which he had purchased alone from the issuer to this larger group, at an increase or "step-up" in

price. The investment banker who purchased the entire issue directly from the issuer was known as the "originating banker" or "house of issue." The originating banker became a member and the manager of the "purchase syndicate." Goldman, Sachs & Co. is said to be one of the first investment banking firms to develop this method of underwriting securities; and, although this method may have been developed to underwrite the securities of the smaller, less well-known industrial enterprises and of the family concerns which were for the first time launching securities for sale to the public, other investment bankers used the same method to underwrite the securities of large industrial enterprises, railroads and utilities. As business enterprises in this country grew in size, and as the amounts of capital required by these enterprises became larger, sometimes a second group, more numerous than the "purchase syndicate," would be formed in order to spread still wider the risk involved in the purchase and sale of the securities. The "purchase syndicate" would then sell the securities which it had purchased at an increase in price from the originating banker to this second larger group, which was sometimes called a "banking syndicate," at another increase or "step-up" in price. The originating banker and the other investment banking firms, which were members of the "purchase syndicate," usually became members of the "banking syndicate" and the originating banker became its manager. The transfer of the securities to the "purchase syndicate" and then to the "banking syndicate" was practically simultaneous with the original purchase of the securities from the issuer by the originating banker.

Even at a time before there was any delegation of powers to any particular one of the original purchasers, according to the testimony of Harold L. Stuart of Halsey, Stuart & Co., "there was an agreement between the houses to buy them and to sell them and to maintain a price" which was even then called a "public offering price."

Stuart also described the first syndicate in which his firm participated, which was a $10,000,000 issue of First Mortgage Bonds of the Commonwealth Edison Company in December, 1908. There were two managers who were paid a fixed fee, an equivalent of the present day management fee, and the two managers had broad powers. Sales through the manager pro rata for the accounts of the members of the syndicate and also sales of non-withdrawn bonds on behalf of the syndicate members through dealers and directly to institutions and other buyers were contemplated. Further details appear in the syndicate agreements of certain issues of bonds of the Pacific Gas & Electric Company and United Light & Railways Company in 1912 and 1913.

From all the above it is evident that the various steps which were taken, including use of the purchase and banking groups above described, were all part of the development of a single effective method of security underwriting and distribution, with such features as maintenance of a fixed price during distribution, stabilization and direction by a manager of the entire coordinated operation of originating, underwriting and distributing the entire issue.

This evolution of the syndicate system was in no sense a plan or scheme invented by anyone. Its form and development were due entirely to the economic conditions in the midst of which investment bankers functioned. No single underwriter could have borne alone the underwriting risk involved in the purchase and sale of a large security issue. No single underwriter could have effected a successful public distribution of the issue. The various investment bankers combined and formed groups, and pooled their underwriting resources in order to compete for business. These groups of investment bankers were not combinations formed for the purpose of lessening competition. On the contrary, there could have been no competition without them. Unless investment bankers combined and formed such groups there

would have been no underwriting and no distribution of new security issues. Perhaps the English system,[1] which seems superior in the view of some, has many advantages. But the investment banking business in America grew and developed and prospered according to an indigenous American pattern.

The most significant fact about the period prior to World War I is that in it will be found the beginnings, the seeds as it were, from which in the course of time and by a gradual and traceable evolution there grew the elaborate and effective modern methods by which investment bankers, skilled in the application of their special techniques, perform the integrated services by which they earn their livelihood.

Thus in these early times we find investment bankers employing trained experts who spend much of their time developing plans and designing the set-ups of issues of securities which will be especially suitable for the needs of a particular issuer, at a particular time and under particular circumstances. We find groups forming for the purposes of competition, sometimes small groups developing into larger ones. And we find the already well developed shaping up of the syndicate system, with features of price maintenance and stabilization and broad powers delegated to the managers in connection with distribution and otherwise, not as a means of merely merchandizing securities, as one would buy and sell hams and potatoes, as suggested by government counsel, but rather as a means of integrating the steps of purchase and distribution necessary to the attainment of the ultimate goal of channeling the savings of investors into the coffers of the issuer as a single unified, integrated transaction. No longer does the issuer bear the risk alone and distribute its securities by agents selling on a commission basis. The pattern of performing a series of interrelated services by the investment banker, including the formu-

lation of the plan and method to be pursued in raising the money, the undertaking of the risk and the distribution of the security issue as a whole, has already emerged.

## II. Between World War I and the Securities Act of 1933

The aftermath of the war was a period of over-production and mal-distribution accompanied by a sharp decline in the prices of commodities. A nation at peace could not absorb all the products of an economy, which, but a short time before, had been geared for the effective waging of war. Many business enterprises were faced with the problem of reorganizing in order to get their operations back on a profitable basis. By the year 1923, however, the nation's economy had recovered from the "commodity or inventory panic," and business enterprises began to enjoy more prosperous conditions.

In the following decade there was an unprecedented expansion of industrial and business enterprises, an increase in the number and geographical distribution of investors; and the use of the corporate form was adopted more and more widely. As domestic business units increased in size and number, the demands for investment capital reached a magnitude never before experienced. The United States had become a creditor nation; and, for the first time, foreign governments, foreign municipalities and foreign corporations turned to this country to raise capital from private American investors. Those investment banking firms which were dependent upon European capital for their underwriting strength went into eclipse and other banking investment firms came to the fore.

J. P. Morgan & Co. was the leading firm. But all the great publicly owned banks were in the investment banking business, first for their own account and later indirectly through either subsidiary or affiliated corporations formed for the

---

1. See Louis Loss, Securities Regulation (1951), pp. 106–7, and authorities there cited.

purpose. Dillon Read, Lee Higginson, the old Kidder Peabody and Blair appear to have been perhaps the best known names in all-around business. Kuhn Loeb together with J. P. Morgan & Co. were leaders in railroads, in which field older firms such as Speyer, J. & W. Seligman, and Ladenburg Thalmann were also important. Bonbright, Harris Forbes, Halsey Stuart and Coffin & Burr were leaders in public utilities. Lehman and Goldman Sachs were leaders in merchandising and other fields. The largest distributing firms were those particularly connected with the banks, such as National City, Guaranty and Chase. But a number of other banks were active, such as First National, Bankers Trust, the principal banks in Boston, Chicago, Cleveland and Pittsburgh, and others. Among other firms then in existence but appearing less frequently were E. B. Smith, C. D. Barney, White Weld, Blyth Witter, Stone & Webster, Field Glore, Hallgarten and Brown Brothers.

Security issues followed one another in rapid succession and, whereas before World War I an issue of one million dollars was considered large, in the middle 20's issues of twenty and twenty-five million dollars were by no means unusual.

The impact of these economic forces upon the investment banking industry was precisely what one would have expected. The number of underwriters in the syndicates increased, in order both to spread the risk and to effect a widespread and rapid distribution of the securities to the public. Even so the problems of distribution became so complicated that it became customary to form an additional group called a "selling syndicate" or "selling group." The new "selling syndicate" was much larger and more widely dispersed than the purchase and banking groups had been.

There were three types of these selling syndicates throughout this period. While they represented successive steps in the development of investment banking, and while there were shifts in the

type that was most extensively used, all three were used throughout the 1920's.

The first type was known as the "unlimited liability selling syndicate." In this group, each member agreed to take a pro rata share in the purchase of the security issue by the selling syndicate from the previous group, at a stated price, and to take up his share of any unsold securities, which remained in the syndicate at the time of its expiration. The syndicate agreement stated the terms upon which the offering to the public was to be made. Each member was given the right to offer securities to the public, and he received a stated commission on all confirmed sales. However, regardless of the amount of securities which he sold, he still retained his liability to take up his proportionate share of unsold securities. The undivided syndicate combined selling with the assumption of risk; therefore, both houses with distributing ability and houses with financial capacity, but without distributing ability, were included in the syndicate. Usually, a banking group was not organized where this type of selling syndicate was to be used. The purchase group sold the security issue directly to the selling syndicate.

The dealers who did the actual selling of the securities objected to the "unlimited liability selling syndicate," as they were compelled to take up in their proportionate shares the securities, which the other dealers, who were members of the selling syndicate, were unable to sell. Consequently, the second type of selling syndicate, which was known as the "limited liability selling syndicate," subsequently was developed. This syndicate operated in much the same manner as the undivided syndicate, except that the obligation of each member was limited to the amount of his commitment, and, when he distributed that amount, he was relieved of further liability. Each member retained his proportionate liability for the costs of carrying the securities, shared in the profits or losses of the trading account, and was liable for

such other expenses as occurred after the purchase from the purchase or banking group. A banking group was usually organized where the "limited liability selling syndicate" was to be used.

The "limited liability selling syndicate" gradually evolved into the third type of selling syndicate, which was simply known as the "selling group." The "selling group" differed from the "limited liability selling syndicate" in that its members relieved themselves of all liability for carrying costs, the trading account and other expenses. Each member of the "selling group" was concerned only with expenses connected with the actual retail distribution of securities. The financial liability of the member was restricted to selling or taking up the amount of securities for which he subscribed. Usually, a large banking group was organized where the "selling group" was to be used. The banking group took over the liability for carrying costs, the trading account and other expenses.

The size and makeup of the selling syndicates varied with the circumstances of the particular security issue. Among the important factors, which were considered in the selection of dealers, were the size of the security issue, the type and quality of the security, the size and nature of the class of investors to whom the distribution was to be made, and the ability of a dealer to distribute securities of a particular type. All of these factors were considered in the selection of underwriters and dealers for the formation of the underwriting syndicates and selling groups.

In all of these types of selling syndicates, the members acted as principals, and not as agents of the manager, in distributing securities to the public. The syndicate agreement specified the price at which the securities were to be sold, and it was a violation of the agreement for a member to sell at any other price. The manager traded in the open market during the period of distribution in order to maintain the public offering price. Through such stabilizing operations, the manager sought to prevent any securities, which had been sold by dealers, from coming back into the market in such a manner as to depress the public offering price. It was felt that with respect to the securities which appeared in the market, the members of the selling syndicate had not performed their function of "placing" with investors, for which they were paid a selling commission; and, consequently, "repurchase penalties" were provided for, whereby the manager had the right to cancel the selling commission on the sale of those securities which he purchased in the market at or below the public offering price. Under most agreements, the manager had the option of either cancelling the selling commission on the sale of the securities, or of requiring the member who sold the securities to take them up at their cost to the trading account. Records of the serial numbers of securities were kept, and the securities which appeared in the market were thus traced to the dealers who sold them. Stabilizing operations and the repurchase penalty were used in all of the three types of selling syndicates which prevailed throughout this period. However, where a "selling group" was used, it became more and more common practice to restrict the re-purchase penalty to the cancellation of commissions.

The operations of the "selling syndicate" like those of the pre-war withdrawing subscribers, dealers and selling agents, were directed by the manager whose general supervisory function over the whole machinery of purchase and distribution was continued. Even in the earlier period provisions for maintenance of the public offering price by persons to whom title had passed had been included in some agreements.

As testified by Harold L. Stuart "you simply had to have such a clause in order to make this business function in putting the securities on the market," because "there were many ways that shrewd people could beat the game and spoil the putting of any security issue on the market unless you did this."

A significant development and one quite in keeping with the economic conditions above referred to, is that the periods for distribution became much less shorter than they had been in the period prior to the war. Usually the life of the syndicate was designated as from thirty to sixty days, with a provision for earlier termination or for extension not exceeding a like period by the manager. As a matter of fact, however, the periods of distribution were generally much shorter.

The "market out" clause was evidently developed somewhere in the neighborhood of 1914 or 1915, and its use was fairly general at an early date.

As the amounts of capital required by business enterprises became larger, and the number and size of securities issues greatly increased, the problems with which investment bankers were confronted, in connection with the underwriting of security issues, multiplied. Extensive investigations had to be conducted into the affairs of a business enterprise, and studies made of its financial structure and capital needs, at considerable expense to the investment banker, before that banker would undertake the risk and underwrite the securities of that enterprise. In this connection, investment banking firms were compelled to bring into their organizations individuals who had new types of specialized knowledge and experience; so that they gradually built up teams of specialists, who were experts in the different fields in which their respective investment banking firms underwrote securities.

Throughout this period prior to 1933, officers and directors of issuers continued to be made participants on original terms in the underwriting of the security issues of those issuers and other moneyed individuals also continued to participate. This was the much criticized "gravy train" about which much was heard in the early stages of the trial. The practice seems to have gradually disappeared in the course of time, due perhaps to the fact that the investment bankers in adequate numbers became available as underwriters and the liability provisions of the Securities Act of 1933 made such opportunities for profit less attractive. In any event, government counsel now agree that this issue is out of the case.

While there were some instances in the earlier period of a purchase by the members of a banking syndicate in severalty, the more usual legal form in which the transfer was made from the issuer to the participating underwriters in the decade now under consideration was a joint or joint and several purchase.

More important than any of the other developments between World War I and the passage of the Securities Act of 1933 was the effect of the unprecedented era of expansion upon the participation of the great banking institutions and their affiliates. As the need for vast amounts of new capital for expansion, plant construction and the establishment of thousands of new enterprises made increasing demands for new money, the banks and their affiliates became increasingly interested in managing and participating in the various underwritings. While the evidence in this case relative to the pre-Securities Act period is far from complete, there is ample documentary evidence to show that many of the banks became directly interested through their bond departments and many others formed affiliates, as above stated. J. P. Morgan & Co., the First National Bank and the Bankers Trust Company and many others in New York City, as well as large banking institutions in Chicago, Cleveland and other cities did a large investment banking business. The National City Company, the Guaranty Company and Chase Securities Corporation, affiliates of the National City Bank, the Guaranty Trust Company of New York and the Chase National Bank were in the investment banking business in a big way. The National City Company as of December 31, 1929, had a capital of $110,000,000. On the same date the capital of the Chase Securities Corporation was over $101,000,000. The economic power of these huge aggregations of

capital vis-a-vis the relatively small capital of issuers was a factor of no mean significance in the period just before the great depression. There was an additional leverage in the multiplicity of banking functions which could be placed at the disposal of issuers. Added to this was the vast influence and prestige which must have made itself felt in a variety of ways. Issuers were dependent upon these great banking institutions in a way which finds no parallel in the relations between issuers and investment bankers in the period subsequent to the passage of the Banking and Securities Acts.

Before it became necessary by law to choose between commercial banking on the one hand and investment banking on the other, many of these great banking institutions were private banking houses under no statutory duty to make the disclosures required of national banks and others and this, coupled with the lack of legal requirements for disclosure of relevant facts connected with security issues, helped to make the period under discussion what has been described in the trial as an era of "dignity and mystery."

In such an atmosphere it seems altogether probable that, wholly in the absence of any conspiratorial combination, issuers felt a strong inclination to continue to bring out issue after issue with the same bankers. Indeed, it is probably not too much to say that many issuers took pride and satisfaction from the very circumstance of their connection with these giants of American finance. Such sponsorship of an offering of securities to the public was of real value.

In any event, these great banking institutions and their affiliates were doing a huge investment banking business, and they were using the money of their depositors as well as their own resources to underwrite one security issue after another.

Some of the evidence which goes back to this earlier period leads to the suspicion that with reference to one or two particular issuers there may have developed some arrangement or combination of participants, continuing throughout a number of successive issues, which might, taken in isolation and separately, have constituted violations of the Sherman Act. At this late date, after practically all of those personally concerned have died and the files and other documentary evidence are no longer available, no adjudication of the legality of such isolated transactions is possible, nor is such adjudication requested by the government. Some references have been made in the evidence to contracts with a few issuers by which an investment banker was given "preferential rights"; and Harold L. Stuart testified that he tried to get such contracts whenever he could. They seem to have been ineffectual, however, and have long since gone out of use, due at least to some extent to the disapproving attitude of the SEC. In any event, I cannot find that they were sought or used to any extent by the defendants in this case.

## III. Further Developments 1933–1949

Following the Armstrong Insurance investigation [1] in 1905 and Governor Hughes' Committee Report in 1909 [2] there had been other investigations which covered activities of investment bankers. The Pujo investigation [3] was conducted in 1912 and 1913, the Utility Corporation inquiry by the Federal Trade Commission [4] started in 1928; and

1. Public Hearings, September 6, 1905, through December 30, 1905, before the Joint Committee of the Senate and Assembly of the State of New York, Appointed to Investigate and Examine into the Business and Affairs of Life Insurance Companies, pursuant to the Concurrent Resolution adopted July 20, 1905.

2. Report of Governor Hughes' Committee on Speculation in Securities and Commodities, June 7, 1909.

3. Hearings before a Subcommittee of the House Committee on Banking and Currency, pursuant to H.Res. 429 and 504, 62d Cong., 2d Sess. (1912); May 16, 1912 through February 26, 1913.

4. FTC Utility Corporation Inquiry; Letter from the Chairman of FTC Trans-

these were followed by a long series of hearings, under the auspices of various committees of the Congress, which resulted in the Banking Act of 1933 [5] (known also as the Glass-Steagall Act), the Securities Act of 1933 [6] and the Securities Exchange Act of 1934.[7] From December 10, 1931 through February 1932 the Senate Committee on Finance pursuant to the Johnson Resolution [8] undertook to investigate the flotation of foreign bonds and other securities in the United States. Perhaps the most important of these investigations was the Gray-Pecora investigation of the Senate Committee on Banking and Currency [9] which began on April 11, 1932 and continued through May 4, 1934.

In this chronological survey of the history and development of the investment banking business it will suffice to say that these statutes, together with the Public Utility Holding Company Act of 1935 [10] and the Maloney Act,[11] effective June 25, 1938, which added Section 15A to the Securities Exchange Act of 1934, and authorized the organization of the National Association of Securities Dealers, Inc. (NASD), under the supervision of the SEC, which followed, effected changes of the most radical and pervasive character; and these changes were made with a complete and comprehensive understanding by the Congress of current methods of operation in common use in the securities issue business, such information having been made available in the course of the investigations to which reference has just been made.

Institutions which had previously engaged both in commercial and deposit banking on the one hand and investment banking on the other were required to elect prior to June 16, 1934, which of the two functions they would pursue to the exclusion of the other. This resulted in the complete elimination of the commercial banks and trust companies from the investment banking business; and the various bank affiliates were dissolved and liquidated.

The elaborate procedures which now became necessary in connection with the sale of new issues of securities were at first implemented by the Federal Trade Commission and then, upon the creation of the Securities and Exchange Commission, transferred to it. The regulation of the securities business which followed with such salutary and beneficial results has been one of the significant developments of our time. The era of "dignity and mystery" was over.

When we come to discuss the syndicate system and its operation, it will be appropriate to treat in some detail the various applicable provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, with their respective amendments, and also the numerous regulations, interpretations and releases of the SEC relative thereto. For the sake of continuity and clarity, however, this brief recital of the development of the investment banking business will be continued in order to furnish general background.

Security issue financing was relatively inactive as the result of the great depression, up until about the end of 1934. Thereafter, except for an occasional falling off in the depression of 1937 and in

mitting in Response to S.Res. 83 a Monthly Report on the Electric Power and Gas Utilities Inquiry, Sen.Doc.No. 92, Parts 1–79, 70th Cong., 1st Sess. (1928); March, 1928 through August, 1935.

5. 48 Stat. 162 (1933).

6. 48 Stat. 74 (1933), 15 U.S.C.A. § 77a et seq.

7. 48 Stat. 881 (1934), 15 U.S.C.A. § 78a et seq.

8. Hearings before Senate Committee on Finance, pursuant to S.Res. 19, 72d Cong., 1st Sess. (1931).

9. Hearings before Senate Committee on Banking and Currency, pursuant to S. Res. 84, as amended, 72d Cong., 1st Sess. (1932) and S.Res. 56 and S.Res. 97, as amended, 73rd Cong., 1st Sess. (1933).

10. 49 Stat. 803 (1935), 15 U.S.C.A. § 79 et seq.

11. 52 Stat. 1070 (1938), 15 U.S.C.A. § 78o–3.

the early years of World War II, the needs of industry kept the demand for new capital at a high level. The reduction of interest rates as the result of government manipulation brought about refundings on a large scale and further refundings continued in volume as interest rates continued to fall.

The size of issues increased. An issue of $5,000,000 was considered small. In this period there were 155 issues of $50,000,000 and larger; 559 issues of $20,000,000 and larger and over 1,000 issues of $10,000,000 and larger.

Due largely to the impact of the income and inheritance tax laws, the importance of the individual as an investor diminished and there was an extraordinary and continued growth in the size and investment needs of large institutional investors such as life and casualty companies, savings banks, investment trusts, pension funds, universities, hospitals and fraternal orders.

Perhaps the most significant change of all was caused by the withdrawal from the field of investment banking of the capital funds of the commercial banks and their affiliates, which had previously been among the foremost managers and underwriters of security issues. As already stated, investment banking firms could participate in and manage underwritings only with their own money. As of the end of 1949 only 7 of the defendant firms had a capital of 5 million dollars and larger, 8 a capital of between 2 and 5 millions and 2 a capital of between 1 and 2 millions. Nor could any of them use all of their capital or borrowing power for underwritings, as each was engaged in other activities which tied up a part of their capital funds and they were all subject to certain regulations of the SEC and the various exchanges which promulgated rules and regulations affecting the amount of capital available for underwriting.

The Revenue Act of 1932, which became effective on June 22, 1932, for the first time imposed a tax on the transfer of bonds, Sec. 724, 47 Stat. 274, 26 U.S. C.A. Int.Rev. Acts, p. 634. A transfer tax on stocks had previously been enacted in 1914; but in 1932 this tax was greatly increased in amount, Sec. 723, 47 Stat. 272, 26 U.S.C.A.Int.Rev. Acts, p. 630. Section 11 of the Securities Act of 1933 imposed on each underwriter a civil liability, for any omission or misstatement of a material fact in the registration statement, equal to the entire amount of the issue. By later amendment in 1934, Title II, Sec. 206 (d) of the Securities Exchange Act of 1934, this liability was changed to "the total price at which the securities underwritten by him and distributed to the public were offered to the public." 15 U.S.C.A. § 77k(e). The liability thus defined plus the transfer taxes made it necessary for the underwriters to abandon the purchase of security issues jointly or jointly and severally, and resulted in the purchase by the various underwriters in severalty, which has been the prevailing method ever since. Otherwise an underwriter might still be liable under Section 11 of the Securities Act of 1933, as amended, for the entire amount of the issue. Significantly, since the 1933 Act, the underwriters still frequently take title jointly or jointly and severally when the security is a municipal or other issue not subject to the Securities Act of 1933.

The old banking and purchase syndicates with the "step-up" of earlier days which had been gradually going out of vogue, now completely disappeared. The form in which underwriting transactions commonly took place from the passage of the Banking and Securities legislation up to the present time is that of a purchase or "underwriting agreement" between the issuer and the underwriters represented by the manager, and an "agreement among underwriters."

The substance of the entire transaction is substantially what it was before. The manager, like the originating banker or manager in the previous periods, handles the negotiations with the issuer and supervises the whole process of underwrit-

ing and distribution. The management fee of today is not a new development either in form or in purpose after the Securities Act of 1933, but is the direct equivalent of the management fee paid by the members of the syndicate to the manager for his services in pre-1933 financings, where the syndicate either purchased directly from the issuer or from a prior "original purchaser."

Dealer and group sales are still made, under the authority of the manager who directs the entire process of distribution. But the change in the character of the investing public and especially the development of institutional investors on such a large scale and the impact of regulation by the SEC and of the Securities Act of 1933, the Securities Exchange Act of 1934 and the organization and functioning of the NASD, brought about a gradual decrease in the use of selling group agreements, especially in issues of the higher grades of debt financing and preferred stock. It is worthy of note that in performing his function of making sales for the accounts of the underwriters both to dealers and to institutions the manager sells "out of the pot." In other words, he does not allocate particular bonds to particular underwriters but simply sells "bonds" and does not allocate numbers to any participant until the time comes for delivery of securities to the purchasers.

In accordance with the trend of the previous period spreads are gradually becoming smaller and smaller; and the maximum life of the syndicates is now 15, 20 or 30 days, although in some cases the maximum period may be longer, and it is not unusual to find clauses authorizing the manager to extend the period with or without the consent of a certain proportion of the underwriters. Price restrictions may, however, be removed earlier than the actual termination date of the syndicate, and as a practical matter they are generally terminated within a few days after the offering.

Stabilization provisions have become commonplace pursuant to statutory provisions and administrative regulations and interpretations relating to their use. While the authority to stabilize is generally given, it is only in relatively few cases that the authority has been exercised.

The use of "penalty clauses" has varied and the same is true of the use of price maintenance clauses. This subject will be discussed in greater detail when we come to the portion of this opinion devoted to syndicates. But it is well to bear in mind throughout that the entire pattern of the statutory scheme above referred to, as implemented by the various rules and regulations of the SEC and the rules of Fair Practice of the National Association of Securities Dealers, Inc., approved by the SEC pursuant to legislative authority, contemplates the sale of each security issue at the public offering price proposed in the prospectus and set forth in the registration statement as finally made effective by the SEC. Having proposed and tendered a security issue to the public at the public offering price, it is not strange that those who propose to sell the entire issue at this public offering price should be required to make a bona fide attempt to do so.[1] Otherwise, the elaborate statutory provisions relative to "the public offering price" would be meaningless. Nor, under these circumstances, should one wonder that some investment banking houses continued to use price maintenance clauses while others did not.

In the previous period a few issues were brought out by public sealed bidding and there were some private placements. In the present period public sealed bidding transactions very greatly increased due to the adoption by the SEC in 1941 of Rule U-50, in connection with all security transactions of companies affected by the Public Utility Holding Company Act of 1935 and to the ruling in 1944 of the Interstate Commerce

1. See infra, p. 691 ff., for a full discussion of the SEC rulings, and the interpretations by the NASD of its Rules of Fair Practice.

Commission, requiring all debt issues of railroads to be sold at public sealed bidding.

Due in part to the registration provisions of the Securities Act of 1933, but also in large measure to the increase in the number of institutional investors and their particular requirements, private placements grew by leaps and bounds.

In 1937 the $48,000,000 Convertible 3½s of the Bethlehem Steel Corporation which came out on September 8, 1937 and the $44,244,000 issue of 5% Convertible Preferred Stock of the Pure Oil Company on September 3, 1937 were conspicuously unsuccessful and many of the underwriters suffered serious embarrassment. Repercussions were felt throughout the entire investment banking industry; and thereafter the number of underwriters in practically every syndicate was largely increased in order to spread the risk more widely.

The period 1933–1949 is the critical period in this case, as it includes the years immediately prior to the filing of the complaint in October, 1947.

Fortunately, there is in the record accurate and complete stipulated data with respect to every relevant security issue in the United States from July 26, 1933 to December 31, 1949. The Issuer Summaries, in two volumes, give the name of the issuer, the date of the offering, the description of the issue, the type of transaction, the number of underwriters and whether defendants or non-defendants, the name of the manager or co-managers, contemplated gross spread and certain other information relative to secondaries. The Issue Data Sheets for all underwritten issues of $1,-000,000 or more, in the fifteen year period 1935–1949, give all the information and particulars concerning the names and positions of the participants, a breakdown of the contemplated gross spread and so on. Public Sealed Bidding Sheets, which are to be read together with the Issue Data Sheets, set forth the names of the managers of the winning and losing accounts, whether defendants or non-defendants, and the names of the defendant firms who were participants therein. This permits statistical analysis of the entire period. With respect to the period prior to July 26, 1933, Pre-Securities Act Issuer Summary Sheets, containing further stipulated data, whenever available, are in evidence and give the necessary background applicable to all issuers whose various security issues touch controverted issues of fact in the case.[1]

Few if any of the documents in evidence can be properly understood except with reference to the detailed information thus stipulated. Here is an indisputable record of what the defendant firms did as distinguished from mere scraps and fragments of miscellaneous documents containing surmise, conjecture and the thoughts of some who were scarcely in a position to define or implement firm policies. To make matters worse, casual memoranda are subjected by government counsel to critical analysis, such as might be applied to deeds or wills or other documents prepared by lawyers, using technical, closely integrated words of art. Had this complete and accurate static data been available to the government before the suit was brought I gravely doubt that the action would have been filed.

In this last and final period the Securities and Banking Acts, the numerous and detailed rules and regulations of the SEC, the multiplicity of forms, prospectuses and registration statements which were required to be prepared and filed, and the organization and operation of the NASD, all had a profound effect upon the investment banking business. But none of these developments altered the basic function of the syndicate operation as a unitary, integrated means of underwriting and distributing a security issue, under the direction of a manager.

---

1. See Appendix, following this opinion, for a more comprehensive description of the "Statistical Compilations, Tables and Charts."

This remained fundamentally the same as it was in the beginning. Such changes as had taken place from first to last were the normal and natural reactions of business men with common problems, to the course of economic events and the legislation which has been described.

## IV. How the Investment Banker Functions

It was extremely difficult, in the midst of the conflicting statements of counsel and the welter of miscellaneous documents which followed one another into the record without witnesses to describe the attendant circumstances, to get any adequate grasp of just what investment bankers did. Finally, when Harold L. Stuart of Halsey Stuart & Co. was called as a government witness and remained on the witness stand for many months the light began to dawn. I watched him closely for many weeks, asked questions which were designed to test his forthrightness and credibility and checked his testimony with the utmost care against many of the documents already in evidence and much of the testimony taken by deposition, which had already been read into the record. I became convinced that this man, who probably knows as much if not more about the investment banking business than any other living person, was a man of complete integrity upon whose testimony I could rely with confidence.

Thereafter, and with the consent and approval of counsel for all parties, I went with counsel for both sides to the office of Halsey Stuart & Co. and watched one of the large issues "go through the hopper." I examined the bundles of securities, the tickets and slips from which the various book entries were to be made, watched the deliveries and snooped into every nook and cranny of what was going on. This was all done with the understanding that anything that occurred would be placed upon the record if anyone so desired; and, with a similar understanding, the greater part of two weeks was spent in my chambers with Stuart and various assistants and members of his staff going over every aspect and practically every document connected with two typical security issues from beginning to end. One was a negotiated underwritten issue and the other an issue brought out at public sealed bidding. Neither of these issues had any relation whatever to this case and nothing of a controversial character was included. But the result was that for the first time I felt possessed of the necessary background, and could thereafter, with a modicum of assurance, interpret and assess the probative value of the documents which constituted the greater part of plaintiff's proof. As Stuart continued to testify as a witness for many weeks thereafter, the facts relative to the actual operation of the investment banking business were fully developed in the record.

The types of issues, methods of raising money and the general apparatus of finance which I am about to relate are the ABC's of investment banking, known to every investment banker but not to others.

The problem before an issuer is in no real sense that of selling a commodity or a manufactured article. In essence what the issuer wants is money and the problem is how and on what terms he can get it. Basically, it is simply a question of hiring the money.

Thus a knowledgeable issuer, and most of them are definitely such, will scan the possibilities, which are more numerous than one might at first suppose.

The available types of transactions include many which may be consummated by the issuer without using any of the services of an investment banker. In other words, the raising of a particular sum may be engineered and consummated by the executive or financial officers of an issuer according to a plan originated and designed by them; and this may be done after prolonged collaboration with one or more investment bankers, whose hopes of being paid for the rendition of some sort of investment banking services never reach fruition.

Thus the necessary funds may be raised by:

1. A direct public offering by the issuer without an investment banker.

2. A direct offering to existing security-holders without an investment banker.

3. A direct private placement without an investment banker.

4. A public sealed bidding transaction without the assistance of an investment banker.

5. Term bank loans, commercial mortgage loans, leasebacks and equipment loans by commercial banks, life insurance companies and other institutions.

Where the services of an investment banker are used, the typical transactions are even more varied. The principal ones are:

1. A negotiated underwritten public offering.

2. An underwritten public offering awarded on the basis of publicly invited sealed bids, an investment banker having been retained on a fee basis to shape up the issue.

3. A negotiated underwritten offering to existing security-holders. Here the investment banker enters into a commitment to "stand by" until the subscription or exchange period has expired, at which time the investment banker must take up the securities not subscribed or exchanged.

4. An underwritten offering to existing security-holders awarded on the basis of publicly invited sealed bids, an investment banker having been retained on a fee basis to render the necessary assistance.

5. A non-underwritten offering to existing security-holders, with an investment banker acting as agent of the seller on a negotiated basis.

6. A private placement with an investment banker acting as agent of the seller on a negotiated basis.

There are many and sundry variations of the types of transactions just described, depending on the designing of the plan, the amount of risk-taking involved and the problems of distribution; and these variations are reflected in the amount of compensation to be paid to the investment banker, which is always subject to negotiation. And it is worthy of note that, where the services of an investment banker are availed of in the preparation of an issue for publicly invited sealed bids, then pursuant to SEC, ICC and FPC rulings, the investment banker who has rendered financial advisory services for a fee cannot bid on the issue.

Moreover, the static data reveal numerous instances where combinations of these types of transactions are used. The avenues of approach to the ultimate goal of hiring the money on the most advantageous terms, and in ways peculiarly suited to the requirements of the particular issuer at a given time and in a certain state of the general securities market, are legion. And issuers, far from acting in isolation, are continually consulting and seeking advice from other qualified financial advisers such as their commercial bankers and others.

Sometimes an issuer knows pretty well in advance which type of transaction it wishes to use. More often this is not determined until every angle has been explored. In either event, the methods to be followed present a complex series of possibilities, many of which involve intricate calculations of the effective cost of the money and a host of other features affecting the capital structure of the issuer, plans for future financing, problems of operation of the business and so on.

Generally the money is needed for a special purpose at a particular time, which may or may not be determined at the will of the issuer. Examples are: for expansion, the building of a new plant, the purchase of existing facilities, the scrapping of one set of elaborate and costly machines and their replacement by others more efficient and up-to-date, or for refunding. Often it is deemed important by the management that there

be a wide distribution of the securities or that they be placed with investors in a particular geographical locality or among those who utilize the services of the issuer or purchase its products. When good will is involved or favorable treatment of existing security-holders is desired, the issuer may have sound reasons for not wishing to obtain the highest possible price for the issue.

If a given type of transaction is tentatively selected, the issuer has before it an almost infinite number of possible features, each of which may have a significant bearing on the attainment of the general result. The method to be pursued may be through an issue of bonds or preferred or common stock or some combination of these. If a debt issue is contemplated there are problems of security and collateral, debentures or convertible debentures, serial issues, sinking fund provisions, tax refund, protective and other covenants, coupon rates and a host of other miscellanea which may affect the rating (by Poor's or Moody's, Fitch or Standard Statistics), or the flexibility necessary for the operation of the business and the general saleability of the issue in terms of market receptivity. These details must each be given careful consideration in relation to the existing capital structure and plans for the future. If equity securities seem preferable on a preliminary survey, the available alternatives are equally numerous and the problems at times more vexing. What will do for one company is not suitable for another, even in the same industry. At times prior consolidations and reorganizations and an intricate pattern of prior financing make the over-all picture complicated and unusually difficult. But in the end, sometimes after many months of patient effort, just the right combination of alternatives is hit upon.

The actual design of the issue involves preparation of the prospectus and registration statement, with supporting documents and reports, compliance with the numerous rules and regulations of the SEC or ICC or FPC and the various Blue Sky Laws passed by the several States. In view of the staggering potential liabilities under the Securities Act of 1933 this is no child's play, as is known only too well by the management of issuers.

This hasty and far from complete recital of available alternatives will suffice to indicate the milieu in which the investment banker demonstrates his skill, ingenuity and resourcefulness, to the extent and to the extent only that an issuer wishes to avail itself of his services. It is always the hope of the investment banker that the issuer will use the full range of the services of the investment banker, including the design and setting up of the issue, the organization of the group to underwrite the risk and the planning of the distribution. If he cannot wholly succeed, the investment banker will try to get as much of the business as he can. Thus he may wind up as the manager or co-manager, or as a participant in the group of underwriters with or without an additional selling position; or he may earn a fee as agent for a private placement or other transaction without any risk-bearing feature. Or someone else may get the business away from him.

Thus we find that in the beginning there is no "it." The security issue which eventuates is a nebulous thing, still in futuro. Consequently the competition for business by investment bankers must start with an effort to establish or continue a relationship with the issuer. That is why we hear so much in this case about ingenious ways to prevail upon the issuers in particular instances to select this or that investment banking house to work on the general problem of shaping up the issue and handling the financing. This is the initial step; and it is generally taken many months prior to the time when it is expected that the money will be needed. It is clear beyond any reasonable doubt that this procedure is due primarily to the wishes of the issuers; and one of the reasons why issuers like this form of competition is that they are

under no legal obligation whatever to the investment banker until some document such as an underwriting agreement or agency contract with the investment banker has actually been signed.

Sometimes an investment banking house will go it alone at this initial stage. At times two or three houses or even more will work together in seeking the business, with various understandings relative to the managership or co-managership and the amount of their underwriting participations. These are called nucleus groups. Occasionally one comes across documents pertaining to such nucleus groups which seem to contemplate the continuance of the group for future business, only to find that in a few weeks or less the whole picture has changed and some realignment of forces has taken place.

The tentative selection of an investment banker to shape up the issue and handle the financing has now been made; and there ensues a more or less prolonged period during which the skilled technicians of the investment banker are working with the executive and financial advisers of the issuer, studying the business from every angle, becoming familiar with the industry in which it functions, its future prospects, the character and efficiency of its operating policies and similar matters. Much of this information will eventually find its way in one form or another into the prospectus and registration statement. Sometimes engineers will be employed to make a survey of the business. The investment banker will submit a plan of the financing, often in writing; and this plan and perhaps others will be the subject of discussions. Gradually the definitive plan will be agreed upon, or perhaps the entire matter will be dropped in favor of a private placement, without the services of an investment banker. Often, and after many months of effort on the part of the investment banker, the issuer will decide to postpone the raising of the money for a year or two.

In the interval between the time when the investment banker is put on the job and the time when the definitive product begins to take form, a variety of other problems of great importance require consideration. The most vital of these, in terms of money and otherwise, is the timing of the issue. It is here, with his feel and judgment of the market, that the top-notch investment banker renders what is perhaps his most important service. The probable state of the general security market at any given future time is a most difficult thing to forecast. Only those with ripe trading experience and the finest kind of general background in financial affairs and practical economics can effectively render service of this character.

At last the issue has been cast in more or less final form, the prospectus and registration statement have been drafted and decisions relative to matters bearing a direct relation to the effective cost of the money, such as the coupon or dividend rate, sinking fund, conversion and redemption provisions and serial dates, if any, are shaped up subject to further consideration at the last moment. The work of organizing the syndicate, determining the participation positions of those selected as underwriters and the making up of a list of dealers for the selling group or, if no selling group is to be used, the formulation of plans for distribution by some other means, have been gradually proceeding, practically always in consultation with the issuer, who has the final say as to who the participating underwriters are to be. The general plans for distribution of the issue require the most careful and expert consideration, as the credit of the issuer may be seriously affected should the issue not be successful. Occasionally an elaborate campaign of education of dealers and investors is conducted.

Thus, if the negotiated underwritten public offering route is to be followed, we come at last to what may be the parting of the ways between the issuer and the investment banker—negotiation relative to the public offering price, the spread and the price to be paid to the issuer for the securities. These three

are inextricably interrelated. The starting point is and must be the determination of the price at which the issue is to be offered to the public. This must in the very nature of things be the price at which the issuer and the investment banker jointly think the security can be put on the market with reasonable assurance of success; and at times the issuer, as already indicated in this brief recital of the way the investment banker functions, will for good and sufficient reasons not desire the public offering price to be placed at the highest figure attainable.

Once agreement has been tentatively reached on the public offering price, the negotiation shifts to the amount of the contemplated gross spread. This figure must include the gross compensation of all those who participate in the distribution of the issue: the manager, the underwriting participants and the dealers who are to receive concessions and reallowances. Naturally, the amount of the spread will be governed largely by the nature of the problems of distribution and the amount of work involved. The statistical charts and static data indicate that the amount of the contemplated gross spreads is smallest with the highest class of bonds and largest with common stock issues, where the actual work of selling is at its maximum. While no two security issues are precisely alike and they vary as the leaves on the trees, it is apparent that the executive and financial officers of issuers may sit down on the other side of the bargaining table confidently, and without apprehension of being imposed upon, as data relating to public offering prices, spreads, and net proceeds to issuers from new security issues registered under the Securities Act of 1933 are all public information which are publicized among other means by the wide distribution of the prospectuses for each issue.

And so in the end the "pricing" of the issue is arrived at as a single, unitary determination of the public offering price, spread and price to the issuer.

With public sealed bidding issues the whole procedure is radically different. The issue is designed and shaped up by the management of the issuer, with or without the services of an investment banker. As the problems of distribution are not the same, due particularly to the high quality of the securities generally involved, their sale in bulk to institutional investors, and the fact that, as no one knows in advance who the successful bidder will be, there is no time available for preparing the market or setting up any elaborate distribution machinery, the formation of the underwriting group follows a different pattern; and the issuer is not concerned with the public offering price but only with receiving the highest amount bid for the issue. However, when the participating underwriters in a public sealed bidding account confer at their "price meetings" before agreeing upon the amount of the bid to be submitted on their behalf by the manager, they first make up their minds on the subject of the price at which they think the entire issue can be sold to the public.

After the bids are opened, and without reference to the issuer, the underwriters in the winning account promptly decide among themselves the public offering price, the method of sale and the amount of any concessions or allowances. The difference between the bid price and the public offering price thus arrived at is the spread or anticipated gross compensation of the participants and the manager.

This very brief outline has been telescoped into bare essentials by way of general background. As a matter of fact no two security issues present quite the same problems; some are relatively simple and follow somewhat standardized lines, especially in many public sealed bidding transactions. The methods and practices of the various defendant investment banking firms vary greatly. The competitive pattern of the different firms will be found to depend largely on the background, the personnel and matters of policy peculiar to each firm. But

one thing stands out. · This record has not revealed a single issuer which can fairly be said to be the "captive" of any or all or any combination of these seventeen defendant firms. The reason why private placements of new debt issues, with or without the services of an investment banker, increased from 14% of the total of all such issues in 1936 to 73% of the total of all such issues in 1948, is because the issuers were free to choose and did choose to use this type of transaction to raise the funds they needed, rather than to go by the negotiated underwritten route or any of the others which were available. And it is equally clear that, although there has never been any rule, regulation or statutory or other law preventing issuers from resorting of their own free choice to public sealed bidding as a means of raising capital, issuers have done so only in rare and exceptional cases, unless compelled to resort to public sealed bidding by the mandate of the SEC or the ICC or some state regulatory body having jurisdiction.

## PART II

### The Seventeen Defendant Investment Banking Firms

The last but far from the least important feature of the background of the case concerns the origin, organization, personnel and general competitive pattern of each of the defendant investment banking houses. Without a clear understanding of the significant differences between them, and the circumstances under which they were formed and developed their respective policies and ways of doing business, it is futile to attempt any rational appraisal of the documents which form the bulk of the government's case. Here again one must bear in mind that the facts about to be described are all matters of common knowledge throughout the investment banking industry. Letters, reports and memoranda are interpreted and understood by investment bankers in the light of these facts. The descriptions of the various firms will follow the order in which their names appear in the complaint.

### 1. Morgan Stanley & Co.

On July 1, 1871, Francis A. Drexel, Anthony J. Drexel and J. Pierpont Morgan, with others, formed a co-partnership for the transaction of a general foreign and domestic banking business under the firm names of Drexel Morgan & Co. in New York and Drexel & Co. in Philadelphia. Following the death of Anthony J. Drexel in the year 1893, the co-partnership of Drexel & Co. (Philadelphia) and Drexel Morgan & Co. (New York) expired on December 31, 1894, and the partners thereof, on the same day, formed a co-partnership for the transaction of a general foreign and domestic banking business under the firm names of J. P. Morgan & Co. in New York and Drexel & Co. in Philadelphia. The partners of Drexel Morgan & Co. and of J. P. Morgan & Co. were at all times partners of Drexel & Co., but, from about the year 1910, certain persons possessed the authority of partners in Drexel & Co., who were not partners of J. P. Morgan & Co. This Drexel & Co. is not the same investment banking firm as the Drexel & Co. which is a defendant in this case.

J. P. Morgan & Co. was, at the time that the Banking Act of 1933 was enacted on June 16, 1933, a private banking firm, engaging in what was known as a private banking business. This included investment banking, deposit banking, and other kinds of commercial banking and letter of credit business, both foreign and domestic. The important investment banking business of J. P. Morgan & Co. was conducted on a wholesale basis, as J. P. Morgan & Co. had no distributive facilities for securities. It had only one office in New York City, and no branches or offices elsewhere, excepting the office which was maintained in Philadelphia by Drexel & Co., which was regarded as the "Philadelphia end of J. P. Morgan & Co." J. P. Morgan & Co. was not a departmentalized firm,

but mingled its commercial and investment banking activities. Among the partners who have been shown in the record to have engaged in investment banking work were George Whitney, Thomas W. Lamont, Arthur M. Anderson, William Ewing and Harold Stanley.

On or about June 16, 1934, J. P. Morgan & Co. elected to cease engaging in the investment banking business, and chose to remain a bank of deposit, in compliance with the provisions of the Banking Act of 1933, which required the separation of commercial and investment banking to be effected by June 16, 1934. J. P. Morgan & Co., in effect, discontinued its investment banking activities on or about June 16, 1933, the date upon which the Banking Act of 1933 was enacted, with the exception of one or two security issues. The investment banking business of J. P. Morgan & Co., therefore, simply ceased to be. By the time that Morgan Stanley & Co. Incorporated, commenced business, the investment banking business of J. P. Morgan & Co. had been discontinued, as a practical matter for approximately two and one-half years, and, absolutely, for approximately one and one-half years.

Morgan Stanley & Co. Incorporated, was organized pursuant to a decision made by some of the partners of J. P. Morgan & Co. to resign from that firm and to form another investment banking organization. The first discussions within J. P. Morgan & Co. concerning a new investment banking organization were had in June and July, 1935, as the securities market was opening up, and the final decision to organize Morgan Stanley & Co. Incorporated, was made around the middle or 20th of August, 1935. Various alternatives were examined and abandoned before the ultimate form of organization was decided upon. There was some thought of using the Drexel name, but difficulty arose with the heirs of the Drexel Estate. Another plan considered was the formation of a company to be known as Ewing & Co., which would have small capital, and would not underwrite but only give financial advice, but this plan was abandoned as unsound.

Morgan Stanley & Co. Incorporated, was organized on September 6, 1935, under the laws of the State of New York, and commenced business on September 16, 1935. Certain of the partners and employees of J. P. Morgan & Co., and certain of those persons who possessed the authority of partners in Drexel & Co., most of whom were active in the investment banking business of those firms, withdrew from those firms and formed the new organization. Of the then seventeen partners of J. P. Morgan & Co., Harold Stanley, Henry S. Morgan and William Ewing resigned; and, at about the same time, there also resigned from J. P. Morgan & Co. certain employees, namely, John M. Young, who was head of the Bond Department, Allen Northey Jones, who was head of the Statistical Department, and Archer M. Vandervoort. These men, together with Perry E. Hall and Edward H. York, Jr., who at that time possessed the authority of partners in Drexel & Co., organized the new Morgan Stanley & Co. Incorporated. On February 13, 1936, Alfred Shriver became an officer and a director of Morgan Stanley & Co. Incorporated, and, on October 19, 1936, Sumner B. Emerson became an officer and a director. The previous association of both of these men had been principally with the Guaranty Trust Company of New York or its securities affiliate, the Guaranty Company.

On September 16, 1935, when Morgan Stanley & Co. Incorporated, commenced business, Harold Stanley was president, William Ewing was executive vice-president, Henry S. Morgan was treasurer and secretary, and each of these three men was a director. Prior to December 31, 1927, when Harold Stanley became a partner in J. P. Morgan & Co., he had been an employee and subsequently vice-president of the Guaranty Trust Company of New York from 1915 to 1927, and president of the Guaranty Company from 1921 to 1927; and prior to the time that William Ewing became a partner in J.

P. Morgan & Co., he had been an employee of N. W. Harris & Co. and subsequently of the Harris Trust & Savings Bank from 1906 to 1916, and an employee of J. P. Morgan & Co. from 1916 to 1927.

On or about September 16, 1935, all of the common (voting) stock of Morgan Stanley & Co. Incorporated, was owned entirely by stockholders who were both officers and directors, with the exception of Allen Northey Jones, who was an officer but not a director. Allen Northey Jones, however, became a director on February 13, 1936. Alfred Shriver and Sumner B. Emerson became common stockholders of Morgan Stanley & Co. Incorporated, shortly after their employment as officers and directors. On September 18, 1935, Morgan Stanley & Co. Incorporated, issued $7,000,000 (70,000 shares) of preferred (non-voting) stock, of which $400,000 (4,000 shares) was purchased by two officers of Morgan Stanley & Co. Incorporated, namely, Henry S. Morgan and William Ewing, and of which the remaining $6,600,000 (66,000 shares) was purchased by nine partners of J. P. Morgan & Co. In 1936, Harold Stanley acquired $100,000 (1,000 shares) of preferred (non-voting) stock, pursuant to an option dated September 18, 1935.

On or about November 28, 1941, Morgan Stanley & Co. Incorporated, adopted a plan of liquidation. On December 5, 1941, all of the outstanding preferred (non-voting) stock was redeemed and cancelled pursuant to the plan of liquidation which was completed on December 23, 1941. Morgan Stanley & Co., the partnership, was formed on December 16, 1941, and it is this partnership, apart from certain withdrawals and additions, which is a defendant in this case. The corporation was dissolved and the partnership formed by the former common stockholders in order, among other reasons, to qualify Morgan Stanley & Co. for membership on the New York Stock Exchange, and to enable William Ewing to retire from active participation while becoming a limited partner.

When Morgan Stanley commenced business on September 16, 1935, it set up an entirely new office at No. 2 Wall Street, and organized an entirely independent staff. Morgan Stanley never conducted business in the premises of J. P. Morgan & Co., but moved into its own office the day it opened for business. Morgan Stanley and J. P. Morgan & Co. remained thereafter as distinct, independent and autonomous firms. Morgan Stanley & Co. Incorporated, did, however, conduct closings of its underwritings, that is, the payment for and the delivery of securities, on the premises of J. P. Morgan & Co. very often until the year 1941, and, thereafter, the current partnership "generally" conducted its closings in the same place. Morgan Stanley paid a fee to J. P. Morgan & Co. in connection with each closing. No legal succession or privity of title existed as between Morgan Stanley and J. P. Morgan & Co. There was no devolution of any kind from one to the other. Morgan Stanley was run by its common stockholders as an independent, separate business, without consultation with J. P. Morgan & Co., although casual talks may have occurred.

Morgan Stanley was a conspicuously small organization when it first opened for business, and it has remained, to this day, a small organization. It had only one office when it first opened for business, and still has only one; it had only seven common stockholders when it first opened for business, and it does not have many more partners today. When the new organization commenced business, it immediately proceeded to try to obtain business from whatever source it could, and, in this connection, it made every kind of new business effort that its executives could think of. It broadcast announcements of its formation; compiled studies of outstanding securities that might be refunded at a saving; its personnel took turns calling on various people throughout the country; and they called on banks and asked them,

if they knew of any business that might be done, to remember that Morgan Stanley was in business.

Morgan Stanley was a new organization for the underwriting and wholesaling of investment securities, and it confined its activities entirely to underwriting and wholesaling. Morgan Stanley started out exclusively as a wholesale organization, underwriting and selling to dealers, and from the beginning made no effort to build up an organization for the handling of distribution. It was not until some time in May, 1941, that it began to retail securities. Morgan Stanley has done primarily a high-grade bond business, but it has also managed issues of common and preferred stock. Unlike some of the other defendant firms, Morgan Stanley did no business in equipment trust certificates, and there is no evidence that it did any business in municipals. It has sought the managership of security issues, rather than participations in underwriting syndicates, and, consequently, has been in a position where other investment banking firms have sought from it participations in underwriting syndicates which it has formed and managed. Morgan Stanley was opposed to competitive bidding and did not participate in competitive bidding before it was made compulsory by Rule U–50, which became effective on May 7, 1941, as to the securities of public utility companies which were subject to the Public Utility Holding Company Act of 1935.

### 2. Kuhn Loeb & Co.

The partnership of Kuhn Loeb was founded in New York City in 1867, and has continued as such ever since. There is no problem of successorship, as the firm elected to eliminate its private banking functions on or prior to the date fixed by the Glass-Steagall Act. Until the late '20's it was a strictly family affair, and the partners included over the years many names of distinction in the banking business, including Jacob H. Schiff, Felix M. Warburg, Otto H. Kahn, and Mortimer L. Schiff. The first partner to

be taken in, who was not related by marriage or otherwise to one or another of the others, was Jerome J. Hanauer in 1911.

The firm decided at an early date not to become interested in public utilities, but it had a large and select clientele among the railroads. With a small organization, Kuhn Loeb concentrated its efforts in the fields of railroad and industrial financing.

During the early and middle '20's there were only four partners. Lewis L. Strauss, the son-in-law of Hanauer, George W. Bovenizer and Sir William Wiseman became partners in 1929; John M. Schiff, Gilbert W. Kahn and Frederick M. Warburg, all of the younger generation, entered the firm in 1931; and Benjamin J. Buttenwieser, an employee, joined in 1932. Elisha Walker, a banker of wide experience, and Hugh Knowlton became partners in 1933. In 1941, after a long interval, two more employees were taken in, Percy M. Stewart and Robert F. Brown. In 1942 Hugh Knowlton left the firm but again became a partner in 1946. In 1949 the firm had only twelve partners, including J. Emerson Thors and Robert E. Walker, who became such in that year.

This firm, with a limited number of employees and a single office in New York City, differs radically from many of the other defendant firms, which are highly organized and departmentalized, have large distributing facilities, and hundreds of employees. While some of these other firms had large buying departments, most of this work was done in Kuhn Loeb by the partners.

The old Kuhn Loeb "prestige" business with the railroads was seriously affected by the ICC order requiring public sealed bidding for railroad securities which became effective on July 1, 1944. Thereafter, the firm's policies as to the number and character of the issues it would sponsor as manager radically changed.

### 3. Smith Barney & Co.

The firm of Chas. D. Barney & Co., a partnership, was organized in Philadel-

phia in 1873 to do a general investment banking business. The investment banking firm of Edward B. Smith & Co. was also founded in Philadelphia, in 1892. From their organization to December 31, 1937, these two firms were in no way connected or affiliated with each other.

At the time that the Banking Act of 1933 was enacted on June 16, 1933, the Guaranty Company of New York was a very large organization, with a total personnel of approximately 500 persons, including 17 senior officers and 21 junior officers. The decision of the Guaranty Trust Company of New York to dissolve its securities affiliate, the Guaranty Company, presented an acute personal problem to these officers and employees, since this action would necessarily eliminate most of their jobs. On June 6, 1934, William C. Potter, chairman of the Board of Directors of the Guaranty Trust Company of New York, wrote a letter to the stockholders of the Guaranty Trust Company of New York concerning this proposed dissolution. This letter explained how the problem of the future employment of those officers and employees was partly solved:

"* * * Arrangements have been made by Mr. Joseph R. Swan, President of the Guaranty Company of New York, and some of the principal executives (all of whom are retiring from the Guaranty Company of New York on or before June 16, 1934) to become members of the firm of Edward B. Smith & Co., a banking house that has for many years conducted a general securities business. It is expected that a majority of the staff of the Guaranty Company will become associated with the new firm. Certain others of the Guaranty Company organization will remain and liquidate its affairs. Others will be taken into the organization of the Trust Company, and the remainder we shall endeavor to assist in finding employment elsewhere."

On June 16, 1934, 4 of the 17 individuals, who had been senior officers of the Guaranty Company on June 16, 1933, joined Edward B. Smith & Co. as general partners. These were Joseph R. Swan, president, and Burnett Walker, Irving D. Fish, and J. Ritchie Kimball, vice-presidents. Similarly, on June 16, 1934, 13 of the 21 individuals, who had been junior officers of the Guaranty Company, were employed by Edward B. Smith & Co. Among these 13 individuals were Holden K. Farrar, James N. Land and Karl Weisheit, all 3 of whom eventually became partners in Smith Barney.

In 1934, 3 other individuals, who had been senior officers of the Guaranty Company, joined other investment banking firms as partners or officers: John D. Harrison joined Lazard Freres; Frederick L. Moore joined Kidder Peabody; and John F. Patterson joined Blyth. In 1936, Alfred Shriver, who had been a senior officer of the Guaranty Company prior to June 16, 1934, and president of the Guaranty Company in liquidation thereafter, joined Morgan Stanley, as a vice-president and director. In late 1933, John A. Wright, Jr., a junior officer of the Guaranty Company, joined the investment banking firm of Drysdale & Company. The remaining 9 of the 17 senior officers and the remaining 7 of the 21 junior officers of the Guaranty Company remained with the Guaranty Company in liquidation, joined the staff of the Guaranty Trust Company of New York, or went with other commercial banks, brokerage houses, industrial or business corporations.

Looking at the reorganized firm of Edward B. Smith & Co. on and after June 16, 1934, we find that it included 15 general partners, 3 special or limited partners (2 of whom were also general partners), and 522 employees. Of these, 4 general partners and 237 employees had formerly been with the Guaranty Company, either as senior or junior officers or employees; 11 general partners, all 3 special or limited partners, and 285 employees, had been with the old firm of Edward B. Smith & Co. The 237 employees of Edward B. Smith & Co., who

had formerly been with the Guaranty Company, constituted slightly more than one-half of the total personnel of the Guaranty Company as of June 16, 1933. The capital of Edward B. Smith & Co., as of June 16, 1934, totalled $5,000,000, of which $3,500,000 was general capital, and $1,500,000 was limited capital. All of its capital was contributed by the general and special partners of the firm.

Edward B. Smith & Co. did not succeed, either *de jure* or *de facto*, to the investment banking business of the Guaranty Company, the securities affiliate of the Guaranty Trust Company of New York, by reason of the fact that individuals, who had been with the Guaranty Company as senior or junior officers or employees prior to June 16, 1934, joined Edward B. Smith & Co. on that date as general partners or employees, or for any other reason.

The firm of Edward B. Smith & Co. as so constituted, remained without substantial change until December 31, 1937, when it was dissolved in connection with the formation of Smith Barney & Co.

In 1937, as a result of two highly unsuccessful security issues, namely, an offering to shareholders of $44,244,300 of 5% cumulative convertible preferred stock of the Pure Oil Company on September 3, 1937, and an offering to shareholders of $48,000,000 of 3½% convertible debentures of the Bethlehem Steel Corporation on September 8, 1937, Edward B. Smith & Co. not only suffered heavy losses, but found itself in the difficult position of having its available capital, which was required to be free if the firm was to continue in the underwriting business, substantially frozen in the then unsaleable securities of these two companies. Accordingly, as of the close of business on December 31, 1937, the firm of Edward B. Smith & Co. in effect merged with the theretofore wholly separate firm of Chas. D. Barney & Co., which had the necessary capital, to form the new firm of Smith Barney & Co.

Smith Barney & Co. was organized to begin operations as of January 1, 1938, as successor to the business of Edward B. Smith & Co. and Chas. D. Barney & Co., as a limited partnership under the laws of the State of New York, by a group of 27 general partners and 4 special partners (one of whom was also a general partner), all of whom had been general or special partners of either the firm of Edward B. Smith & Co. or of the firm of Chas. D. Barney & Co. Of the 27 general partners of Smith Barney as of January 1, 1938, 13 had been partners of Chas. D. Barney & Co. and 14 had been partners of Edward B. Smith & Co. Among those general partners of Smith Barney as of January 1, 1938, who had previously been partners of Edward B. Smith & Co., were Joseph R. Swan, Burnett Walker, Irving D. Fish, J. Ritchie Kimball, James N. Land and Karl Weisheit, all of whom had been affiliated with the Guaranty Company either as senior or junior officers.

Since at least June 16, 1934, Edward B. Smith—Smith Barney has had a large organization with extensive distribution facilities. It has principal branch offices in charge of one or more partners in Philadelphia and Chicago, and the firm has or has had offices in other important cities, including Boston and Cleveland. In addition to the usual Buying and Syndicate Departments, the firm has New Business, Trading, Sales and Municipal Departments. Smith Barney is engaged in a general investment banking business, and distributes all types of securities at both wholesale and retail.

The size of the organization and the widespread location of its offices, indicate the great importance to the firm of obtaining a relatively large volume of securities for distribution. With a large distributing force, a large number of participations in issues managed by other houses is essential to the economic and proper functioning of its organization. Accordingly, Edward B. Smith—Smith Barney has always been very much interested in participations as well as managements, and the evidence shows many instances in which its principal effort was directed toward this objective. Jo-

seph R. Swan testified on deposition that his "principal concern" personally was to try to obtain the managership of financing, or so to establish himself with the issuer that, if he could not obtain the managership of the business, he would get as large a participation as possible.

The stipulated static data confirm this. Thus, the participation tables show that in the period 1935–1949, Edward B. Smith—Smith Barney participated in almost five times as many negotiated underwritten issues managed by others as it did in those which it managed or co-managed itself. Edward B. Smith—Smith Barney managed or co-managed some 130 negotiated underwritten issues during this period. It participated, however, in 607 such issues managed by others. Similarly, in total dollar volume of participations in all negotiated issues $1,000,000 and larger (including those managed by itself), Edward B. Smith—Chas D. Barney—Smith Barney ranked third among all defendant and non-defendant firms for the period 1935–1949.

The stipulated public sealed bidding sheets show that Smith Barney was a member of an account headed by the alleged co-conspirator, Lee Higginson, which bid unsuccessfully for a $6,860,000 bond issue of Chicago Union Station, which was offered on June 10, 1941.

Prior to this time Chas. D. Barney & Co. had bid unsuccessfully on several issues offered at public sealed bidding, twice as a member of accounts headed by others (Connecticut River Power Co., February 18, 1936; Pennsylvania Railroad Co., January 10, 1936), and once as manager of an account (Turners Falls Power & Electric Co., November, 1936).

During the period 1941–1949, Smith Barney, bidding as either the head or a member of a bidding account, bid for a total of 275 new and secondary issues $1,000,000 and larger of domestic and foreign business corporations (excluding domestic railroad equipment trust certificates). It bid for 86 issues as the head of a bidding account, winning 16 issues.

## 4. Lehman Brothers

Since about 1850, a series of partnerships, formed from time to time upon the withdrawal or death of partners, has conducted business under the name of Lehman Brothers. The early phases of its development have already been discussed in Part I of this opinion [1] and will not be recounted here. At the date of the commencement of this action, the firm of Lehman Brothers consisted of 16 partners.

Lehman Brothers' principal place of business is in New York City. It also has offices in Chicago, Los Angeles and Houston, and it holds memberships on the New York Stock Exchange, American Stock Exchange,[2] Chicago Board of Trade and Midwest Stock Exchange.[3] Lehman Brothers ranks high among the leaders of the investment banking industry in the amount of capital employed. In 1944, its capital was about $10,000,-000.

Throughout the record there are frequent references to a number of persons who are or have been partners of Lehman Brothers. Members of the family have always been its leading partners, as today in the person of Robert Lehman, who has been a partner since July 1, 1921, and is now the only partner bearing the Lehman name. Philip Lehman, who was a partner from about September 1, 1885, until his death on March 21, 1947, was a son of one of the three founders of the firm and its moving spirit in the first decades of the century. Robert Lehman is his son and successor. Other members of the Lehman family who were partners of the firm at one time or another are Arthur Lehman, Harold M. Lehman and Allan S. Lehman, all three of whom are now deceased, and Herbert H. Lehman, formerly Governor of the State of New York and presently a United States Senator. There were gathered around this family core as partners other men of

---

1. See supra, p. 635.

2. Formerly, New York Curb Exchange.

3. Formerly, Chicago Stock Exchange.

outstanding ability, who have contributed immensely to the firm's development. Among these other partners were: John M. Hancock, who became a partner on August 1, 1924, and was the first person outside of the Lehman family to be admitted to partnership; Monroe C. Gutman, widely experienced in domestic and international banking, became a partner on January 1, 1927, and has since played an important part in the buying of new issues; he is the only partner of the firm whose deposition was taken by the government in pre-trial proceedings in this action, and was too ill to be cross-examined; Paul M. Mazur, a well known marketing and department store expert, became a partner on July 1, 1927; he had previously done constructive work for various department stores, and is now primarily responsible for the operation of the firm's Industrial Department. Each of these three individuals are partners of the present firm.

Lehman Brothers acts in all capacities for issuers in the handling of negotiated transactions. It has headed and it has participated in underwritten public offerings, and it has acted as agent for the issuer in non-underwritten public offerings, and private placements, and assisted issuers in obtaining term bank loans. It engages in arbitrage transactions and does a commission business on commodities and securities exchanges. It distributes all types of securities, both at wholesale and retail, and it has bought, sold and placed securities for its own account. It distributes also a large volume of municipal securities.

The firm effects the distribution of corporate securities through its Syndicate and Sales Departments. It has a separate Municipal Department which handles all matters with respect to municipal and revenue securities. Another department of significance in this case is its Industrial Department, which includes its New Business Department, and was developed as part of an agressive movement to increase its investment banking business during the series of disputes with Goldman Sachs, hereafter referred to.

Lehman Brothers offers issuers a wide variety of services which go far beyond simply assisting in the raising of capital. The firm attaches great importance, quite apart from investment banking matters, to its role as a counselor to industry. The multiform activities of the Industrial Department typify the scope of the services which Lehman Brothers offers to business enterprises. The Industrial Department, while embracing the characteristics of the "buying department," common to most investment banking firms, includes, in addition, a complex of services which most nearly resembles management or efficiency engineering.

As has been previously pointed out in Part I of this opinion,[1] commencing with the underwriting of the United Cigar Manufacturers preferred and common stocks in June, 1906, Lehman Brothers conducted its business of heading security issues in an informal partnership with Goldman Sachs. This informal partnership between Lehman Brothers and Goldman Sachs lasted for nearly 20 years and was never reduced to writing. The two firms worked together on the basis of mutual trust. Later the two firms entered into a period of bitter controversy, which is to some extent described in a subsequent part of this opinion,[2] and, for about two years they split apart, and then came together again.

Long before the ICC required the debt securities of railroads to be sold at public sealed bidding, Lehman Brothers, as head of a bidding account, bid for and won the Cincinnati Union Terminal $12,-000,000 bond issue of February 14, 1939. On February 18, 1936, many years prior to promulgation by the SEC of Rule U–50, Lehman Brothers, as head of a bidding account, bid for and won the Connecticut River Power $20,300,000 bond issue, which had been put up for bidding under a local administrative rule. Much earlier, in April, 1926, with Halsey

1. See supra, p. 636 ff.

2. See infra, p. 779 ff.

Stuart and Hallgarten, Lehman Brothers bid for and won a $30,000,000 bond issue of Uruguay, and in April, 1928, with Kountze Bros. and Wood Low & Co., won an issue of $2,145,000 equipment trust certificates of Chicago & North Western Railway.

During the period 1941–1949, Lehman Brothers, bidding as either the head or a member of a bidding account, bid for a total of 385 new and secondary issues $1,000,000 and larger of domestic and foreign business corporations (excluding domestic railroad equipment trust certificates). The firm thus bid on 61% of the total of 632 such issues which were sold at public sealed bidding during this period. It bid for 186 issues as the head of a bidding account, winning 35 issues.

### 5. Glore Forgan & Co.

On March 1, 1920, Charles F. Glore and others formed in Chicago the partnership of Glore, Ward & Co.

On December 29, 1920, Marshall Field, Glore, Ward & Co., a corporation was organized under the laws of Illinois. It continued the business previously conducted by the partnership Glore, Ward & Co. Marshall Field III, who was 26 years of age and who had not been a member of the former partnership, became president of this corporation. He had participated in a student training course in the Chicago office of Lee Higginson & Co. from October 23, 1919 to February 1, 1920. The partners of the former partnership became vice-presidents. On December 31, 1927, the name of this corporation was changed to Field, Glore & Co. On September 26, 1929, Field, Glore & Co., Incorporated, was organized under the laws of Delaware, and it continued the business previously conducted by the Illinois corporation, Field Glore & Co.

On March 16, 1931, the partnership of Field, Glore & Co. was formed, and it continued the business previously conducted by the Delaware corporation, Field, Glore & Co., Incorporated. From that day to the present the business has been conducted by a succession of partnerships formed from time to time upon the withdrawal or addition of partners, under the same firm name, which, however, was changed from Field, Glore & Co. to Glore, Forgan & Co. on January 2, 1937. On July 6, 1935 Marshall Field III retired from the then firm.

At the time of the commencement of this action the defendant firm of Glore, Forgan & Co. consisted of eight partners: Charles F. Glore, who died during the trial; John F. Fennelly, Rudolph E. Vogel and James W. Pope, were located in the Chicago office; and J. Russell Forgan, Halstead G. Freeman, Edward F. Hayes and Wright Duryea, in the New York office. The following became partners on August 1, 1950: Hyde Gillette, Charles S. Vrtis, Edwin Cummings Parker, James P. Jamieson and Alfred C. West, in the Chicago office; Charles J. Hodge, Thomas D. Mann and Paris S. Russell, Jr., in the New York office.

This Chicago firm has done a general investment banking and brokerage business; has good distributing facilities, and is interested in managerships and as many participations in desirable issues as it can secure. Its public sealed bidding record is good. There is no successorship problem involved.

### 6. Kidder Peabody & Co.

The original firm of Kidder Peabody & Co., for many years one of the leading houses, and described throughout the trial as "old" Kidder Peabody, was founded in 1865, to engage in the commercial and investment banking business. In its heyday it did a large and profitable business and was identified with a long series of security issues of the American Telephone & Telegraph Company, acting as New England manager for all negotiated underwritten issues of the Telephone Company and its subsidiaries after about 1899.

During the fall of 1930 the "old" firm ran into financial difficulties, caused by falling prices of securities it owned, the withdrawal of large deposits by the Italian Government, and to time deposits

which were due or renewable, including a payment to the Bank of International Settlements, said to have amounted to $4,000,000.

Harold Stanley testified:

"J. P. Morgan & Co. had sold the stock of Bank of International Settlements, which looked as if it wouldn't be able to get its money back and have to take a loss unless something were done. If Kidder, Peabody had failed, an old firm—and it had been a very prominent firm in some ways—it would have shaken confidence and upset everything."

Accordingly, in an effort to save "old" Kidder Peabody, a $10,000,000 Revolving Fund was raised, of which $2,500,000 each came from J. P. Morgan & Co. and Chase National Bank, $1,250,000 from First National Bank of Boston, $1,000,-000 each from Bankers Trust Company and Guaranty Trust Company of New York, $750,000 from Shawmut Bank of Boston, $500,000 from First National Bank of New York and $250,000 each from Merchants National Bank and Second National Bank, both of Boston. The partners of the "old" firm raised an additional $5,000,000.

It soon developed that the condition of the "old" firm was worse than had been supposed. It was thought that the name and some vestige of the repute of the "old" firm might still be salvaged and the advances already made recovered. There is no point in tracing every step of the negotiations. Edwin S. Webster, one of the heads of Stone & Webster, and a man of substance, thought his son, Edwin S. Webster, Jr., who had met with an accident and was then confined to a hospital, might be interested. Young Webster and Albert Gordon had been classmates in the Harvard Business School, both seemed men of promise and they, together with Chandler Hovey, a brother-in-law of Mr. Webster, Sr., who had a brokerage business in Boston, began business as the three partners of the new Kidder Peabody & Co., which is the firm named as a defendant herein, on March 17, 1931. None of the members of the "old" firm remained as partners, three, with the remnants of the "old" firm's staff, remained for a time as employees. Later on in that year, G. Herman Kinnicutt, then in his 60s, became a fourth partner. He had formerly been senior partner of Kissel Kinnicutt & Co., which had gone into liquidation.

The subsequent history of the Revolving Credit and the arrangements made for the repayment of the $5,000,000 loaned as above stated, is developed in great detail but may be passed over. In 1935 the new firm threatened to exercise an option it had to give up the name, and dissolve the firm; and this led to a settlement agreement which was eventually carried out.

By the Bill of Sale as of March 6, 1931, certain securities and assets, including the firm name and good will, leases, stock exchange seats, furniture, fixtures, documents and books, were transferred to the new firm. An agreement of the same date between the old and the new partners, and corporations representing those who had made the advances above referred to, contained a large number of terms, including Article III, Section 2, which provides: "The new firm does not assume directly or indirectly any liabilities of the present firm whether known or unknown, direct or contingent, except the liabilities specifically set forth herein to be assumed by the new firm." These do not appear to have been substantial.

In 1934, when the Glass-Steagall Act took effect, Kidder Peabody took over the lease for office space of the Phildelphia National Company, the securities affiliate of the Philadelphia National Bank; and virtually the entire organization of employees, together with the president, Orus J. Matthews, left the Philadelphia National Company and came with Kidder Peabody. Matthews became a partner some time in 1935.

When Chase Harris Forbes Corporation went out of business, 10 or 15 salesmen from its organization were added to the Kidder Peabody sales staff; other men came over from the Guaranty Com-

pany and the National City Company. During 1934 Frederick L. Moore, from the Guaranty, became a partner, and Walter V. Moffitt, also from the Guaranty, became a partner in 1935.

Under the leadership of Gordon the affairs of Kidder Peabody prospered; progress was slow at first, but there was steady growth in every phase of its business. The partners and employees went after everything, for managerships if they could be secured, if not for participations and even selling positions. No issue was too small, no participation too insignificant. Offices were opened, first in Chicago, then in Hartford and Albany, in addition to the principal offices in New York, Boston and Philadelphia. By the time this action was commenced, Kidder Peabody maintained a larger selling organization and a larger trading department than at any time in its history, with representatives and correspondents in many leading cities of the United States where it did not have offices, and had moved up from practically no business at all, in 1931 in the depths of the great depression, to a major position in the entire investment banking industry.

The statistical tables are so comprehensive and complete that they accurately reflect the progress and also the competitive pattern of each of the defendant banking firms. Kidder Peabody will serve as an illustration. In the first triennial period, 1935–1937, Kidder Peabody ranked 18th in dollar amount of new negotiated underwritten managements of issues $1,000,000 and larger, and it ranked 25th in number of issues. In the last triennial period, 1947–1949, it ranked 3rd in number of issues and 11th in dollar amount. Its progress in the smaller issues is shown by the tables relating to issues between $100,000 and $1,000,000, and indicates that the whole competitive pattern of the firm was undergoing change, development and growth during the entire period 1935–1949. With reference to these smaller

issues, Kidder Peabody had no rank whatever in number of issues, and it stood 200th in dollar amount, in the first triennial. In the last triennial it ranked first both in number of issues and dollar amount. Its progress in public sealed bidding accounts and private placements was substantial.

### 7. Goldman Sachs & Co.

In 1882, Marcus Goldman and Samuel Sachs formed a partnership to continue a commercial paper business which had been begun by Marcus Goldman in 1869. With the withdrawal of partners or the addition of new partners from time to time, the business has been conducted by a succession of partnerships from 1882 to date, except for the period from January 21, 1922, to December 31, 1926, when the business was conducted as a joint stock association. Beginning in 1885, each of the partnerships and the joint stock association did business under the name of Goldman Sachs & Co. As in the case of Lehman Brothers, the early phases of its development have already been discussed in Part I of this opinion [1] and will not be narrated here. Similarly, its relationship with Lehman Brothers is described to some extent above in the statement of the origin, organization and personnel of Lehman Brothers [2] and also in a subsequent part of this opinion.[3]

Goldman Sachs' principal place of business is in New York City; and, in addition, the firm has various branch offices and representatives in other cities. Goldman Sachs not only has a New Business Department, but, as Walter E. Sachs testified on deposition, "Goldman, Sachs & Company is a new business department." In approximately 1935, Goldman Sachs established a Retail Sales Department. Its capital in 1944 was about $6,500,000.

At the date of the commencement of this action, the firm of Goldman Sachs consisted of 13 partners. Among the personnel of Goldman Sachs whose names

1. See supra, p. 635.

2. See supra, p. 662.

3. See infra, p. 779 ff.

appear in the record, and who are or have been partners in the firm, are the following: Marcus Goldman, who founded the business in 1869, and who is the grandfather of Walter E. Sachs; Samuel Sachs who joined Marcus Goldman as a partner in 1882, when the business became known as M. Goldman & Sachs, is the father of Walter E. Sachs and an uncle of Howard J. Sachs; Walter E. Sachs, who was first employed by Goldman Sachs in 1905, and who became a partner in 1910, is the only member of the present firm whose deposition was taken by the government; Howard J. Sachs, who became a partner in 1915 and is a member of the present firm, is a cousin of Walter E. Sachs; Henry S. Bowers, also a member of the present firm at the time of the commencement of this action, became a partner in 1915, and was the first partner of the firm who was not related to either the Goldman family or the Sachs family; and Sidney J. Weinberg, who entered the employ of Goldman Sachs in 1907, became a partner in 1927, and is a member of the present firm.

The business now conducted by Goldman Sachs consists in part of: (1) dealing in commercial paper—the buying of short term promissory notes from merchants and manufacturers and the selling of such notes to banks or institutional investors—the business which the firm's founder started in 1869; (2) a brokerage business, the firm having been a member of the New York Stock Exchange since the late 1890's, except for the period when it was a joint stock association; and (3) investment banking.

It is not a part of the regular business of the firm to invest its own capital in permanent long term investments in the companies whose securities it underwrites. Since the time that Goldman Sachs first entered the investment banking business in 1906, it has concentrated its underwriting efforts on the security issues of companies engaged in retailing or merchandising or in the manufacturing of consumers' goods. It has never been prominent as an underwriter in the railroad or public utility fields; but it distributes all types of securities both at wholesale and at retail.

The passage of the Glass-Steagall Act, which became effective on June 16, 1934, had no material effect on Goldman Sachs. In the early days of its business, Goldman Sachs did not accept deposits at all. For some years prior to the Glass-Steagall Act, the firm did have some depositors, but this activity was never a very important feature of the firm's business, and after the passage of the Act, the firm discontinued it. The Act did not affect Goldman Sachs' commercial paper business, which continued.

In October, 1929, when the devastating crash in the stock market occurred, Goldman Sachs found itself as an underwriter in the midst of a number of underwritings, and, as Walter E. Sachs testified on deposition, it lost millions of dollars in having to take up securities at the underwritten price at a time when the market price of those securities was greatly depressed. Not only did Goldman Sachs suffer large monetary losses at the time, but because of the losses incurred by investors in securities of the Goldman Sachs Trading Corporation, which Goldman Sachs had sponsored, its reputation as an investment banker was dealt a blow from which it took years to recover. After heading with Hayden Stone the financing for Warner Brothers Pictures on August 25, 1930, Goldman Sachs was not to head another underwriting for almost five years.

In the period 1906–1917, Goldman Sachs had few, if any, underwriting participations in financings headed by others. In the period 1918–1933, it had some modest participations in such financings. There was a further change in the post-Securities Act period. After approximately 1935, when, as has been previously stated, Goldman Sachs established a Retail Sales Department, it began to take substantial participations in issues managed by others. The stipulated data indicate the extent of this change. In the period 1935–1949, Goldman Sachs participated in 570 underwriting syndi-

cates for negotiated issues managed by other investment banking firms, in addition to having participations in 87 such syndicates which it managed or co-managed itself. Another change in this period 1935–1949, and one which resulted from the registration requirements of the Securities Act, was the increased use of private placements by issuers as an alternative method of raising money. The growing importance of this method of financing, in direct competition with other methods, was reflected in the large number of private placements handled by Goldman Sachs in this period, as compared with the previous periods. In the 29 years after 1906, the year it entered the investment banking business, to 1935, Goldman Sachs had handled only 2 private placements. It handled 69 private placements in the 15-year period 1935–1949. Throughout the period 1935–1949, Goldman Sachs continued to solicit the business of heading financings for relatively small concerns which had not previously offered securities to the public, and, during this period, Goldman Sachs headed financings for 28 such issuers.

When Rule U–50 became effective on May 7, 1941, Goldman Sachs, which had had very little experience in the management of public utility issues, did not reorganize its staff or alter the organization of its Buying Department or of any of its other departments in order to enable it to head public sealed bidding accounts for such issues to any large extent. Despite this, however, during the period 1941–1949, Goldman Sachs headed bidding accounts which bid for a total of 24 new and secondary issues $1,000,000 and larger of domestic and foreign business corporations (excluding domestic railroad equipment trust certificates), winning 6 issues. But the firm's record of participating in bidding accounts headed by others tells a different story. In the period 1941–1949, it was a member of bidding accounts which bid for 334, or 53%, of the total of 632 such issues which were sold at public sealed bidding during that period. .

## 8. White Weld & Co.

Established in 1895 under the name of Moffat & White, this partnership changed its name in 1910 to White Weld & Co. and the firm has been in continuous operation under that name ever since. It is not claimed to be "successor" to any institution which was forced to give up investment banking by the terms of the Glass-Steagall Act.

The activities of the firm differ from those of any of the other defendants, and consist of three broad categories, "position" business, commission or brokerage business, and that of managing and distributing security issues. About one-half of the firm capital is devoted to the purchasing of securities of corporations which White Weld is interested in building "from the ground up" and then holding such securities for the long pull and not for resale. One-quarter of the firm capital is employed in its commission business, and only the remaining one-quarter is available for investment banking of the kind with which we are here concerned. As the entire capital of White Weld as of July 6, 1949, was in the neighborhood of $6,500,000, about $1,650,000 was available at that time for underwritings. As of the close of 1945 these figures were much smaller.

White Weld has made a specialty of private placements, as is indicated by the statistics, which show White Weld as agent for the seller in 53 private placements in the period 1935–1947. While opposed to compulsory public sealed bidding on principle, as not being in the best interests of issuers, White Weld's record of public sealed bidding accounts during the same period exceeded its position in negotiated underwritten transactions by a considerable margin. The bulk of its business in the distribution of securities consisted of its participations, as underwriter, in negotiated and public sealed bidding issues managed by others. Thus, despite the relatively small amount of capital allocated to its underwriting activities, White Weld nevertheless ranked high in participations in both public sealed bidding and negotiated is-

sues. Comparing the records of all investment bankers for the fifteen year period, 1935–1949, the statistical tables show that White Weld ranked ninth in number and eleventh in dollar amount of participations in public sealed bidding issues, and that it ranked tenth in number and sixteenth in dollar amount of participations in negotiated issues of $1,-000,000 and over.

The partners who exercise the major over-all responsibilities are Alexander M. White, Jr. and Francis Kernan. Harold B. Clark, whose deposition was taken, was then a senior partner. He started with the old firm in 1901, and became a partner in 1907. The older partners who became such in 1901, 1905 and 1912, Harold R. White, Sr., Francis M. Weld, who died during the pendency of the action, and Wm. J. K. Vanston, gradually withdrew from active management of the affairs of the firm, turning things over to the younger men as they came along. The remaining partners, in the order in which they were taken in, are: J. Preston Rice, Jean Cattier, Benjamin S. Clark, David Weld, Harold T. White, Jr., E. Jansen Hunt, William C. Hammond, Jr., J. C. Ransom, Dimitri Yassukovich and Clarence E. Goldsmith.

Relatively speaking, White Weld is a small organization, with its main office in New York, and branch offices in Chicago, Boston, Philadelphia, Buffalo and Cleveland. There is no regularly set up Buying Department, but the firm has a Syndicate Department and a Statistical Department, and its trading activities are considerable.

### 9. Eastman Dillon & Co.

Founded in 1910 by Herbert Lowell Dillon and Thomas C. Eastman, Eastman Dillon & Co. is a co-partnership engaged in the securities business and in general investment banking. Its existence over the years as a partnership has been continuous and there is no problem of "successorship."

The "Dillon-Eastman era," from 1910 to 1935, shows the firm engaged in a general brokerage business, primarily interested in the Pennsylvania area, where it maintained at various times from three to five branch offices.

After World War I the firm began to grow. By 1925 there were 7 partners, in 1929 the number had increased to 13; and in 1933, it increased to 16 and then dropped to 11. After the return of the senior partners from the service, the firm began to do a certain amount of underwriting, and was active in that field in the period 1924–1929.

The "Gilmour era" began in 1935, when Lloyd Gilmour left Blyth to join Eastman Dillon. He has for some time been the most active partner, is head of the Buying Department and is principally responsible for negotiations with issuers, the obtaining of participations and the general management of the investment banking part of the firm's business. Under Gilmour's leadership, Eastman Dillon took on new vigor and growth. The firm's underwriting activities began to expand, and in 1940, the year which represents Eastman Dillon's emergence as an important managerial house, there was a marked increase in its investment banking business.

Henry L. Bogert, the only senior partner of Eastman Dillon whose deposition was taken by government counsel, was at the time he testified, the managing partner with general supervision of the office management, a position which he had held since 1937. He had come to Eastman Dillon in 1922 from Lee Higginson, where he had been an employee in the syndicate department. After a short period of experience in charge of wholesaling and syndicating, he became inactive in 1929 and ceased to be a partner in 1933, devoting his time for two years to the management of a dairy farm in Virginia. In 1935 he again became a partner, was rather inactive for a few years, and finally became the managing partner.

Eastman Dillon has memberships on several exchanges, carries on an active general brokerage and underwriting business and trades for its own account. The character of its investment banking

business is very general, extending to both stocks and debt issues of public utilities, industrial and railroad securities, which it distributes both to institutions and at retail; and it is interested in participations and selling group positions.

In 1943 the firm engaged also in the business of furnishing financial advice to issuers through its Statistical or Investment Research Department, for a fee. This service was discontinued in 1946. Today Dillon and Eastman are limited partners and the firm is primarily under the guidance of Gilmour. There is no evidence in the record concerning the firm's attitude on the subject of competitive bidding.

### 10. Drexel & Co.

Defendant Drexel & Co., a Philadelphia partnership, is the youngest and one of the smallest of the 17 defendants. It was formed on April 1, 1940, at an initial capitalization of $1,100,000.

As already pointed out [1] this defendant is not the Drexel & Co. which is mentioned in the Morgan Stanley statement, as the "Philadelphia end of J. P. Morgan & Co." In 1933–1934, J. P. Morgan & Co. (and its Philadelphia branch, Drexel & Co.) in complying with the Glass-Steagall Act, discontinued its investment banking business in New York and Philadelphia, but continued in both cities its commercial banking business, its investment advisory service, its registrar and transfer business, and certain other activities. In 1940, J. P. Morgan & Co., deciding to terminate its Philadelphia activities entirely, organized a trust company in New York under the New York Banking Act, took over the Philadelphia deposits of its branch, Drexel & Co., and withdrew from Philadelphia.

A number of the partners and employees of the old Drexel & Co. thereupon organized the new firm of Drexel & Co., the defendant in this action. The partners of the new Drexel & Co. included Edward Hopkinson, Arthur Newbold, Jr., Gates Lloyd, Thomas Gates, Jr., and Edward Starr, Jr. Several new partners have since been added, including Robert H. Lee, William L. Day, Edward Howard York, Jr., Walter H. Steel, Clarence W. Bartow, and William F. Machold. With the exception of Newbold and Day, these men continued to be partners in Drexel & Co. as of March 15, 1950.

In addition to carrying on the business then being conducted by the J. P. Morgan & Co. organization in Philadelphia, with the exception of commercial banking, defendant Drexel & Co. also announced its intention to engage in the investment banking business, from which the Morgan organization had withdrawn some six years previously.

The new firm obtained from J. P. Morgan & Co. the right to use the name Drexel & Co., an important name in Philadelphia financial circles for some one hundred years, and took over the furniture and lease of the old Drexel & Co. office. It also obtained from J. P. Morgan & Co. the books and records connected with the investment advisory service and the registrar and transfer business of the old firm. However, the new Drexel & Co. received nothing in connection with the commercial banking end of the business, which J. P. Morgan & Co. transferred to New York, and nothing with reference to the investment banking business formerly carried on by the old Drexel & Co., since that phase of the J. P. Morgan & Co.—Drexel business had been discontinued for many years.

No deposition testimony, and little other evidence, was offered against Drexel & Co., and consequently there is no foundation for a discussion of its internal organization or competitive pattern.

### 11. The First Boston Corporation

The defendant First Boston came into existence as the result of the impact of the Glass-Steagall Act on the securities affiliates of two great banking institutions, The First National Bank of Boston and the Chase National Bank in New

---

1. See supra, p. 655.

York. The legal steps which were taken in order to accomplish this result are complicated and have little relevance to this case, but the background does have a bearing upon the issue of "successorships."

The Harris Forbes organization which later became identified with the Chase Securities Corporation, the securities affiliate of the Chase National Bank, started in 1882 when N. W. Harris, "the father of the modern bond salesman," formed the partnership of N. W. Harris & Co. in Chicago. By 1890 there were offices of N. W. Harris & Co. in Chicago, Boston and New York. In 1907 the assets and business transacted at the Chicago office were transferred to the Harris Trust & Savings Bank, which we shall meet again, in connection with the defendant Harris Hall. In 1911 the New York and Boston offices were each incorporated. In 1922 the stock of each of the two Harris Forbes & Co. corporations thus formed was transferred to a parent company named Harris Forbes Companies. The purpose of this elaborate arrangement was to preserve the name of Harris Forbes as connected with a nationwide organization, but to maintain offices otherwise separate and distinct, in each of the cities above referred to. In August 1930 Chase Securities Corporation, securities affiliate of the Chase National Bank, acquired all the stock of Harris Forbes Companies; and in June 1931 the names of the two corporations known as Harris Forbes & Co. were changed to Chase Harris Forbes Corporation, and thereafter the Chase Securities Corporation conducted no securities business except through these corporations.

Long before the effective date of the Glass-Steagall Act the Chase National Bank decided not to wait but to go out of the investment banking business, even before the Glass-Steagall Act was enacted. Accordingly, in May 1933, Chase Securities Corporation terminated its securities business and, having changed its name to Chase Corporation, proceeded with the liquidation of its two subsidiaries. The two Chase Harris Forbes Cor-

porations made such progress in liquidating the companies that, by the end of 1933, over 1,000 employees were released from employment, and the number still on the payroll had been reduced to 42.

When the transaction which resulted in the defendant First Boston becoming a publicly owned corporation, completely divorced from the First National Bank of Boston, took place on June 16, 1934, an agreement was made between First Boston, the Chase Corporation, and the Chase Harris Forbes Corporations, which, among other things, gave First Boston an option, which it exercised, to have assigned to it

"\* \* \* the name 'Harris Forbes' and the good will thereof incident to the general security business, other than government, state, municipal, political subdivision or governmental instrumentality financing \* \* \* "

together with all of the capital stock of three corporations which were formed in New York, Massachusetts and Canada, "for the purpose of preserving the name 'Harris Forbes.'" In addition, some of the records of the Chase Harris Forbes Corporations and of Chase Securities Corporation, pertaining to corporate financings, were turned over to First Boston.

Eleven of the employees and seven officers of the old Harris Forbes organization found employment with First Boston. The officers were men of great experience and ability and represented the real leadership of the old Harris Forbes organization. They were John R. Macomber, who had been president of the Boston Harris Forbes Corporation, Harry M. Addinsell, who had been president of the New York Harris Forbes Corporation, George D. Woods and Duncan R. Linsley, both of whom had been vice presidents of the New York corporation. The other three were junior officers. The remaining officers of the Chase Harris Forbes Corporations joined a great variety of other firms, including Field Glore and Kidder Peabody. The lesser employees scattered to the winds, some

of them to the offices of some of the other defendants herein.

On the First National Bank of Boston side of the picture, the corporate changes of its securities affiliates were intricate, but the net result was that its securities affiliate, First of Boston Corporation, became a publicly held corporation on June 15, 1934. Allan M. Pope, James Coggeshall, Jr., Nevil Ford and William H. Potter, Jr., who as early as 1921 had been officers of the First National Corporation, an earlier securities affiliate of the First National Bank of Boston, together with a substantial number of other officers and employees of First Boston, remained with First Boston.

Allan M. Pope continued as president of First Boston and, as of June 15, 1934, John R. Macomber became chairman of the board and Harry M. Addinsell chairman of the executive committee. In addition, there were 16 vice presidents. Subsequently, 5 of the men above referred to, namely, Woods, Coggeshall, Ford, Linsley and Potter were promoted to executive offices of importance.

In June 1934 First Boston had a capital of $9,000,000; by 1945 its capital was $12,400,000. On July 31, 1946, Mellon Securities Corporation merged with First Boston, 6 of the principal officers of Mellon Securities became associated with First Boston and in 1947, following the merger, the capital of First Boston had risen to $25,000,000.

During the period with which we are interested in this case, First Boston was a large and active house with a large personnel, a well coordinated organization and a very large overhead. In June 1934 it had a total of 600 employees, including the clerical and mechanical help. Addinsell's estimate that in January 1949 the whole organization amounted to about 450 people did not take into account the large number of employees in the purely clerical and mechanical departments.

Throughout the period First Boston has had a very active Trading Department and does a large amount of trading for its own account as principal. There is also a Municipal Department, and a Corporate Buying Department which was, at the time Addinsell testified by deposition herein, "a large organization of experts" having 7 vice presidents engaged in doing nothing else and one whole floor of the three floors at 100 Broadway, New York City, devoted to the buying end of the business, which is highly organized and efficient. At the same time, there are limitations upon the capacity of any buying department, and the research and planning essential to the competition for business and the formulation of plans and shaping up issues, is done under the leadership of approximately 8 men, no one of whom can handle more than a limited number of such matters in the course of a year.

The principal offices of First Boston in January, 1949, were located in New York, Boston and Chicago; it also had offices in Pittsburgh, Cleveland, Philadelphia, San Francisco and Springfield, Massachusetts. The annual burden of operating expense is close to $5,000,000.

While opposed to compulsory public sealed bidding in good faith and on principle, First Boston was an early, active and successful manager of public sealed bidding issues. It handles all types of offerings and offers the full range of investment banking services covering any type of investment banking problem, any type of issue, any type of offering and any type of risk. As of December 31, 1947, shortly after the commencement of this action, the principal executive officers of First Boston were Harry M. Addinsell, chairman of the board, James Coggeshall, Jr., president, George D. Woods, chairman of the executive committee, and Duncan R. Linsley and William H. Potter, Jr., executive vice presidents.

### 12. Dillon Read & Co. Inc.

Dillon Read & Co. Inc. is a New York corporation, having at present only one office, located in New York City.

While deposition evidence of Karl H. Behr was taken by government counsel in the course of the elaborate and prolonged discovery proceedings, none of this was read into evidence at the trial. For this reason, perhaps, there is in the record no more than a bare outline of the history and development of the firm.

On October 11, 1922, Dillon, Read & Co., a New York joint stock association, was formed, with Clarence Dillon as the head of the firm. This in turn became a partnership on January 2, 1942, engaged in a general securities business; the firm became a corporation on March 12, 1945, and has remained such since then, as is indicated by the name above set forth. On May 1, 1951, the stockholders were Clarence Dillon and C. Douglas Dillon. There is accordingly no problem of successorship. Whether or not the firm, prior to the effective date of the Glass-Steagall Act, was engaged in the business of private banking does not appear. If it was, Dillon Reed must have elected to give up such banking activities, as this record shows the firm actively engaged in the investment banking business.

Dillon's experience in the securities business dated from 1913, when he joined the Chicago office of the firm of Wm. A. Read & Co., as a salesman. He moved to the New York office of that firm, and became a member of William A. Read & Co. on April 1, 1916.

In early 1920 Dillon became the senior partner of the old firm of Wm. A. Read & Co. About one year later, in 1921, the name of the partnership firm was changed to Dillon, Read & Co., and thereafter the joint stock association was formed.

In general, the picture is one of a privately owned firm headed by a relatively small group of aggressive individuals, who built Dillon Read up to a position of leadership in the investment banking industry. Among these men were Clarence Dillon, James V. Forrestal, William H. Draper, Jr., Dean Mathey, Ralph Bollard, Karl H. Behr, and, later, C. Douglas Dillon.

Dillon Read is primarily a managerial house. Having no large sales organization, it is not particularly interested in participations in accounts headed by other bankers, but goes after leadership, taking large participations in its own accounts.

While we shall find some evidence that Dillon Read was opposed to compulsory public sealed bidding for security issues, its record of successful public sealed bidding accounts is good. For the 15-year period, 1935–1949, its rank was seventh in dollar volume and eleventh in number of public sealed bidding issues managed. During the same period Dillon Read ranked first in dollar volume of agency private placements.

### 13. Blyth & Co., Inc.

On or about April 18, 1914, Charles R. Blyth and Dean Witter organized a California corporation known as Blyth Witter & Co., for the purpose of conducting a general investment banking business, with Charles R. Blyth, president; Dean Witter, vice president; Roy L. Shurtleff, vice president; and George Leib, vice president, all of San Francisco.

Blyth Witter & Co. concentrated its efforts in the developing and youthful electric power and light industry of the West Coast and became a specialist in its particular problems. With its main office in San Francisco, it began to enlarge, and opened offices in New Orleans, Los Angeles, Portland and Seattle.

By 1925 Blyth Witter & Co. had opened an office in New York City, thereby bringing to the attention of investment banking houses in the East that there was a market for securities in San Francisco, and the fact that Blyth Witter & Co. would make a good underwriter and distributor for securities on the West Coast.

The termination of World War I found Blyth Witter & Co. fairly well established as a distributor of the securities of West Coast public utility companies. Of the fourteen issuers from whom Blyth Witter & Co. either as sole offeror or co-offeror, offered securities during the period 1914

through 1923, thirteen were public utility companies. Of the thirteen public utility companies, eleven were West Coast concerns, including two located in closely adjacent areas, the Mountain States Power Co. and the Central Arizona Light & Power Company.

A factor which restricted the market of potential purchasers of California public utility securities was a fear on the part of eastern and midwestern investors that another earthquake would occur in that area, and that the destruction and property loss would be as great as that suffered in the earthquake which occurred in 1906. As the firm specialized in the underwriting and distribution of West Coast public utility financings in West Coast securities markets, the natural consequence was that Blyth Witter & Co. gradually developed into an important and efficient distributing organization on the West Coast. In performing investment banking services for West Coast issuers, Blyth, Leib and Shurtleff placed great stress upon the fact that Blyth Witter & Co. was a California house, and argued that California enterprises should use California underwriters.

In 1924, Dean Witter resigned from Blyth Witter & Co. and formed the copartnership, Dean Witter & Co. Notwithstanding the resignation of Dean Witter, the corporation continued to function under the name of Blyth Witter & Co. until December 31, 1928, when the principal executive officers decided that the organization, in addition to its general investment banking, should go into the general brokerage business. Consequently, the copartnership, Blyth & Co., was then formed on January 1, 1929.

The venture of Blyth & Co. into the general brokerage business was short-lived, due principally to the devastating stock market crash of October, 1929. In March of 1930, the copartnership, Blyth & Co., was dissolved, and a new corporation, Blyth & Co., Inc., was incorporated under the laws of Delaware on March 10, 1930, to continue the investment banking business previously conducted by the partnership. The firm, in the period 1924–1931, broadened the base of its underwriting and distributing activities from specialization in the underwriting and distribution of the securities of West Coast utilities, to include the underwriting and distribution of issues of non-utility issuers and of non-West Coast issuers.

In the period 1932 through 1935, a number of important changes occurred in the set-up of the Blyth organization. Blyth had built up a very sizable and efficient sales organization throughout the country in order to dispose of those blocks of securities which it acquired through the underwriting of issues and through the operations of its active Trading Department. The Buying Department, however, had not been thoroughly developed. The Blyth buying organization on the West Coast was headed by Roy L. Shurtleff, in the San Francisco office; George Leib, who had started on the West Coast in 1914, was the head of the Eastern organization. His training had been largely in the sales organization. In the Buying Department of the New York office there were two men particularly equipped to analyze the financial structure and requirements of issuers, to develop financing plans, and to follow through on the technique of building an issue and preparing registration statements. These two men were Stewart Hawes and Eugene Bashore. They had assistants who were not then trained to any great extent.

At the end of 1934, Charles R. Blyth wanted to have somebody in the New York office who was trained in buying department activities, to supervise the negotiation of security issue transactions and to head the Buying Department. Charles E. Mitchell turned out to be the man, and on June 17, 1935, Mitchell entered the employ of Blyth as chairman of the board of directors.

Immediately prior to entering the employ of Blyth, Mitchell had his own firm, C. E. Mitchell, Inc., which he had formed in January, 1935. During the period

from October 31, 1916, to April 2, 1929, he had served as president of the National City Company, and from April 2, 1929, to February 27, 1933, as chairman of its board of directors. From May 3, 1921, to April 2, 1929, Mitchell had also served as president of the National City Bank of New York, and from April 2, 1929, to February 27, 1933, as chairman of its board of directors. In February and March, 1933, Mitchell resigned all of his directorships and official positions with the National City Company and the National City Bank of New York, and, since that date, has had no direct or indirect connection with either organization. All of those connections had been severed more than two years before he joined Blyth. There was no succession of any kind, either *de jure* or *de facto*, from the National City Company to Blyth by reason of the fact that Mitchell joined the Blyth organization, or for any other reason.

In addition to a successful career with the National City Bank, Mitchell brought to the Blyth organization his experience as a director of the Federal Reserve Bank of New York.

Mitchell testified that when he joined Blyth in June, 1935, he endeavored to build the firm into the kind of an investment banking firm, which, with an expert buying organization, a statistical organization, and a distributing organization, could successfully obtain leaderships in underwritings. He started to work with the idea of trying to develop Blyth into a well rounded investment banking organization.

Another step in building up the national Buying Department of Blyth was taken when Eugene M. Stevens entered the employ of Blyth as vice-chairman of the board of directors on April 1, 1936.[1] He was placed in charge of the buying department of the Blyth organization in Chicago. Prior to entering the employ of Blyth, Stevens had been vice-president of the Federal Reserve Bank of Chicago, and prior thereto had been an officer of the Continental Illinois Bank and Trust Co. of Chicago.

Blyth's principal Buying Department in the East was centered in New York City. In the middle-west it was in Chicago and on the West Coast it was in San Francisco. To head up this nation-wide buying organization, there were Blyth and Shurtleff in San Francisco, Mitchell, Leib, Hawes and Bashore in New York, and Stevens in Chicago.

In 1935, Blyth's overhead was approximately $175,000 a month, and its capital in June, 1935, was about $2,500,000. By February 9, 1949, Blyth's capital had increased to between $10,000,000 and $11,000,000.

In February, 1935, Blyth had its own wire and private telephones to Boston, Philadelphia, Cleveland, Chicago, San Francisco, Los Angeles, Portland and Seattle. It had 19 offices and 125 salesmen, and it had a large dealer following, as it traded daily with most of the important dealers throughout the country. The functional organization of Blyth as a leading national distributor required it to have a steady volume of securities to sell. Hence, there was always a vital need for obtaining participations in issues managed by others to supplement what could be supplied to the Blyth sales organization by the security issues managed by Blyth itself. An effort to win at least a substantial participation was a secondary alternative to the primary effort to get leadership.

The static data show that prior to the enactment of Rule U-50 on April 8, 1941, Blyth bid six times for security issues which were offered at public sealed bidding. It bid four times as the manager of a bidding account, and twice as a member in accounts headed by others, winning, however, only once. This was in December, 1940, when an account in which Blyth was a member, and which was managed by First Boston, bid for and won a $53,000,000 Boston Edison Co. bond issue.

1. He held this position until his death on January 21 1937.

During the year 1941, the first year of bidding under Rule U-50, Blyth bid for a total of fourteen issues, two of which were not under Rule U-50. It bid seven times as manager or co-manager of a bidding account, winning once, and seven times as a member in accounts headed by others, winning twice.

Among the public utility companies, whose security issues Blyth bid for in 1941, either as manager or co-manager of the bidding accounts, were the New York State Electric & Gas Corporation and the San Diego Gas & Electric Company. The two issues of New York State Electric & Gas (a preferred stock issue and a bond issue tendered for public sealed bidding at the same time) were the first issues of which bids were opened under Rule U-50. These bids were opened on June 23, 1941. The preferred stock issue was won by the account co-managed by First Boston and Glore Forgan. The bond issue was won by the Equitable Life Assurance Society. The San Diego Gas & Electric issue was a registered secondary offering by the parent company, the Standard Gas & Electric Company, and was the first block of subsidiary common stock offered by a public utility holding company under Rule U-50. This issue was won by the account managed by Blyth, and was offered to the public on July 8, 1941.

Blyth's record in the period 1941–1949 in bidding for new and secondary issues of $1,000,000 and larger of domestic and foreign business corporations (excluding domestic railroad equipment trust certificates) shows that Blyth, bidding as either the head or a member of a bidding account, bid for 462 issues compared with 447 issues for Halsey Stuart.[1] It bid for 204 issues as the head of a bidding account, winning 51 issues.

In the period 1935–1949, Blyth ranked third, in terms of the number of issues, among all investment banking firms managing or co-managing new and registered secondary issues, $100,000 and larger,

won at public sealed bidding. In terms of dollar volume, Blyth ranked fifth, managing or co-managing issues amounting to some $489,500,000.

### 14. Harriman Ripley & Co., Incorporated

Harriman Ripley & Co., Incorporated, was organized on May 29, 1934, under the laws of the State of New York, under the name of Brown Harriman & Co., Incorporated, to engage in the investment banking business, and it commenced business on June 16, 1934. Its name was changed to Harriman Ripley & Co., Incorporated, on January 1, 1939.

The National City Company was organized in 1911 under the laws of the State of New York as the securities affiliate of the National City Bank. On June 10, 1933, its name was changed to The City Company of New York, Incorporated, and, on June 4, 1934, it discontinued its securities business and went into liquidation. No legal succession existed as between the National City Company and Harriman Ripley; nor has there been any other kind of succession from one to the other.

Brown Brothers Harriman & Co., a partnership, was formed on January 1, 1931, to carry on the commercial and investment banking activities theretofore engaged in by Brown Brothers & Co., a partnership, by W. A. Harriman & Co., Inc., a New York corporation, and by Harriman Brothers & Co., a partnership. The principal business of Brown Brothers Harriman & Co. has been, and is, commercial banking. From January 1, 1931, to June 16, 1934, it also engaged, to a relatively small extent, in investment banking. On June 16, 1934, Brown Brothers Harriman & Co. ceased doing an investment banking business, which had never been important to it. Brown Brothers Harriman & Co. was and is a private banking partnership, having no legal connection with Harriman Ripley. There has been no succession of any kind

[1]. Halsey Stuart bid only as the head of an account and never as a member of an account headed by another firm. Likewise, it bid only for debt issues.

from Brown Brothers Harriman & Co. to Harriman Ripley.

When Harriman Ripley commenced business on June 16, 1934, it had twelve officers, seven of whom also comprised its board of directors. Seven of these twelve officers had formerly been officers of the National City Company, and of the remaining five, four had formerly been partners, and one had formerly been manager and attorney in fact, of Brown Brothers Harriman & Co.

The leading personalities in Harriman Ripley are Joseph P. Ripley, who is the chairman, and Pierpont V. Davis, who is the president. Joseph P. Ripley had been an employee and subsequently assistant vice-president of the National City Company from 1925 to 1927, vice-president from 1927 to March 16, 1933, and executive vice-president from March 16, 1933 to June 1934. Pierpont V. Davis had been an employee of the National City Company from 1917 to 1918, and vice-president from 1919 to June 1934. These men were also directors of The City Company of New York, Incorporated, at the time that it discontinued its securities business and went into liquidation.

Harriman Ripley commenced business with paid in capital of $5,000,000, of which $4,900,000 was provided by W. Averell Harriman and E. Roland Harriman, and of which the remaining $100,000 was provided by its officers and directors. W. Averell Harriman and E. Roland Harriman are brothers, and they became general partners of Brown Brothers Harriman & Co. upon its formation on January 1, 1931. W. Averell Harriman has been a limited partner since October 1, 1946, but E. Roland Harriman has been a general partner at all times since January 1, 1931.

From October 24, 1938, to September 27, 1946, inclusive, all of the stock of Harriman Ripley, which was owned directly or indirectly by E. Roland Harriman, W. Averell Harriman, or members of their respective families, being in excess of 90% of the total stock outstanding, was subject to the terms of a voting trust agreement, dated October 24, 1938, under which Joseph P. Ripley was one of the three trustees. Harriman Ripley was recapitalized on October 1, 1946, and the voting trust was dissolved. Since October 4, 1946, its officers have owned the majority of the common stock, being the stock presently entitled to vote for the election of its directors, and E. Roland Harriman, W. Averell Harriman and the members of their respective families have owned directly or indirectly 43% of its voting stock and 97.66% of its non-voting stock.

Harriman Ripley is not only a leading managing underwriter, but it is, in addition, an important distributing organization. It was at the beginning, and has continued to be, a large investment banking house, with a well staffed and aggressive buying, selling and distributing organization. It has offices in a half dozen other cities throughout the country, including Chicago, Philadelphia and Boston. When Harriman Ripley commenced business on June 16, 1934, it had 431 employees, of whom 223 had been employed by Brown Brothers Harriman & Co. immediately prior to their employment by Harriman Ripley, 205 had been employed by The City Company of New York, Incorporated, and three by other employers.

From the time that Harriman Ripley commenced business, it has engaged vigorously in the retail selling of securities. A large part of the volume of Harriman Ripley's business was in municipal securities, and in equipment trust certificates. It began doing business in municipal securities in the year 1934, and it was also active in bidding for public utility issues, during the period prior to the enactment of Rule U–50. The public sealed bidding sheets covering the period January 1, 1935 to December 31, 1940, record twenty-two corporate issues which were offered at public sealed bidding during that period. Harriman Ripley bid, either as a manager or participant, for eleven out of the twenty-two issues, although, in eight out of the eleven issues bid for, the bids were not suc-

cessful. It bid seven times as manager, but won, however, only once; and this was the Androscoggin Electric Corporation bond issue which was offered on May 7, 1935. This issue was Harriman Ripley's first public utility purchase at public sealed bidding. It also participated, under the management of First Boston, in four other accounts which submitted bids, winning two and losing two.

## 15. Stone & Webster Securities Corporation

Defendant Stone & Webster Securities Corporation, a New York corporation, is a wholly owned subsidiary of Stone & Webster, Incorporated, and is engaged in the investment banking business generally. The parent firm, not a defendant in this case, operated through a number of subsidiaries which offer consulting and engineering, and general advisory services, as well as investment banking facilities.

Organized in 1927, under the name of Stone & Webster and Blodget, Incorporated, this defendant took over the investment banking business which previously had been conducted by the Securities Division of Stone & Webster, Incorporated, and by the investment banking firm of Blodget & Co. In January, 1946, the name of Stone & Webster and Blodget, Incorporated, was changed to Stone and Webster Securities Corporation.

It is not alleged in the complaint that this defendant "succeeded" to the investment banking business of any institution which, pursuant to the Glass-Steagall Act, elected to give up investment banking on June 16, 1934.

Among the personnel of the new corporation were Robert van Deusen, previously an employee of the Securities Division of Stone & Webster, Incorporated, and Edward K. Van Horne, previously an employee of Blodget & Co. Robert van Deusen became an officer and director of the firm upon its formation in 1927; Van Horne became a vice-president of the corporation in 1933, and a director in 1935. At the time the deposition testimony was taken, van Deusen was chairman of the board and Van Horne the president of the corporation, and both directors.

Stone & Webster Securities Corporation engages in a general underwriting business, underwriting and distributing at both wholesale and retail, corporate, government and municipal bonds, as well as preferred and common stocks. It furnishes comprehensive financial services to issuers of securities and to investors. The firm concentrates primarily on utilities financing, but also emphasizes natural gas pipeline, gas distribution company, and power industrial issues. It does not manage public sealed bidding accounts for railroad underwritings, although it occasionally participates in such financing.

The home office of Stone & Webster Securities Corporation is located in New York. It has branch offices in Boston, Chicago, and Philadelphia, and representatives located in Hartford, Providence, and Syracuse. The firm is organized into departments to handle the several aspects of its investment banking business. These divisions include New Business, Municipal, Retail Sales, Syndicate, Accounting, and Wholesale Sales Departments.

On January 3, 1950, the capital of the firm was about $3,000,000.

## 16. Harris Hall & Company (Incorporated)

The background to Harris Hall is interesting. In 1882 N. W. Harris, one of the pioneers in the investment banking business, formed the Chicago partnership of N. W. Harris & Co. Many of those who figure prominently in the evidence in this case were at one time or another connected with N. W. Harris & Co. Harold L. Stuart started his career with this firm in 1895; William Ewing, one of the organizers of Morgan Stanley, worked with "the Harris organization" in Chicago from 1905 to 1916; William Given, later to become president of American Brake Shoe Co., spent a year

with this well-known group, beginning about 1908.

In 1907 Harris Trust & Savings Bank was organized in Chicago and N. W. Harris & Co. transferred to it the assets and business of the Chicago office; later the Boston and New York offices followed a course which is to some extent reflected in the thumb-nail sketch of First Boston in this Part II of the present opinion, and we need not follow the details too closely. Suffice it to say that what is sometimes described in this record as the "Harris Forbes organization" had its roots in N. W. Harris & Co.

In 1921 Harris Trust & Savings Bank organized the N. W. Harris Company as an affiliate, and a certain amount of investment banking business was also done in the Bond Department of the Bank. But, pursuant to the terms of the Glass-Steagall Act, and on June 16, 1934, the affiliate was dissolved and the Bank elected to discontinue investment banking, except as to the types of securities exempted from the operation of the statute.

In the meantime, as part of an effort to maintain the organization above referred to on a nationwide basis, an agreement was made between the Chicago, Boston and New York houses, which were now in legal contemplation separated, by which each afforded the other an option to participate on original terms, in certain fixed percentages relative to various types of financing, in their respective security purchases. In July, 1930, they agreed to continue this arrangement until December 31, 1932; but it was cancelled in 1931.

The confusion and uncertainty, which everywhere followed in the wake of the Glass-Steagall Act, were naturally evident in Chicago; and it was not until October 30, 1935, that Harris Hall came into existence, organized and incorporated by four of the personnel of the Bond Department of Harris Trust & Savings Bank. Edward B. Hall, who had been with the Bank since 1909, became president of Harris Hall; Norman W. Harris,

grandson of the founder of N. W. Harris & Co., became vice-president; Lahman V. Bower became vice-president and treasurer, in charge of the buying activities; and Julien H. Collins became a vice-president. Each of the four was a member of the board of directors.

The capitalization plan envisaged 2500 shares of preferred stock and 60,000 shares of common, or $1,102,000. A proposal was made to the Bank to transfer 12,000 shares of the common stock to the stockholders of the Bank for "the good will of the Harris Trust & Savings Bank heretofore acquired in and pertinent to the purchase and sale of securities"; the proposal was accepted and the transaction consummated. Stockholders of the Bank subscribed for the preferred stock. In 1945, the capital of Harris Hall was $1,291,000.

This small mid-western firm has done a varied and general investment banking business, specializes somewhat in public utility securities and railroad equipment trust certificates; but is interested in managerships in all types of issues and in getting as many participations as it can. It has a surprisingly good record in private placements, considering the size of its organization and its general facilities; its public sealed bidding record is good; and its record of managerships in the various triennials, 1935–1949, has fluctuated widely.

## 17. Union Securities Corporation

Union Securities Corporation was formed in October, 1938, for the purpose, among others, of continuing the investment banking business of J. & W. Seligman Co. There is no "predecessor-successor" problem with respect to Union, since Union admitted in its answer, and has never questioned, that it was formed to continue the investment banking business of J. & W. Seligman.

J. & W. Seligman Co., a partnership formed prior to 1915, has been engaged in many branches of the banking and securities business, including brokerage, investment counseling, securities underwriting and private banking. The firm

discontinued its commercial banking business in about 1933, by reason of the Glass-Steagall Act, and divested itself of its underwriting activities in 1938, at the time Union Securities Corporation was formed. J. & W. Seligman continues today in the business of brokerage, investment counseling and other branches of the securities business other than investment banking. The firm received no consideration for the transfer of its underwriting business to Union.

Union Securities Corporation was organized under the laws of the State of Maryland to engage in the origination, underwriting and distribution of securities and for other purposes. With respect to its investment banking functions, it was organized to continue such business as had theretofore been conducted in that field by J. & W. Seligman Co., and as a subsidiary of two investment companies, Tri-Continental Corporation and Selected Industries Incorporated. The stock of Union was owned in equal proportion by these two investment companies until March 31, 1951. As of that date, Selected Industries Incorporated was merged into Tri-Continental Corporation, and all of the outstanding capital stock of Union is presently held by the latter.

Union Securities Corporation is engaged in the general underwriting business of stocks, bonds and municipal securities, and is interested in leadership and participations as well. It is not engaged in the brokerage business, nor does it purchase securities for its own permanent investment. It has on occasion engaged in reorganization or recapitalization plans, involving the purchase of stock, rehabilitation of the company and subsequent disposal of the securities purchased.

Union has various departments to handle the several functions of its investment banking business, including Sales, Syndicate, Buying and Accounting Departments.

Union took over the entire underwriting business of J. & W. Seligman, and part of the personnel engaged in the underwriting and new issue business of the Seligman firm. A number of the men who have been officers and directors of Union Securities since its formation were, and continue to be, partners in J. & W. Seligman Co., and officers and directors of Tri-Continental Corporation and—until its merger with Tri-Continental—Selected Industries Incorporated. Included in this group are Henry C. Breck, Cyril J. C. Quinn, and Francis F. Randolph. The latter has been chairman of Union's board of directors since 1940, succeeding to that position upon the death of Earle Bailie. Bailie, who had headed the Union board since the formation of the company, was at the time of his death also a partner in the Seligman firm, and chairman of the boards of both Tri-Continental and Selected Industries.

Randolph, in addition to heading Union's board since 1940, was also president of Union from its organization in 1938, through 1945. He was succeeded in this post by the present incumbent, Joseph H. King, who had come up through the Seligman firm and had been a vice-president of Union.

Although Union was organized to carry on the investment banking business of J. & W. Seligman Co., in actual fact the new company "inherited" practically no business from the old firm. Not only did the Seligman firm give up its commercial banking business after passage of the Banking Act, but also during the depression engaged in very little investment banking activity, managing or co-managing only three issues from the early 1930's up to the time of the formation of Union Securities.

Consequently, Union itself got off to a slow start, the static data indicating that for the first triennial of its existence, 1938–1940, Union managed three negotiated issues (of over one million dollars) and co-managed none. With this record, it ranked 28th among investment banking firms with reference to number of issues managed, and 27th with reference to dollar amount of such issues.

Its progress was still slow in the next triennial, 1941–1943, with two managerships and four co-managerships to its credit, and the firm's rank increased only slightly. But in the next three-year period, 1944–1946, Union took hold, managing twenty issues and co-managing an additional twenty; it rose to 7th in number of issues managed, and 16th in dollar volume of managerships.

While it suffered some decrease in the next triennial, 1947–1949, Union remained an important factor in investment banking activity, ranking 17th in number of issues managed, and remaining 16th in dollar volume of leaderships.

Union now does a wide distributing business also. Its participations in underwritings show a rise similar to that of its managerships. In negotiated issues for the five successive triennials, it ranked in number of issues 25th, tie for 28th, 10th, 14th, and 18th, and in dollar volume 24th, 23rd, 12th, 8th and 13th.

Thus we have the picture of a new firm, organized to continue the almost extinguished investment banking business of J. & W. Seligman, slowly building on this foundation until it became a major underwriting and distributing house.

The static data also reveal some interesting evidence of Union's attitude toward public sealed bidding. At the same time that Union forged ahead in the negotiated field, it began to organize syndicates to bid at public sealed bidding. Thus, while in the period 1944–1946 it managed none and co-managed but two such issues, in the next triennial, 1947–1949, Union managed six and co-managed six public sealed bidding issues, thus ranking 9th among investment banking firms in number of public sealed bidding issues led and 7th in dollar volume of such issues. Its participations in public sealed bidding issues tell a similar story. It commenced to take participations in the second triennial 1938–1940, notwithstanding certain opposition to the Eaton-Young-Stuart campaign for compulsory public sealed bidding, and occupied in successive triennials the rank of tie for 14th, 21st, 16th and 4th. In the last triennial, 1947–1949, it has, in underwriting participations of public sealed bidding issues, been exceeded in terms of dollar amount only by Halsey Stuart, First Boston and Kidder Peabody.

## PART III

### The Syndicate System

During the prolonged pretrial sessions, some of which were of a formal character, in the courtroom and reported, and many others, described as "powwows," were in chambers without the presence of a reporter, and during many months of the trial, the government position relative to the so-called price-fixing phase of the case was strictly in accordance with the charge as formulated in the complaint. No attack was made on the syndicate system as such, but the defendants were said to have abused the system in the course of the formation and operation of the over-all, integrated combination and conspiracy vis-a-vis the hundreds of other firms in the investment banking industry. This system, supposed to have been invented by defendants "and their predecessors" was claimed to be one of the terms of the conspiracy. The government's original position was made too clear for any possible misunderstanding in the course of the clarification process which took so much time and proved in the end so helpful to all concerned.

Thus the following colloquies took place:

"The Court: * * * You say as to such things as this so-called price-fixing arrangement, that these are illegal in and of themselves even if done by one group of underwriters in connection with a particular transaction.

"Mr. Baldridge: Yes, but we are not pressing that position here, your Honor. We are pressing our over-all charge of conspiracy among those who have been named defendants."

And again, later:

"The Court: But let us look at it right straight in the eye. Suppose we come out of this and find there was no concert of action between these defendants at all, absolutely none, because that is what they have been contending. If there was no concert of action, no combination, no conspiracy, then I say the whole matter would fall and it would not be left for me to do what I was talking about earlier this morning, namely, find that separate contracts or separate specific underwritten negotiated issues by the syndicate method were illegal. That is right at the point, isn't it, Mr. Whitney?

"Mr. Whitney: Yes, sir.

"Mr. Baldridge: We are not asking for relief, your Honor, outside the over-all conspiracy.

"The Court: I guess that is enough.

"Mr. Baldridge: As I explained this morning, two or three price-fixes are illegal outside the conspiracy, but we are not pressing that.

"The Court: Well, I think we have had a very useful discussion about this matter. But I still would like to have the briefs, just so I can get my legal thinking straight on this matter."

This is what has been described during the trial as the government's first position on the subject of the syndicate system. In the meantime the various discussions and colloquies were making it plain that many of the 10,640 documents which had been, or were in the course of being, authenticated and printed for introduction in evidence as part of the government's case, showed a vigorous state of competition between the seventeen defendant firms and others as well. These documents had been selected out of hundreds of thousands of other documents examined by government investigators because each contained some phrase or clause upon which reliance was placed; and it had not been realized that the balance of many of the documents indicated that a particular defendant or sometimes several of them were doing the various things that government counsel were claiming they had combined and agreed not to do. And so the number of documents intended to be used was cut down by government counsel to about 4,000. As the trial progressed and document after document was placed in evidence it was apparent that government counsel were gradually disproving their own charges. This was especially clear after Harold L. Stuart had on cross-examination furnished the background which was essential to an understanding of the contents of many of the documents.

The result of all this was that finally government counsel attempted to accomplish what they had said in the beginning was not one of their contemplated objectives. Having assured me that the sole issue was the existence or non-existence of the over-all, integrated combination and conspiracy charged in the complaint, they entered upon a series of maneuvers, which, if successful, would have brought into the case two new and additional charges the effect of either of which, if sustained by me, would have been to outlaw many of the clauses customarily used in syndicate agreements by the entire investment banking industry, with the approval and cooperation of the SEC.

Thus it was claimed that the cross-examination by Arthur H. Dean of Harold L. Stuart was a consent, express or implied, to the inclusion in the case of "some other conspiracy" than that charged in the complaint, namely a conspiracy, not by the seventeen against all the rest of the investment banking firms, but one participated in by the industry as a whole. After due consideration, I rejected this contention, as it was clear to me that nothing could have been further from Mr. Dean's intention than any such broadening of the issues.

Then it was asserted that the issue had somehow been in the case all along despite government counsel's disclaimer.

Again, after careful examination of the question and a study of the record, I expressed the view that the sole issue was that of the existence or non-existence of the over-all conspiracy. But I agreed to give the matter further consideration after all the government's proofs were in. I have done this, and now decide that the "some other conspiracy" is not before me. The subject will be discussed again in a subsequent portion of this opinion.

At last government counsel did what they should have done as soon as they decided to shift their ground and attack the syndicate system and the entire investment banking industry. It was well known that various clauses of underwriting and selling group agreements containing various types of clauses relative 'to the public offering price, resale price maintenance, withholding of commissions, uniform concessions and reallowances and stabilization were in common use throughout the industry; the SEC had held that the fixed-price method of issuing new securities gave no offense to the Sherman Act; and the entire process was inextricably interwoven into the texture of a long series of Acts of the Congress and the subject of numerous rules, regulations, releases and memoranda issued by the SEC. No wonder government counsel hesitated to take the responsibility of attempting to tear apart a system which seemed to the Congress and to the SEC to be of such utility to the American economy, and which was the result of over fifty years of gradual growth. But attack it they finally did.

Formal motion papers were served and an application made to amend the complaint. Passing over the intermediate formulations of the new charge, which were so vague as merely to add to the confusion, the motion in end result became one to add to the complaint the following new paragraphs:

"*VIII. The Contracts in Restraint of Trade*

"47. Since at least January 1, 1942 to date, each defendant has entered into, and threatens to continue to enter into, and unless enjoined by this Court will enter into, contracts with various investment bankers and security dealers in unreasonable restraint of the interstate commerce described in this complaint and in violation of Section 1 of the Sherman Act. These contracts are commonly referred to by defendants as 'Agreements among Underwriters', and 'Selling Agreements' or 'Dealer Offering Letters', and are those employed by defendants as syndicate managers in the merchandising of security issues. Each such contract continues in full force and effect for a stated period of time provided therein. Each purchaser under such a contract purchases, usually severally, a part of the security issue named in the contract and acquires title thereto. Each of these contracts contains, among other things, a fixed schedule of sale and resale prices for the securities named in the contract including

"(a) the public offering price applicable to all retail sales made to the public by members of the buying group or by the syndicate manager as agent for the members of the buying group or by members of the selling group;

"(b) the price applicable to sales made by members of the buying group, acting through the syndicate manager, to selected dealers who are included in the selling group;

"(c) the price applicable to sales made by members of the buying or selling groups, to dealers not members of the selling group.

"48. Each of the defendants, when a party to any of such contracts, has agreed for the period of time provided therein (a) to maintain the fixed schedule of prices, and (b) to authorize the syndicate manager to stabilize the price of the securities named in the contract by making purchases and sales of such

securities in the open market or otherwise. Each of the defendants has frequently agreed in such contracts that if the syndicate manager shall so purchase any securities delivered to a member of the buying or selling group, the syndicate manager is authorized to withhold, or if already paid, to obtain the return of a sum of money calculated in accordance with the provisions of the contract as a penalty from such member.

"49. Each of the defendants, when acting as syndicate manager of a buying group or both a buying group and a selling group engaged in merchandising a security issue, has policed the price schedules contained in the contracts relating to that issue and has induced or attempted to induce the members of the buying and selling groups to adhere to the schedule."

After hearing extensive oral argument, studying the numerous memoranda submitted by counsel for various parties and deliberating on the matter for several weeks, I denied the motion. Thereafter counsel for the government urged me to reconsider the matter and I again took it under advisement, with the understanding that I would not decide it until all the government's proofs were in and I had the benefit of the connecting statements to be made pursuant to my Pretrial Order No. 3 and such briefs as might be submitted by counsel in support of and in opposition to the respective motions to dismiss at the end of the government's case.

Thus we come to a consideration of the government's first position.

## I. Did the Seventeen Defendant Investment Banking Firms Use the Syndicate System as a Conspiratorial Device in Connection with Any Integrated Over-all Combination?

██ There are in evidence about 1,-300 underwriting papers, colloquially referred to as "syndicate agreements." They cover a period of well upwards of thirty years, some of them much older, and they contain a great variety of provisions relative to price maintenance, the trading account or stabilization, withholding commissions (the so-called "penalty" clauses), uniform concessions and reallowances, authorizations to the manager to act for the group in such matters as group sales, dealer sales, syndicate and price termination, extension or price reduction and so on. I have spent many weeks studying these syndicate agreements and my conclusion, based on the evidence as a whole, is that, in the drafting and use of these agreements these defendant firms acted as separate entities and were motivated solely by normal, ordinary business considerations. These firms played their several parts, just as did other prominent and leading investment banking houses, in the evolution of the syndicate system as described in the preliminary portion of this opinion devoted to the history of the investment banking business. Different firms had different policies, and these are often reflected in the draftsmanship by some of the leading law firms, who sometimes entertained different views on questions of law. At times the forms of agreement used by a single firm on various occasions differ markedly one from another. There is a conspicuous lack of uniformity. Indeed, Morgan Stanley eliminated price maintenance clauses from its underwriting and selling agreements as long ago as 1938; it gave up selling agreements entirely in 1946; and its withholding commissions clause, for failure to place securities with investors, was for a time eliminated from its underwriting agreements and later restored. Price maintenance clauses were omitted from Harriman Ripley agreements in 1943. There is a bewildering variety of clauses used from time to time in their syndicate agreements by the other defendant firms.

Of course there is a certain fundamental similarity in those features which are characteristic of the system. In view of the evolution of the syndicate system over the years how could it

be otherwise. The underwriters are formed into a group, broad powers are delegated to the manager, there are provisions for group and dealer sales and with respect to concessions, reallowances and so on. In a moment we shall find that all these similarities and others are reflected in the forms, registration statements, prospectuses and reports required by the SEC pursuant to the authority of the Congress.

But government counsel would have me believe that the very variety of the clauses used by the different defendant firms is some evidence of subtle connivance; that some changes were due to fear engendered by this or that investigation or by the filing of the brief in the PSI [1] case by the Antitrust Division of the Department of Justice attacking the single-price security offering as violative of the Sherman Act. Doubtless the filing of this brief attacking price maintenance clauses, stabilization clauses and the rest did cause a near-panic among some investment bankers, both defendants and non-defendants. And why not? It is not a very pleasant prospect for a business man, who thinks he has been complying with the law, and who has been following as best he can the directions of the Congress and the SEC, to find himself face to face with a possible indictment and the onerous expense connected with defending oneself against an antitrust charge. But the reaction of the different defendant firms to the filing of that brief was as various and sometimes as contradictory as could well be imagined. Some continued as before, some did not. Even Halsey, Stuart & Co. gave up using price maintenance clauses for a year or so and then came back to them because Stuart thought they could not do business without them.

Finally, I was asked to make a microscopic examination of a long series of clauses in a succession of Morgan Stanley agreements, which were supposed to demonstrate that the abandonment by Morgan Stanley of price maintenance clauses in 1938 was merely colorable. It will suffice to say that I find each and every one of these changes, and other changes made by Harriman Ripley and by other defendants, were made in good faith and for proper reasons, having nothing to do with any other investment banking house or any conspiracy or combination or any attempt at concealment or subterfuge.

The net result of this phase of the government's case is that these defendant firms used the syndicate system, just as did other investment banking houses so far as this record discloses, according to their several and separate views of what was thought by them to be suitable and helpful in connection with each security issue as it came along. There was, with reference to the development and use of the syndicate system, no concert of action, no agreement and no conspiracy, integrated, over-all or otherwise.

## II. Alternate Claims Belatedly Attempted to Be Asserted against the Investment Banking Industry as a Whole

The government's second position, concerning what government counsel have termed "some other conspiracy," not specifically alleged in the complaint but said to be vaguely included by implication or by consent, and its third position, stated in the papers supporting the motion to amend the complaint, involve alternative claims against the investment banking industry as a whole. In other words, in the event that it should be determined as matter of fact that no such combination or conspiracy as is alleged in the complaint ever existed, government counsel would have two new and additional strings to their bow.

Despite assurances that no attack was being made upon the syndicate system except insofar as it was abused by the operation of the alleged over-all, integrated conspiracy, government counsel ultimately decided, as above stated, that

1. See infra, p. 698 ff.

they would, if permitted to do so, ask for an adjudication that the provisions of syndicates relative to the public offering price, resale price maintenance, stabilization and withholding commission clauses, uniform concessions and reallowances, and termination periods for the life of syndicates or the continuance of price restrictions, were illegal per se under the Sherman Act. It needs no argument to demonstrate that these positions are diametrically opposed to the original claim that these seventeen defendant investment banking firms entered into a conspiracy and combination to keep "the cream of the business" for themselves and exclude the rest of the investment banking industry from participation therein. Moreover, there is nothing in the claim that counsel for certain of the defendants consented to the broadening of the issues by reason of his cross-examination of Harold L. Stuart. The evidence thus elicited had a direct bearing upon the history of the syndicate system and completely demolished the government claim that the syndicate system had been invented by defendants "and their predecessors" in or about 1915; other questions related to matters which constituted indispensable background material relative to the nature of the investment banking business. Even though counsel for some defendants at one time urged me to grant the motion to amend and thus broaden the issues and even to adjudicate concerning the "some other conspiracy," counsel for other defendants vigorously opposed the granting of the motion and insisted that the "some other conspiracy" was not an issue legitimately arising out of the state of the pleadings and the proofs. In the end counsel for all defendants aligned themselves in opposition to the inclusion of these two new groups of issues.

 It is clear to me that neither of these matters is before me as of right. There are many reasons why, in the exercise of discretion, they should be kept out of the case. Indeed, under the circumstances of this case it might well be an abuse of discretion to treat these issues as justiciable herein and to decide them.

True it is that the questions involved are important to the investment banking industry as a whole; it is stated that these questions have never before been decided by any court; and much time and effort have been expended during this long trial in extensive and scholarly research, the submission of voluminous briefs and in prolonged and helpful argument by counsel.

But I question the wisdom of establishing a precedent which may add to the already too-heavy burden of expense resting upon defendants in a sprawling, circumstantial-evidence type of case such as the present one, by permitting the government to shift in mid-trial from one alleged conspiracy to a new and different one. The injustice of thus enlarging the issues in this case is especially manifest when one considers that much additional evidence would in all probability have to be received, despite protestations to the contrary by counsel for the government; and the setting of an integrated, over-all combination and conspiracy case, with its multiplicity of miscellaneous issues, does not seem to me to be an appropriate one in which to determine the legality of a specific underwriting or selling agreement made in connection with an issue of new securities by a particular issuer managed by one of the defendant firms. Indeed, the discussion of "specific agreements" is misleading, as the effect of the procedure urged upon me by government counsel would be to put together large numbers of agreements containing, and not containing, various types of clauses of the character above described, and, out of the general resulting admixture, try to reach some sort of determination of the legality of syndicate agreements in general. This would be highly prejudicial to the defendants.

As I said during the trial, in a colloquy with one of the government counsel:

"It seems to me you keep talking about specific price agreements, but

what you are really talking about is a general fog in which hundreds of syndicate agreements, by different parties, over long periods of time, are all put in the pot together and stirred around, making a general stew; and out of such a mess as that I do not believe good law can reasonably be expected to come."

The most satisfactory way to arrive at definitive factual and legal conclusions, which could be tested on appeal and serve as precedents for others in similar circumstances, would be to bring before a court of competent jurisdiction the question of the legality under the Sherman Act of a single group of agreements relating to a specific security issue. In such a case there would necessarily be before the court evidence or appropriate offers of proof of all the attendant circumstances, such as the amount of the issue, the state of the market, the number and relative percentage positions of the underwriting participants, and the amount of their underwriting strength, the selling group or dealer arrangements and a host of other factors such as were considered in the PSI [1] case by the SEC. The period of completed or actual continuance of the syndicate agreement or maintenance of the public offering price may be too long; other provisions may, under the peculiar circumstances of a given situation, make the entire arrangement in a particular case unreasonable. It seems scarcely likely that such a case could continue to a conclusion, as here, without a single witness to testify to the facts surrounding the making of the syndicate agreements under attack. To proceed in the manner I have just suggested would avoid all the confusion inevitably attendant upon an attempt to decide these questions on a record such as we have in this case, which would furnish counsel for the government with a species of grab-bag out of which they could pick whichever type of clause suited the convenience of the moment as the discussion shifted this way and that. It is difficult for me to see how it would be "in furtherance of justice" to permit this to be done.

Added to all this is the fact that the bringing in of such new issues could hardly fail to prolong the trial, a circumstance of no mean moment in a case which has already covered a period of upwards of three years of trial and pretrial; and the result might be the burden and expense of an appeal which would otherwise not have been prosecuted. One must not be blind to the possibilities of oppression in these overly-long and unduly complicated antitrust cases.

Having in mind the possibility that I may have fallen into error in refusing to entertain and decide these new issues, it seems fitting that I should briefly set forth such views as I have on the subject of the validity of these syndicate agreements in general. The subject is a thorny one and not without a certain fascination. Literally months of my time before and after daily court sessions have been consumed in the study of its various aspects. The following discussion of the questions of law affecting the syndicate system in general, is by way of dictum.

To begin with, the history and development of the syndicate system as set forth in the preliminary portion of this opinion demonstrates that the modern syndicate system in general use today by the investment banking industry is nothing more nor less than a gradual, natural and normal growth or evolution by which an ancient form has been adapted to the needs of those engaged in raising capital. By no stretch of the imagination can it be considered a scheme or plan or device to which investment bankers have from time to time adhered. There is nothing conspiratorial about it; nor, on the record now before me, can these defendant firms or anyone fairly be said to have formed at any time any combination or conspir-

---

1. See infra, p. 698 ff.

acy to operate under the syndicate system.

But the Sherman Act applies not alone to conspiracies and combinations but to "agreements" as well, and we are now concerned with written agreements and other contractual arrangements in connection with the underwriting and distribution of security issues. When such agreements contain price maintenance clauses binding on the underwriters, resale price maintenance clauses binding on the selling groups or selected dealers, stabilization and repurchase or withholding commissions clauses, specified and uniform concessions and reallowances and termination provisions of 15, 20 or 30 days, with some powers of extension, or change in the public offering price, under various conditions: do any of these clauses, or any combination of them, constitute per se violations of the Sherman Act?

The group of problems thus propounded suggests a number of pertinent preliminary questions: Has the rule of reason been abandoned to make way for a cliche or rubric to the effect that any agreement relative to price maintenance is taboo, irrespective of whether it fosters and promotes rather than restricts and restrains competition, irrespective of whether it is intended to or does or can affect general market prices, and irrespective of any and all other factors? If there remain some vestiges or at least the hard core or perhaps the integral whole of the rule of reason, should the courts inquire into the substance of the nexus of agreements and relationships as between the various parts of the underwriting and distributing team and the issuer, or look merely at the superficial and formal aspects of the transaction? If the Congress engaged in the elimination of harmful practices, after numerous and prolonged investigations passed a series of statutes into the terms of which the established procedures of investment bankers relative to the public offering price, stabilization and so on have been inextricably interwoven, thus indicating that the members of the

Congress were implementing the operation of a system which they regarded as generally legal and proper, what weight should a court give to such attitude on the part of the Congress, in determining whether or not the practices thus implemented are violations of the Sherman Act, in view of the circumstance that no general exemption from the provisions of the Sherman Act is set forth in such legislation? And, finally, if the SEC, organized as an administrative body to supervise the functioning of these Acts of Congress, after careful deliberation and consideration of the views submitted both in writing and by oral argument by the Antitrust Division of the Department of Justice, filed a long and well considered opinion to the effect that the particular agreements in the case before it, which contained price maintenance clauses, resale price maintenance clauses, stabilization and "penalty" clauses and a long period of continuance of the syndicate, were in every respect legal and not per se or any other sort of violations of the Sherman Act, what weight should a court give to this pronouncement by the commissioners, who probably knew more about the practical workings of the syndicate system than any other public body?

Moreover, it is interesting to observe that no one will ever know the extent to which the machinery and apparatus of the syndicate system of today have been moulded into their present state, not merely by the provisions of the Securities and Banking Acts and the amendments thereto and State Blue Sky laws, but by informal conferences between investment bankers and their counsel on the one hand, and SEC, ICC, FPC and various state commissioners and members of their technical staffs on the other, and by the numerous published releases, suggestions and deficiency memoranda issued by one or another of these administrative bodies. No court can turn back the hand of time; and the plain unvarnished truth of the matter is that the intricate, highly sensitive and flexible syndicate system which

now serves its purpose so well, is perhaps to a large extent the product of legislation by the Congress and administrative rulings by those functioning under the authority of the Congress. The eggs cannot now be unscrambled. And if they could, *cui bono?* We must not forget that the law is a living dynamic force at all times responsive to the needs of society, and not a mere game in the playing of which judges move about quotations from earlier cases as one would shift kings and queens on a chess-board.[1]

## A. The Rule of Reason

■ The law is full of perplexities which mystify lawyers and laymen alike. Much of the difficulty is caused by endless and at times futile discussion of decisions rendered in earlier cases, with liberal quotations from opinions intended to apply to particular situations. This in turn leads to discussion of other cases and further quotations and the making of distinctions and explanations. Much of the confusion, especially in the field of antitrust law, is due to the fact that the breadth and scope of the Sherman Act are so general and so beneficent that lawyers and even judges often fail to heed repeated admonitions that each case must necessarily stand on its own legs, and that the conclusions reached in each depend largely upon the peculiar characteristics of the particular industry involved. That is why discussion of "loose-knit" and "close-knit", "vertical" and "horizontal" combinations, wholesale and retail "merchandizing", and "good intentions", the "elimination of trade abuses", "hardship" and so on is mere mumbo-jumbo which, far from leading to a solution of the questions of law involved, adds to the general confusion. Probably this is just another manifestation of how human nature works. Those of ripe experience in any craft rejoice in every opportunity to surround their skills with an air of mystery, by using an esoteric terminology; and lawyers who are specialists in patent, admiralty and antitrust cases are no exception to the general run of mankind.

In any event, plaintiff here relies especially upon general statements about price-fixing in the following cases: United States v. Trenton Potteries, 1927, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L. Ed. 1129; United States v. National Association of Real Estate Boards, 1950, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; United States v. Masonite Corp., 1942, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; Dr. Miles Medical Co. v. John D. Park & Sons Co., 1911, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502; United States v. Bausch & Lomb Co., 1944, 321 U.S. 707, 64 S. Ct. 805, 88 L.Ed. 1024; and United States v. Paramount Pictures, 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. Many others are referred to in the oral arguments and briefs but these are the ones chiefly relied upon, and the others do no more than apply the same principles to differing sets of facts.

Defendants, on the other hand, quote extensively from: Board of Trade of City of Chicago v. United States, 1918, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683; United States v. Columbia Steel Co., 1948, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533; Appalachian Coals, Inc. v. United States, 1933, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825; Prairie Farmer Pub. Co. v. Indiana Farmer's Guide Pub. Co., 7 Cir., 1937, 88 F.2d 979, certiorari denied, 301 U.S. 696, 57 S.Ct. 925, 81 L.Ed. 1351, rehearing denied, 302 U.S. 773, 58 S.Ct. 5, 82 L.Ed. 599; United States v. New York Coffee and Sugar Exchange, Inc., 1924, 263 U.S. 611, 44 S.Ct. 225, 68 L.Ed. 475, and many others, including most or all of those relied on by the government.

1. Cf. opinion of Judge Wyzanski, in United States v. United Shoe Machinery Corporation, D.C.Mass.1953, 110 F.Supp. 295.

I can find nothing in any of these cases which would permit me to conclude that the rule of reason has been abandoned or discarded. Moreover, the basic principles of the Chicago Board of Trade and the Appalachian Coals cases have never been repudiated. Indeed, these cases have been cited by the Supreme Court again and again over the years.

My own opinion is that the situation before me now is *sui generis*—none of the cases cited by either side is precisely applicable. Despite all the general condemnation of price-fixing, I find nothing in any of these cases which can be regarded as controlling precedent here or which binds me to hold the clauses of these syndicate agreements now under attack to be illegal per se under the Sherman Act.

We may accordingly, by an original and independent process, apply the rule of reason to the general methods used by the investment banking industry in making an orderly distribution or placement of a new issue of securities on behalf of an issuer.

That the underwriters and the members of the selling group or selected dealers have a certain practical relationship with the issuer, and form a team and act together under the supervision of the manager, is not disputed. Each performs his function or functions in an integrated, unitary transaction. They have a common purpose, they work together toward it, using jointly the efforts, reputation, and experience of all; and their community of endeavor has a value in the practical world which negates any possible inference that their association is a mere cloak for an agreement to fix prices in restraint of trade.

Those who participate as underwriters or dealers are in no sense competitors. When we speak of competitors nothing but confusion will follow unless we first determine what is the "it" for which the competitors are supposed to be competing. Perhaps a few months before the issue under discussion some of the participants were engaged in the underwriting and distribution of a quite different issue of securities, and others of another. But that can have nothing to do with the issue we are talking about. If, as is certainly the case, these participants and dealers are banded together in the enterprise of underwriting and distributing a particular issue, then by very definition they cannot be competitors. The necessary relation that each bears to the issuer makes it clear that they do not and cannot enter the syndicate as competitors, despite the fact that occasionally representatives or agents of one or two of the firms in the team may try to sell the bonds or stocks to the same customer. As SEC Commissioner Robert S. Healey wrote in the PSI [1] case, which will be more fully discussed later: "Having combined, it was proper for each quasi-partner to agree not to cut his other partners' throat."

The utility and reasonableness of the entire operation, and the fact that functionally it serves a legitimate business and trade-promoting purpose, is amply demonstrated by its unchallenged growth by a gradual process of evolution over a period of a half-century, more or less.

Furthermore, the syndicate system has no effect whatever on general market prices, nor do the participating underwriters and dealers intend it to have any. On the contrary, it is the general market prices of securities of comparable rating and quality which control the public offering price, as explained in the preliminary part of this opinion. Whether by bringing out one issue or many, none of these defendants nor any group of them acting together, have ever, so far as appears in this record, been so foolhardy as to attempt to control or in any manner affect general price levels in the securities market. The particular issue, even if a large one, is but an infinitesimal unit of trade in the ocean of security issues running into the billions, which constitutes the general market.

[1]. See infra, p. 698 ff.

According to plaintiff's claim, the purchase of a security issue from an issuer and its distribution to the public via underwriters and dealers is just the old story of a purchase and resale of commodities or a manufacturer's product with the well-worn scheme of price restrictions all down the line. But is it? In reality the investor either lends money to the issuer, if the issue consists of bonds or debentures, or he makes a continuing investment in the issuer's capital, if the issue is preferred or common stock. The document in the form of a bond or stock certificate, which is "sold" and delivered to the investor, is merely evidence of a relationship which is created, and the relationship survives loss or destruction of the document.

Of even greater significance are the basic underlying characteristics of the relationship between the issuer, the investor and the group of underwriters and dealers, who together serve the issuer in making the single, entire, unitary transaction possible by shaping up the issue, underwriting the risk and planning and carrying out the distribution. Purchases and sales, wholesaling and retailing, of commodities and manufactured products provide no parallel even remotely resembling the complicated and unitary group action necessary to the successful underwriting and distribution of a new and unseasoned security issue.

Defendants advance two arguments on the facts:

(1) "That the function of the investment banker in the capital funds market is not merely to buy and sell as a trader or wholesaler, but to furnish integrated investment banking services to the issuer who is seeking expert assistance in raising capital by a security issue flotation"; and

(2) "that the underwriting syndicate is an *ad hoc* common enterprise, limited in number of participants, in purpose, and in duration; and it

is a reasonable business combination having the purpose and effect of efficiently promoting, rather than restraining, trade."

█ I agree with both of these contentions, which are amply sustained by the evidence, and I make findings of fact accordingly.

Against this factual background of substance, such a purely fortuitous and incidental feature as the taking of title by the underwriters in severalty, as they now do, because of the changes in the law relative to general liability for material errors in registration statements, and in the amount and incidence of the tax on transfers, as explained in the preliminary part of this opinion on the history of the investment banking business, cannot possibly be controlling. To make it so would indeed make the law an ass. Nor does it make sense to separate the underwriting participants from the selected dealers as one might separate the sheep from the goats, simply because of the formal transfer of title from one to the other. It is axiomatic under the Sherman Act that matters of form must always be subordinated to matters of substance. Basically the underwriting participants and the dealers who constitute the selling group are in the same boat together, pulling in unison toward the same mark.

It matters not whether the members of the team be called "partners," "quasi-partners," "joint adventurers" or what not; the significant fact vis-a-vis the Sherman Act is that they are acting together in a single, integrated, unitary, cooperative enterprise, the purpose of which is not "raising, fixing, pegging, or stabilizing the price" of anything, nor the exercise of any manner of control over general market prices, but solely the distribution of a new security issue in an orderly manner.

It is for these reasons that the classic words of Justice Brandeis in the Chicago Board of Trade case have such pertinency. He wrote:[1]

I. 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683.

"But the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable."

■ The application of the rule of reason in accordance with this simple, fundamental formula does not leave the outcome in doubt on the facts we have before us here. It is upon the basis of these facts, peculiar to the business of raising new capital for issuers, whether by syndicates of underwriters proceeding in negotiated transactions or by public sealed bidding, that the Congress and the SEC evidently arrived at the same conclusion that I arrive at, namely, that the fixed-price type of public offering of new securities viewed in the large, and on the basis of methods now in common use by the investment banking industry, gives no offense to the Sherman Act.

But this is not to say that there may not some day come before the courts a series of underwriting agreements relating to some specific issue of securities in the future which, by virtue of the contemplated or actual period of continuance of price restrictions or the number and underwriting strength of the participants or the existence of other factors or attendant circumstances which we cannot now know, will warrant the courts in making findings of fact from which the conclusion of law will inevitably follow that such agreements are illegal under the Sherman Act. Nor do I say that there has never been any such in the past.

**B. The Securities Act of 1933, the Securities Exchange Act of 1934, and the Amendments Thereto; the Rules, Interpretations and Releases of the SEC Thereunder; and the Organization and Functioning of the NASD**

■ I shall not labor the point that the Securities Act of 1933, the Securities Exchange Act of 1934, and the various amendments thereto, including the Maloney Act authorizing the organization and functioning of the NASD in 1938 by adding Section 15A to the 1934 Act, are to be read together as one comprehensive scheme of regulation. Despite the vigorous and oft repeated claims to the contrary by government counsel, I find literally nothing of substance to support the view that the two statutes form separate, air-tight compartments, the 1933 Act applicable to new securities and the 1934 Act to those already issued and outstanding. The textual evidence that the two are to be read together seems in itself conclusive on the point;[1] and there would appear to be no reason to doubt that the Congress intended this interrelated pattern of regulation to reach all transactions whether

---

[1.] See the various provisions of both Acts giving the SEC broad powers to prohibit or regulate any and all securities transactions which may have the effect of manipulating the prices of securities, i. e., Sec. 17(a) of the 1933 Act, and Secs. 9, 10 and 15(c) of the 1934 Act. In administering these Acts the SEC has uniformly dealt with these sections as part of an integral plan to protect investors in the securities' markets generally, and has consistently held exchange transactions and over-the-counter transactions to be subject alike to these broad powers of prohibition and regulation. Sec. 17(a) of the 1933 Act, and Secs. 9 and 10(b) of the 1934 Act have remained in their original form. In 1936 and 1938, however, the Congress added to Sec. 15 of the 1934 Act certain additional specifications as to manipulative devices by incorporating subsection (c) therein.

on national exchanges or on the over-the-counter securities market. This is the view taken by the SEC; and a contrary view flies in the face of common sense and the objectives of the Congress in formulating and drafting this legislation.

The Securities Act of 1933 recognizes syndicates as a group means of distributing new securities.

> Sec. 2(11) "The term 'underwriter' means any person who has purchased from an issuer with a view to, or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. * *"

The disclosures required by the 1933 Act are to be incorporated in the registration statement, and no sales or offers to sell are permitted until the registration statement becomes effective, which is "the twentieth day after the filing thereof", 15 U.S.C.A. § 77h(a), with certain allowances for acceleration, which become applicable, for example, when the issuer files a so-called "price amendment" just before the issue comes out.

Sec. 6(a) provides: "A registration statement shall be deemed effective only as to the securities specified therein as proposed to be offered."

Sec. 7 requires the inclusion in the registration statement of information specified in Schedule A, of which subdivision (16) reads:

> "(16) the price at which it is proposed that the security shall be offered to the public or the method by which such price is computed and any variation therefrom at which any portion of such security is proposed to be offered to any persons or classes of persons, other than the underwriters, naming them or specifying the class. * * *" 15 U.S. C.A. § 77aa.

Rule 460 of the SEC also requires, within ten days after the security is initially offered to the public, a report on the actual offering price, and an explanation of any variation between the actual price and the proposed public offering price.

■ Especially in view of the words "any portion" contained in subdivision (16) of Schedule A, the clause "the price at which it is proposed that the security shall be offered to the public" must mean the entire issue. And, if so, the Congress has made specific provision for the fixed-price public offering of a new security issue, in accordance with the mode of floating such issues customarily used by investment bankers for many years. The intent is that the public shall know precisely what it is expected to pay for the security.

Many other provisions of the 1933 Act, and numerous rules and regulations of the SEC, are integrated with this basic clause in subdivision (16) of Schedule A, which is applicable to negotiated underwritten issues, and underwritten public sealed bidding transactions as well, in the field of security issues with which we are concerned in this case. Thus Sec. 6(b) requires the payment of a fee at the time of filing the registration statement "of one one-hundredth of 1 per centum of the maximum aggregate price at which such securities are proposed to be offered". Sec. 11, relative to civil liabilities for material errors or omissions in registration statements, according to the 1934 amendment discussed in the preliminary part of this opinion, is measured as to underwriters by "the total price at which the securities underwritten by him and distributed to the public were offered to the public."

The SEC's Form S-1 requires that the following information be set forth in

substantially the following tabular form on the first page of the prospectus:

| | Price to public | Underwriting discounts and commissions | Proceeds to registrant |
|---|---|---|---|
| Per unit ..... | | | |
| Total ......... | | | |

This is in accordance with Schedule A (15), (16) and (17) and Sec. 10(a) (1).

The SEC has ruled that these requirements as to "the price at which it is proposed that the security shall be offered to the public" are not complied with unless there is made "a bona fide attempt for a reasonable time to distribute the security at no more than such public offering price." This appears in Exchange Act Release No. 3807, April 16, 1946, which criticizes "free riders", who attempt to treat their allotments of securities in the distribution as their own unrestricted property, by holding them for a rise in the market.

That a bona fide public offering of the entire issue at the public offering price is required to be made within a reasonable time is recognized throughout the industry according to Harold L. Stuart. While this may seem to leave the matter somewhat to the conscience of those making the distribution, it is clear that a substantial and genuine effort must be made and anything short of such is apt to get the participating underwriter or dealer, who makes a purely perfunctory and colorable effort, in trouble with the NASD and the SEC.

By express statutory provision, Securities Exchange Act of 1934, Section 15A(n), the Rules of Fair Practice of the NASD are, when approved by the SEC, exempt from the application of the antitrust laws, if in conflict. This is not disputed.

The Board of Governors and the Advisory Council of the NASD have interpreted Rule 1[1] of Article III of the Rules of Fair Practice as requiring that (NASD Circular, March 13, 1950):

"Members have a moral obligation to make a bona fide public offering of securities acquired in a participation in an initial public offering."

And, for the purposes of this interpretation the NASD states that:

"* * * the term 'initial public offering' or 'period of original distribution' is intended to mean a sufficient period within which a bona fide public offering can be and has been made to the investing public, and investors have had an opportunity to purchase the issue at the initial public offering price."

While it does not appear that these interpretations have been passed upon by the SEC, they reflect the only meaning that can be reasonably attributed to the statutory language adopted by the Congress. Otherwise, "the price at which it is proposed that the security shall be offered to the public" has no practical meaning whatever.

On this point, as on so many others, the views of counsel for the government have changed radically as the trial progressed. At first they supported a species of "flash" theory, to the effect that there must be a period during which at least a portion of the security issue could be purchased at the public offering price by an investor, but that this period was a merely theoretical or instantaneous one and that no real offers or purchases need be made. When this fantastic view seemed to be pressing the matter too far, counsel receded to the position which as I understand it they take now, namely, that a bona fide attempt, for a reasonable time, to distribute the entire issue must be made, but that the syndicate clauses providing for 15, 20 or 30 days life to a syndicate or to price maintenance are illegal as not being necessarily measured in terms of "a reasonable time". This would seem to take the entire mat-

1. Rule 1, Article III of the NASD Rules of Fair Practice reads: "A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade."

694

ter out of the category of per se violations of the Sherman Act. Moreover, the government has offered no evidence to show that the prescribed period was in any particular instance in any way unreasonable.

One of the embarrassments under which counsel for the government have been laboring is that they insist that the provisions of the various Acts of Congress, and the various rulings of the SEC in administering these Acts, are in every way lawful and in strict accordance with the letter and spirit of the Sherman Act, whilst at the same time declaring that the basic clauses of the syndicate system constitute per se violations of the Sherman Act. The plain truth of the matter is that the legal questions now under discussion form an area of head-on collision between the SEC on the one hand and the Antitrust Division of the Department of Justice on the other.

We pause for an additional bit of practical background before proceeding to discuss stabilization and uniform concessions and reallowances, and clauses requiring repurchase or loss of commissions for failure to place the securities with investors rather than speculators, traders or "free riders".

In the case of most security issues the public offering price has been established so expertly that the issue is readily absorbed by the investing public at the public offering price. In such cases the statement in bold-face type in the prospectus, required by SEC Rule 426 under the 1933 Act, that stabilization activities may be employed to facilitate the offering of the securities, is commonly used, but means little, even though supplemented by the placing by the manager of an open bid in the market at the public offering price. Where the issue has been priced too low, both the SEC and the NASD require a bona fide offer of the entire issue at the public offering price; and a prompt distribution is inevitable as dealers and underwriters are not allowed to put the securities on their shelves for sale later at prices above the public offering price. Where the issue has been priced too high, however, or where war or the happening of some other catastrophe sends general market prices down, what actually happens? According to the record before me, if the dip in the market is of a minor character or if the issue, while well worth the public offering price in sound value, is for some reason not appealing at the moment, stabilization may help to tide over for a short interval the difficulty of placing a large issue with investors, under not particularly favorable circumstances.[1] But if there is a general market recession, or the issue has really been priced too high, no sensible manager would waste the funds of the syndicate by pouring them down a stabilization "rathole"; and the syndicate would be promptly terminated or the price lowered or the price restrictions removed entirely, in which event the underwriting participants and the dealers would be free to do whatever they wished with the securities they had taken down. Some might prefer to put the securities "on the shelf"; others might sell them for what they could get. In other words, stabilizing, as thus far sanctioned by the SEC in connection with new security issues, has had nothing to do with price fixing in the sense of the Sherman Act cases, but only as a means of assisting in the placement distribution of such issues in an orderly way. If the stabilization powers were used by way of manipulation in order to raise or fix prices or

1. This is to be distinguished from purchases in the open market by the manager for the purpose of covering "over-allotments." Knowing that some may decline to participate and others may refuse to take all of what he proposes to allot to them, the manager will sometimes allot and offer more than he has, hoping to come out even. If then all accept, he has an "oversold" position. Whether or not the SEC will regard this as stabilizing becomes a question of the original intention of the manager.

do anything other than to facilitate an orderly placement of the securities, there is ample reason to suppose that the SEC, pursuant to its undoubted statutory powers on the subject, would promptly issue a new rule or regulation putting a stop to such manipulation.

After these preliminaries we come to the question of what are the provisions of the statute relative to stabilization? [1] The long and short of the matter is that the Congress decided not to prohibit such activities, or to include any specific statutory regulation thereof, but left it to the SEC to prescribe appropriate rules and regulations.

The Senate Committee Report of April 17, 1934, reporting on the bill of which Title I became the 1934 Act and Title II the most important amendments yet made to the 1933 Act (No. 792, 73d Cong., 2d Sess., 1934, pp. 8–9) states:

"The impropriety of practices such as 'pegging', or fixing or stabilizing the price of a security has received most careful consideration by the committee. The committee recommends that such practices be not abolished by statute but subjected to regulation by the Commission."

In similar fashion House Report No. 1383 of April 27, 1934, on the same bill, states (p. 10):

"The evidence [as developed by the Senate Committee on Banking and Currency] as to the value of pegging and stabilizing operations, particularly in relation to new issues, is far from conclusive. While abuses are undoubtedly associated with such manipulation, because of the desire of the committee to proceed cautiously such operations have not been forbidden altogether, but have been subjected to such control as the administrative commission may find necessary in the public interest or for the protection of investors."

And (at p. 21):

"Many experts are of the opinion that the artificial stabilization of a security at a given price serves no useful economic function. On the other hand the practice has been widespread on the part of many investment bankers who regard it legitimate, particularly if the public is aware of the plan. Instead of being prohibited, therefore, this practice is left to such regulation by the Commission as it may deem necessary for the prevention of activities detrimental to the interests of investors."

And that is precisely what the Congress proceeded to do by the provi-

1. It is interesting to note that the Dickinson Report transmitted to the House Committee on Interstate and Foreign Commerce and the Senate Committee on Banking and Currency by President Franklin D. Roosevelt on January 25, 1934 dealt extensively with this subject, in which this interdepartmental committee, headed by John Dickinson, under appointment by the Secretary of Commerce, had evinced special interest during the course of its investigation. Mr. Dickinson was an Assistant Secretary of Commerce and his committee was one of considerable distinction, including among its members, A. A. Berle, Jr., James M. Landis, later to become chairman of the SEC, Henry J. Richardson and Arthur H. Dean, of counsel for several of the defendants in this case. See comments on the operation of the syndicate system and stabilizing transactions connected therewith (Report, pp. 13–15). The general recommendation is study and regulation. This report was submitted shortly before the hearings on the bills which, after a certain amount of redrafting, subsequently became the Securities Exchange Act of 1934. See also testimony of Thomas G. Corcoran, a co-author of the bill, before the Senate Committee (Hearings before Senate Committee on Banking and Currency on S. 2693, 73d Cong., 2d Sess. 1934, p. 6512) and that of Thomas G. Corcoran and James M. Landis, then a Commissioner of the Federal Trade Commission engaged in administering the Securities Act of 1933, before the House Committee (Hearings before House Committee on Interstate and Foreign Commerce on H.R. 7852 and 8720, 73d Cong., 2d Sess. 1934, pp. 114 and 21).

sions of Sec. 9(a) (6), which relates to "pegging, fixing, or stabilizing the price" of any listed security. This subdivision of Sec. 9 is not self-operating but contemplates implementation through Commission rules and regulations.

Thus Sec. 9(a) (6) makes it unlawful:

"To effect either alone or with one or more other persons any series of transactions for the purchase and/or sale of any security registered on a national securities exchange for the purpose of pegging, fixing, or stabilizing the price of such security in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

And this is supplemented by Sec. 10, relative to manipulative and deceptive devices employed in connection with the purchase or sale, not only of any security registered on a national securities exchange but also of "any security not so registered". So that these sections, together with Sec. 17 of the 1933 Act and Sec. 15(c) (1) of the 1934 Act, added by amendment in 1936, cover every possible loophole and have the general effect of providing that stabilization, a well-known species of manipulation, should not be outlawed but should be subject to such rules and regulations as might be formulated by the SEC.

The language of these various sections is, by reason of the subject matter, technical; but the intent is plain. No distinction is or should be made between securities already outstanding and those currently issued. The scheme of regulation is made broad and general as well as flexible; it includes listed and unlisted securities, those traded on national exchanges and those dealt with in the over-the-counter market. Any other interpretation would be contrary to the whole spirit of the statutory scheme and to the expressions found in the Senate and House Reports above referred to.

The integration of the 1933 Act and the 1934 Act relative to stabilization is reflected in various rules and regulations of the SEC.

Thus, pursuant to authority found in Sec. 17 of the 1933 Act, the SEC adopted Rule 426 (formerly Rule 827) requiring a statement in bold face type "either on the outside front cover page or on the inside front cover page of the prospectus", if "any of the underwriters knows or has reasonable grounds to believe that the price of any security may be stabilized to facilitate the offering * * *." And Rule X–10B–5, issued under Sec. 10(b) of the 1934 Act, and applicable alike to newly issued and already outstanding securities, significantly uses in effect the substantive language of Sec. 17(a) of the 1933 Act. Cf. Rule X–15C1–2; and Items 23(a) and (b) of Form S–1, under the 1933 Act, which require disclosure in the registration statement of prospective stabilizing activities.

Rule X–17A–2 requires that full information be filed with the SEC with respect to all purchases and sales of a security being stabilized by "the manager of the stabilizing syndicate." (Exchange Act Release No. 2008.) See also Form X–9A6–1, relative to the giving of notice of intention to stabilize.

It would serve no useful purpose to discuss in greater detail the various releases issued by the SEC on this subject. Suffice it to say that there is ample evidence of a belief on the part of the SEC that it has the power to promulgate, whenever in its judgment it is necessary or expedient to do so, "in the public interest or for the protection of investors," such rules and regulations concerning the stabilization of new issues of securities as circumstances may require, or even to prohibit such stabilization entirely. (See especially pp. 22–3, 41, of the SEC opinion in the PSI[1] case, Securities Exchange Act Release No. 3700, quoting from Securities Exchange Act

---

1. See infra, p. 698 ff.

Release No. 2446 and commenting thereon.) The fact that it has not done so is perhaps to some extent due to the organization and functioning of the NASD, pursuant to the terms of the Maloney Act, and to the fact that the thousands of reports already on file relative to such stabilizing activities indicate that no such rules or regulations are as yet, in the judgment of the SEC, necessary or desirable. Cf. SEC "Statement" of March 18, 1940; Barrett & Co., 1941, 9 S.E.C. 319, 328; Masland Fernon and Anderson, 1941, 9 S.E.C. 338, 345, 347.

Turning to clauses for repurchase or withholding of commissions, the so-called "penalty clauses", it will be found that such clauses are entirely consistent with SEC registration requirements. That these clauses serve the purpose of orderly distribution and are intended, and often expressly stated, to be applicable where the securities have "not been effectively placed for investment", is reflected in Item 23(c) of Form S–1, the general form for registration of securities under the 1933 Act, which requires a statement concerning any arrangement for "withholding commissions, or otherwise to hold each underwriter or dealer responsible for the distribution of his participation."

In view of what has already been said, it would not seem to be necessary to comment on the uniform selling concessions, discounts and reallowances, except to point out that, in discussing Schedule A(16) and (17) of the 1933 Act the opinion of the SEC in the PSI[2] case states:

"Clearly the fixing of an offering price to the public, and an agreement or understanding as to fixed commissions or discounts, are contemplated by the Securities Act."

The fundamental problem would seem to be the same whether viewed with relation to general uniform price offerings or with relation to uniform concessions, discounts and reallowances.

Do the provisions of the Act of 1933 and the Act of 1934 (except the Maloney Act) amount to an implied exemption, in whole or in part, from the provisions of the Sherman Act? In my opinion they do not. Where it was thought desirable and necessary to do so the Congress made specific provision for such exemption, as in Sec. 15A(n) of the Maloney Amendment to the 1934 Act, where it was thought that the Rules of Fair Practice of the NASD might run afoul of the Sherman Act.

It must be borne in mind that this whole statutory scheme was worked out with the greatest care by members of the Congress thoroughly aware of antitrust problems, often in close contact and cooperation with those who were later to administer the intricate phases of this well articulated and comprehensive plan of regulation of the securities business, and in possession of the fruits of many prolonged and penetrating investigations. They intended no exemption to the Sherman Act; and it is hardly probable that they would inadvertently accomplish such a result. The real point is that all those who worked together on the formulation of this most significant and beneficial legislation went about their task of integrating into the statutory pattern the current modes of bringing out new security issues then in common use by investment bankers generally, with complete assurance that no violation of the Sherman Act was even remotely involved. This recognition by the Congress of the legality and utility to the American economy of the general features of the syndicate system cannot lightly be disregarded by any court or judge.

That the so-called Reece Bills, the first of which was introduced in the House on August 22, 1944 (H.R. 5233, 78th Cong., 2d Sess.), shortly after the filing by the Antitrust Division of its brief in the PSI case on February 10, 1944, never came out of committee need cause no

---

2. National Association of Securities Dealers, Inc., Exchange Act Release No. 3700, June 13, 1945, at p. 40.

surprise.[1] These Bills were an ill-considered attempt to legalize certain features of the uniform-price offerings of new securities generally, without reference to the attendant circumstances of their use in particular cases, and had little merit. If passed by the Congress the effect could not have been otherwise than to muddy the waters.

## C. The Opinion of the SEC in the Public Service Company of Indiana Case [2]

Rule 1 of the Rules of Fair Practice of the NASD, approved by the SEC, provides:

> "A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade."

On December 7, 1939, under the management of Halsey Stuart, there was placed on the market an issue of $38,-000,000 of First Mortgage 4% Bonds of Public Service Company of Indiana. There were 67 underwriters and 396 selected dealers. The Agreement Among Underwriters and the Selling Agreement contained price maintenance, "penalty", stabilization, uniform concession and reallowance, and other clauses, such as have been attacked here as illegal per se under the Sherman Act. Title to the bonds was taken by the underwriters in severalty and the selected dealers similarly took title to the bonds for which they subscribed and which they took down. The Selling Agreement provided that it would terminate at the close of business on February 7, 1940, but that Halsey Stuart might extend it for not more than 60 days, or terminate it, whether or not extended, without notice. The Agreement Among Underwriters was to terminate 30 days after the termination of the Selling Agreement, except that it could be extended by Halsey Stuart upon the consent of underwriters who had agreed to buy an aggregate of more than 50% of the bonds, and except that Halsey Stuart could terminate the agreement any day after the date of settlement with the issuer, without notice, whether or not extended.

The issue was "sticky" and there were numerous breaches of the price maintenance provisions of the agreements, both by underwriters and by members of the selling group. Distribution was not substantially completed until March 18, 1940, at which date Halsey Stuart terminated the Selling Agreement. It will be recalled that the invasion of Poland began on September 1, 1939.

Disciplinary action by the NASD for alleged violation of Rule 1 resulted in the imposition of a number of fines on the offending members of the NASD; and in the course of time the proceedings resulting in such disciplinary action came on for review in the SEC under Sec. 15A(n) of the 1934 Act as amended.

We need not concern ourselves with the elaborate arguments advanced by the parties on the question of whether or not the NASD had power to impose the fines. Suffice it to say that a majority of the SEC found that such action was not warranted and the orders imposing the fines were reversed. But, in the meantime, and at the close of the hearings before the trial examiner, the Antitrust Division of the Department of Justice intervened and, on February 10, 1944, filed a brief attacking the various clauses of the agreements above referred to as per se violations of the Sherman Act. The same position was taken by counsel for the Trading and Exchange Division of the SEC. The filing of the brief by the Antitrust Division fell like a bombshell on the investment banking industry.

The antitrust issue thus raised was given the most careful and exhaustive examination. Having been requested by

---

1. The second of the two Reece Bills is H.R. 1626, 79th Cong., 1st Sess., introduced January 18, 1945.

2. National Association of Securities Dealers, Inc., Exchange Act Release No. 3700, June 13, 1945; referred to in this opinion, supra, pp. 118, 122, 129, 144.

the Antitrust Division to pass on the legal and factual questions involved, the SEC did so; and illuminating and well-reasoned opinions resulted. Chairman Purcell and Commissioners Pike and Healy agreed that there was no per se violation of the Sherman Act. The concurring opinion of Commissioner McConnaughey does not discuss the merits of the antitrust issue, but there is no indication of disagreement with the other Commissioners thereon. Commissioner Healy agreed with the Chairman and Commissioner Pike on the antitrust phase of the case but thought the NASD had properly interpreted its Rule 1. Much of the factual material in the opinions relating to the history and development of the syndicate system was verified and authenticated by Harold L. Stuart on his cross-examination, and forms a substantial basis for part of the preliminary portion of this opinion. My only disagreement with the SEC is on the subject of implied exemption of stabilizing transactions from the provisions of the Sherman Act. The opinion concurred in by Chairman Purcell and Commissioner Pike appears to consider the various statutory provisions relative to stabilization, which have been discussed supra, as having "removed that problem from the scope of the Sherman Act." Counsel for Morgan Stanley and Harriman Ripley agree with the Commission on this point. I do not.

 It will serve no useful purpose to set forth quotations from what the SEC has written on the antitrust questions thus placed before it. The general conclusion, with which I am in complete agreement, is:

"Our views on the application of the antitrust laws to the securities field may be summarized as follows: the mere making of agreements containing provisions for a fixed offering price, price maintenance and stabilization is not per se unlawful. But, like many other contracts, these may be entered into and performed under circumstances that amount to an unlawful suppression of competition."

 These views are not binding upon me, or upon any other court or judge; but they are persuasive and helpful, especially as they are those of public officials of ripe experience in dealing with this very subject matter from day to day. Moreover, the very commissioners who expressed these views had been in close cooperation with the members of the Congress who formulated the terms of some of the statutory provisions under consideration. After all, these antitrust problems are largely factual and their true solution depends in the last analysis upon an intimate familiarity with the characteristic features of the particular industry in which these problems arise.

### Some Interim Observations

Before leaving the syndicate system and the general subject of the history and development of the investment banking business, it will perhaps be helpful to consider, in a preliminary and tentative fashion, the bearing of such matters upon the charge of an integrated, over-all conspiracy and concert of action between these 17 defendant investment banking firms. If, on the important and fundamental phase of the case which has just been examined, there was no joint action nor any combination by the seventeen acting as a group, lack of such concerted action among them may likewise appear in other phases of the case as well. The process of reasoning by which the use of the syndicate system, the opposition to the campaign for compulsory public sealed bidding, the alleged "Pink" agreement, the so-called infiltration of boards of directors of issuers and a host of other minor issues were brought in to support the "triple concept" charge of "traditional banker", "historical position" and "reciprocity" was that only in such fashion could the alleged conspiracy be proved. There is much to be said in support of this reasoning; but the converse of it is equally sound. As each of these several

props to the government charge is disproven and thus eliminated, the structure as a whole finds less and less support. The principal factual issue in the case from first to last has been whether or not there was any joint action, combination or conspiracy as between the seventeen defendant firms.

It was only after the connecting statements and oral arguments at the close of plaintiff's case, and after some months of study of the evidence as a whole, that I at last came fully to appreciate why government counsel, and defense counsel as well, had so earnestly insisted that all the principal phases of the charge must be taken into consideration. At first it seemed to me that the "triple concept" charge could well have been thoroughly examined and the rest eliminated or greatly reduced in scope. But as I proceeded to study the mass of detail it became more and more apparent that counsel for the government had perhaps taken the only course open to them. The basic facts about "reciprocity" and "historical position" were such that it might well in the end be clear that the "traditional banker" part of the "triple concept" could scarcely stand up in isolation and without substantial support from the balance of the alleged conspiratorial scheme. In the final analysis, it might come down factually to one of two possibilities: either the all pervasive, integrated, over-all conspiracy existed or there was no conspiracy at all. Differently expressed, one might be forced by the facts of the case to the conclusion that nothing short of the entire scheme as charged, with its theoretically perfect articulation and symmetry, could have been expected by hard-headed and experienced business men in their sound minds, to have had even the slightest hope of success. In a circumstantial evidence case there must always be the possibility of a negative as well as of a positive answer.

It now appears that counsel for the government have been led astray in connection with their claims relative to the syndicate system by a fundamental, factual misconception of the way investment bankers in general function and have functioned for many years. It will soon appear that this same misconception of the basic facts runs through the entire case. The problem of elucidating this mass of evidence and doing so in such fashion as to hold up to view from time to time the framework constructed in the complaint is not easy of solution. It must be constantly kept in mind that we are dealing with a multiplicity of alleged restraints all supposed to be cunningly devised and fitted together by these defendants.

It would put the whole case out of focus and perspective if I proceeded to discuss the "triple concept" of "traditional banker", "historical position" and "reciprocity" without first reviewing the evidence which it is claimed demonstrates that, in other ways, the seventeen defendant investment banking firms combined and conspired together to dominate and control the financial affairs of issuers, so that new issues of the securities of such issuers should be brought out by the negotiated underwritten method in connection with which the "triple concept" could operate, and then be parceled out to the conspiratorial "traditional bankers". For, if issuers were free agents, they could always turn to any one or more of the dozens of other competent and well-equipped investment bankers, said to be eager to get the business but unable to do so because of the operation of the combination and conspiracy of the seventeen. Private placements and agency transactions were always available, too. The fact that certain of the leading firms had, as is alleged, agreed not to compete for business against their co-conspirators who were "traditional bankers", would not bind such other leading firms as Halsey Stuart, Merrill Lynch Pierce Fenner & Beane, Salomon Bros. & Hutzler, Lazard Freres, Paine Webber Jackson & Curtis and many others who were admittedly not in the alleged combination or conspiracy. No amount of judicious parcelling out of

occasional participations to these so-called independent firms would suffice to induce them to refrain from competing for the much more lucrative managerships, which carried so much kudos, and were concededly coveted by all investment bankers so staffed as to be able to handle the business. In the absence of substantial domination and control of issuers, as alleged, the "triple concept" charge may come down to mere dialectics.

## PART IV

**Did the Seventeen Defendant Investment Banking Firms Combine for the Purpose of Dominating and Controlling and Did They in Fact Dominate and Control the Financial Affairs of Issuers by Directorships and Solicitation of Proxies?**

As with so many other phases of the case the government charge of domination and control of issuers by the 17 defendant firms acting in concert underwent a very considerable shrinking process as the trial proceeded; and substantially all that remained at the close of the case was the "red flag" or "signpost" claim, supplemented by a certain amount of fragmentary material relating to the possible use of confidential information by one or two of the defendant firms and a showing that at times a director who was a partner, officer or employee of one of the defendant firms withdrew from the meeting when the issue was voted on or otherwise showed consciousness of the inconsistency between his position as a director and his interest arising out of the profit his firm might make out of the transaction, and other miscellanea all of which have been carefully considered, but which require no discussion other than as stated herein.

The charge in the complaint as amended is comprehensive and explicit. Paragraph 44 alleges:

"44. The conspiracy has consisted of a continuing agreement and concert of action among the defendants, the substantial terms of which have been that defendants:

\* \* \* \* \* \*

"E. Agree to influence and control the management and financial activities of issuers, among other means—

"(1) By severally securing the appointment or election of directors, officers and members of protective committees, of issuers who, in addition to the performance of their duties, as such, would promote the interests of securing further underwriting business for each of the several defendant banking firms.

"(2) By causing the voting power of large blocks of stock held by investment trusts and others in security issuing companies to be exercised in the interests of securing further underwriting business for the defendant banking firms.

"(3) By inducing and utilizing friendly or allied stockholders of issuers, commercial banks, and other financial institutions serving the financial needs of issuers to influence such issuers to favor defendant banking firms in the sale of security issues.

This is supplemented by the following paragraph.

"45. During the period of time covered by this complaint, and for the purpose of forming and effectuating the conspiracy, the defendants, by agreement and concert of action, have done the things they agreed to do as hereinabove alleged, and, among others, the following acts and things:

"A. Defendants formulated and adopted, subsequently operated, and now operate pursuant to, among others, the following restrictive customs and practices:

\* \* \* \* \* \*

"(10) Defendant banking firms maintain and preserve their relationships with issuers by achieving and continuously exercising an ef-

fective degree of influence and control over the financial and business affairs of issuers. In many instances, they have severally caused one or more of their partners, officers, or other nominees to be appointed or elected to the board of directors or as an officer of issuers for whom they severally act as financial adviser or from whom they severally purchase security issues. Such appointees thereafter develop, and are in a position to exert, within the issuers' organization, strategic influence against the employment of other investment bankers and against the disposal of security issues by methods or under circumstances not favored by defendant banking firms. * * *."

The charge about "members of protective committees" in subdivision (1) of Paragraph 44E was eliminated; subdivision (2) of Paragraph 44E, together with its counterpart Paragraph 45A (11), was withdrawn in its entirety; the charge in Paragraph 44E(3), as supplemented by Paragraph 45A(12) and (13) relative to utilizing the influence of "commercial banks, and other financial institutions serving the financial needs of issuers" was withdrawn, except as to J. P. Morgan & Co. and the Guaranty Trust Company of New York, and no substantial evidence was offered in support of the charge as thus limited. Further allegations on the subject of domination and control, relating to "securing clearances from * * * issuers before making available to competing business enterprises" the facilities of defendant firms, refusing "to act as advisers or as underwriters for small business concerns," the encouragement and promotion of "consolidations, mergers, expansions, refinancings, and debt refundings," and the alleged agreement "to concentrate the business of purchasing and distributing security issues in a single market," contained in Paragraphs 44F, G and H, were all abandoned and withdrawn. The reference to influence and control of "business" affairs of issuers in Paragraph 45A(10) was deleted.

There were many colloquies on the subject of whether government counsel intended to charge joint or group action by the 17 defendant firms on the subject of directorships. It is plain to me that such is the clear meaning of the allegations above quoted, but counsel for the government seemed reluctant to take this view.

Probably the government position is sufficiently clearly stated in the following:

"The Court: Either this matter of directors goes to the heart of the case or it is just on the periphery, and if it is just on the periphery and relates only to a few defendants and is not something that they agreed to and adhered to together, then its importance is certainly less than it would be if it was one of the terms of the alleged agreement.

"Mr. Kramer: The part your Honor read [Paragraph 45A(10)], the government says, is not a term of the conspiracy, but it does relate to each of the defendants."

And, about six months later:

"The Court: I thought the thrust of the directorship was the idea that I was told at the very opening of the trial, a red flag to the other conspirators to hold off. I hadn't understood that it was illegal or any violation of the Sherman Act for a firm, an investment banking firm, to have a man on the Board and to tell him, 'Now, Joe, you go out and get this business. We really want it.'

"Mr Piel: That is right. I don't think Mr. Kramer contends anything different from that.

"The Court: All right.

"Mr. Piel: But he does claim that the alleged conspiracy has as one of its terms that representatives of the defendant conspirators will go on boards of directors not to represent their own firms but to represent the

conspiracy to influence and control the affairs of the issuers.

"The Court: That is right.

"Mr. Kramer: That is right, not only to represent their own firms.

"Mr. Piel: That is the other half of his claim on the subject.

"Mr. Kramer: That is very well put."

Throughout the case government counsel have frankly recognized the fact that the use of a directorship to further competition for investment banking business gives no offense to the Sherman Act. Thus in the closing statements one of the government counsel said:

"If this was a free, open competitive business without a conspiracy operating therein, what conditions would we find?

\* \* \* \* \* \*

"4. You would find a member of an investment banking firm on a board of directors of an issuer, and that aside from the moral or legal question as to whether they are entitled to so act, but you would find that, your Honor, because one of the keenest competitive maneuvers there is in the investment banking business would be to put a director on a board of an issuer; he would be the man the issuer might be looking forward to for financial advice."

And the record discloses many other ways in which having a partner, officer or employee on a board of directors of an issuer may be used competitively.

In fact, as we shall see, there were about as many different policies toward directorships as there are defendant firms in the case. Goldman Sachs and Lehman Brothers, largely influenced by the character of their business and their historical background, had partners and employees on the boards of directors of a large number of issuers, especially in the marketing and merchandising field, but also generally. Earle Bailie, who was Chairman of the Board of Union Securities, wrote to Fitzpatrick of the Chesapeake & Ohio Railway Company in 1938, when Bailie was a director of the C. & O.:

"The ideas I have expressed above are simply my preliminary thoughts on the subject which I am passing on to you for whatever they are worth. I have not discussed them with any other director. I have not, of course, discussed them with any banker. You already know my ideas about the propriety of unauthorized conversations with bankers by directors \* \* \* I do not want my firm to have any financial connections with the Chesapeake & Ohio or any of its affiliated companies as long as I am a director of the Chesapeake & Ohio."

In strong contrast to the course previously followed by J. P. Morgan & Co., Morgan Stanley had and maintained a policy of keeping to a minimum, participation by its partners on the boards of directors of issuing companies. In the entire period 1935–1949, Stone & Webster did not manage a single underwritten new negotiated transaction for an issuer on whose board of directors there was any officer or employee of that defendant firm.

It would serve no useful purpose to attempt to resolve the controversy over whether or not these directors were the "representatives" of their respective firms. It is natural enough that they should sometimes be referred to as "representatives" of this or that investment banking house. But no legal connotation was intended or is to be inferred as a general proposition. Sometimes they were put on for the specific purpose of representing their firms in a limited way; in many instances they were not.

### Proxies

Before proceeding to discuss the evidence it will be well to mention another subject which loomed large in the beginning, but which has now receded into the shadows. One of the "practices" charged against all the defendants in the government's trial brief on the facts, was that of systematically caus-

ing a wide distribution of the stock issues of an issuer and then getting "control of the proxy gathering machinery of their issuers so that they could secure votes for perpetuating such a friendly management or for ousting an unfriendly management."

Proof of this phase of the case collapsed entirely; and there was no reference whatever to it in the closing statements of counsel for the government, who assured me: "We haven't left out anything that we think your Honor ought to consider or needs to consider in ruling on the motions to dismiss." This was in accordance with the spirit and intent of my Pretrial Order No. 3, so that my consideration of this colossal record should not be made so burdensome as to prevent a determination of the issues within a reasonable period of time.

There was some evidence that Goldman Sachs helped a few issuers in connection with proxy gathering; there are incidental references to the subject in evidence introduced against two or three other defendant firms. As to the rest the record is silent. There is no evidence whatever to support the claim that a wide distribution of stock issues was ever made by any defendant for such a purpose; and the most that can be inferred against Goldman Sachs is that the solicitation of proxies in the few instances where this was done, notably for the B. F. Goodrich Company, was at the request of the management and probably as a service which might ingratiate the firm with the executives of the company and thus give the firm some competitive or other advantage later on. The charge as made is without any foundation in fact.

Were there any domination and control of issuers one would suppose that numerous witnesses would be available to testify in support of the charge. The documents in evidence bring into sharp relief a considerable number of company executives of dynamic and fearless personalities, who were far from being "in the pockets" of the defendant banking firms or any of them. And yet only one

financial or executive officer of an issuer was called. Robert R. Young, Chairman of the Board of the Chesapeake & Ohio Railway Company, proved an unfortunate choice. It is difficult for me to picture him as under the influence and control of anyone; and anyone who tried to influence and control him would probably live to regret it. He seemed eager to renew his old controversy with the Guaranty Trust Company of New York, which went back to 1938 and 1939, and issued fulminations against what he called "The House of Morgan", composed of J. P. Morgan & Co., Morgan Stanley and the Guaranty Trust Company of New York, and Earle Bailie, Tri-Continental and Selected Industries together as "a Morgan banking satellite"; but such picturesque expressions added little of probative force to the case; and he frankly admitted that he never had any trouble finding investment banking houses, including a number of the defendant firms, to compete for his business.

The government might have called J. Spencer Love, President of Burlington Mills, but it did not. And a scrutiny of the numerous Burlington Mills documents in evidence plainly shows the reasons for not calling him, despite some of the statements in his letters.

### Burlington Mills

It so happens that many letters and memoranda, supplemented by deposition testimony, are in evidence on various phases of the government charge, all having to do with transactions between a number of investment bankers, including several of the defendant firms, and J. Spencer Love, whose career in the textile field is described as "meteoric." As with most of the other documentary evidence, government counsel are interested in detached phrases, sentences or paragraphs, containing language thought to be helpful to the plaintiff's case. But here we have a substantial sequence, enough, taken together with the static data relative to a long series of security issues of Burlington Mills, to give a fairly clear picture of the way investment

bankers compete against one another and the shrewd and effective measures taken by corporation executives to get the most out of the investment bankers by way of services, suggestions and prices. This series of documents is of special significance as government counsel rely upon them so heavily and refer to them again and again.

In connection with the charge of domination and control of issuers, some of Love's letters are stressed because he states in one of them, with reference to William J. Hammerslough, a partner of Lehman Brothers, "we didn't elect him on the board to tie ourselves in with Lehman Bros. but because we wanted an outside director and we thought he was a man of ability and skill and that he was interested in us."

In another, Love writes:

"Invariably, when we meet other people who might be people to be helpful to us, we meet with the response that we are a Lehman company and that others aren't going to approach us or be interested in us as long as we are so known. They feel that everything they might propose to us would go right straight to Lehman because of your being on our board."

The letters would indicate that Love was unable to get suggestions from other investment bankers, lacked "a free opportunity to select our own syndicate," and would be better off if he could get Lehman Brothers "in much less of a dominating position." My own conclusion, in the absence of testimony by Love himself, and from the documents and deposition testimony, is that Love was a "tough" and canny trader, who from first to last sat in the driver's seat alone, who took the initiative in the selection of several members of the syndicates and who over the years and from issue to issue had the advice of, and the full benefit of competition by, a number of investment banking firms, defendant and non-defendant, in addition to Lehman Brothers, including Union Securities, Kidder Peabody, Blyth, Commercial Investment Trust and Merrill Lynch. He was also to some extent in touch with Dickson of Greensboro, N. C., where Burlington Mills was located and Wertheim. Far from being "dominated," it was Love who kept the investment bankers constantly on the qui vive and traded them off against one another. *Non teneas aurum totum quod splendet ut aurum.*

If at times Lehman Brothers told Love "that we considered ourselves to be Burlington's bankers and that we felt he should discuss any new financing with us first," this was merely a competitive maneuver, which, as it turned out, had no effect whatever on Love. Indeed, he turned it to his own advantage in the correspondence which later ensued. And it is not without significance that, in the period 1935–1949, Burlington Mills brought out no less than eight issues of securities by private placement, without using the services of any investment banker.

The negotiated underwritten issues shape up as follows: April 14, 1937, $3,578,000 of common stock, co-managed by Commercial Investment Trust and Lehman Brothers; December 11, 1940, $4,240,000 of convertible preferred stock, managed by Lehman Brothers; September 23, 1942, $2,562,000 of convertible preferred stock managed by Lehman Brothers; March 3, 1943, $6,792,000 of cumulative preferred stock, co-managed by Kidder Peabody and Lehman Brothers; July 3, 1945, $15,600,000 of preferred stock managed by Kidder Peabody alone; and, finally two issues of $5,000,000 and $10,400,000, preferred and convertible second preferred stocks respectively, on February 20, and April 10, 1946, both managed by Kidder Peabody alone.

If the "traditional banker" and "red flag" devices or practices had been functioning Kidder Peabody would have refused to compete for the business. When Love, after the original solicitation of business in 1939 or 1940 by Albert H. Gordon of Kidder Peabody, approached Gordon in December 1942 or January 1943, Gordon made no attempt to get

"clearance" from Lehman Brothers. Indeed, Love and Gordon, each with different motives, were careful to keep their negotiations to themselves. Lehman Brothers had no suspicion or intimation of what was going on; but Love was careful to send Gordon a copy of his long complaining letter to Gutman of Lehman Brothers of January 23, 1943. The last paragraph of this letter is a masterpiece of shrewd negotiation. It reads:

"In writing this letter, please do not feel that we are unmindful of the many constructive things that you have done for us and the friendly relationship that has always existed. We hope that we can work things out so that this relationship will not be in any way seriously disturbed and that our future operations can be strengthened and be handled in such way that all of us may ultimately benefit."

This would keep Lehman Brothers on their toes and impress them with the fact that the "friendly relationship" still existed. As a copy went to Kidder Peabody it would be clear to that firm that they might get the business, but would have to give the best possible service and the best possible terms in order to get it. The net result was exactly what Love had hoped for, the issue came out with the dividend rate for which he had been contending, and Kidder Peabody and Lehman Brothers managed the issue together.

But this was the very thing the conspiracy was supposed to have been formed to prevent, according to the claims of government counsel.

To make matters worse, Kidder Peabody succeeded in ousting Lehman Brothers from the co-managership; and one cannot help feeling that the state of mind which led Love, on August 5, 1944, to ask for Hammerslough's resignation as a director of Burlington Mills, had been inspired at least to some extent by the competitive efforts of Kidder Peabody to get Lehman Brothers out of the

picture entirely. And when Lehman Brothers tried to hold onto their joint managership by taking the matter up with Love, Gordon testified on deposition, that he told Love "we did not think anything would be served by having them joint manager in the issue; we thought that the company would be better off if it relied on us alone." Ironically, too, Gordon of Kidder Peabody ultimately and in the spring of 1948 became a director of Burlington Mills, despite Love's statement in his letter to Hammerslough of August 5, 1944, that he had reached the conclusion that Burlington Mills ought not to have on its board any "banker or lawyer or efficiency expert, or even an outside textile man" or anyone else who would "likely be doing direct business with us."

What the record shows of the unsuccessful competition of Union Securities and Blyth is in bare outline but, against the background of Love's equivocations and trading proclivities, and in a practical rather than a theoretical business world, it is sufficient to indicate that the first attempt by each of these firms with Love was to get a participation, and the contact thus made was followed by suggestions and other competitive measures, designed to lead to the managership or co-managership of some or all of the securities business of Burlington Mills.

On February 2, 1942, Gutman of Lehman Brothers wrote to Love, acceding to Love's suggestion that Union Securities be given a participation "in any Burlington financing." As early as July, 1941, according to a memorandum of July 30, 1941, by Siff of Lehman Brothers, Love told Siff that "Joe King" of Union Securities "had called him last week." Correspondence with King ensued and King was not only prompt to make suggestions, but was soon talking to Siff in terms of what "we" should do in the matter of formulating a "joint opinion and program for future financing." It was in this connection that Siff in a memorandum to Hammerslough, wrote:

"I would recommend that you do not call King on this, and that in any dealings with Love you take the position that Lehman Brothers are bankers for the company and any discussions regarding additional financing should be carried on through to a conclusion with us before discussions are entered into with Union Securities or anyone else. I believe that we are entitled to take this position in view of the considerable, and I believe effective, work that we have been doing in the way of creating public knowledge and acceptance of the Burlington securities during the past six weeks."

Had the alleged conspiracy been functioning, as charged, Siff would have recommended that Hammerslough call King and remind him of the term of the conspiracy about deferring to the "traditional banker," as there can be no doubt of the "satisfactory relationship" then existing between Lehman Brothers and Burlington Mills; and King would have "deferred" to Lehman Brothers. Moreover, as King must have known that there was a continuing relationship between Lehman Brothers and Burlington Mills, it is difficult to reconcile Siff's fears with the government claim of conspiracy. The whole tenor of Siff's memorandum would seem to refute rather than support the charge.

In the spring of 1945, just as Kidder Peabody was succeeding in ousting Lehman Brothers entirely, George Leib of Blyth called on Love at Greensboro, N. C., and on May 30, 1945, Love wrote Gordon suggesting that Blyth be given a second position in the underwriting. That this visit was designed as the beginning of a competitive effort to follow in the footsteps of Kidder Peabody, and get the managership, or if possible at least the co-managership, of some or all of the business of Burlington Mills seems probable. As we shall find later, one does not compete for managerships by ringing doorbells or by direct solicitation to company executives. They normally resent this sort of thing. Approaches such as made by King of Union Securities and Leib of Blyth are much more sensible. If one can get a participation in the underwriting of an issue, this may lead to direct contact with the executives; and many officers of issuers are only too glad to talk about their problems and discuss suggestions. This is the sort of competitive effort that gradually builds up a critical attitude on the part of an issuer toward the investment banker who has been bringing out its securities. It is all very subtle, and for that very reason the more effective.

### Jewel Tea

John M. Hancock became a director of Jewel Tea on December 9, 1919, and has remained such over the years. On August 1, 1924, he left the presidency of Jewel Tea and became a partner of Lehman Brothers. On September 6, 1941, Hancock wrote a memorandum for the attention of certain of his partners with reference to a forthcoming issue of securities and mentioned the fact that he had agreed to a form of indemnity clause slightly less favorable to Lehman Brothers than their standard clause. The particular sentence culled from this memorandum by government counsel reads:

"The reason for agreeing to this departure from the standard is the fact that Jewel is particularly open to the charge of being 'banker dominated.'"

I cannot find on the evidence before me that the financial affairs of Jewel Tea were dominated by Lehman Brothers or anyone else; but it does appear that Goldman Sachs and Lehman Brothers had jointly offered $4,000,000 preferred stock in January, 1916, an issue of $3,500,000 notes in May 1919, and 50,000 shares of 4¼% preferred stock in September, 1941. This interval of more than 22 years between issues co-managed by Goldman Sachs and Lehman Brothers can hardly be said to support plaintiff's claim that banker-directors "promote the interests of securing further underwriting business for each of defendant bank-

ing firms." In the meantime and in December, 1928, Jewel Tea had offered $4,-000,000 of common stock to its security holders without any investment banker.

Henry S. Bowers, a partner of Goldman Sachs, had become a director shortly after the 1916 issue and remained such throughout the period with which we are concerned in this case; and Arthur Lehman, a partner of Lehman Brothers, became a director on February 13, 1918 and remained on the board until his death on May 16, 1936.

What Hancock was probably referring to in the memorandum was his own period of service as president of the company before he became a partner of Lehman Brothers in 1924 and to his position as a director since then. During World War I, Herbert H. Lehman, then a partner of Lehman Brothers, met Hancock, who was at the time a regular Navy officer, who had been in charge of Naval procurement. Because of the favorable impression thus formed, Herbert H. Lehman asked Hancock to go with Jewel Tea, which was in financial difficulties. Hancock became president of Jewel Tea and, with extraordinary resourcefulness and administrative efficiency, he succeeded in putting the company back on its feet. Thinking, not because of any delicacy but to avoid possible criticism, that even the use of the standard Lehman Brothers indemnity clause might appear to give Lehman Brothers some advantage due to Hancock's prior service for and relationship to the company, he agreed to the use of a clause more favorable to the company than that generally used by his firm. This does not support plaintiff's charge, despite the fact that it contains the phrase "banker dominated." The few remaining letters relating to Jewel Tea show a similar concern for the affairs of the company, and they require no further comment. It is also in evidence that, contrary to the advice of counsel, Goldman Sachs and Lehman Brothers loaned money to Jewel Tea during the period of its difficulties.

## The Evidence Generally Applicable to Directorships Discloses No Conspiratorial Pattern but Rather the Contrary

From stipulated data set forth in the record, counsel for the government prepared 17 "directorship charts," one for each of the defendants. The chart for each defendant lists every new negotiated underwritten security issue during the 15-year period, 1935–1949, offered by an issuer whose board of directors at the time of the issue included a partner, officer or employee of that defendant. From these charts it appears according to the claim of government counsel "that when a defendant had a director on the board and an issue was done, that that defendant who had the man on the board acted as either manager or co-manager in approximately 86 per cent of the cases." No attempt was made to show the circumstances under which any of these men became directors; the charts do not indicate those instances where a defendant firm was the managing underwriter for the issuer before one of its partners, officers, or employees went on the board, nor which investment banking house managed issues brought out by the issuer after the partner, officer or employee left the board, nor the private placements or offerings to security holders made without the services of any investment banker while such partner, officer or employee was on the board. Moreover, in computing its figure of 86% correlation between directorships and managerships, counsel for the government included a large number of instances in which the defendant firm with a director on the board of an issuer co-managed issues of that issuer together with one or more other investment bankers, either defendants or non-defendants. If the other co-managing firm had no partner, officer or employee on the board of the issuer, and there were many instances of this, it would seem that such issues should not be included in the figures used to arrive at the aggregate of 86%. Nor is any explanation offered for the

fact that in numerous instances investment bankers from two or more firms were on the board of the same issuer at the same time.

The charts would seem to add little of real evidentiary value to support the "red flag" or "signpost" theory, in the absence of some proof of attendant circumstances, as it requires little argument to demonstrate that in many cases the men in question were invited by the management to come on the board of directors because a prior relationship with them had demonstrated their ability and usefulness, as with Hammerslough and Burlington Mills, and the mutual confidence reflected in such a relationship would make it probable that the issuer would turn to the director's own investment banking firm when bringing out a new issue of securities, even though there were no conspiracy whatever in operation. Moreover, one must not be blind to the fact that the men who served on these boards in such considerable numbers were in most cases men of wide experience, and of proven competence and judgment, many of whom had in one way or another rendered conspicuous service to the nation; and, in the natural course of events, they were doubtless urged and importuned by company executives to join this or that board of directors, wholly apart from considerations having to do with the raising of capital.

For my own enlightenment I have prepared a chart (subject to a checking of my figures by counsel for the respective parties) and have included therein an enumeration of the total number of issues of new negotiated underwritten security transactions, $100,000 and larger, managed by each of the defendants during the 15-year period, so that a comparison can be made with the government directorship charts. Pro-rating co-managerships, it appears that the defendants managed, in all, a total of 139.7 new negotiated underwritten security issues offered by issuers during the 15-year period, 1935–1949, at a time when a partner, officer or employee of one or more of the defendants was on the board of directors of that issuer. But the defendant firms managed a pro-rated total of 1117.0 of such issues, with or without directorships, during the same period. Thus, only 12.5% of defendants' business in these issues was obtained from issuers upon whose boards there was any partner, officer or employee of a defendant at the time of the issues. And almost half of this "directorship" business was done by three firms, Goldman Sachs, Lehman Brothers and Kuhn Loeb, the older firms who had in the early days become more or less accustomed to have a partner on the board of an issuer because of their sponsorship of the issue, and as a measure of protection for the investors to whom the securities were sold.

The variety of policies of the 17 defendant firms toward directorships are also to some extent reflected in the chart, which follows:

| | A | B | C |
|---|---|---|---|
| | Total Number of Managerships | Number of Managerships When Partner, Officer or Employee a Director | Percentage of Managerships Where Director on Board to Total Managerships |
| Blyth ........................ | 137.2 | 13.0 | 9.5%· |
| Dillon Read .................... | 87.7 | 2.1 | 2.4 |
| Drexel ........................ | 14.5 | 2.5 | 17.2 |
| Eastman Dillon ................. | 36.3 | 5.5 | 15.2 |
| First Boston ................... | 122.4 | 8.0 | 6.5 |
| Glore Forgan ................... | 47.7 | 6.3 | 13.3 |
| Goldman Sachs ................. | 49.6 | 27.5 | 55.4 |
| Harriman Ripley ................ | 54.6 | 6.5 | 11.9 |
| Harris Hall .................... | 24.0 | 2.0 | 8.3 |
| Kidder Peabody ................ | 65.8 | 3.0 | 4.6 |
| Kuhn Loeb ..................... | 69.5 | 19.6 | 28.2 |
| Lehman Brothers ............... | 81.1 | 19.7 | 24.2 |
| Morgan Stanley ................ | 128.3 | 4.0 | 3.1 |
| Smith Barney .................. | 88.2 | 4.5 | 5.1 |
| Stone & Webster ............... | 43.5 | — | 0.0 |
| Union Securities .............. | 30.7 | 9.5 | 30.9 |
| White Weld .................... | 35.9 | 6.0 | 16.7 |
| Totals .................... | 1117.0 | 139.7 | 12.5% |

The documents relied upon to support the government case make the lack of any conspiratorial pattern all the more apparent. There were 89 such documents in all, in connection with which 17 additional documents were considered on behalf of certain defendants. A large number of the government documents were concentrated in the period 1934–1937; and they were all received against Blyth, Dillon Read, Goldman Sachs, Kuhn Loeb and Lehman Brothers. In the closing statements government counsel in effect conceded that they had practically nothing on directorships against: Eastman Dillon, Drexel, Glore Forgan, Harris Hall, Kidder Peabody, Morgan Stanley, Smith Barney, Stone & Webster and White Weld. A sampling will indicate that there was ample basis for the concession, despite the charts above referred to.

The government chart with reference to Eastman Dillon contains but four issuers. The first directorship complained of was in 1940 and the first issue complained of was in 1944. The complete story about the Eastman Dillon directorships is set forth in a chart prepared by its counsel, based upon the static and stipulated data, in the nature of a brief for the information of the court. It includes all security issues offered during the 15-year period by every issuer which, at any time during that period, had a partner or employee of Eastman Dillon on its board of directors. Of the 25 negotiated underwritten new issues of such issuers, Eastman Dillon was manager or co-manager of, or agent for the seller for, 18 issues. Eastman Dillon was manager or co-manager of, or agent for the seller for, 10 of these 18 issues at a time when Eastman Dillon had no director on the board; and of the remaining eight, four related to Suburban Propane Gas, of which Eastman Dillon was one of the promoters.

The government tabulation with respect to Glore Forgan indicates that there were 12 negotiated new underwritten security issues for 7 different issuers, during the 15-year period, which were offered at a time when a partner of Glore

Forgan was on the board of directors of the issuer. Of these, Glore Forgan was the sole manager of only 4 and co-managed 7. The remaining issue, which was the only one listed for one of the issuers, was managed alone by Lehman Brothers. And an examination of all the new security issues offered by 13 issuers during this period (except at public sealed bidding), each of such issuers having offered at least one issue during that period while a partner of Glore Forgan served as a director thereof, indicates that of the 34 such issues, 17 were not managed by Glore Forgan. Ten of such issues were offered without the services of any investment banker, and 7 were managed alone by other defendant firms.

Similarly, with respect to Kidder Peabody, of the four issuers who brought out negotiated new underwritten issues during this period at a time when a partner of Kidder Peabody was on the board, the security issues of two of them were managed by other defendant firms. Of the eight issuers represented on the government's Smith Barney chart, Smith Barney managed or co-managed the issues of only four of them. Despite Stone & Webster "representation" on the boards of two issuers, who offered three negotiated new underwritten issues during this period, Stone & Webster neither managed nor co-managed any of them. Proof against others of these nine defendant firms can be analysed in like manner.

As to three of the defendant firms, First Boston, Harriman Ripley, and Union Securities government counsel claims that, despite the absence of documents introduced against these firms on the directorships issue, there is some significance in the static data, or other proof.

### First Boston
### Addinsell and Phillips Petroleum

In the connecting statements by government counsel, despite the fact that no documents had been offered against First Boston on the directorships issue, it was insisted that the circumstantial effect of certain letters received against Eastman Dillon indicated that First Boston had adhered to the so-called "practice" of using directorships as a "red flag" or "signpost" to remind other defendant firms that there was a "traditional banker" relationship to which they must defer, in accordance with the terms of the conspiratorial arrangement. These letters were written in 1935 and the one principally relied upon is from Frank Phillips, President of Phillips Petroleum Company to Lloyd S. Gilmour, a partner of Eastman Dillon, of which a copy was sent to First Boston, under date of April 1, 1935. In this letter Phillips wrote:

"We naturally are looking to Mr. Addinsell, Chairman of the Executive Committee of The First Boston Corporation, who is one of our directors and who originally purchased the entire issue."

As the various documents and deposition testimony relative to Phillips Petroleum are heavily relied upon by government counsel on various phases of the case, particularly the so-called "practice" of "giving advice" and the "concept" of "traditional banker," it will be convenient briefly to review the salient facts which concern the relationship between Phillips Petroleum and First Boston. Taken as a whole they prove no adherence to any "practice" or "concept"; nor do they support the allegations of conspiracy and combination. On the contrary, they show a continuing relationship, which had its origin in the twenties and which became stronger over the years due entirely to the ingenuity, skill and integrity of Harry M. Addinsell and his associates.

The Issuer Summaries show an unbroken and continuous relationship with First Boston. In 1935 First Boston acted as agent for the company in connection with a private placement of $14,-000,000 Joint Serial Notes; there was an offering to shareholders, without investment banker assistance, in 1936, two private placements without the services of any investment banker in 1937 and 1939; the remaining seven financings

were all managed by First Boston and consisted of $25,000,000 of 3% Convertible Debentures in 1938, another of a negotiated underwritten offering to shareholders of $20,000,000 of 1¾% Convertible Debentures in 1941, another of 1,007,517, shares of common stock in 1947 and three negotiated underwritten public offerings, two of which came out on January 9, 1941, and the other on February 16, 1944.

There was no reason under the Sherman Act or any other law which should deter First Boston from resorting to every legitimate means in its power to hold on to this business. And it is strange that government counsel should think the following testimony by Addinsell helped plaintiff's case:

"The thing I tried to point out to you this morning, Mr. Stebbins, was that we, under one label or another over a long period of years, had performed services for Phillips Petroleum that they found eminently satisfactory, and I don't think that they were particularly interested in changing to somebody else just as the client of an individual lawyer who may go from one place to another, I mean, from one firm to another, may follow the lawyer."

How this business followed him personally from the old firm of Harris Forbes to First Boston is also used against First Boston. Addinsell testified:

"But, broadly speaking, we have, through that period, established a relationship, and I hope you won't think I am immodest if I say that I think I, in particular, have established a relationship with that company where, strange as it may seem, they value my point of view and value the relationship that they have had with the, first, old firm of Harris Forbes, and then when we, some of us, moved over to the First Boston, with the First Boston. Because, while I don't want to exaggerate my opinion about the value of my services, that has only been pos-

sible because I have had a team that could do whatever the job was that was to be done. We had a firm that had the capital, and the standing, and the organization, to do the necessary things for them.

"That is a broad outline of the background.

"In order to get to one point that, of course, you will come to, I would like to say that I think it was in 1932, when I was president of Chase Harris Forbes, Mr. Phillips came to me, entirely unsolicited as far as anybody I know about was concerned, and said that they would like very much to have me go on the board of directors which, after consulting with my associates in the Chase bank, I told him I would do. That is a simple statement of the background and facts about it."

When Addinsell testifies that Phillips "is a strong-minded individual * * * he is a rugged individualist * * * he built that company in the face of competition from the old line companies * * * it is a so-called independent company," I believe him. There is ample evidence in this record to support a finding that there was no domination or control of Phillips or Phillips Petroleum asserted or even attempted by Addinsell or by First Boston. Indeed, the very documents relied on by government counsel, supplemented by others offered on behalf of First Boston, show that the services performed by First Boston, under the able leadership of Addinsell, were of a superlative quality, amply justifying the confidence in First Boston which is revealed in the letter to Gilmour of April 1, 1935. The reference to the fact that Addinsell was a director of the company is incidental and has no significance whatever.

To characterize the effective and valuable services performed by First Boston over the years for Phillips Petroleum as an "adherence" to the "practice of giving advice" is unwarranted. As shown in the preliminary part of this opinion on the history and development

of the investment banking industry, Addinsell was following the course of competitive effort which had gradually and functionally developed from the early days as a normal and ordinary way of doing the business. Automobile salesmen, plumbers, real estate brokers and innumerable others whose business is fundamentally the rendering of services, all try their best to establish and hold on to continuing relationships with their customers, by doing a great variety of acts for which they make no separate and specific charge. When a real estate broker works hard getting information for a substantial property owner, attending endless conferences relative to the state of the market, the price to be asked for certain properties, the advertising to be used, and so on, he well knows that he will be compensated only when, as and if he makes a deal.

The bearing of all this on the directorships phase of the case is merely further to weaken another of the supports upon which the government charge of over-all conspiracy rests.

### Harriman Ripley

Some of the situations involved were of a special character, such as Cramp Shipbuilding Co., where Harriman Ripley acted as the direct result of a request by the Secretary of the Navy in 1940, to reorganize the corporation so that the shipyards could be reopened for national defense.

### United Air Lines

Counsel for the government claim that a telegram of October 27, 1943, from Joseph P. Ripley, then a director of United Air Lines, to W. A. Patterson, the president of the company, supports their charge. It reads:

"You remember advances made by one of our board to Smith Barney Stop Cutler of that firm is now trying to get me and am sure he is going to ask my permission to go to see you and try to get leadership of underwriting Stop Do not see how I can refuse and hope you will wire me back that am at liberty to tell him to go ahead and see you if he wants to stop am sure you know what my views are as to where it should go."

Emphasis is placed upon the word "permission," which suggests that Ripley's state of mind was such that, because he was a director, Cutler of Smith Barney could not, by reason of the "red flag" or "signpost," approach the issuer without first "clearing" through Ripley.

The explanation is simple. Section 409(b) of the Civil Aeronautics Act of 1938, 49 U.S.C.A. § 489(b), and again hereinafter referred to,[1] made it impossible for Ripley's firm to manage or participate in any of the financing of United Air Lines while Ripley was a director. At the time the telegram was sent, as appears from the deposition testimony and other exhibits, it was anticipated that he would remain as a director and that the contemplated financing, which was the first made by the company since the passage of the Civil Aeronautics Act of 1938, would be handled by some investment bankers other than Harriman Ripley. In 1940 Patterson had appointed a committee of the board of directors to look into the matter of financing and this committee consisted of Patterson, Sewall and Ripley. That Patterson had great confidence in Ripley and regarded him highly was matter of public knowledge, as might be inferred from the general relationship between the two men over the years, and also from the fact that in 1942 Patterson had made a speech at the Bond Club of New York in which he publicly referred to Ripley in very favorable terms and praised his handling of United Air Lines' financing. It also appeared that numerous investment banking houses had been pestering the management of the company over this prospective financing and John Newey, one of the executives of the company, had informed Ripley that they had been

1. See infra, p. 717.

told to go and see him about any matter pertaining to underwriting. The only firms identified by Newey were F. S. Moseley and First Boston; but Patterson had told Ripley that "he was fed up with having investment bankers coming in to see him." Justin Dart, a director, had discussed the matter with Smith Barney. Some time prior to the sending of the telegram of October 27, 1943, Ripley had recommended to Patterson that the business be given to Blyth and G. M.-P. Murphy as co-managers, evidently because G. M.-P Murphy had a number of aviation experts on its staff and the Blyth wire system was closely identified geographically with the United Air Lines route.

In view of this background it was quite natural that Ripley should think that Cutler was going to ask his "permission" to approach Patterson.

True it is that, when the issue of 105,-032 shares of 4½% Convertible Preferred stock came out on December 29, 1943, it was managed by Harriman Ripley. The reason for this is that, after the exchange of telegrams between Ripley and Patterson on October 27, Patterson changed his mind about keeping Ripley on the board, and decided that it was more important to the company to have the services of Harriman Ripley, which would of course include those of Ripley himself, in connection with the financing. Patterson's memorandum to the directors, under date of November 2, 1943, supports Ripley's deposition testimony, and is interesting on the subject of the attitude of issuers toward continuing relationships with investment bankers. Thus his memorandum concludes:

"Our management has had many difficulties from the day of the air mail cancellation up to the recent abnormal passenger demand. Thanks to Mr. Ripley and his organization we have never had a financial problem owing to the soundness of the development of our financial structure. It would have been impossible on many occasions to have overcome the obstacles over which we had little control without the sound financial foundation previously established.

"In my opinion there are two ways to go about financing. One is to bargain and drive for the best terms by playing one underwriter against the other. When such transactions do not work out favorably to the underwriter who may get the business on this basis, I think it can be said quite definitely that a relationship that can be counted upon in the future does not exist. The other method is to select bankers who have demonstrated by their past methods and commitments an interest in an organization and its success between intervals of financing.

"I prefer that this company follow the latter policy. This does not mean that we should be careless in the terms we finally negotiate. In the interests of our stockholders, arrangements that are fair and reasonable to both parties to the transaction must be accomplished."

## Union Securities

The static data relative to Union Securities is typical of that discussed generally above, and proves just as little. The chart lists 11 issues for 8 issuers; Union Securities managed 10 issues for 7 of these issuers, 9 as sole manager, and one, the only issue for that issuer, as co-manager with Kidder Peabody, which also had a director on the board.

In addition, reliance is placed upon the letter from Bailie to Fitzpatrick of the Chesapeake & Ohio Railroad, of June 23, 1938, from which I have already quoted.[1] This letter advises Fitzpatrick that the Chesapeake & Ohio, in his judgment, should continue with Morgan Stanley and "maintain its existing banking affiliations so long as they are satisfactory." The charge that Morgan Stanley placed Bailie on the board of the

1. See supra, p. 703.

Chesapeake & Ohio remains unproven. The writing of this letter under the circumstances seems to me to be thoroughly consistent with Bailie's duties as a conscientious director.

I find no significant difference between Harriman Ripley, First Boston and Union Securities, and the other nine defendant firms with respect to which the government concession was made. Thus, as to 12 of the 17 defendant firms, there is no substantial evidence that any of them used directorships as a "red flag" or "signpost" to others, defendants or non-defendants, or that they deferred to any other firm because one of its partners, officers or employees was a director of an issuer.

### Directorship Evidence against Goldman Sachs, Lehman Brothers, Kuhn Loeb, Blyth and Dillon Read

The mass of these documents is so heterogeneous in character as almost to defy description. Of the 89 documents introduced by the government on this issue, 24 were against Goldman Sachs and 35 against Lehman Brothers. As pointed out in Part I of this opinion, these firms were associated with one another over considerable periods of time, and historically they had many directors on the boards of issuers at a time when their sponsorship of new issues, especially of closely owned family affairs or others whose securities had not previously been publicly owned, made the presence of one of their partners on the board more or less essential, in their judgment. It was a matter of policy with them to place partners or employees on the boards of directors of issuers, and there is evidence that they each used the presence of such men on these boards in various ways in support of their competitive efforts, partly to get business but principally to hold on to such business, once it had been secured.

### Goldman Sachs

The government chart lists 41 issues by 17 issuers in the 15-year period, offered at a time when a Goldman Sachs partner was on the board of the issuer. Goldman Sachs was sole manager of 15 of these issues, and co-managed 25. Twenty of these 25 co-managerships were with Lehman Brothers. Of the 17 issuers shown on the chart, Goldman Sachs' directorship relations with 14 of them began prior to 1935. Thus, while Goldman Sachs obtained more than half its managerships in negotiated new underwritten security issues, in the period 1935–1949, from issuers on whose boards Goldman Sachs partners were directors, the great majority of these directorship relations were initially established before 1935. On the other hand, the stipulated data show that a Goldman Sachs partner was on the board of directors of only 7 of the 44 issuers for which it first headed financings after the passage of the Securities Act of 1933. For only 3 of these issuers did Goldman Sachs manage underwritings while a partner was on the board: Champion Paper & Fiber Co., Hecht Company and Standard Steel Spring Co.

Of the 24 documents introduced against Goldman Sachs on this phase of the case: 7 had to do with proxies and need no further consideration as the proxy charge has faded out; 13 evidence competitive efforts in respect to May Department Stores, Pillsbury Mills, Endicott-Johnson, B. F. Goodrich and General Foods; 2 concern information possibly of a confidential character, including one which evidently had to do with an attempt to sell the Welch Grape Juice Co. One of the remaining documents will be discussed later in connection with the Pillsbury Mills competition under the heading of "traditional banker." [1] The last one is a 1942 letter from Hartel of National Dairy to Sidney J. Weinberg a partner of Goldman Sachs, stating that Weinberg had been appointed to the sal-

1. See infra, p. 788 ff.

ary committee of the National Dairy board of directors, together with Henry W. Breyer, Jr. and Henry C. Von Elm, who were two of the remaining five "outside" directors eligible to act. No further reference was made to any documents or proof of any kind in the directorships issue against Goldman Sachs in the connecting statements made by government counsel at the close of plaintiff's case, although the stipulated data do show that Charles S. McCain, for many years a director of B. F. Goodrich, later became a partner of Dillon Read, and a 1945 security issue of B. F. Goodrich was jointly managed by Dillon Read and Goldman Sachs.

There is nothing in any of these documents to indicate that Goldman Sachs ever refrained from going after any business because one of the other defendant firms had a director on the board of an issuer.

### Lehman Brothers

The government's directorship chart for Lehman Brothers is an extensive one. It includes 35 issues of negotiated new underwritten securities offered by 19 issuers during the 15-year period 1935–1949, at a time when a partner or employee of Lehman Brothers was a member of the issuer's board of directors. Of these issues Lehman Brothers managed 12 and co-managed 17. Seven of the 17 co-managerships were with Goldman Sachs, and one with Goldman Sachs and a nondefendant. Of the 6 issues in which Lehman Brothers had no share in management, Goldman Sachs managed 3. It is interesting to note that Lehman Brothers' directorship relations with more than half of the issuers shown on this chart date from prior to 1935, a further and significant indication that the genesis of investment banker directorships is historical, not conspiratorial.

Lehman Brothers, together with Goldman Sachs, was a leader in the pre-Securities Act period in developing directorship relations with its customers. And, with the development of the Industrial Department of Lehman Brothers, these directorships became an important feature of Lehman Brothers' method of servicing its customers. Elaborate pains were taken to add to its staff some of the foremost experts in the merchandising and marketing fields and others, and some of the very memoranda relied upon by government counsel reveal the studies made by various partners and employees designed to further the firm's competitive efforts. Two of these memoranda, dated respectively September 15, and 27, 1934, were prepared by H. J. Szold for the attention of Monroe C. Gutman, one of the partners. Another, expressing quite different views of the proper policies to be pursued, was prepared by Hammerslough, one of the partners, on March 25, 1935, and still another, at a much later period by Frank J. Manheim, a recently admitted partner, on June 1, 1946. This last memorandum was apparently offered because one of the lists therein contained was headed "Lehman Brothers' Companies," although Gutman testified on deposition that the companies on the list were not known or described in the firm as "Lehman Brothers' Companies."

The interesting and I think the most significant feature of these frank inter-office memoranda of Lehman Brothers is that there is no direct or indirect reference in any of them to either of the two reasons alleged by government counsel to be the reasons for Lehman Brothers attempting to get directorships: to control financial affairs of issuers, or to serve as a "red flag" to warn off other defendant firms.

Eight of the 35 documents introduced or referred to as against Lehman Brothers on the directorships issue had to do with proxies, 4 related to Burlington Mills, 4 to Jewel Tea, 2 to the possible use of confidential information and 5 to policy statements, including the memoranda just discussed, and some excerpts

from Hancock's TNEC testimony in 1940.[1]

In this case I am not concerned with the moral or ethical problem involved in the use of directorships as a means of furthering the competitive efforts of investment bankers to get business and to hold on to it. This is a conspiracy case under the Sherman Act and the more competitive are the policies of a defendant firm the stronger its position vis-à-vis the Sherman Act. This was candidly admitted by government counsel, as stated in the preliminary part of this opinion relating to directorships. What offends the Sherman Act is an agreement, combination or conspiracy not to compete.

And yet one of the documents offered on this phase of the case against Lehman Brothers, is an agreement of January 15, 1940, between the partners of Lehman Brothers, to the effect that Robert Lehman, one of the partners and a director of Pan American Airways, "shall receive or be entitled to receive no interest or share, direct or indirect, in any profits" which might accrue to the firm as a result of the forthcoming new negotiated underwritten public offering of 525,391 shares of Pan American Airways stock, under the joint management of Lehman Brothers and G. M.-P. Murphy. This would seem to be in the same category with evidence that a partner of an investment banking house which is about to manage a forthcoming issue of securities, goes out of the room when the directors vote on the issue and then walks back in again. The agreement was made to get around Section 409(b) of the Civil Aeronautics Act of 1938, 49 U.S.C.A. § 489(b), which provides:

"After this section takes effect it shall be unlawful for any officer or director of any air carrier to receive for his own benefit, directly or indirectly, any money or thing of value in respect of negotiation, hypothecation, or sale of any securities issued or to be issued by such carrier, or to share in any of the proceeds thereof."

I confess that this sort of thing does not sit well with me, as the conflict in interest would seem plainly to require that a director, whose investment banking firm is financially interested in an issue, should refrain entirely from any participation whatever in the negotiations, rather than merely go through the pantomime of walking out of the room when the vote is taken, or make an agreement which may comply with the letter of the law but surely is not consonant with its spirit. But my function is not to pass on incidental questions of propriety or even legality, but to decide the factual and legal issues in this case.

If, on the other hand, as seems not unlikely, the purpose of government counsel is not merely to make insinuations of impropriety, but to anticipate defense argument based on the fact that, after an intervening offering to shareholders without the services of any investment banker in June 1945, the next new negotiated underwritten public offering of securities by Pan American Airways, of $43,930,000 of common stock and purchase warrants on July 3, 1945, was co-managed by Blyth, Kuhn Loeb, Ladenburg Thalmann and Lazard, without the presence of Lehman Brothers as co-manager, I can only say that there is

---

**1.** The Temporary National Economic Committee was created by a joint resolution of the Congress (Public Resolution No. 113, 75th Cong.), following a message from President Franklin D. Roosevelt on April 29, 1938, stating a need for a thorough study of economic power and its effects on the American economy. Hearings with respect to investment banking were held between December 12, 1939 and January 12, 1940, and were recorded in Parts 22 through 24 of the published hearings. The 729 page Report, while containing a number of conclusions and recommendations with respect to other phases of the investigation, makes no reference to investment banking nor do any of the 43 monographs published by the TNEC discuss investment banking.

no reason to suppose that Lehman Brothers, had they been able to hold on to the Pan American Airways business, would not again have followed the advice of counsel and made a similar agreement, as Robert Lehman was still a Pan American Airways director when the later issue came out. The net result is that we have another instance where the "red flag" or "signpost" part of the alleged conspiracy should have been functioning but was not. Blyth and Kuhn Loeb and their associates evidently took the business away from Lehman Brothers, and they did it despite the fact that Robert Lehman was on the board of directors. And Lehman Brothers, having co-managed the last previous issue with G. M.-P. Murphy, was supposed to be the "traditional banker." Nothing appears in the record to indicate any deterioration in the friendly relations between Lehman Brothers and Pan American Airways in the interval.

### Cluett Peabody

The few documents introduced against Lehman Brothers on this phase of the case and relating to Cluett, Peabody & Co. are so fragmentary as to be of little value. They relate to a period in 1937 when, in the course of the fratricidal strife between Goldman Sachs and Lehman Brothers over the business of issuers whose security issues the two firms had co-managed jointly, each was trying to oust the other. In the case of Cluett, Peabody & Co., Goldman Sachs won out and cries of anguish on the part of Hancock of Lehman Brothers are reflected in his letters. What government counsel were evidently interested in was a reference in one of the exhibits to what seems to have been a piece of misinformation transmitted to Hancock, to the effect that Weinberg of Goldman Sachs had threatened to resign from the board of directors if the business were not given to Goldman Sachs alone and Lehman Brothers excluded entirely. As usual there is a word or phrase upon which reliance is placed. Hancock writes that "if" Weinberg threatened to resign,

"did he not control the Cluett financing by the threat which the board undoubtedly felt would, if carried out, harm the company." This seems rather far-fetched; but Hancock was advancing every argument he could think of. What reduces all this to mere words is the fact that Hancock knew nothing of the facts concerning the alleged threat to resign, and he testified before the TNEC that he had been told that the rumor, which had been relayed to him about Weinberg's supposed threat to resign, was untrue. The aftermath was that Goldman Sachs got the business and, after the issue came out, Hancock resigned as a director.

### Food Fair

A single document, presented wholly without context, relates to Food Fair, Inc., originally known as Union Premier Food Stores, Inc. It is a memorandum of September 11, 1943, by an employee of Lehman Brothers, Lucille Schwartz, who reported a meeting of the employees in the Industrial Department at which no partner was present. The portion of the memorandum relating to Food Fair reads:

"This business came into Lehman Brothers many years ago but was turned down because we had many other relationships in the field and Food Fair was very small at the time. Now this company is expanding dynamically and it is very anxious to do business with us. Eastman Dillon and Wertheim are on the board but nevertheless, the company still wants Lehman Brothers to do the business. We don't want to have any bad relations with either of these investment houses. Therefore, we prefer to have Food Fair go to Wertheim and Eastman Dillon and say that they want Lehman Brothers to be in on the deal."

What action on this suggestion was taken by the partners does not appear; nor do we know the basis or authorization for the statement that Food Fair was "very anxious to do business" with

Lehman Brothers. In any event, it is clear that this document does not fit into the alleged conspiratorial scheme, as the last prior issue was one of 55,000 shares of preferred stock in December, 1940, co-managed by Hemphill Noyes and Wertheim. There was also a 1937 issue managed by Childs, Jeffries & Thorndyke, and another in 1938, co-managed by Childs, Jeffries & Thorndyke and Van Alstyne Noel. Wertheim is not claimed to be a co-conspirator; and, accordingly, there was no defendant firm "traditional banker," to whom Lehman Brothers was supposed to defer. The memorandum also shows on its face that some of the employees present at the meeting "are still unknown to the partners." The next issue was brought out by Eastman Dillon alone.

### Allied Stores

The two documents relating to Allied Stores Corporation, formerly Hahn Department Stores, add little to plaintiff's case. The first of these, suggestive of another of Lehman Brothers' rescue operations, is a memorandum of agreement between the president of the company and Arthur Lehman, a partner of Lehman Brothers, to the effect that Arthur Lehman use his best efforts to assist in the filling of two vacancies in the board of directors by the election of men suggested by the president; Lehman reserves the right to object to one solely on the basis of "something involving that candidate's integrity, moral position or standing in the community" but may object to the other unless he is "a man either of merchandising experience or a man who stands so well in the business world that his counsel will be recognized as being of value to the company," with more to the same effect. The other document is a copy of the minutes of the annual Allied directors meeting on June 29, 1945, which show that Paul M. Mazur and Harold J. Szold, both at the time partners of Lehman Brothers, were elected members of the 11-man Executive Committee, and members of the 5-man Advisory Committee,

Szold to be Secretary of each. Mazur was a merchandising expert of outstanding reputation and both he and Szold had much to offer in the way of knowledge and experience; they were each to be paid by the company, $10,000 a year for their services, and concessions by government counsel indicate that they were worth every cent of it.

### Aviation Corporation

One document relating to Aviation Corporation, later Avco, is a letter of April 17, 1930, signed by Robert Lehman as chairman of the Executive Committee, to Sanderson & Porter, employing that firm of management engineers to provide the company with an executive head and serve it and its subsidiaries in an advisory capacity, with an option to purchase 50,000 shares of the company's treasury stock. This was a speculative venture, organized a few months before the market crash in 1929, and there were 14 investment bankers on the board, a majority of whom were in no way connected with any of the defendant firms. Other documents concerning Avco relate to proxies and require no discussion.

### Sears Roebuck

Only two documents relating to Sears, Roebuck & Co. were introduced against Lehman Brothers on the phase of the case now under discussion, but there is considerable other evidence in the case relating to that mail order house and it will be convenient to treat it all together at this point, especially as the dealings of various of the defendant firms having to do with prospective issues of Sears Roebuck are strongly relied upon by counsel for the government in support of its general charge.

It will be recalled, from Part I of this opinion, on the history and development of the investment banking business, that as early as 1906 Lehman Brothers and Goldman Sachs headed the offering of 90,000 preferred and 45,000 common shares of Sears Roebuck. By reason of their sponsorship of these securities,

Philip Lehman became a director on July 2, 1906, and Henry Goldman in 1907. Thereafter a partner of each of the two firms was on the Sears Roebuck board without substantial interruption until at least late 1951. In May and July 1909, Lehman Brothers and Goldman Sachs headed offerings, first of 50,000, and then of 25,000 shares of common stock. There was no further financing until October, 1920, when Chase Securities with Lehman Brothers and Goldman Sachs headed an offering of $50,000,000 of Sears Roebuck notes.

Fourteen years later on June 21, 1934, Burnett Walker, a partner of Edward B. Smith & Co., who had only a few days previously and on June 16, 1934, left the Guaranty Co., by reason of the Glass-Steagall Act, to come with Edward B. Smith & Co., heard a rumor that some Sears Roebuck financing was in prospect and he proceeded to investigate. He tried to get Hancock, of Lehman Brothers, who was a director of Sears Roebuck, on the telephone, but Hancock was out and he spoke to Gutman. We have in evidence the memoranda of this conversation prepared by Gutman, on the one hand, and by Karl Weisheit, then an employee and later a partner of Edward B. Smith & Co., on the other. A true understanding of this conversation will throw considerable light on one of the most important of the contentions advanced by counsel for the government.

Let us first examine the part relied upon by government counsel. It is the following memorandum by Gutman:

"Mr. Burnett Walker of E. B. Smith & Company (formerly Guaranty Trust) called to tell us that they heard rumors of Sears Roebuck financing and would not of course encroach on this because it was our bailiwick, but, on the other hand would be very glad, if they could in any way pay their way, to have us remember them if any financing takes place.

"I told Mr. Walker that we could not in any way commit ourselves, but that I would make a memorandum of my conversation with him and promised him that we would give the matter consideration at the proper time."

From Walker's standpoint, angling for information, he desired to ascertain: (1) whether financing was really in prospect; (2) whether the old relationship with Sears Roebuck, going back almost thirty years, had in any way deteriorated so as to make it seem worthwhile to go after the leadership of such financing as might be under consideration; and (3) if he found that Lehman Brothers had the situation well in hand, to lay a foundation for obtaining a participation.

From Gutman's standpoint it was desirable to keep his ears open and say as little as possible. Walker merely commented "that he understood that such an issue was being planned," according to the memorandum made by Weisheit. Gutman's attitude evidently convinced Walker "that they did have such an issue in mind" and, thus considering it futile to waste time and effort working on the Sears Roebuck people in an endeavor to get the leadership of the business, it was then and only then that Walker made his remark about not encroaching because the business was in the "bailiwick" of Lehman Brothers. This is an instance of the way a few investment bankers thought it smart to work up to a participation, when they had no reasonable expectation of obtaining the managership; and it explains a number of the documents upon which government counsel lean heavily.

Weisheit's memorandum follows:

"Mr. Montgomery was given to understand by a friend today that Sears, Roebuck & Co. were planning a convertible bond issue. Mr. Walker spoke to the Guaranty Trust Company about this possibility but they said that they knew nothing of it.

"Mr. Walker also telephoned to Lehman Brothers and in the absence of Mr. Hancock (a Director of Sears,

Roebuck) spoke to Mr. Gutman. Mr. Walker purposely avoided asking him if they were working on such an issue but said that he understood that such an issue was being planned and from Mr. Gutman's attitude Mr. Walker was convinced that they did have such an issue in mind. Mr. Walker said to Mr. Gutman that we realized this was their business and that we did not wish to interfere in any way but that if there were any place for us in the business on a basis where we 'could pull our own weight' we should appreciate it if they would keep us in mind if and when an issue materialized.

"Mr. Gutman said he would be pleased to make a note of the conversation for consideration at the proper time."

There is no testimony to throw further light on these memoranda; and the record does not tell us whether financing was or was not then under consideration by the management of Sears Roebuck in view of the background. It seems extremely improbable that Walker telephoned Gutman with any real expectation that it would be worthwhile for Edward B. Smith & Co. to attempt to secure leadership. In any event, nearly two years later Weinberg of Goldman Sachs, as indicated by a letter of March 25, 1936, succeeded in ousting Lehman Brothers from its earlier position as co-manager and on December 26, 1936, Goldman Sachs alone managed an offering of 442,560 capital shares to Sears Roebuck shareholders. The Goldman Sachs participation was 15.25%, Lehman Brothers got 10% and Edward B. Smith & Co. only 5%. The letter was offered by government counsel because, as part of his competitive effort to oust Lehman Brothers, Weinberg had written to the president of Sears Roebuck:

"As a matter of fact we always considered that, as the term goes here in the Street, Sears Roebuck was really our issue."

Very likely, had the opportunity to do so arisen, Lehman Brothers would have told the president that they considered that Sears Roebuck was their issue.

Finally, there is a Hancock memorandum of September 22, 1943, indicating that Lehman Brothers did not wish to become interested in financing for a competing concern, Chicago Mail Order House (later named Aldens) if General Wood and Arthur Barrows of Sears Roebuck disapproved, which they did not. This memorandum also makes reference to the appointment of a committee, composed of Hancock as chairman, Weinberg, Humm and Barker, to consider financing in connection with post-war planning and expansion. But there was no post-war financing; in fact there was no further financing whatever.

### Cleveland Cliffs Iron Co.

The last four of the documents introduced or referred to in the concluding connecting statement against Lehman Brothers on this phase of the case, have to do with Cleveland-Cliffs Iron Co. This was still another rescue operation, involving the consolidation of Cliffs Corporation and Cleveland Cliffs Company. Due to bad financial management the situation had become difficult; and the loan agreement of December, 1935, with the three banks holding the bank indebtedness, contained a provision that if either William G. Mather or E. B. Greene, who had come into the management after service as an officer of a bank in Cleveland, died or ceased to hold office, their successors should be satisfactory to all the banks. One of the documents is a letter of December 6, 1935, from Greene to Lehman Brothers, Field Glore, Hayden Stone and Kuhn Loeb, who had agreed on December 4, 1935, to purchase $16,500,000 First Mortgage 4¾% bonds, that in recognition of their "continuing interest, for the protection of the bondholders, in seeing that the company has a satisfactory management," he confirmed assurances that these underwriters would also be consulted about successors to himself and

Mather; and another document merely transmits a copy of this letter and certain other enclosures to Kuhn Loeb.

Of the remaining two, the first evidences the formation of a group consisting of Lehman Brothers, Field Glore, Hayden Stone and Kuhn Loeb on June 28, 1935, to do the financing. The part relied upon is: "Lehman Brothers are to manage the initial business; subsequent leadership is to rotate." But the "rotation" never took place. The $16,-500,000 issue was managed by Lehman Brothers and came out on December 10, 1935. In the next two financings Lehman Brothers acted alone, as sole agent for Cleveland-Cliffs, in two private placements in 1939 and one in 1940. In April, 1945, the company placed $5,000,-000 of its notes privately without any investment banker.

The last document, a memorandum of December 12, 1935, has to do with compliance with an agreement between the company, Greene and the Adams Express Company, a substantial stockholder, to the effect that Adams Express should have representation on the board. Hayden Stone in some way came into the picture and Gutman had said he preferred an Adams Express man, but if a Hayden Stone man were being thought of he felt someone from Lehman Brothers should be elected rather than someone from Hayden Stone. Steele Michell of Adams Express was elected.

I find as a fact that there is no basis for plaintiff's charge against Lehman Brothers on the "directorships" issue.

### Kuhn Loeb

The government chart lists 24 issues of negotiated new underwritten securities for 10 issuers during the period 1935–1949, offered at a time when a partner of Kuhn Loeb was on the issuer's board of directors. Of these 24 issues, Kuhn Loeb managed 17 and was co-manager of 6. Kuhn Loeb's directorship relations with half of these issuers were formed before 1935.

Nine documents were offered or referred to against Kuhn Loeb on the phase of the case now under discussion. Six of these were in the 1932–1939 period; the others were in 1944 and referred to Armour & Co.

The evidence fails to support the claim that Kuhn Loeb used any of these directorships as a "red flag" or "signpost" to warn off other defendant firms or that any of the other defendants "recognized" any such signal.

### Franklin Simon

The document chiefly relied upon by government counsel is a memorandum of November 19, 1934, by Benjamin J. Buttenweiser, a partner of Kuhn Loeb, reporting conversations relative to a proposal by a middleman or finder that the firm should interest itself in a secondary offering of all of the common and part of the preferred stock of Franklin Simon & Co., which was owned by the Franklin Simon Estate.

Two partners of the firm of Henrotin, Moss & Lewis, Inc., claimed to represent the Estate and called to see if Kuhn Loeb would be interested. No reason was suggested as to why the Estate did not speak to Kuhn Loeb directly. Buttenweiser remarked that the preferred stock had been brought out by Goldman Sachs and Lehman Brothers, and mentioned incidentally that they were represented on the board, but Henrotin claimed that there had been a resignation. The memorandum constitutes one of the principal pieces of documentary evidence against Kuhn Loeb, as it contains the phrase "Street etiquette." It has little significance on the directorships issue or the alleged domination and control of issuers. Indeed, as it refers to a secondary, there could be no "traditional banker," according to plaintiff's definition.

It may be well to remark in passing, however, that, as will more fully appear hereafter, Kuhn Loeb in 1934 followed a competitive technique which was unique and finds no parallel in the conduct of any of the other defendant firms. It gave wide currency to what appeared on the surface to be a complete

and utter refusal to solicit or even accept underwriting business "belonging to some other house" and statements of this attitude by Kuhn Loeb constitute a very considerable part of plaintiff's evidence. The purpose of all this was not eleemosynary, or conspiratorial; on the contrary, this was itself a form of competitive effort, designed to give the impression that Kuhn Loeb was a firm of such prestige and eminence that it was beneath its dignity to run around after business. Otto Kahn called it "his show window." Underneath this facade, however, we shall find shrewd and ingenious methods used to get business of the highest quality, whilst all the time protesting that the firm would never, never take business away from another banker.

This particular document shows the operation of the Otto Kahn-Kuhn Loeb technique, when approached by a finder; and it also shows from another angle the currying of favor for possible future participations, as we have seen done by Edward B. Smith & Co. in its approach to Lehman Brothers, relative to Sears Roebuck. The chronological sequence of events is always important.

A paragraph of the memorandum reads:

"We advised Messrs. Henrotin and Lewis that we appreciated their approaching us in this connection but it was our recollection that Messrs. Goldman, Sachs & Co. and Lehman Brothers had offered Franklin Simon preferred shares and were represented on its board, and that, as Mr. Henrotin knew, we were always scrupulously careful not to intrude in any way on what might be considered other people's business. Mr. Henrotin replied that he was aware of this situation and had anticipated our taking this view, but made clear that, according to his information, the Goldman, Sachs & Co. Lehman Brothers' representative had resigned as a director and consequently he assumed that these two firms were no longer interested in that situation. We then said that we would like to discuss this matter with our other partners and would advise them in due course."

The reasons for this cautious response at once suggest themselves. It would be a mistake even to hint at the possibility of a commitment to a finder who might or might not be in the confidence of the Franklin Simon Estate. More important still, the maintenance of the "show window" of prestige and eminence required that whatever be said or not said at the conference with Henrotin and Lewis be in every respect of such a character that, whatever happened thereafter, the Kuhn Loeb "show window" would remain intact.

The reason for later deciding not to consider this business, as stated in the next paragraph of the memorandum, is not given; it may have been based on the fact that the Estate was selling out not only to raise money to pay taxes but also "because it felt that the management of Franklin Simon & Co. was being adversely affected by continuing disagreements between the late Mr. Simon's son and son-in-law." The reason quite evidently was not that stated to Henrotin and Lewis about not intruding on other people's business. Had that been the reason, the business would have been ejected out of hand at the first conference.

Having decided to reject the business, the partners proceeded to step two. They must make sure that Lehman Brothers was informed of the attitude Kuhn Loeb had taken with Henrotin and Lewis at the first conference. Of course, had the decision been the other way, it is highly improbable that Lehman Brothers would have been told anything about the conference with these middlemen.

Accordingly, Buttenweiser suggested that Henrotin convey to Lehman Brothers the information that Kuhn Loeb did not wish to intrude, but Henrotin said "he would prefer our discussing the matter with Lehman Brothers." This

led to a call to Allan Lehman, because of "the recent discussions which we had with him with regard to our views on similar Street etiquette as it affected the government's holdings of Pennsylvania equipments." But Allan Lehman turned Buttenweiser over to Mazur, who was more familiar with the Franklin Simon situation. When Buttenweiser spoke with Mazur he explained to him "that our only purpose in approaching them was to steer Mr. Lewis their way." This does not appeal to me particularly, but there is no denying the fact that it might well gain some competitive advantage for Buttenweiser and his partners, when the time came for making a close decision relative to a participation in some underwriting in which Kuhn Loeb desired a substantial position. The Lehman Brothers response is interesting too. It was that "they felt that their approach to the business was sufficiently strong that they would rely on it alone without bolstering it up through whatever contact Mr. Lewis may have."

As no secondary sale of Franklin Simon & Co. stock appears in the Issuer Summaries, I cannot remove from my mind the possibility that neither Kuhn Loeb nor Lehman Brothers was really interested. If Kuhn Loeb had been interested, the course of events would have been very different, as we shall see when we come to Armstrong Cork.[1] All this is matter of inference but that is what a documentary case such as this is about.

### Miscellanea

Three of the documents refer to the subject of retiring from or not being present at meetings, and a fourth, from one of the Armour officials in 1937, suggests the possibility of Elisha Walker's presence at a board meeting "to help convince some of our directors as to the proper conversion rate and other provisions." In view of what I have already written on the subject of the presence or absence of banker-directors at meetings where security transactions are passed

on, there seems to be no reason to discuss it further in connection with these documents.

A memorandum of Lewis L. Strauss, a partner of Kuhn Loeb, makes reference on July 16, 1935, to what seems to be a dispute of no significance between him and Hertz of Lehman Brothers over a suggestion that Mr. Selig, said to be a director of General American Transportation Company, be elected to the Studebaker board. Evidently Strauss had first suggested Dr. Julius Klein, a well known economist and head of an engineering firm, and had withdrawn the suggestion upon objection by Hertz. The gist of the matter is that Strauss said he had asked and obtained Selig's consent to serve and that he would not withdraw his name. As Hertz apparently took the position that he would not serve on the board with Selig, Strauss commented dryly, "I would be willingly resigned to the fact that he [Hertz] would not serve."

Then there is a March 11, 1932 memorandum by Buttenweiser on the subject of directorships. It is argumentative and seems not to represent any firm policy. The principal reason for introducing it was because it lists separately the J. P. Morgan & Co. directorships. Perhaps Buttenweiser thought they should first try to get directors on the boards of issuers where there was a better chance of getting worthwhile financings, than there would be with issuers on whose boards there was a J. P. Morgan & Co. man.

The last two relate to Armour & Co. and are an exchange of letters between Chase Ulman, a director of Armour, and Elisha Walker. Ulman makes various suggestions relative to a forthcoming issue. There is some testimony by Harold L. Stuart to the effect that a previously proposed financial plan, suggested by Armour's chairman, had proved impossible of consummation and that the credit of the company was so weak that it was not practical to resort to com-

---

1. See infra, p. 760 ff.

petitive bidding, a subject mentioned in Ulman's letter. The sentence selected by government counsel from Walker's reply to Ulman, of August 24, 1944, reads, "As I have said before, my firm intends to give the Company the best terms that it considers advisable." This is claimed to demonstrate an arrogant attitude, suggestive of control. The difficulty with this is that the letter, read as a whole, will bear no such interpretation, nor could it have been viewed in that light by Ulman. In the second paragraph, immediately after the one containing the quoted sentence, Walker adds, "I am very hopeful that the terms we will work out with the management will be satisfactory to you."

### Dillon Read

The government chart and the potpourri of 18 documents used against Dillon Read on domination and control of issuers and use of directorships are far from impressive. The chart lists only two issuers, CIT Financial Corporation and B. F. Goodrich Co., who offered four negotiated new underwritten security issues during the period 1935–1949, at a time when a Dillon Read officer was on the issuer's board of directors. Dillon Read managed one of these issues alone, and co-managed the other three. Two of the documents referred to proxies.

### National Cash Register

Of the other documents, the earliest in point of time is an agreement of January 4, 1926 between the stockholders of the old, privately owned, National Cash Register Company and Dillon Read, relating among other things to the reorganization of the company and to the first public distribution of National Cash Register stock in the history of the company. The stockholders of the old company retained control. Among paragraphs dealing with various matters such as stock options, reimbursement agreements and employee stock, is the part relied on by government counsel, to the effect that Dillon Read is given the right to designate a minority of the directors of the new company. The only fair inference from this, it seems to me, is that in sponsoring such an offering Dillon Read wished to make reasonably sure that the new company had proper management, for the protection of those who bought the securities. For only a short period, after the first year, was there more than one Dillon Read man on the board.

It is interesting to note that in 1935 or 1936, despite the presence of this Dillon Read man on the board, Ripley, upon the invitation of Colonel Deeds, made a trip to Dayton, Ohio, and tried to get the National Cash Register business. When he was told by Colonel Deeds and Mr. Allyn "that they felt that if they did any financing that they wanted to do it through Dillon Read," Ripley continued to compete and asked if Brown Harriman could not be a joint manager. The "red flag" or "signpost" arrangement did not seem to be functioning.

### Amerada Petroleum

A letter of January 30, 1926, with certain exhibits attached, constitutes an offer by two stockholders of Amerada Petroleum Corp. to sell common stock to a syndicate to be formed by Dillon Read. The transaction related to the transfer of control from British to American interests. The situation is similar to that of National Cash Register just referred to. Dillon Read is assured that, over a five year period, there will be elected to the board of directors "a majority of the members thereof satisfactory to you." Under these conditions it is understandable that, in offering the shares to the American public, Dillon Read should wish to give some assurance of a capable board for this limited period.

### Outlet Company

Two documents going back to 1927 and 1928 relate to a piece of patently unattractive business brought to Dillon Read by Freeman, the middleman or finder, whom we shall meet again. In January, 1927, Freeman talked with Van Bibber, of Dillon Read, and said that

as the president of the Outlet Company wanted to retire, "any purchaser would have to provide management." On May 22, 1928, Shields of Dillon Read advised Freeman he was "concerned as to the future management". Also that the price was too high. Freeman was persistent, however, and a memorandum of October 26, 1928, contains the phraseology which it is claimed helps plaintiff's case. It reads:

"M. L. Freeman again suggested the possibility of financing for this company or the purchase of control. I told him we would not be interested, partly because of the management and partly due to the fact that the company had their own bankers, Lehman Brothers, who had handled two issues of securities for them and were represented on the board."

This is confirmed by a letter to Freeman of the same date.

I can find nothing here but the exercise of good business judgment on the merits. After an appraisal of the situation Dillon Read gives what seems to me to be entirely adequate business reasons for letting the matter drop.

### Beneficial Industrial Loan

There are seven 1931 documents, in series, relative to Beneficial Industrial Loan Corporation. The emphasis is placed upon the following sentence contained in a letter of May 26, 1931, from Willcox of Dillon Read to Alexander Randall of the investment banking house of Mackubin, Goodrich & Co., there being a Dillon Read man on the board at the time:

"More important, I am somewhat troubled by your not approaching the company on this matter through the leaders [Dillon Read] of the investment banking group which was formed to handle the investment banking affairs of the company."

The explanation appears on the face of the letters, read against the background of the static data.

In March, 1931, a security issue of Beneficial Industrial Loan was underwritten by Blyth, H. M. Byllesby, Dillon Read and Mackubin Goodrich, Dillon Read leading and handling the business. Of $10,000,000 6% convertible debentures, $7,000,000 were offered March 11, 1931, and there was an option on the remaining $3,000,000. It is this option feature of the 1931 financing which was the subject of the approach of Randall to the executives of the company. There is no doubt that any plan in which Blyth, Byllesby, Dillon Read and Mackubin Goodrich were jointly interested, by reason of their percentages of Dillon Read, 47.50%, Blyth, 23.75%, Byllesby, 23.75% and Mackubin Goodrich, 5%, should have been presented by Dillon Read; and Willcox, on May 26, 1931, wrote to O. W. Caspersen, Vice President of Beneficial Industrial Loan, substantially repeating what he had written on the same day to Randall.

Government counsel treats these letters as warning off a potential competitor, but such was not the case. They were all in the deal together, and Caspersen's reply to Willcox, of May 29, explains Randall's "approach," as follows:

"Mr. Randall wanted to discuss the matter with you, but as you were absent he asked us not to do anything about it until you returned and had the opportunity to pass on it."

A memorandum of Willcox in this series, dated September 10, 1931, suggests that Dillon Read ask George Franklin to go on the board of Beneficial Industrial Loan. The phrase selected here follows a reference to two lawyers on the board, and is "both of whom speak our language." But the use of this common phrase would not seem to justify an invidious interpretation.

Part of the correspondence is between Warner of Byllesby and Willcox to the effect that Byllesby feels that it is entitled to have a "representative" on the board. Willcox puts it up to Byllesby to work out with Blyth, so that there

may not be "three representatives of the banking group," in view of the willingness of the company to have two. But Byllesby and Blyth could not agree and the purchase contract accordingly only called for one. The emphasis here is placed by government counsel on the following sentence in the last letter by Willcox:

> "The Company has taken a very firm position on this subject, and it seems to us hardly proper to put pressure on it to change the agreement."

Whatever "pressure" may have been suggested, however, was suggested by Byllesby, and not by Dillon Read.

By way of sequel, it appears by the deposition testimony of Bogert, of Eastman Dillon, that Eastman Dillon took the business away from Dillon Read, and the next negotiated underwritten offerings of Beneficial Industrial Loan, starting in December, 1938, came out under Eastman Dillon management.

## Union Oil

A letter from W. S. Charnley to Robert E. Christie, Jr., both of Dillon Read, dated July 20, 1931, mentions recommending Wilbur DuBois, "one of our men," to be named as a director of Union Oil Company Pantapec Liquidating Corporation. The sentence selected by government counsel here is:

> "I am very glad that you agreed to this request as in view of the possible future circumstances it is, I think, very necessary that we put the Union Oil under every obligation possible."

Charnley was a director of Union Oil Company of California from before July 26, 1933, until after he left Dillon Read on March 10, 1934. Except for one issue in June, 1923, the pre-Securities Act Issuer Summary Sheet shows Dillon Read as "offeror" or as being in "privity of contract," either alone or with others, with respect to all underwritten offerings between 1922 and 1930. All underwritten issues since 1935 have been man-

aged by Dillon Read, and private placements in 1947 and 1949 were handled by Lehman and Dillon Read respectively.

That the reference to DuBois was merely part of Dillon Read's competitive effort to get or keep business, by taking advantage of an opportunity to be of service to the company, seems apparent. It was only intended that he should serve "during the period of division of properties of Union National Petroleum Company." Gregg of Union Oil, in a letter to DuBois, refers to "the very limited services which you will be called upon to perform"; and DuBois resigned as a director after serving less than two months.

## Commercial Investment Trust

A single document of February 28, 1941, is a combined notice of annual meeting of stockholders and proxy statement of Commercial Investment Trust Corporation, which merely states:

> "Mr. Bollard (an officer of Dillon, Read & Co.) was originally elected in 1929, and Mr. Altschul (a partner of Lazard Freres & Co.) in 1930 and Mr. Strauss (a partner of Kuhn, Loeb & Co.) in 1936 were without formal action designated as candidates, by the Boards of Directors then in office because of their affiliation with underwriters of the Corporation's securities."

## Rheem

Finally, there are three Dillon Read memoranda relating to Rheem Manufacturing Company in March and April of 1944. The last previous negotiated underwritten issue had been managed by Blyth, followed by a private placement without the services of any investment banker in 1943. The first memorandum, dated March 23, 1944, gives a summary of miscellaneous information about the company, probably prepared for the purpose of going after the business, and the part relied on by government counsel notes, concerning the board of directors, that it "is an entirely employee board with the exception of A. E. Ponting,

Coast representative of Blyth." The second, from Behr to McCain, both of Dillon Read, indicates that Keplinger who "was connected with Dillon, Read & Company before he was connected with Rheem," was still of the opinion that Rheem desired "to do business with us instead of Blyth," and would like to bring the president of Rheem in to see Dillon Read, to dispel any impression that Keplinger had misinformed them of the company's position in the matter. The last memorandum, of April 20, 1944, without details notes a talk between Mr. Rheem and Keplinger with Mitchell of Blyth, a subsequent talk between Mr. Rheem and Keplinger with McCain of Dillon Read and concludes with the statement that "Blyth & Company is now working on a debenture issue for this company." Strange to relate, government counsel seem to think these memoranda indicate that Dillon Read started after the business, had a good chance to get it and then stopped competing because Blyth was the "traditional banker" and because of the "red flag" shown by the presence of Ponting on the board.

All the inferences are to the contrary. To begin with, as Dillon Read knew that Blyth had brought out the last previous negotiated underwritten security issue it should not have gone after the business at all, if the alleged conspiracy was in operation. No "red flag" was necessary. The significant thing is that they did compete for the business and they lost out partly because Blyth was evidently in a strong competitive position and Keplinger, in his efforts to help his old firm to get the business, overplayed his hand. Mitchell of Blyth was a formidable opponent and more than a match for Keplinger. Moreover, Mr. Rheem evidently preferred to do business with Blyth. It would be interesting to hear what took place at the conversation between Mr. Rheem, Keplinger and Mitchell shortly prior to the decision to count Dillon Read out. This is not a case of deferring, but of the very sort of active competition that the op-

eration of the conspiracy was supposed to be designed to prevent. There is nothing whatever to indicate that Keplinger's efforts were frustrated by the presence of Ponting on the board.

I find as a fact that there is no basis for plaintiff's charge against Dillon Read on the "directorships" issue.

### Blyth

The government chart shows that Blyth had directors on the boards of 8 issuers, who offered 14 issues of negotiated new underwritten securities during the 15-year period. Of these 14 issues, Blyth managed all but one, the sole issue for one of the issuers. It appeared, however, that Blyth or Blyth Witter had handled financing for 6 of the remaining 7 issuers before its man was made a director; and all 8 are West Coast companies. Blyth never had any general policy of placing directors as a means of competing for business; but where continuing relationships existed in particular instances these may well have been improved and fostered by the presence of a Blyth officer on the board of directors.

In addition to the Dillon Read documents relating to Rheem, which have just been discussed, government counsel introduced only three documents on this phase of the case against Blyth, and one other, received against Lehman Brothers, was referred to in the connecting statements.

### Rayonier

The Lehman Brothers document is a letter from Robert Lehman to Donald N. McDonnell of Blyth, dated October 6, 1943, asking for an underwriting position in a possible financing by Rayonier, Inc. The statement "with two associates on the board of directors, I presume your firm must know the whole story," is supposed to illustrate the power or advantage that a directorship gives an investment banker over potential competitors. But Lehman Brothers had no reason to suppose that it was in a position successfully to compete for the business

nor does it appear that Lehman Brothers even contemplated doing so.

## Pan American Airways

A letter from George Leib to Charles E. Driver, both of Blyth, dated June 1, 1937, indicates that Leib is after a participation and has not been able to make any progress with Lehman Brothers, which, Leib appears to have had some reason to believe, was about to manage a Pan American Airways issue. The letter comments, "Representatives of several investment banking houses are on the board—particularly Lehman," and goes on to suggest that "if they have an underwriting" about the only way Blyth could be included in the group was by an approach through Lew Manning, representing Aviation Corporation, one of the largest stockholders of Pan American.

Far from helping the government because of the phrase "particularly Lehman," the significance of the document seems to be that it was one of the early steps in a competitive effort which finally succeeded in getting the business away from Lehman Brothers, as is shown in the discussion of Pan American Airways financings under the sub-title of Lehman Brothers, on the phase of the case now under discussion.[1]

Another feature of the Pan American Airways financing tends to refute a contention of government counsel which seems to rest on no more substantial foundation than pure assertion. It is claimed that one of the features of the conspiratorial scheme is that, if a defendant investment banking house once has an underwriting position or participation in a financing managed by another defendant, this precludes the participant from competition for the management of future financings of the issuer whose securities are under consideration. But Blyth had participated in the 1940 issue of Pan American Airways, co-managed by Lehman Brothers; and this did not deter Blyth from joining with Kuhn Loeb, Lazard and Ladenburg Thalmann in seeking the leadership of the 1945 issue. There are numerous other instances of the same thing and I shall not mention the subject again. An appropriate finding of fact relative thereto may be submitted in due course.

## Anaconda Copper

Mitchell, of Blyth, when with the National City Company, had for many years worked on Anaconda financings, which in the pre-Securities Act period were handled by the National City Company and the Guaranty Company. Mitchell had been a director of Anaconda for a long time, having been invited by John F. Ryan, then President of Anaconda, to become a director in 1929. During the summer of 1935, Anaconda became interested in a proposed financing which was to be the first substantial new money issue after the Bank Holiday of 1933. Blyth worked out a financing plan and Mitchell testified extensively by deposition concerning the details of what was done. Swan of Edward B. Smith & Co., Stanley Russell of Lazard and others were also after this business. It was only natural that the men who had previously handled Anaconda financings at the National City and Guaranty companies should be found competing against one another for this business after they had been forced to make new connections by the operation of the Glass-Steagall Act.

Despite all this, government counsel claimed, in connection with the "successorship" phase of the case, that the business of Anaconda had "gravitated" to Blyth by reason of a conspiratorial agreement among the defendants to the effect that "part" of the business of National City should be "inherited" by Blyth. As a matter of fact I find that Blyth got this business due to the competitive efforts of Blyth, under the able guidance of Mitchell; and, when Cornelius F. Kelley of Anaconda wrote Mitchell on August 2, 1935, that if Na-

---

1. See supra, p. 717.

tional City Company and Guaranty Company were permitted by pending legislation to resume their investment banking activities, "inasmuch as they have always been the principal bankers of the Company, they would be entitled to lead in the financing if they so desired," Kelley was merely exercising the prerogative of an issuer to select its own investment bankers according to its own free choice. The pending legislation did not pass, however, and the $55,000,000 issue of debentures came out on October 15, 1935, under the management of Blyth.

This is all leading up to a document introduced against Blyth on "directorships," which is a letter from Mitchell to Kelley of August 21, 1935, tendering his resignation as a director of Anaconda, "in order that there may be no conflict of interests in my position as Chairman of Blyth & Co. and in my holding a Directorship in the Anaconda Copper Mining Company, with respect to consideration of the financial program of your Company." Mitchell testified that this was a "matter of judgment" in this "particular case." He never came back on the board.

### Iron Fireman

The final document against Blyth on directorships is a letter from T. H. Banfield, president of Iron Fireman Manufacturing Co., to Shurtleff of Blyth with reference to a vacancy on the board of directors and among the voting trustees of the company, caused by the death of Mansel Griffiths, manager of Blyth's Portland office. The part relied upon reads:

"When Blyth & Co. purchased part of the Iron Fireman Manufacturing Company's holdings and put the same on the market to the public, there was an understanding that Blyth & Co. would have two directors on the Iron Fireman Manufacturing Company's board.

"During the life of this agreement, we have been very happy with the association of both Manse Griffiths and Henry Boyd and it goes without saying that we regret very much the loss of Manse Griffiths.

\* \* \* \* \* \*

"The other Voting Trustees and Directors would welcome you to become a member of the Voting Trustees and also a member of the Board of Directors of Iron Fireman if same would meet with your pleasure. I understand that this is quite satisfactory to Charley Blyth."

There is no evidence that Blyth sought to have any of its officers or employees selected as voting trustees or directors; and I do not see why it is not a reasonable inference that those who served as voting trustees or directors did so at the request of the stockholders or the management and for good business reasons.

With respect to Blyth I find the facts on the "directorships" issue to be the same as with reference to the other defendants. There was no adherence to any "red flag" or "signpost" term of any agreement, and no domination or control over any issuer.

### Some Further Interim Observations

It is because the allegation of domination and control of issuers presents one of the fundamental and crucial controverted issues of fact in the case, that I have gone to such pains to review the evidence in detail and in this comprehensive fashion. After all the talk about domination and control of issuers which is to be found in the TNEC hearings, and in the course of other investigations by numerous public officials over the years, it was to be expected that substantial evidence would be produced at this trial in support of the specific and detailed allegations in the complaint on this subject. Certainly there was nothing to prevent government counsel from having access to every living witness and every shred of documentary evidence in existence. Partners, officers and employees of investment banking houses were subject to subpoena before the Grand Jury, which considered these issues for many months but found no in-

dictment against any of the defendants. While I was adamant in refusing to permit any prying into the proceedings before the Grand Jury, and would take the same position if I were to go through this whole weary process again, there is ample indication in the long record now before me to indicate that truckloads of documents were produced before the Grand Jury. The precise number of the hundreds of thousands of documents, from the files of issuers and defendant and non-defendant investment banking houses, which were examined, tabulated and photostated by government investigators, will probably never be known. The intimate and confidential character of hundreds of the documents in evidence would seem to indicate that there was no suppression of evidence whatever by anyone.

 And yet, as is shown by the detailed summary just concluded, the result is nothing but a hodge-podge of confusion. *Mons parturibat deinde murem prodidit.* No judge or court could possibly make a finding of domination and control of the financial affairs of issuers, by defendants or anyone else, on the basis of such proofs. The myth of domination and control of issuers by investment bankers, at least in the post-Securities Act period with which we are principally here concerned, which was fostered by the ex parte TNEC proceedings and blown up by the long continued propaganda in favor of compulsory public sealed bidding should, perhaps, be given a decent burial and quietly laid to rest.

There is further significance, however, in this discussion of the evidence on directorships. It illustrates the method pursued, and the strategy and tactics employed, in a documentary case such as this. Mere fragments are culled from a host of miscellaneous documents, in complete disregard of the transactions revealed by the context in which these words or phrases are used. But mere "words" are as empty air. The facts concerning the transactions in the course of which these "words" are used must

constitute the building materials out of which court judgments are constructed.

Moreover, the same clear indication of the lack of any combination or concert of action by and between the seventeen defendant firms, which appeared in connection with the consideration of the evidence on the so-called price-fixing phase of the case and the operation of the syndicate system, is found again in the proofs relating to alleged domination and control of the financial affairs of issuers and the use of directorships and proxies. In a circumstantial evidence case of this character the lack of such joint action on these important and basic issues cannot fail to be matter of grave consequence.

## PART V

### The "Triple Concept"

The definition of "traditional banker" contained in paragraph 22(II) of the complaint will be hereinafter referred to. The "triple concept" is alleged in paragraphs 44 and 45. Thus, omitting the references in subdivisions A(1) and (5) which relate to the syndicate system, discussed in PART III of this opinion, paragraph 44(A) of the complaint as amended alleges as follows:

"44. The conspiracy has consisted of a continuing agreement and concert of action among the defendants, the substantial terms of which have been that defendants:

"A. Agree not to compete among themselves for and in the merchandising of security issues, and to divide among themselves, on a mutually satisfactory basis, the merchandising of the security issues obtained by each of the defendant banking firms from issuers, among other means—

\* \* \* \* \* \*

"(2) By recognizing and deferring to the claims of the defendant traditional bankers to manage and co-manage and control the merchandising of the securities of particular issuers.

"(3) By determining their respective participations and positions in buying groups in accordance with the concept of historical position.

"(4) By reciprocally exchanging participations in the buying groups which they manage.

\* \* \*."

The reference to the same subject in paragraph 45 as amended is as follows:

"45. During the period of time covered by this complaint, and for the purpose of forming and effectuating the conspiracy, the defendants, by agreement and concert of action, have done the things they agreed to do as hereinabove alleged, and, among others, the following acts and things:

"A. Defendants formulated and adopted, subsequently operated, and now operate pursuant to, among others, the following restrictive customs and practices:

"(1) Whenever an issuer agrees to permit one of the defendant banking firms to manage the merchandising of a security issue, the other defendant banking firms recognize this as establishing a continuing banker-client relationship and recognize such firm as the traditional banker for the issuer, exclusively entitled to act thereafter for the issuer in merchandising its future security issues. A defendant traditional banker's recognized exclusive relationships in this respect continue indefinitely and, upon dissolution or reorganization of an investment banking firm acting as traditional banker, the other defendant banking firms agree as to which defendant banking firm or firms, if any, they will thereafter recognize as the successor or successors to the previously recognized relationships of such firm as traditional banker. When one of the defendant banking firms is the traditional banker for an issuer, none of the other defendants will discuss or undertake the mer-

chandising of new security issues for that issuer. Defendant banking firms observe an ethic not to compete and refuse to 'poach on each other's preserves.'

\* \* \* \* \* \*

"(3) Defendant banking firms, in forming buying groups, select on a reciprocal basis, other defendant banking firms as underwriters. Over a period of time, the amount of gross spreads which one of such firms enables another to earn by selecting it for participation in buying groups is substantially equivalent (with due allowance for differentials in prestige and underwriting strength) to the amount of gross spreads it has earned in the same period of time, as a participant in buying groups formed and managed by such other firm. Each defendant banking firm keeps a reciprocity record to show the business it has given to each of the other defendant banking firms and the business it has received from each of such firms.

"(4) Defendant banking firms claim and accord to each other a continuing right to participate in the merchandising of all of the security issues of a particular issuer by respectively demanding and receiving from each other recognition of their historical position with respect to such issues. Once a defendant banking firm has been selected as an underwriter in a buying group formed to merchandise a security issue, it is recognized by the other defendant banking firms as having certain proprietary rights or historical position and is granted an opportunity to participate in every buying group thereafter formed to merchandise future security issues of the same issuer, and the extent of the participation and group position offered to such firm is usually the same. The historical position of an investment banking firm devolves through 'inheritance' upon the de-

fendant banking firm or firms agreed upon by defendants as successor or successors of such firm.

"(5) The defendant banking firms employ their traditional banker and historical position concepts as devices to exclude other investment bankers from participation in the buying and selling groups they form and manage. Whenever such exclusion is not possible or practical, they avoid, or attempt to avoid, competition by inducing possible competitors to join with them in their buying groups."

Plaintiff wholly failed to prove the "reciprocity" part of the "triple concept" as appears in the introductory part of this opinion under the sub-title, Certain Alleged Unifying Elements Abandoned or Disproved, which precedes Part I.[1]

### Semantics

It must now be plain that a goodly portion of the time spent in formulating the complaint, and preparing for the presentation of the government's case at the trial, was devoted to semantics. There is a certain amount of this in every case; and the subject need not long detain us. Here we need only briefly comment on the subject by way of background to the discussion of the "triple concept" and "successorships."

Counsel for certain of the defendant firms assert that some of the fundamental misconceptions of counsel for the government, relative to the simple ABCs of the investment banking business, arose from an overly-persistent reading of the TNEC proceedings, where, it is claimed, those who conducted the proceedings sought to put into the mouths of the investment-banker witnesses, words carefully selected for their "dynamic power," seemingly innocent enough on their face, but having a hidden, but nevertheless very real, opprobrious meaning, detrimental to the interests of investment bankers. From an examination of the various extracts from testimony given in the TNEC proceedings by witnesses connected with defendant firms and others, I cannot find this charge substantiated, although the ex parte character of the investigation and the absence of any opportunity given to the investment bankers to state their side of the case, together with what often seems to me to be an unfair sort of questioning of the witnesses, give me the impression that the TNEC proceedings can scarcely be considered as a repository of uniformly dependable information on the subject of what investment bankers did generally in the 30s and prior thereto. This view is supported, at least to some extent, by the absence of any conclusions or recommendations on the subject of investment banking in the TNEC Report, and the similar absence of any reference to investment banking in any of the 43 monographs published by the TNEC.[2]

That the draftsmen of the complaint, and government counsel in the pretrial proceedings, and during the trial, persistently used words of the character above described in their references to various acts and transactions of the several, separate defendant firms, is too clear for reasonable debate. It cannot fairly be said that there was any general currency among investment bankers, defendant or non-defendant, of such words or phrases as: "caretaker" accounts, "infiltration" of boards of directors, "red flag," "signpost" or "reciprocity." True it is that the words "reciprocity" or "reciprocal" appear two or three times, but that is without significance; and the others are mere characterizations of counsel, which are repeated so often, sometimes in questions put to witnesses giving testimony on deposition, and sometimes in argument or colloquy, that, unless one is watchful, it is easy to get the impression that the defendants, or some of them, brought these words into the case.

On the other hand, some of the words, such as "regular banker," "historical

---

1. See supra, pp. 632, 633.

2. See supra, p. 717.

position," "inheritance," "successor," "predecessor" and "satisfactory relationship" do appear in documents or in testimony of such a character that the words cannot be considered as having been suggested by counsel for the government. One of the questions in the case, which can only be resolved after a careful consideration of the evidence as a whole, has to do with the frequency with which such words are used, and by whom, and with what meaning. It must constantly be borne in mind that the essence of the charge is the alleged combination, conspiracy and joint action of the seventeen defendant firms.

It is alleged in the complaint that "traditional banker" is "the term used by defendant banking firms to describe an investment banker who has managed and participated in one or more syndicates to purchase the security issues of a particular issuer on a negotiated basis." I find against the government on this. None of the very numerous documents emanating from the files of one or another of the defendant firms contains this phrase. While Joseph H. King of Union Securities and Henry L. Bogert of Eastman Dillon gave some testimony on deposition to the effect that they had heard the term used, I am inclined to give more weight to the testimony of Harold Stanley on the point, in view of the state of the documents. If, after examining hundreds of thousands of miscellaneous documents in the files of defendant firms, and of issuers, many of them of the most intimate and confidential character, not a single document containing this term could be unearthed, this is strong corroboration of Stanley's statement that he first heard the term during the TNEC proceedings in 1939 and 1940. It has been bandied about to such an extent since then that a certain amount of confusion on the subject is not to be wondered at.

When I inquired about the references to "satisfactory relationship" in connection with the "triple concept," I was told by government counsel that "satisfactory relationship" and "traditional banker" meant the same thing. As I pondered on all this, after it had been explained by government counsel that "successors" and "predecessors" as alleged did not mean real successorship but were all part of a species of conspiratorial lingo, I had a vague notion that plaintiff's theory was that "satisfactory relationship" was some sort of double-talk claimed to be used by "the defendants" for "traditional banker," and that this was equally true of the "negotiation" of a price for a security issue, the description by investment bankers of themselves as "experts" and the issuers as "clients," and of the references in the depositions by various investment bankers connected with some of the defendant firms to the investment banking business as having "professional characteristics." So also, selecting as a basis for the assertion a word used by Harold L. Stuart in his testimony before the ICC, the description in depositions by these witnesses of the extensive work done by investment bankers in formulating plans, shaping up issues and discussing financial matters with issuers, is referred to by government counsel as "bunk." Quotation marks placed around many of the words in government briefs filed during the first year or so of the trial, when viewed in retrospect, strongly support the view that government counsel claimed that "the defendants" used words with hidden meanings. But the multiplicity of the issues and the general confusion prevented me from understanding the matter sufficiently to insist upon some clarification by counsel for the government. At last, during the connecting statements by government counsel, at the close of the taking of the government's proofs in support of its charge, I began to see clearly that what had been insinuated from the beginning was that these seventeen defendant firms were in every sense of the word conspirators, consciously engaged in an illegal undertaking, and that they had ingeniously devised a language all their own to conceal their operations, just as counterfeiters or bootleggers might use a sort of canting speech. From this

point of view, talk about "satisfactory relationships" would be a cover-up for "traditional bankers," "negotiation" of a price for an offering of securities would mean a price forced upon a issuer under the control and domination of the "traditional banker," references to "inheritance" and "successors" and "predecessors" would mean, to the initiates, the foisting upon an issuer of an investment banking firm which had been selected by the co-conspirators to take over the conspiratorial "rights" of some banking house, and member of the conspiracy, which had been forced by the Glass-Steagall Act to give up investment banking; and every time one of the co-conspirators in testimony or in a document mentioned a sense of responsibility to the public, or a duty to be "fair" to investors, or referred to "ethics" or "professional characteristics" of the business, or indicated any disposition to do other than selfishly feather his own nest, this was deceitful talk, a sort of special language agreed upon and designed by the co-conspirators to cover up their real purpose, which was to surround the entire operations of the investment banking industry with a series of unlawful restraints, and monopolize "the cream of the business" for themselves.

At the close of the evidence such charges seemed extravagant, and the then chief trial counsel for the government, whose understanding of the early proceedings was naturally limited, as he first came into the case in the fall of 1952, vigorously denied that such insinuations had ever been intended. But they may again rear their ugly heads; and it is well to have everything out in the open.

This brings me to one of the most remarkable and one of the most significant shifts of theory made by counsel for the government. The "traditional banker" allegations of the complaint are clear and unambiguous. When one of the defendant firms managed an issue of securities for an issuer, it was charged that he thus became the "traditional banker," and that "the other defendant banking firms recognize this as establishing a continuous banker-client relationship and recognize such firm as the traditional banker for the issuer, exclusively entitled to act thereafter for the issuer in merchandising its future security issues." This made sense in a practical, work-a-day world of profit-seeking business men; it was workable, assuming the "payoff," by the practices of "historical position" and "reciprocity," all of which are also alleged in the complaint, as we have already observed. It made sense vis-a-vis the Sherman Act, too, because it was patently artificial and could not reasonably be accounted for as a normal and to-be-anticipated result of the ebb and flow of natural, unrestrained competitive effort. All a member of the conspiracy would be required to do would be to consult one of the standard security manuals, see which, if any, member of the seventeen alleged conspiratorial firms, or other alleged co-conspirator, had managed the last issue of the issuer under consideration, and he would then know that he was supposed not to compete for the business of that issuer, but rather to defer to his co-conspirator, who thus clearly appeared to be the "traditional banker." It is also clear from the allegations of the complaint quoted in the preliminary portion of this part of the opinion, that the "triple concept" only applied as between the seventeen defendant firms and to other firms who had joined the combination and conspiracy and who were referred to throughout the trial by government counsel as "co-conspirators." It would not matter whether or not the relationship between the issuer and the "traditional banker" was "satisfactory," or slightly impaired or wholly bad. Even if the relationship was so bad as to be practically non-existent, one would be forced to infer from the allegations of the complaint that no member of the conspiracy could compete for the business previously done by the "traditional banker," without some new agreement among the co-conspirators, such as the obtaining of "clearance" or

"permission" from the "traditional banker."

This "concept" of "traditional banker" was so thoroughly demolished during the trial that counsel for the government, during the connecting statements at the close of the government's case, virtually abandoned the theory of the complaint and urged upon me a new and quite different theory, described as "this lesser charge," claimed in some way to be included in the "greater" one alleged in the complaint. This "lesser charge" was that there was a "code" among the co-conspirators according to the terms of which the "traditional banker" was the one who had brought out the last issue, providing his relationship with the issuer was still "satisfactory." Sometimes this is referred to merely as an "ethic" to the effect that members of the conspiracy "will not interfere with satisfactory relationships, so long as they remain satisfactory," without reference to the leadership of the last security issue of the issuer; and there are numerous references by government counsel to alleged refusals by defendant firms to interfere with "satisfactory relationships" where the defendant firms claimed to have the "satisfactory relationships" had not managed the last prior security issue. These twists and turns are very confusing and they led to much argument which need not be summarized. That they indicate some fundamental weakness in the central theme of the government's case seems probable.

But I cannot enter upon a discussion of the evidence relating to the "triple concept" without first pausing to appraise the effect of this fundamental change of theory. In the first place it dilutes the charge to such an extent as to make it almost impossible to conceive of the existence of any such conspiracy. How is one to know with any degree of certainty whether in a given situation the relationship between the issuer and the investment banker who brought out the last issue has continued to be "satisfactory"? Then, too, there are so many different degrees of "satisfactory rela-

tionships" that, on the same set of facts one person might infer that the relationship was "satisfactory," and another might reach the opposite conclusion. No standard is even suggested. Moreover, the plaintiff has the burden of proof, and it would seem that the very least the law should require by way of evidence to support this "lesser charge," is proof by plaintiff, in respect to a given issuer, that the relationship between the issuer and the investment banker who brought out the last issue has or has not continued to be "satisfactory," as government counsel endeavor to demonstrate that there is a deferral to the "traditional banker" on the one hand, or endeavor to explain competition by one of defendant firms, on the other. Surely there can be no presumption on a subject such as this, especially where the initial "satisfactory relationship" is proved by nothing more than evidence that the alleged "traditional banker" managed the last issue.

Then, too, proof of the operation of the conspiratorial scheme as alleged in the complaint would disclose a pattern of behavior far removed from anything which could be considered as due to normal, ordinary business judgment, whereas evidence supporting the new and "lesser charge" might do little more than show that investment bankers, like people in other lines of business, only go after business that they have some reasonable expectation of securing, which is pretty close to the exercise of normal and ordinary business judgment.

It is difficult to put out of one's mind the thought that this "lesser charge" is nothing more than a maneuver to cover up the lack of evidence to support the charge as formulated in the complaint. Anyone can see that, if the relationship between an issuer and an investment banking house is such that the investment banking house has brought out a long and continuous series of issues, and goes back uninterruptedly for many years, as in some of the instances already described in this opinion, it would be a mere waste of time for another invest-

ment banking house to formulate elaborate plans for future financing and otherwise do the things necessary to be done, in order seriously to compete for the business of that issuer. It is little wonder that, under such circumstances, many of the witnesses who testified on deposition said that they would not go after such business, they would not waste their time. After all, as testified by Harold L. Stuart, there is no point in doing this sort of thing unless "invited" to do so by the issuer, who generally resents the ringing-door-bell type of approach.

If what is complained of is merely that, as a result of successful competitive effort, the seventeen defendant firms have too large a slice of the business, "more than their fair share" as it were, whatever that may mean, then the avenue of approach would seem to be to the Congress for new legislation on the subject, as was done in the case of public utility holding companies, prior to the passage of the Public Utility Holding Company Act of 1935.

In the view of government counsel, this new maneuver provides a solution for all their difficulties. Thus, without calling a witness to describe the negotiations or the attendant circumstances or anything else, government counsel would place the defendants in the following dilemma. If the documents or deposition evidence show competition by one or more of the defendant firms for the business of an issuer whose last security issue was managed by another defendant firm, this shows that the relationship of that firm with the issuer could not have been "satisfactory," especially if the competing defendant firm suceeds in getting the management or co-management of the next issue. On the other hand, if the defendant firms do not compete for the business, then they are "deferring" to the "traditional banker." It is difficult to take this seriously.

Furthermore, how is the new theory about "satisfactory relationships" to fit into the allegations of the complaint as amended with reference to "predecessors" and "successors"? At the beginning I was told that the conspirators parcelled out among themselves by agreement the conspiratorial "rights" possessed by the various banking institutions who were members of the conspiracy, but who had to drop out on June 16, 1934, when the Glass-Steagall Act took effect. How is one to "inherit" a "satisfactory relationship," which must necessarily be of a personal character, as between specific individuals or groups of individuals? Moreover, a "relationship" is a two-way street; it would not be practicable for investment bankers to agree among themselves as to which one as "successor" would have at any time an "existing satisfactory relationship" with an issuer, unless the latter is also a party to the scheme, which is not claimed.

But let us for the moment lay aside these shifts of theory and examine in detail plaintiff's specific contentions as made at the close of the evidence, and the state of the proofs relative thereto.

■ At various parts of this large record are to be found very numerous instances of competition by each and every one of the principal defendant firms, and by the others as well, which are contradictory of the existence and operation of the alleged "triple concept." Only an opinion of inordinate length and prolixity could cover even a sampling of this competition, which, in view of the many issuer situations which are the subject of extended comment herein, seems unnecessary. General findings relative to such competition by the several defendant firms may be submitted in due course. The evidence pertaining to the "traditional banker" part of the case, however, which we are about to discuss, must be evaluated against the extensive background of the competition just referred to.

The inferences to be drawn from the words and phrases emphasized by government counsel depend in no small measure, as government counsel have contended from the beginning, upon the state of the proofs as a whole. We shall find that the fatal, underlying defect in

the approach by government counsel, which affects each of the principal factual supports of the theory of an integrated, over-all combination and conspiracy as alleged, is the misconception of the facts relative to the functioning of the entire investment banking industry, which has already been pointed out. Just as the operation of the syndicate system of today is the result of many decades of gradual, functional growth and development, so also will it be found that the habits and preferences of issuers and the whole pattern of competitive behavior of these seventeen defendant firms and other investment bankers as well; such as Halsey Stuart, are likewise the result of a similar gradual, functional growth and development. At the very heart of the case lies the fundamental principle which is implicit in every antitrust case, and which government counsel have never disputed, that the Sherman Act was not designed to compel businessmen in any industry to compete in any particular way, but rather to break up and dissolve monopolistic or restraining combinations, conspiracies or agreements not to compete.

### "Historical Position"

After some vacillation on the subject on the part of government counsel, it is now agreed by all that the "reciprocity" and "historical position" parts of the "triple concept," even if proved, would not in themselves give any offense to the Sherman Act. In other words, if the proof fails as to the "traditional banker" feature of the "triple concept," the others have no significance.

The evidence concerning "historical position" puzzled me for a long time, and the situation was not cleared up until after I heard the testimony of Harold L. Stuart. The competition for participations in the various underwritings, and to some extent even for positions in the selling groups, is intense, as many of the investment banking houses have large selling organizations and they need a constant and substantial amount of securities to sell. The documents are full of such words as "claims" and "rights," sometimes based upon work done in the past in connection with the distribution of the securities of a particular issuer, but more generally based upon the underwriting position of the claimant in the last or some previous security issue by the same issuer. There is a good deal of dissatisfaction with the participations which are finally allotted, and practically every investment banker seems always to be using various arguments to get a better position than before, or at least a position which is no worse than before.

At first blush one would suppose that the assertion of a "claim" or "right" to a certain position, based on the records of the prior issues, would indicate some sort of understanding or agreement. But this seemed hardly consistent with the fact that an investment banker who had at any time in the past participated in the underwriting of an issue of the particular issuer, seemed to have the "right" to make the "claim," no matter how long ago he had thus participated and wholly irrespective of the fact that there had been numerous intervening issues in which he had not participated at all. If they all made "claims" there would not be enough participations to satisfy the "claims." While there might be some "declinations," one could never be certain of that. Moreover, such "claims" were asserted by defendant and non-defendant firms alike.

Several partners or officers of some of the defendant firms had testified on deposition that the references in the documents to "claims" or "rights" were really in the nature of arguments supporting the requests for participations, and that these were "considered," together with all available relevant data affecting distributing ability and underwriting strength, and a decision made strictly on the merits. I was skeptical about this before I heard Stuart's testimony.

I questioned Stuart on the subject and found that the fact was as some representatives of defendant firms had already testified on deposition; and a further

study of the documents shows that this testimony is thoroughly in accord with the general tenor of the documents which, more often than not, set forth arguments which go to the merits in support of their "claim." Moreover, "claims" based on "historical position" are made throughout the industry as a whole, and not by any single group, such as the seventeen investment banking houses made defendants in this case.

The upshot of the matter is that a participant in prior issues has already had experience in the distribution of the securities of that particular issuer and thus must know a good deal about the company and the type of investor, individual or institutional, who would be in the market for securities of this character; and the very fact of prior participation as an underwriter is some indication of sufficient underwriting strength to support the risk involved. Accordingly, it would not be fair to deny him a reasonable hearing on his application for a participating position similar to or better than the one he had before. Hence, in the patter of the trade, he is said to have a "right" to present his "claim." Stuart waxed quite eloquent on the subject, using such expressions as "moral right" and "decent commercial ethics." But, as I had already been informed by the others, the catch is that neither the manager nor the issuer, to whom these "claims" are not infrequently addressed, is under any obligation to honor the claim. All that is required is that the "claim" be "given consideration," which means a consideration of the whole picture on the merits, including present underwriting strength, past performance, improvement or deterioration in distribution facilities and so on. Stuart evidently considers it morally wrong to exclude a participant who has been doing "a good job." There is nothing conspiratorial about this; and I find no discrimination against non-defendant firms, despite the considerable number of letters written by a few of the defendants to non-defendant firms, which give as an excuse for not granting or recommending participations the fact that there are "obligations" to firms who participated in the last issue, or too many "historical" claims, or that the list could not be extended beyond "those underwriters who participated in the various past issues." These letters are mere "polite refusals," calculated to give the least offense to the applicant. Occasionally a document will indicate some selfish reason for including a particular firm as a participant, without too much regard for the merits; but this is true of a very few defendant firms, and has little significance.

While these "historical position" requests are described in the complaint as "proprietary rights" and are alleged to be "usually" granted, counsel for the government conceded that the most the plaintiff's evidence showed was that they were "frequently" allowed. There is no substantial evidence to sustain the definition of "historical position" in the complaint as a "term used by defendant banking firms to describe the recognized claim of an underwriter to continue to participate in future syndicates to merchandise security issues of the same issuer."

At times the positions of the underwriters in successive issues of a particular issuer were the same, or more or less so; more often they were not. Moreover, new underwriters were often added to the syndicate which was being formed to underwrite the next security issue, and underwriters who had been participants in the syndicate which had underwritten the previous issue were frequently eliminated. And there is abundant proof that issuers had the final say, and that in many cases the issuers gave directions and made suggestions relative to including this or excluding that investment banking firm from the list of participants, or changing their positions up or down, as we have already had occasion to observe. While it is difficult to generalize on the subject, however, it seems to me that the issuers more or less left it to the manager to make up the group, as the manager would be in

a better position to know who should be included.

In instances too numerous for detailed discussion, both defendant and non-defendant firms were denied a participation in a forthcoming issue, despite "claims" asserted on the basis of "historical position"; and even the "polite refusals" are inconsistent to some extent with the theory of over-all conspiracy, as in most such cases, although the letters would indicate that the firm sending the letters was more or less bound by the "historical positions" of the participants in the last issue, it is established by the static data that the underwriting groups being made up, or having already been constituted at the time the letters were sent, included non-defendant firms who had not participated as underwriters in the previous issue of the same issuer.

That all managerial houses give some consideration to the positions and percentages of the participating underwriters in past issues of the same issuer seems not in substantial dispute. Otherwise, I do not see how they could make up the underwriting groups without lost motion, and considerable waste of time collecting data, which is necessarily reflected in the past positions and percentages.

### Chicago Union Station

There were twelve security issues of Chicago Union Station in the period beginning February 8, 1916, and ending March 15, 1940. Counsel for the government continually refer to this as a "frozen" account, and the static data and a long series of documents in evidence are claimed by government counsel to give some support to the "traditional banker," "historical position," "successorship," and opposition to the campaign for compulsory public sealed bidding phases of plaintiff's charge. Accordingly, it will be convenient to discuss the whole matter here. I may say, at the outset, that, as will presently appear, the evidence relative to the Chicago Union Station does not fit into any of the government claims above referred to.

In 1912 Kuhn Loeb and Lee Higginson formed a nucleus group to "try to get the Chicago Terminal business"; and they agreed that each would undertake responsibility for carrying 50% of any such purchase, whether alone or with associates. Kuhn Loeb invited National City Bank and Clark Dodge to be associated with it on original terms for any financing which might eventuate, and Lee Higginson invited J. P. Morgan & Co., First National Bank of New York and Illinois Trust & Savings Bank. On this basis the group purchased and offered $30,000,000 of 4½% Series A bonds on February 18, 1916. The purchase group consisted of all except J. P. Morgan & Co. and Clark Dodge, and these two, although participants on original terms, did not enter into the purchase contract with the issuer.

In the remainder of the pre-Securities Act period substantially this same group purchased six additional issues and the seven issues together make up what is called the "frozen account," because the percentage interests, except for the elimination of Clark Dodge at the time of the purchase of the 1921 issue, remained about the same.

As this was a purchase on original terms and is of a character quite different from the other issues generally involved in the case, there would seem to be no room for the application of the "triple concept," especially as six of the seven issues were brought out under the same $60,000,000 mortgage executed in 1915. There seems to be no illegality connected with the formation of this group nor anything to indicate that it was an overly large one or that the underwriting strength of the members of the group was such as to constitute any illegal restraint. Perhaps, if witnesses had been called and all the relevant details fully disclosed, there might have been some basis for a ruling that the specific arrangement violated the Sherman Act. But no such issue is presented in this case, no witnesses were called to testify on the subject, and government

counsel made it plain that they desired no such ruling.

An incident connected with the $850,000 issue of 1924 is stressed by counsel for the government but seems to merit no extended discussion. $7,000,000 of the Series B bonds had been sold subject to ICC approval, and, in March 1924, the ICC gave its approval, but, relative to the $850,000 of Series A bonds, directed that they "be sold to the highest bidder after public advertisement for competitive bids." No bids were received. Halsey Stuart did not bid, although there was no reason why the firm should not have observed the usual public announcement of the decision of the ICC; nor is there anything to indicate that the lack of bids was in any manner due to any activity on the part of any of the defendant firms. The suggestion that members of the purchase group "controlled" the issuer seems gratuitous, and is unsupported by evidence. The proprietary roads were the Chicago, Burlington & Quincy, the Chicago, Milwaukee & St. Paul, the Pittsburgh, Cincinnati, Chicago & St. Louis and the Pennsylvania, each of which guaranteed the Station's bonds pursuant to an operating agreement executed in 1915, and supplemented in 1919.

The remaining five issues all came out in the post-Securities Act period. Only two of the original group remained in the investment banking business—Kuhn Loeb and Lee Higginson. The answer to the claims of government counsel is to be found in the conduct of these two leaders or managers of the two 50% interests above referred to. Kuhn Loeb took in Harriman Ripley, which was no more than natural as Pierpont V. Davis of the then Brown Harriman had represented the National City Bank in the negotiations for the 1924 issue, and was highly regarded by the issuer and the representative of the Pennsylvania. This does not seem to me to be any recognition of "successorship."

The Lee Higginson side of the picture is complicated by the fact that First National and Continental Illinois evidently thought that there might be legislation to permit them to return to the investment banking business, and Lee Higginson, whose former position of eminence in the investment banking industry appears to have suffered some diminution in prestige, appears to have made a deliberate effort to please its three former associates, First National, J. P. Morgan & Co. and Continental Illinois. J. P. Morgan & Co. declined to make any suggestions. Lee Higginson then invited First Boston to join the group with a 5% interest, which was accepted. Charles Glore of Field Glore was a director of the Burlington and he made strenuous efforts to have his firm included; but the Continental Illinois completely ignored any question of the claimed "interests" and recommended Field Glore to Kuhn Loeb rather than to Lee Higginson. Just how Field Glore got in is far from clear, and it may well have been with some assistance from the executive officers of the Pennsylvania, through the intervention of Budd, president of the Burlington. One of the letters of Jessup of Lee Higginson indicates also that Sturgis, of the First National Bank of New York, was aware of the very persistent efforts of Field Glore to get some sort of a position in the business. That Charles F. Glore, the head of the firm, tried every angle of approach is plain; and it was natural that he should do so, as Field Glore was a Chicago house and this was an important piece of financing in the Chicago area.

The First National seemed quite sanguine about the prospects of a change in the law, and wrote to Lee Higginson "We would like to nominate E. B. Smith & Company to receive ½, Lazard Freres ¼ and White Weld ¼ of our previous interest," adding later that they "hoped that banks were not permanently out of the underwriting business and if and when we could legally do so, we would expect to recapture this business from them." Accordingly, the Lee Higginson group as reconstituted included, in addition to Lee Higginson, Edward B. Smith & Co., First Boston, White Weld

and Lazard Freres. In 1936 Morgan Stanley came into the group with a 15% interest, which was slightly larger than the interest of J. P. Morgan & Co. in the pre-Securities Act period. There is nothing to show that Morgan Stanley was not invited by Lee Higginson to come in, after the organization of Morgan Stanley, for reasons similar to those which had motivated Kuhn Loeb in taking in Brown Harriman.

The notion that an investment banking firm having "historical position" could nominate a "successor" is not part of the conspiratorial scheme alleged in the complaint. Indeed, plaintiff's theory is that the co-conspirators agree among themselves upon who the "successors" shall be. The net result, accordingly, is that this was a special situation having little relevance to any of the terms of the alleged conspiracy, concert of action and agreement. From whatever angle the matter is approached, it is clear that a new group of an entirely different character was formed, under circumstances met with nowhere else in this case.

The final contention has to do with the 1940 issue. In December 1939, Bovenizer of Kuhn Loeb proceeded to negotiate as representative of the purchase group for the sale of new Series F bonds, to replace approximately the equal amount of outstanding Series D 4% bonds; and on February 5, 1940 the group offered to pay Chicago Union Station 101½, or a basis of 3.16 to the Station, for new 3¼% bonds. An informal conference with the members of the ICC on February 26, 1940, elicited the suggestion that the proposed issue was one which might lend itself particularly to competitive bidding. This was authorized by the directors of the Chicago Union Station. The invitation for competitive bids was mailed on March 5, 1940, to 107 bankers, banks and insurance firms. Halsey Stuart submitted the only bid, in the amount of 98.05 for the 3⅛% bonds which had been authorized. Without rejecting the bid or discussing the price which had

been offered by Halsey Stuart, Pabst of the Chicago Union Station called Bovenizer to find out what the purchase group would now offer for the bonds. Bovenizer replied that Kuhn Loeb did not make competitive bids and would give an answer only in the event that the Chicago Union Station should decide to reject the one bid which it had received. Apparently after further conference with the ICC, Pabst advised Bovenizer that the Halsey Stuart bid had been declined, and Kuhn Loeb then informed him that the purchase group would continue the offer previously made, which, on the same basis of 3.16, was for the 3⅛% bonds, almost 1½ points better than the Halsey Stuart bid. The bonds were accordingly sold to the purchase group, whose members sub-underwrote about half of their commitment, and the transaction received the approval of the ICC. While Stuart, in his testimony, claimed that Halsey Stuart should have been given an opportunity to make another bid, contemporary correspondence shows that at the time Halsey Stuart had described the Kuhn Loeb purchase group bid as "over pricing and inadequate margin of profit"; and the outcome appears to have been that the market had gone down after the date of the Halsey Stuart bid, and Kuhn Loeb and its associates were in fact obliged to reduce the public offering price to 100¾.

**The Alleged "Practice" of "Traditional Banker" and "Successorships"**

As we are now dealing with the central theme of the government charge, I shall follow the course pursued when analyzing and evaluating the plaintiff's proofs on the subject of alleged domination and control of issuers, discussing the evidence principally relied on as against each of the seventeen defendant firms. I shall follow the order in which the defendant firms are named in the complaint, so that reference can easily be made to the basic facts relative to each firm, described, also in the same order, in Part II of this opinion, under the

title, The Seventeen Defendant Banking Firms.[1]

## 1. Morgan Stanley

In the 1935–1937 triennial, immediately after the establishment of this firm, the statistics show that Morgan Stanley managed about 20% of the total new negotiated underwritten security financing. Accordingly, if there was to be a charge of conspiracy, Morgan Stanley had to be named as one of the co-conspirators. There was some difficulty about this, however, as none of the hundreds of thousands of documents, examined by the government investigators, indicating or even hinting at the alleged "rights" of "traditional bankers" or claims to "historical position" or "successorship," had emanated from the files of Morgan Stanley. No Morgan Stanley memorandum or report, diary entry, letter or telegram gave the slightest indication that Morgan Stanley had "deferred" to any other investment banker, defendant or non-defendant, or that Morgan Stanley had ever urged any investment banker to "defer" to it. No amount of argument or explanation can supply this significant absence of documentary evidence admissible testimonially against Morgan Stanley.

To make matters worse for the plaintiff, even government counsel asserted that Morgan Stanley "had more business than they could handle," and there is much in this record to show that their strong competitive position was due to the experience, the very numerous personal relations with issuers, the technical skill in matters of finance, and especially the absolute integrity of Harold Stanley, the head of the firm.

Sensing from the outset the importance of his credibility as a witness, I followed with great care and attention the reading of his deposition testimony and of the excerpts taken from testimony given by him in other proceedings. I checked every statement of fact with other parts of the record, and with the testimony of Harold L. Stuart, in search for discrepancies or possible equivocations or lack of frankness; and I submitted his statements, under oath and otherwise, to every one of those tests which an experienced judge applies in his everyday search for the truth. As a result I became convinced that his testimony could be relied upon.

The fact that Stanley denied the existence of any such conspiracy as charged, and that it was wholly unknown to Stuart, is one of the significant features of the case.

### The "Master Mind"

And yet, having in the beginning taken the position that there was "not up to this time"[2] any claim of the existence of a ringleader or "master mind" to direct the operations of the alleged combination, government counsel, in the connecting statements and summations after the close of the evidence, came out flatly with the assertion that Stanley, or Morgan Stanley, which meant the same thing, was the ringleader, and that he substituted for J. P. Morgan in this role, after J. P. Morgan & Co. had decided, upon the passage of the Glass-Steagall Act, to withdraw from the investment banking business. It seems likely that government counsel had all along planned ultimately to take this position, if hard pressed, as it was originally charged that the conspiracy was formed at the time of the Anglo-French loan in 1915, under the management of J. P. Morgan & Co.; and a reluctance to make such a serious charge is understandable, because the law does not require the prosecution in a conspiracy case to show that there is a "master mind" or even to show when and under what circumstances the combination of co-conspirators was formed. Proof of such matters is always relevant, however, as it makes more probable the existence of a conspiracy; and, once a conspiracy is shown to exist, slight evidence is nec-

1. See supra, p. 655.

2. January 18, 1951. The trial commenced on November 28, 1950.

essary to connect individual co-conspirators with the illegal undertaking, as, in the natural course of such lawless operations, particular individuals are bound to join for a time and then drop out.

And so, the proof against Morgan Stanley, to establish the revised version of the "triple concept," as at least in effect "prior to 1933" instead of "in or about 1915" as originally claimed, and as reduced to the "lesser charge," concerning non-interference with "satisfactory relationships," all of which is supposed to be one of the regulations or terms of a "code," starts with a part of the statement prepared by J. P. Morgan and read by him on May 23, 1933, when he testified before a Subcommittee of the Senate Committee on Banking and Currency. This was received "subject to connection."

Thus in giving his views "on the subject of the duties and uses of private bankers," as contrasted with those arising from "the laws and regulations of the government," reflected in the charter of an incorporated bank, J. P. Morgan said:

"The private banker is a member of a profession which has been practiced since the Middle Ages. In the process of time there has grown up a code of professional ethics and customs, on the observance of which depend his reputation, his fortune, and his usefulness to the community in which he works.

"Some private bankers, as indeed is the case in some of the other professions, are not as observant of this code as they should be; but if, in the exercise of his profession, the private banker disregards this code, which could never be expressed in legislation, but has a force far greater than any law, he will sacrifice his credit. This credit is his most valuable possession; it is the result of years of fair and honorable dealing and, while it may be quickly lost, once lost cannot be restored for a long time, if ever."

There is nothing in the context even to suggest that the witness before the Senate Committee is referring to investment banking, much less to refraining from competition with other bankers having "satisfactory relations" with their clients or customers. The remainder of this short statement by J. P. Morgan makes it plain that he has other matters in mind. The reference to the Middle Ages probably concerns such private bankers as the Fuggers of Augsburg or the Medici of Florence, any of whom, were he alive today, would doubtless be shocked at the very notion that there was a code among private bankers to prevent him from competing with anyone for anything he wanted. When it came to honoring one's obligations on the very due day and keeping one's word, despite hardship and inconvenience and the absence of any writing, that would be a different story, one quite in keeping with the traditions of the Fuggers, and the Medici as well, when it came to matters of business.

The document containing this testimony was not admissible testimonially against Morgan Stanley, and it would in all probability never have been mentioned but for the fact that, at a subsequent hearing on June 27, 1933, Otto H. Kahn also referred to a "code," which we shall find, when we come to the evidence against Kuhn Loeb, was a "code" of a very different character, expressive of the Otto H. Kahn "show window" policy of Kuhn Loeb. Even this reference by Otto H. Kahn was perhaps an improvisation, suggested by the NRA which was at the time in the forefront of everyone's mind. The two references to a "code" concern matters as far apart as the poles. J. P. Morgan was making an effort, after careful preparation and mature consideration, to explain what he thought was the very real contribution of private banking houses, such as J. P. Morgan & Co., to the economic well-being of the nation, wholly unmindful of the fact that those who heard or read his statement might be wondering whether or not such unregulated power in a firm

of private bankers was consistent with the general welfare of a democratic nation. Otto H. Kahn, on the other hand, was merely polishing up his "show window." It is highly improbable that either of these witnesses had up to 1933, when their testimony was given, even considered the possibility that there might come a time when the Supreme Court would regard insurance or the business of investment banking as "trade and commerce" between the states.

The first excerpt from Stanley's testimony in other proceedings comes from his examination as a witness in Morgan Stanley & Co., Incorporated v. Securities and Exchange Commission, 2 Cir., 1942, 126 F.2d 325, which dealt with a claim of statutory affiliation between Dayton Power & Light Company and Morgan Stanley, through J. P. Morgan & Co. and United Corporation. The standards to be applied were those of Rule U-12F-2, adopted by the SEC on December 28, 1938, and revoked on April 8, 1941, just after the decision of the Commission on March 27, 1941, in the Dayton Power & Light case. This Rule contained an alternative definition of statutory affiliate, for purposes of financing only, as to any person found by the SEC "to stand in such relation" to the company "that there is liable to be or to have been an absence of arm's-length bargaining" in transactions between them. The parent company was Columbia Gas & Electric. The questions put to Stanley related to efforts or lack of efforts on the part of J. P. Morgan & Co. to compete for the management of a $50,000,000 issue of Columbia Gas & Electric, which came out in 1931, while Stanley was still a partner of J. P. Morgan & Co.

The background is, as always, relevant and interesting. Stanley was a director of Columbia Gas & Electric in the period 1922–1935; he had been vice-president of Guaranty Trust Company of New York in 1916–1927, and president of its securities affiliate, Guaranty Company, in 1921–1927. Columbia Gas & Electric brought out eight underwritten issues during 1924–1931; Guaranty Company had offered one together with four other investment banking houses, and was alone as the underwriter in privity of contract with Columbia Gas & Electric for the seven others.

When questioned on the subject Stanley said:

> "Well, there was no reason to consider approaching Columbia. I knew personally that Columbia had adequate and satisfactory arrangements with the Guaranty Trust Company, and I assumed so long as they were satisfied with them they would continue with them."

He also testified that while he was a partner, J. P. Morgan & Co. did not, he thought, try to obtain the business of other companies who had done business repeatedly with other underwriters; that he could not think of any case of their having done so; and that there is no reason to try to break up such relations if they are satisfactory to both parties.

Evidently he did not at the moment recall the Missouri Pacific issue of $61,-200,000 on January 26, 1931, which was managed by J. P. Morgan & Co., following nine issues handled by Kuhn Loeb in the period 1925–1930.

But the more significant fact is that Stanley's testimony in the Dayton Power & Light case is quite consistent with his testimony by deposition in this case and with his testimony at the SEC open hearing on January 28, 1941, just prior to the adoption by the SEC of Rule U-50, requiring compulsory public sealed bidding in connection with security issues of companies affected by the Public Utility Holding Company Act of 1935.

In explaining to the SEC his reasons for thinking that Rule U-50 should not be adopted, Stanley took the position that if the issuers found the services of an investment banker satisfactory to them, he could not see why the SEC was so anxious to force public sealed bidding on them against their will. That was what the hearing was about.

Accordingly, Stanley volunteered the statement:

"Mr. Stanley: Mr. Chairman, just for the sake of the record, I think you stated that you understood the investment bankers assumed theirselves to be free to solicit business. I would like to say so far as I am concerned that I do consider myself free to solicit business without responsibility to anyone excepting myself. Every man in the bond business is free to do what he wants. The reason I have not done it is that there has not been business that I wanted that I did not think was being satisfactorily done by others. If the business is satisfactorily done, it would be fair enough to think that the fellow who has it should keep on with it."

This gives no support to the theory that there was a "code," prohibiting interference with "satisfactory relationships." Indeed, Stanley testifies precisely to the contrary.

His testimony in this case is to the same effect. Thus he said:

"Q. Has your practice in this regard [interfering with satisfactory relations] changed since you testified [in 1941] before the SEC? A. I don't thinks so. If we thought we would get the business we would go after it, before and after. Ordinarily when the issuer is satisfied we have not any chance of getting the business away from the man who had done business before or who is in negotiation with him.

"Q. Well, has it been your practice to go to issuers where another banker has been negotiating or is handling prior issues and offer competing prices on better terms? A. Well, if asked to do so by the company we have expressed our opinion of the price.

"Q. But you have not gone in and made unsolicited bids where another banker was negotiating for an issuer? A. Where you knew the terms of the issue?

"Q. Whether or not you knew the terms of the issue? A. Well, I think we did in the case of Norway at the request of the Norwegian representative in New York.

"Q. But you did not where the company does not ask you to do so? A. Yes, in the case of—yes, that was subsequent to this testimony, in the case of Denmark, we endeavored to arrange to do the next piece of business for the Government, and we knew others were trying to get it. We knew negotiations were at the point where bankers were being discussed, and we endeavored to be selected by the Danish Government over the other people and were selected.

"Q. You did not do that unsolicited for industrial issuers though, did you? A. Yes, we have in the case of the Socony-Vacuum in 1946. We went to the company and asked if they were going to be considering some financing, knowing that previously other bankers had done business with them, and they asked us to negotiate with them on an issue that shortly afterwards they did decide to consider, and told us they were negotiating with other people at the same time.

"Q. The prior transactions with Socony-Vacuum had been done on an agency basis, had they not? A. Yes, one had. Another transaction some years before that I think was done on a public issue through Dillon, Read.

"I might add that we—well, that was probably before this date, I don't remember it, but we went to them knowing that at the time they were considering an agency transaction and tried to get them to make a public issue."

The central theme about which all this discussion revolves is of course com-

pulsory public sealed bidding, which men connected with various government agencies had for years been trying to force upon unwilling issuers. Despite all the minor questions which serve to confuse and blur the outlines of the scene of battle, and whether or not individual contestants even realized at the time that it was so, the real question was whether the old order should be swept away by government fiat. That is why it is so important that the history and development of the investment banking industry be clearly understood.

For, on the one hand, there is the old, established way of conducting the investment banking business, which had slowly grown up functionally over the years. The testimony of Harold L. Stuart, the principal witness for the government, makes it clear that the reason why the major part of the competitive effort of investment bankers generally was devoted to an attempt to establish relationships with issuers was that the issuers willed it so. The preferences of issuers were the controlling factors. As Stuart said, if an investment banker had any sense he would not push himself in, but would wait to be "invited," and many an anxious hour was spent by investment bankers of all ranks in devising ways of playing their cards so that the "invitation" might be forthcoming. That is why there is so little price competition after the issues have been shaped up; and it is also due to the preferences and desires of issuers that suggestions are made, plans submitted and what is called by government counsel "advice" given, all without specific and separate charge. As we enter the first and second triennials, 1935–1937 and 1938–1940, the competition for business is intense and continuous, including many instances fully described in this opinion and many others in addition thereto, where one of the defendant investment banking houses competed for the business of an issuer, despite the fact that another defendant firm had managed successive prior issues of that issuer; but generally speaking they did

not. The reason they did not do so more often is not that they were under any obligation or conspiratorial duty to refrain, but because of the plain common sense of the matter. In most cases where one investment banker had brought out a number of successive issues for an issuer, there was no reason whatever for a competing investment banker to think he could dislodge the firm which had been doing the business for years. This is one side of the picture.

On the other hand, as we shall observe more closely when we come to the part of the case dealing with the campaign for compulsory public sealed bidding, there were certain men connected with the government in one capacity or another, who sincerely felt that the relationships which had thus become established in the natural, normal course of competition, should be broken up and that there should be forced upon issuers and investment bankers alike, a new way of doing business, on the basis of price competition alone, in order to "give the little fellow a chance." We shall see later the extent to which the position of the "little fellow" was improved by compulsory public sealed bidding. We shall also see how a few determined and resourceful men aided in the effort to advance the day when the views of those above referred to would be transferred from the realm of theory into that of positive and binding governmental rulings and regulations.

But the theories were there and the facts were there. These never changed. Were the old-fashioned ways to continue; or would the new day dawn? We shall now see the results of a period of investigating, which we may take to have been carried on steadily from the public hearings before the SEC in January, 1941, down through the Grand Jury proceedings in the Southern District of New York and the six thousand odd pages of depositions taken in the course of discovery proceedings in this case. Stanley, in his effort to convince the SEC that the issuers should be permitted

to run their own affairs, had told the SEC that "if the business is satisfactorily done, it would be fair enough to think that the fellow who has it should keep on with it;" and government counsel, in an avalanche of words, which did not change the basic facts one iota, came back to the subject of a "satisfactory" job, "satisfactory relations," and the like again and again. Perhaps another myth had been in the making.[1]

No amount of questions and answers, repeated endlessly, with varying formulas and a bewildering variety of ways of saying the same thing in a slightly different fashion, can obscure the basic fact that there was no "code," there was no agreement or "practice" on the subject, but that the common experience of investment bankers generally—not these seventeen firms alone—was that, because of the habits and preferences of the issuers, as explained by Stuart, and the normal and ordinary functioning of the investment banking industry, there was no point in running around, wasting one's time, in a patently futile attempt to get business, where a competitor was on good terms with an issuer and doing a good job.

Once in a while, after seemingly interminable questioning, a witness may finally use some expression deemed by government counsel to be particularly helpful, as when Joseph R. Swan, of Smith Barney, in answer to a leading question says there was a "custom," or where Henry L. Bogert of Eastman Dillon speaks of not "upsetting the apple cart." But the testimony of each of these witnesses must be read as a whole and the net effect is as above stated. And if each of these investment banking houses was, pursuant to its own particular policies and in keeping with its own staff and capital and needs, using every reasonable effort to get all the business within its reach, every financing that there was some hope of getting, I do not see how there can be any violation of the Sherman Act.

There are no documents emanating from the files of Morgan Stanley to support the charge that Morgan Stanley ever claimed to be the "successor" to the investment banking business of J. P. Morgan & Co., or that it on any occasion "recognized" any other defendant firm as "successor" to the investment banking business of any of the institutions which ceased to do investment banking after the dead-line of June 16, 1934, fixed by the Glass-Steagall Act. Indeed, contemporaneous documents show that Stanley repeatedly characterized such "claims" as "far-fetched" and "silly." The references in a few of the documents of five of the other defendant firms to, "if Morgan came back in the bond business," or to Morgan Stanley as "the investment security end of J. P. Morgan & Co.," indicate no conspiratorial agreement that Morgan Stanley would be considered the "successor" to the "rights" of J. P. Morgan & Co. as "traditional banker," but only the expectation on their part that Stanley and his associates, because of their experience and their numerous personal relationships with the executive and financial officers of issuers, and their natural acumen and standing in the financial community, would in all probability be able to secure by normal and ordinary competitive means, the business of many issuers whose financings had previously been handled by J. P. Morgan & Co. There is nothing strange or surprising about this attitude on the part of Blyth, First Boston, Smith Barney (then Edward B. Smith & Co.), Glore Forgan and Goldman Sachs; and that is very likely the way the rest of the investment banking industry thought on the subject.

From Stanley's point of view, however, the prospect did not look quite so alluring; and he and his associates did everything in their power to make the

---

1. See reference to the TNEC proceedings in Morgan Stanley & Co., Incorporated v. Securities and Exchange Commission, 2 Cir., 1942, 126 F.2d 325, 328, 329.

new firm widely known and to get every piece of desirable business they could secure. This competitive effort is briefly described in the recital of the basic facts concerning Morgan Stanley in Part II of this opinion,[1] and need not be repeated here.

One must not forget the superlative equipment and background which Stanley possessed; and his associates also were men of wide experience and excellent reputation. If their former connection with J. P. Morgan & Co. was a circumstance which helped them to get business, which seems highly probable, there is no reason perceptible to me why it should not have done so. After all, the Glass-Steagall Act was designed to effect the discontinuance of underwriting by the great banking institutions and their affiliates, not to destroy the livelihood of those individuals who had spent their lives working in and for these institutions and who were now making new connections and establishing new firms. Had Stanley himself for any reason dropped out of the picture shortly after Morgan Stanley was formed, I venture to say that the history and success of the firm would have been far otherwise than as is reflected in this record. Then too, it seems not unlikely that some of the railroads and other issuers who had previously done investment banking business with J. P. Morgan & Co., sought advice and the recommendation of that firm and that what they were told played some part in their decision to select Morgan Stanley. There is no proof of this in the record, but I can see no reason why the partners of J. P. Morgan & Co. should not have spoken well of their former associates, just as is commonly the case with those in other lines of business, when a long continued relationship is terminated with no loss of mutual esteem and friendliness.

There were only three pieces of business that Stanley definitely knew were coming to the new firm before it opened its doors on September 16, 1935, and

each of these was explained to my entire satisfaction. None of them lend any support to the government's claim of "successorship," *de jure* or *de facto*, conspiratorial or otherwise.

### The Telephone Business

The final decision to set up Morgan Stanley was made around the middle or 20th of August 1935. The discussions leading to this decision were paralleled by conversations between Whitney and Stanley, of J. P. Morgan & Co., with executives of the Telephone Company who were planning to bring out an issue for Illinois Bell Telephone Company.

Walter S. Gifford, president of American Telephone & Telegraph Company, had asked if he could borrow some people in J. P. Morgan & Co. to advise his staff in the preparation of a registration statement, and Young and Jones had been given this assignment of work. Gifford had been told in July that consideration was being given to the question of whether any of the partners or employees of J. P. Morgan & Co. would form a separate company; Gifford had heard rumors about it; and in a conversation with Stanley, at about the time the decision to organize Morgan Stanley was made, Gifford was informed of it. Stanley testified that thereupon Gifford said, "that solves my problems," and put on his hat and went home.

Further talks with Gifford and with Charles P. Cooper, vice-president of the Telephone Company in charge of finance, ensued after Morgan Stanley opened for business on September 16, 1935. What Morgan Stanley did is summarized by Stanley in his testimony:

"Sometime after we had opened our new offices I had talked with Mr. Gifford and Mr. Cooper, having had talks with them earlier before the formation of Morgan Stanley, to the effect that Morgan Stanley was going to be formed. I knew then that a great many people had approached

---

1. See supra, p. 655.

Mr. Gifford wanting to undertake business for him. By 'people' I mean investment bankers. The substance of my talks with Mr. Gifford and Mr. Cooper after September 16th was that they wanted to go ahead with this Illinois Bell issue, that they had talked with the Securities and Exchange Commission, who were very anxious that the Telephone Company be one of the ones who would help get the market going under the SEC regulations and registration, and that they would like to have Morgan Stanley & Co. manage the financing. They wanted to deal with one person in the negotiation of their contract, and not be bothered by having to talk with a lot of different people at the same time, who might have several contracts of purchase, under the procedure that was current, namely, having a group of people make a several purchase from the borrower. They said they wanted us to guarantee the performance of the people that we had as underwriters, because they looked to us to select the underwriters and get good ones— people of financial strength—and make the marketing a success. They were very keen about making it a success. They and we both wanted a small group. Almost everybody in the business had approached them. It is obvious that you could not have everybody as an underwriter unless you had a very large group. So we selected the ones that we thought best fitted to do the job. There were other people who would be helpful but we did not need them. We thought this was a compact, good group of people, of high standing and ability."

The issue came out on October 16, 1935, in the amount of $43,700,000; and it is hardly probable that Gifford and Cooper were being led by the nose.

In this connection, and in my study of the record as a whole, I have given careful consideration to the very numerous documents and other evidence relating to the pre-Securities Act period; and I find nothing in this evidence to change the factual conclusions which are set forth in this opinion. In view of the ample and detailed discussion of numerous transactions in the 1935–1949 period, it would seem that any further references to "ancient history" would unduly prolong an opinion which already perhaps transcends reasonable bounds.

There is much to be found in documents emanating from the files of other defendant firms to show competition by defendant firms and others for the Telephone Company's business, and also to show that Stanley made up the syndicate strictly on the merits and without perfunctory or other adherence to any "practice" of "historical position." A memorandum by Mitchell of Blyth records a conversation on September 25, 1935, in which Stanley stated that Morgan Stanley "intended to consider each individual business separately." Other documents of Blyth, Kuhn Loeb, First Boston and the alleged co-conspirator Mellon Securities (prior to its merger with First Boston) indicate repeated statements later emanating from Morgan Stanley, to the effect that "no precedent was to be set by this," "it is expected that when the next financing is done that the group will be altered" and "for this issue only, and not as a precedent."

Government counsel, citing the pendency of the long-drawn-out investigation of the American Telephone & Telegraph Co., by the FCC [1], regard all these state-

1. On March 15, 1935, a joint resolution of the Congress became effective, authorizing the FCC to investigate and report on the American Telephone & Telegraph Co., "in aid of legislation by the Congress and for the use of governmental agencies, including State regulatory commissions, for the information of the general public, as an aid in providing more effective rate regulation, and for other purposes in the public interest." The scope of the investigation included: corporate and financial history; capital structure; intercompany relationships; service con-

ments as mere window-dressing, but I do not. In fact, the absence of substantial proof against Morgan Stanley on every phase of the case except the position it frankly took on the subject of compulsory public sealed bidding, and its failure to submit bids on certain occasions, which will be discussed later in this opinion, is one of the striking features of the case. A few of the other defendant firms resorted to little or great competitive exaggerations or equivocations, the methods of some, particularly in regard to directorships, are questionable, and two or three sometimes sent "polite refusals" of participations, containing statements which may be polite, but which do not accurately state the facts. But against Morgan Stanley there is none of this. Nothing emanating from Morgan Stanley and admissible against it testimonially shows any "reciprocity," or direct or indirect references to any "traditional banker": there is nothing which can be construed as giving or seeking "permission" to compete; no dallying with "historical position"; no talk of "successorships," other than a clear repudiation of the notion that there could be such a thing; no competitive policy as to directorships; no assisting in the gathering of proxies; no off-color practices of any kind. And yet I am told that Morgan Stanley is the ringleader of the conspiracy and Stanley its "master mind." It may perhaps be more reasonable to infer that the absence of any such dealings by Morgan Stanley had much to do with its reputation for integrity and for its success. We shall sometimes find indications in the statistics that the business of those few other defendant firms who occasionally used dubious methods of competition suffered as a result thereof.

### Consumers Power

Stanley obtained another piece of business before Morgan Stanley was incorporated. After it was decided to organize the firm, Wendell Willkie, at the request of Whitney of J. P. Morgan & Co., had a conversation with Whitney and Stanley during the course of which Willkie was told about the new firm, who was to be in it, and when it was to start business. Stanley testified:

"Mr. Willkie said that he would like to have the new company, Morgan Stanley, be joint manager with Bonbright & Company for a Consumers Power Company bond issue that he was then considering and wished to issue very soon in the fall, and I said that we would be glad to do it, if there was time to do it, to get prepared on it.

"He spoke of the fact that he wanted to have someone in addition to the Bonbright firm who had managed a couple of Commonwealth issues previously, because the people that formerly had been the Bonbright firm had retired, and he had a very large amount of financing in contemplation at some date, and he wanted to have somebody in addition to Bonbright. He wasn't critical of them in any way, but he just wanted additional help in this issue and possibly in others, but there wasn't any discussion of others except in a vague way."

The Issuer Summaries show that Bonbright alone had managed an $18,594,000 issue of Consumers Power, which came out on June 21, 1935; and Bonbright and Morgan Stanley together managed the issue referred to above, which came out on September 23, 1935, in the amount of $19,172,000.

tracts; accounting methods; apportionment of investment revenues, and expenses between State and interstate operations; policies and practices; methods of competition; the effect of monopolistic control upon the reasonableness of telephone rates and charges; and the reasons for the failure generally to reduce telephone rates and charges during the years of declining prices. An order adopted by the Telephone Division of the FCC on March 4, 1936, prescribed the procedure to govern the conduct of the investigation, which continued through June 14, 1939, when the Report was filed. H.R.Doc.No.380, 76th Cong., 1st Sess.

I have considered in this connection the evidence relating to the formation of United Corporation by J. P. Morgan & Co. and Bonbright, and it does not alter my conclusions.

The third and last piece of business which came to Morgan Stanley before the firm opened for business, was a $20,000,000 issue of Dayton Power & Light Company bonds, which came out on October 14, 1935. As Edward B. Smith & Co. and W. E. Hutton & Co. were working on this issue before Morgan Stanley was formed, and as they hoped to be selected as co-managers, with some misgivings which will be discussed in a moment, government counsel described this as an example of what they call "caretaker" situations. Accordingly, this particular transaction will serve as an introduction to that subject.

Enough has already been shown, however, to indicate that Morgan Stanley would in all probability, be in a position to secure a large amount of the most desirable financings, and to do so strictly on the merits. That Stanley and his associates chose the most favorable time to start the new firm was soon apparent, as the great depression and the uncertainties connected with the new laws had brought new financings down to a mere trickle, and they were soon to come into the market like a cataract. It was not the fault of Stanley or his associates that their reputations had evidently not been damaged, as had those of others in the business, by losses and embarrassments of one kind or another connected with the great depression of 1929 and the closing of some of the banks, followed by the Bank Holiday. The collapse of the Insull "empire" had done Halsey Stuart no good, and people were apt to remember what had happened to the Goldman Sachs Trading Corporation and others.

### The Alleged "Caretaker" Situations

### Dayton Power & Light

Stanley had known Philip G. Gossler, chairman of the board of Columbia Gas & Electric, of which Dayton Power & Light was a subsidiary, since he was about 15 years old; Gossler and his wife were friends of the elder Stanleys, and it was Stanley's father, an engineer, who got Gossler his first job when Gossler graduated from Lehigh. This led later to an intimacy between the two men which was such that Gossler used to visit at Stanley's home as early as 1910, and they saw one another constantly, "inside and outside of business." It was while Gossler was president of Columbia Gas & Electric that Stanley became a director on March 25, 1922; and he served in that capacity until he resigned on February 7, 1935, just before the occurrences about to be related.

From the early 1920s until the Securities Acts period almost all issues of Columbia Gas & Electric and its subsidiaries, including Dayton Power & Light, were managed by the Guaranty Trust Company of New York or by the Guaranty Company. Thus it was to be expected that Edward B. Smith & Co. would go after the leadership of a refunding issue which was at first planned for the summer of 1935. There was associated with Edward B. Smith & Co. the firm of W. E. Hutton & Co., who had participated in the last financing, and is included in the list of alleged co-conspirators.

The scene opens in April, 1935, probably in the office of William C. Potter of the Guaranty Trust Company of New York, and there is a conversation between Potter, Stanley and Gossler. No representative of Edward B. Smith & Co. was present. They spoke of the "timing" for calling the outstanding bonds and obtaining the money for refunding them. Stanley urged Gossler very strongly against turning a long-term bond issue into a bank loan, and told him to wait until he had a commitment from the underwriters. The lack of any commitment at this time was not due to any reluctance or unwillingness or inability to give a commitment, but solely to the fact that the negotiations were not sufficiently advanced for one to be made. Stanley says that at that time he was sure that Gossler was going

ahead with Edward B. Smith & Co. and Hutton, and that he continued to have that understanding right through the summer. The June 1, 1935, date for redemption passed without action and the next date for redemption was December 1. Later in the spring Gossler went to Europe and did not return until early in September, 1935.

The government "caretaker" claim is based on the fact that Morgan Stanley brought out the refunding issue of $20,-000,000 of bonds on October 14, 1935, and upon a memorandum of Burnett Walker of Edward B. Smith & Co., dated August 23, 1935, relative to a conversation had with Reynolds, then president of Columbia Gas & Electric. The part of the memorandum relied upon by government counsel notes that Walker and Land, both of Edward B. Smith & Co., had been careful not to get seriously into the question of a group "as I was afraid we would do the 'dirty work' and then not get leadership of the account." From this memorandum the inference may be drawn that Edward B. Smith & Co. and Hutton were "on notice" that they might lose out, but the general tenor of the memorandum is optimistic.

The claim of government counsel is that there must have been some understanding to the effect that Edward B. Smith & Co. and Hutton would get the issue unless "Morgan came back into the bond business," in which event they would hand the business over to any new firm which should be formed for such a purpose.

The difficulty with this theory is that Stanley has in effect denied that he knew of any such understanding, and he testified that on September 10, 1935, Gossler came in to see him upon Gossler's return from Europe, said he had seen the announcement of the formation of Morgan Stanley and that he wanted Stanley's firm to undertake the management of the issue. In view of the background of intimacy between the two men and Stanley's reputation, this does not seem to me to be in the slightest degree strange, but, on the contrary, as rather to be expected under the circumstances. That Edward B. Smith & Co. and Hutton were "on notice" that they might not get the issue may well be due to something that Gossler or one of the officers of the parent or subsidiary companies had told them before Gossler left for Europe.

### Atlantic Coast Line, Toledo & Ohio Central, Chicago & Western Indiana, Nypano (New York, Pennsylvania & Ohio) and Dominion of Canada

An issue of $12,000,000 Notes of Atlantic Coast Line on May 3, 1935, co-managed by Edward B. Smith & Co. and Brown Harriman; one of $12,500,000 Bonds of Toledo & Ohio Central on June 27, 1935, managed by First Boston; one of $6,100,000 Bonds of Chicago & Western Indiana on December 11, 1934, managed by Brown Harriman; another of $8,000,000 Bonds of Nypano on February 13, 1935, co-managed by Edward B. Smith & Co. and Brown Harriman; and two Canadian Government issues of $76,-000,000 Bonds on August 12, 1935 and $48,000,000 of Bonds on January 14, 1936, both managed by First Boston, are claimed by government counsel to be "caretaker" accounts. But the evidence does not support the charge and there seems to be no occasion for detailed comment.

In fact the Dominion of Canada situation shows successful competition by Morgan Stanley, who succeeded in obtaining the leadership of an issue of $85,000,000 Bonds on January 21, 1937, although First Boston was supposed to be the "traditional banker," and there is nothing to show that there had been any deterioration in the relations between the Canadian Government and First Boston when, early in 1936, Henry S. Morgan went to Canada and called on the head of the Bank of Canada and on the Minister of Finance to offer the services of Morgan Stanley. Perhaps Stanley had forgotten about this when he testified before the SEC on January 28, 1941, in opposition to the proposed Rule U–50. But it seems more likely that he thought

the incident not particularly relevant to the point he was trying to put across, which was that if the business was being done to the satisfaction of the issuers he could not see why government officials were so anxious to force them into public sealed bidding. After all, the issuers could always use public sealed bidding as a means of raising the capital they needed, and perhaps they knew their business better than those who had an axe to grind.

I find that Morgan Stanley at no time "adhered" to any "practice" of "traditional banker," nor was Morgan Stanley at any time a party to any conspiracy or agreement on "successorships," nor to any "code" having such or any similar provisions.

## 2. Kuhn Loeb

With a small firm and a very choice and select clientele, Otto H. Kahn and his partners had evidently made a wise move when they worked out the Kuhn Loeb "show window" policy.[1] It had functioned smoothly in the era of "dignity and mystery." A few of those still alive today remember the rows of silk hats at the Lawyers Club in the old Equitable Building in New York City, as the leaders of the bar gathered for luncheon. Even the writer of this opinion remembers Samuel Untermeyer in court, with an always-fresh orchid in his coat lapel, and dressed in the height of fashion. Perhaps the appearance of Otto H. Kahn was in keeping with his "show window."

Taking into consideration the fact that Kuhn Loeb took no part in public utility financing, its position in 1935–1937, the first triennial of our "evidence" period, must have been viewed with envy by many other firms in the business. It led the entire industry in rail issues, with 12.5 issues for a total of $344,100,000, or over $27,500,000 per issue. It also led in dollar volume of negotiated industrials and was second in number of issues. The number of issues was 17.1 and the dollar amount $503,700,000, al-

most $30,000,000 per issue. The total of such issues for all investment bankers during this period was 316, and the total dollar amount $2,758,700,000, or less than $9,000,000 per issue. The steel financing headed or co-managed by Kuhn Loeb in the period included: Bethlehem $158,000,000; Republic, $94,000,000; Inland, $61,000,000; National, $60,000,000; and Wheeling, $35,000,000.

The operation of the "show window" policy fitted perfectly into this background, as the competitive problem of Kuhn Loeb was to seek to maintain its position against the competition which such a position plainly invited And the Sherman Act makes no distinction between competitive effort to keep business and competitive effort to take business away from someone else. These are but two sides of the same coin.

Accordingly, as step one, it was necessary to broadcast as widely as possible, but still with restraint and discretion, the high-toned and exclusive character of the firm. This was done, as we shall see, by statements which must sometimes seem almost exaggerated and gratuitous, to the effect that Kuhn Loeb would never under any circumstances try to "steal" business from any other investment banker. Indeed, it would apparently insist upon having the officials of an issuer, seeking to bring its financings to Kuhn Loeb, make a downright and unequivocal statement that they had completely severed all relations with their former bankers. We shall see later how flexible this formula was, in actual practice. What is more, Kuhn Loeb gave wide currency to the fact that it was their policy only to handle financings on the understanding that the negotiations would be had with Kuhn Loeb exclusively, and that they would under no circumstances engage in price competition, which was below their dignity. If issuers wanted tip-top service Kuhn Loeb was the firm to come to, but it must be on these terms. Consistently with the "show window" policy, we find through-

---

1. See Part IV, sub tit. Kuhn Loeb, Franklin Simon, supra, p. 722 ff.

out the record numerous instances of Kuhn Loeb participating in various underwritings only with a "non-appearing" or "silent" position, where it did not want it generally known that it would stoop to take anything less than top position (or second only to Morgan Stanley), which was the only one consistent with its eminence and dignity.

With this background, it requires no unusual acumen to discover the reason why most of the "traditional banker" documents in evidence in this case are written by partners of Kuhn Loeb, or are based upon something said by one of its partners or employees. In the early stages of the trial such statements were always described by government counsel as having been made by "the defendants," despite the fact that no one connected with any of the other sixteen defendant firms had anything to do with them, in most cases did not even know the documents were in existence, and had quite different business and competitive policies. But there is something of this in every conspiracy case; and the trial judge must be on his guard until the existence of a conspiracy and participation in it by the other defendants is established, lest the others, or some of them at least, suffer some prejudice.

Step two of the Otto H. Kahn "show window" policy is ingenious and almost fool-proof. If the particular piece of business, brought in by a middleman or finder, for example, was not of such a character as fitted into the Kuhn Loeb picture, an unqualified display of the "show window" was called for, perhaps to be followed up by transmitting a copy to or otherwise informing such other firm as might consider themselves as having the inside track, that Kuhn Loeb had refused to "intrude," in order to put such other firm into a friendly frame of mind with respect to a possible substantial participation in the future.[1] Where the business looked attractive, however, there were various expedients which could be resorted to, in order to go after the business, but do so in such a way that there could in all probability be no loss of prestige, such as would be the inevitable consequence of a rebuff, news of which would be bound to get around. We shall see how varied is this technique when we come to discuss some of the issuer situations on which government counsel lean heavily for support, such as Commonwealth of Australia and especially Armstrong Cork.

A few of the documents, even as early as 1934, mention one or another defendant firm as "successor" to some banking institution or affiliate which had ceased to do investment banking business because of the Glass-Steagall Act, but a glance at the context and the dates of the documents will show that these statements indicate no conspiratorial agreement or proposal to agree upon such firms as "successors," but only the normal expectation that anyone in the business might have that the individuals who had formerly been employed by such institutions, and who had personally handled the financings of particular issuers, probably would be able to take the security business of such issuers with them to their new firms. Accordingly, I shall make no further reference to "successorship" in connection with Kuhn Loeb.

### The Otto H. Kahn "Show Window"

The testimony of Otto H. Kahn [2] and the questions of Senator Barkley and Mr. Pecora are given in full, as follows:

"Mr. Kahn: Well, if you want a categorical answer, Mr. Pecora, I can only say it is always the other way around; has been with us for 50 years perhaps, or certainly for the last 30 or 40 years. It is not we that go to the corporations and ask them to do business with us. We hope that we have established a reputation which is our show window, which attracts customers. We hope that our trade mark, our sponsorship

---

1. See supra, p. 722 ff., in Part IV, sub. tit. Kuhn Loeb, Franklin Simon.

2. See supra, p. 744.

is recognized of some value to the corporation. We do not go after them. That may be conceited, but we do not. We would rather do less business. We do not go after them. But if a railroad comes to us, or if any corporation comes to us and says: 'We want to place a $50,000,000 issue through you,' and we know they have been doing business with somebody else, we ask them fairly and openly the question, 'We know that you have been doing business with so and so; are you not doing business any longer with them?' 'No, we have severed our connection.' Then we consider ourselves entirely free to do their business.

"Senator Barkley: But, if you knew that in the preliminary stages of the floating of the $50,000,000 loan they had been under negotiations with some other bank you would not step in voluntarily and seek to take that client away from the other bank?

"Mr. Kahn: I would not seek to take any client away from anybody. I am seeking to develop in our own business and my associates are seeking to develop in our own business.

"Senator Barkley: Is there not a very well developed code of ethics among bankers that one banker will not try to take business away from another banker?

"Mr. Kahn: I think it is a well-recognized code of ethics, and it is getting better through the country.

"Senator Barkley: That is undoubtedly a fact, though, is it not? It seems to me that a very simple proposition which a simple answer would clear up.

"Mr. Kahn: I am not prepared to say that it is a fact, Senator. No; I am not.

"Senator Barkley: Well, then, the conditions are not as ethical as you might hope that they could be?

"Mr. Kahn: I believe I have already shown that in 1926 to 1928 the conditions were such as I am far from approving. But I believe that especially under the new Recovery Act it will be more and more recognized that that kind of competition is detrimental, and is perhaps slightly unethical. I can speak for ourselves. We do not go after other people's business. We do not go after business at all. We have our shop window, as I call it. If somebody comes to us and says, 'I would like to do business with you. I have heretofore done business with John Smith. I would like to do business with you.' We would say, 'Do you mean to say you have definitely broken with them?' 'Yes.' 'And you tell use you are free, without infringing upon our conscientious scruples, to do business with us?' 'Yes.' I would not then hesitate to do business.

"Senator Barkley: Do you know instances where other bankers have gone after your business?

"Mr. Kahn: I have some, Senator. I hope you will not press me.

"Senator Barkley: I am not going to press you, but it has occurred?

"Mr. Kahn: Yes.

"Senator Barkley: Are they reputable bankers—without giving their names?

"Mr. Kahn: Yes.

"Mr. Pecora: Has it succeeded? Has the effort succeeded in those instances?

"Mr. Kahn: In some instances, yes. We are poorer for that effort.

"Senator Barkley: Do you still regard them as reputable bankers?

"Mr. Kahn: I regard them as reputable bankers. I would not have done what they did, but who am I to sit in judgment upon others? 'Let him who is without sin first cast the stone.' I guess I am guilty of other sins, too. But this particular thing I do not believe in.

"Mr. Pecora: Would you say fairly, Mr. Kahn, that in the banking

profession a system or code of ethics exists among the well-recognized bankers, bankers of reputation, in pursuance of which there is no competition among them for the business of a corporation which has had financing previously done for it by some banker?

"Mr. Kahn: As far as we are concerned, that is correct. As far as our firm is concerned, that is correct."

This has no reference whatever to the "code" of private bankers concerning which J. P. Morgan had testified at a separate hearing a month or so previously. Otto H. Kahn was questioned specifically on the subject of trying to take business away from another investment banking house, and he very plainly states that it is a Kuhn Loeb "code" about which he is speaking. He describes it as the Kuhn Loeb "show window." Naturally the witness, not being questioned on the subject, adds nothing about the ingenious ways in which the "show window" policy is manipulated as a competitive device to get business. There was no reason why he should disclose firm secrets, unless it became necessary to do so.

The prosecution emphasizes some TNEC testimony given by John M. Schiff in 1939 concerning his memorandum in the Armstrong Cork matter, which will be referred to shortly, but his explanation is quite consistent with the "show window," as he points out that this was not only because of "the code of ethics" but "it is what is good business." His testimony by deposition in the present case to the effect that at the time he testified the Otto H. Kahn policy was still in effect, must be read with some reservation, as it is obvious that much water had gone over the dam since 1933, the era of "dignity and mystery" was over, and no one in the 40s, and especially after World War II, could be expected to be greatly impressed by the sort of thing that Otto H. Kahn testified was done by Kuhn Loeb in the early 30s and prior thereto. As a matter of fact,

we shall find less and less of the "show window," and a Kuhn Loeb competitive policy in later years which was more in keeping with the times.

Pursuing the matter chronologically, and in an attempt to give the full picture without discussing every one of the documents, we come to what is described as a "Memorandum regarding Bulgaria" bearing the Kuhn Loeb filing stamp of October 26, 1928.

### Bulgaria

This was a patently unattractive piece of business and we find the "show window," without any angling for a continuance of negotiations, and without qualification. The memorandum reads:

"We would not care to compete for or attempt to secure the pending issues simply on question of price, but if the Bulgarian government has no commitments towards its present affiliations and wishes to terminate them, we would be prepared to study carefully and promptly the Bulgarian fiscal situation with a view to undertaking the financing of the government's requirements, if in such case the government will make definite agreement for a term of years constituting us its American bankers and giving us a preferential position as to future issues. * * "

There the matter ended, as far as appears in this record.

Anticipating somewhat, there is a letter from Buttenwieser of Kuhn Loeb to Oscar W. Rexford of Ley P. Rexford & Company, dated April 22, 1935, sent in obvious ignorance of what the Rexford approach, noted in the letter, referred to. Again the "show window" is without qualification and the second and last paragraph of the short letter reads:

"I might also point out for your guidance that, as you may know, we make it a strict rule not to compete for business and to discuss such matters only on an exclusive negotiation basis."

It turned out that what Rexford was after was a participation in the forth-

coming issue of Southwestern Bell Telephone, and Buttenwieser informed Rexford on April 27, 1935, according to a Kuhn Loeb memorandum of that date, that Kuhn Loeb had a "group relationship in telephone business" and that Rexford should not expect any "special treatment."

## Commonwealth of Australia

We now come to a substantial and attractive piece of business. In the period from 1925 to 1928 J. P. Morgan & Co. had placed three issues of Australian bonds in the United States totalling some $165,000,000. In April and May, 1930, there were conversations between Herbert Brookes and other representatives of the Australian Government, and Kuhn Loeb, relative to the handling of some new Australian financing.

The first Kuhn Loeb memorandum, of April 23, 1930, makes no reference whatever to J. P. Morgan & Co. The whole tenor of the conversation related in the memorandum is one of anxiety to get the business and the qualifications to the "show window" policy are conspicuous. To begin with, it was suggested that "the cost to the Australian Commonwealth should not exceed approximately 6% per annum." The mention of "price" is significant. The reference to interference "with existing financial relationships with other banking houses," is qualified by the phrase "when these were more or less definite"; and the statement of the Kuhn Loeb policy not to make competitive bids is followed by, "except in very rare instances, such as City of New York bonds, and then only because of very special reasons." The "very special reasons" are not explained.

The notion of an exclusive arrangement is watered down to the vanishing point, as the Kuhn Loeb representatives Mortimer Schiff and Sir William Wiseman

"pointed out also that Kuhn Loeb & Co. had always felt and still feel that they could only render the best service when they had a continuing relationship and while they understood perfectly that no government could bind itself definitely as to the future they would still hope, if relationships were established with the Australian Commonwealth, that it would be the intention to continue such relationship after an initial issue, if the service Kuhn Loeb & Co. could render proved satisfactory to the Commonwealth Government."

The standard Kuhn Loeb requirement, that there be an expression of severance of relations with the bankers with whom they had previously been doing business, is also skillfully worded. It follows:

"Kuhn Loeb & Co. would consider it a very real privilege to become the bankers to the Australian Commonwealth, and would be most receptive and sympathetic to a proposal to this effect. They take it, of course, that the Commonwealth would not extend such an invitation unless they are entirely free from commitments, expressed or implied, toward other bankers for its financing in this country."

The conversation closed with an expression of hope that, after these observations had been communicated to the Prime Minister, the conversations might be continued, "which would be most agreeable to Kuhn Loeb & Co."

A few days later, however, these sanguine hopes of Kuhn Loeb received an unexpected setback, as James R. Collins, financial adviser of the Commonwealth Government, who had just arrived from London, called on May 5, 1930, with the bad news "that he had instructions from his government to come to New York but no further instructions, and therefore at the moment he had no mission." And so for the first time in these particular negotiations, as far as appears from the documents, a full display of the old "show window" is made. Collins fully understands that Kuhn Loeb "should not be put in the position of appearing to have made an unsolicited bid," and that "an official request for a study of the situa-

tion and an offer should come from the Australian Government." For the first time Morgan is mentioned: "particularly stressing our views regarding the Morgan situation and policy of non-competitive and exclusive negotiations."

Thus, despite Kuhn Loeb's apparent willingness, three weeks earlier, to take the business away from J. P. Morgan & Co., the "traditional banker," if it could succeed in doing so, this new and unexpected development must have led to the suspicion that J. P. Morgan & Co.'s competitive position was stronger than they had thought, and the shift in strategy, which has just been described, was adopted by Kuhn Loeb. And so the matter was left that Collins would cable his government and see Kuhn Loeb again on the following Wednesday.

Accordingly, Collins called again on May 9, 1935. The answers to his cables had not been "entirely satisfactory to him," the Australian government evidently desired "the advice of several leading New York bankers." And so, now definitely abandoning the hope that Kuhn Loeb might get the business for itself alone, there is a further shift in strategy designed, if successful, to get the co-managership with J. P. Morgan & Co. This was just as inconsistent with the alleged conspiratorial scheme as was their first move to get the managership, as J. P. Morgan & Co. was obviously the "traditional banker," not a word had been spoken of any lack of "satisfactory relations" between the Commonwealth and J. P. Morgan & Co., and Kuhn Loeb should have "deferred"; but it did not.

Accordingly, in this conversation with Collins on May 9, Schiff "strongly advised him not to consult any other bankers except Morgan's; that he felt they probably ought to consult Morgan's." The memorandum continues:

"Mr. Schiff suggested that it might be in the best interests of the Australian Government if the banking basis is broadened to include both Morgan's and ourselves, but, of course, this was not a suggestion that we could make to Morgan's but could be properly made by Mr. Collins if he should come to the conclusion that would be a desirable thing."

The conclusion of the memorandum is interesting, too, in view of the part of the Kuhn Loeb policy against price competition, which also seems subject to qualification, according to the exercise of the Kuhn Loeb judgment and discretion. Thus the memorandum indicates discussion of price and Schiff, in his best competitive manner, but all the while seeming not to desire to "intrude," plants the seed that "he thought the former Commonwealth loans had been issued at too high a price," and he mentions figures which come down to a cost to the Commonwealth of "6% or a shade under." The price mentioned in the first conference with Brookes on April 17, 1935, had been "approximately 6% per annum," which might be 6% or a shade over.

The last memorandum of the series is dated May 13, 1935. Collins had seen "Morgan's," had made it perfectly clear that he had taken the initiative in approaching Kuhn Loeb and that Kuhn Loeb had said they "would not care to enter into negotiations with the Australian Government without the knowledge of Morgan's" and "without a direct invitation." "Morgan's" expressed appreciation and Collins is going back to London.

Here the matter ends, as no financing was done at the time. Naturally, nothing appears to have been passed along to "Morgan's" about Kuhn Loeb's first effort to get the business for itself; and Collins seems to have had enough common sense to realize that the suggestion about the co-managership was intended for his ears alone and not to be passed along to "Morgan's." In any event the last memorandum, which records Collins report to Kuhn Loeb of his conversation with "Morgan's," contains no reference to the co-managership.

## Armstrong Cork

This is one of the foundation stones of plaintiff's case; and one of the Kuhn Loeb documents relating to Armstrong Cork furnishes the phrase which is the theme of the complaint, as paragraph 45A(1) alleges:

"Defendant banking firms observe an ethic not to compete and refuse to 'poach on each other's preserves.' "

The subject is of additional significance as the transactions about to be related took place in 1934 and 1935, shortly after the Glass-Steagall Act deadline.

The background shows that in the pre-Securities Act period the last issue of Armstrong Cork was a financing of $14,-931,000 of convertible debentures in June 1930, in connection with which Guaranty Company and Union National Bank of Pittsburgh were in privity with the issuer. And so we should expect to find, in accordance with the aggressive policy adopted by Swan when he left the Guaranty and joined Edward B. Smith & Co., an immediate effort on the part of Swan and his associates to get in touch with the Armstrong Cork people, and seek to continue the close personal relationship which had existed between the officials of the company and Swan and his associates while still with the Guaranty. That is precisely what the documents reveal, and this is further supported by the testimony of Swan that, "we immediately contacted" the Armstrong Cork Co. As no financing seemed in immediate prospect, the matter was dropped for the moment; but we shall find Swan, and the others in Edward B. Smith & Co., in prolonged and continuous negotiations with company officials later on.

The scene shifts to the office of Kuhn Loeb where, on July 26, 1934, Freeman, the middleman or finder, arrived with a proposition that Kuhn Loeb become interested in "the possibility of doing some financing for the Armstrong Cork Company," with which Freeman claimed to have some connection. This was an attractive and desirable piece of business, and it will be interesting to see how the Otto H. Kahn "show window" policy was put in operation.

The first paragraph of the memorandum of July 27, 1934, dictated by Schiff of Kuhn Loeb, reads:

"Yesterday Mr. M. L. Freeman discussed with me the possibility of doing some financing for the Armstrong Cork Company, with which he has a connection. I told him that I would discuss it here in the office, and asked him to return today."

This gave the partners of Kuhn Loeb an opportunity to confer about the matter and lay their plans.

The memorandum continues:

"Having checked up on the Company and found that the original financing had been done by the Guaranty Company, I explained to Mr. Freeman that the Guaranty Company's successor was E. B. Smith & Co., and that naturally we did not want to poach on their preserves."

The reference here, at this early date, to Edward B. Smith & Co. as "the Guaranty Company's successor" cannot, it seems to me, mean more than the normal reaction of any firm in the investment banking business, to the fact that Swan, the former president of the Guaranty Company, and many of the old Guaranty Company's employees had gone with Edward B. Smith & Co., and would probably make every effort to take along with them to the new firm the business of people with whom they had previous personal dealings.

The memorandum continues:

"However, he told me that in 1932 the Company had wanted to borrow $2,000,000 from the Guaranty Trust Company, with whom they have an account, and that the Bank was not willing to loan them more than $500,000 at that time. The Armstrong Cork Company was very distressed at this and later raised the money through Pittsburgh banks

and therefore at present are not desirous of doing business with the Guaranty Company or their successors."

As some indication of the many different interpretations which can be given to the phrase "satisfactory relations," government counsel claim that this rumor, relayed by Freeman, indicates that there was a lack of "satisfactory relations" at this time between the Armstrong Cork people and Swan and his associates in Edward B. Smith & Co. But this could not have been so, if reliance is to be placed upon the numerous statements in the Edward B. Smith & Co. status book and the testimony of Swan, both of which indicate continuous and friendly negotiations, from the time that Swan went with Edward B. Smith & Co., up to the time that the next issue, a financing of $9,000,000 of debentures, came out on July 24, 1935, under the sole management of Edward B. Smith & Co.

The memorandum continues:

"Likewise, Lehman Bros. had approached the Armstrong Cork Company with the idea of buying a block of stock from them, either existing stock in the hands of present holders if they did not need new money or, if they needed new money, treasury stock. However, this did not appeal to the Company."

This is the last we shall hear about competition by Lehman Brothers for the Armstrong Cork business, but it indicates that at least as to Lehman Brothers, the "practice" of "traditional banker" and "successorship" was not being observed. They also knew, of course, that Swan and his associates had left the Guaranty and gone over to Edward B. Smith & Co., and could easily have ascertained the fact that the "traditional banker" was the Guaranty.

We now come to the most interesting part of the memorandum as it shows the special technique put in operation by Kuhn Loeb as part of its "show window" policy, when it really wanted the business. The memorandum continues:

"Mr. Freeman explained that the Company needs from five to ten million dollars for improvement to their plants and would like to issue a preferred stock. He realizes, however, that probably a preferred stock would not be feasible at this time and suggested four or five year notes convertible into stock. I told him that provided he explained in detail to the company that they were coming to us of their own free will, we should be pleased to have a talk with them if he would bring in one of their senior officers the next time he was in New York, which he agreed to do."

We do not know how long it took Freeman to persuade the Armstrong Cork officers to come in and confer with Kuhn Loeb "of their own free will." Certainly Swan and his associates in Edward B. Smith & Co., who had been seriously working on the negotiations since at least as early as October 1934, had no inkling of what Kuhn Loeb was doing. It does appear that sometime prior to March 14, 1935, Freeman had persuaded the executive officers of the Armstrong Cork to come in and talk to Kuhn Loeb. Strauss testified before the TNEC that the Armstrong Cork officials came in to see him after telegraphing for an appointment, and that he discussed financing with them. He also stated in response to a question by Mr. Nehemkis:

"Q. But at that time you did not feel constrained to discuss the matter with E. B. Smith & Co.? A. I had nothing to discuss with E. B. Smith & Co."

Accordingly, on March 14, 1935, when Strauss of Kuhn Loeb perhaps suspected that all was not going well, or perhaps with the "show window" policy in mind, wished to be sure that nothing might occur to damage the "show window," such as would be the case if it appeared plainly that Kuhn Loeb was going after business and failed to get it, we find Strauss going over to Edward B. Smith & Co., where he told Swan and Cutler

that Kuhn Loeb "had this business," and he asked if they would be interested in joining them. This must have come as quite a shock to Swan and Cutler and they immediately "explained that this was an old account of ours and we believed it was still ours," according to one of the Edward B. Smith & Co. status book entries.

At this point things began to happen. We can only surmise the Kuhn Loeb end of the matter. It seems not unlikely that, when the Armstrong Cork officials made their "unsolicited" call on Kuhn Loeb, the Kuhn Loeb partner who conferred with them went through the usual formula about having severed relations with their regular banker, or having no "commitments," or whatever other variation of the formula seemed appropriate. Business men catch on to this sort of thing very quickly, and from what occurred in the Bethlehem Steel financing and others, it seems probable that the Armstrong officials gave the necessary "assurances," despite the fact that all the while their relations with Swan and his associates continued to be friendly and satisfactory in every way, and the negotiations with Swan and his associates were proceeding apace.

Having received notice that Kuhn Loeb was competing for the business, Swan and his associates redoubled their efforts. The same status book entry which contains the reference to the visit by Strauss indicates that Cutler immediately talked to Roy Passmore at the Guaranty "who said that he had been in conversation with officers of the Company within the last thirty days and felt very sure that there was nothing in KL's contention, and that the Company would not do anything without discussing the matter with them at the Trust Co. first, and that he could not believe they would accept any other offer without giving us a chance." This entry on March 19, 1935 concludes:

"I suggested it might be well for us to take a day and run down to Lancaster and see the plant and he

[Swan] thought this would do no harm."

The very next day, March 20, 1935, Cutler reports another talk with Strauss, at which Strauss was told that the Armstrong business was "our business and that when something could be done they would look to us." This entry concludes with some more of the same Kuhn Loeb "show window" technique, as follows:

"Strauss said if that were so KL would not compete, and that he would so inform the Armstrong people. If they really wished to make a change and clear with us, KL will then be willing to talk to them. We indicated that if and when the business would be done we would have a place for them."

On March 21 Cutler called Suter, one of the Armstrong Cork officials, at Lancaster, about making the visit to the plant, but both Suter and Prentis were to be away and Suter suggested coming down the following week. The visit to the plant did not actually materialize until April 3, 1935, at which time there was considerable discussion of the forthcoming financing.

By this time Strauss had evidently got the lay of the land, and, according to Swan, "had done all the competing he could do." In the meantime, the conversations between the Kuhn Loeb partners and the officials of Armstrong Cork had so impressed these executives that we find later that Kuhn Loeb was, according to a memorandum of Horace D. Moore of Edward B. Smith & Co., dated September 21, 1935, included in the business with a 20% participation "at the request of the Company." This will be referred to again.

Now we shall see another phase of the "show window" policy. Having competed for the business, and having done so behind the back of the "successor" to the "traditional banker," and having failed, a face-saving maneuver was in order. Consequently, the later memoranda indicate Strauss exhibiting anxie-

ty to make it clear that he is reporting to Edward B. Smith & Co. whenever he confers with the officials of the company, and that, whenever he confers with the officials of the company, he is reporting conversations had with Edward B. Smith & Co. Kuhn Loeb having told Freeman in the beginning, with reference to Edward B. Smith & Co., that "we did not want to poach on their preserves," Kuhn Loeb is careful to leave the matter at the end on the same theme, despite the fact that they had in the interval been quietly and secretively making every possible effort to get the business. And, whilst thus competing for the managership, Kuhn Loeb had its eye on a substantial participation, which was always one of the desiderata when the "show window" policy was working.

We have already noted that, due to hard work and continuous negotiations with the officials of Armstrong Cork, Edward B. Smith & Co. found it possible to hold on to the business, which they had handled as individuals while still with the Guaranty Company, and Edward B. Smith & Co. as sole manager brought out the $9,000,000 issue of debentures on July 24, 1935. But, in the interval, although Lehman Brothers had dropped out of the competition, other defendant firms, in complete disregard of the "practice" of "traditional banker" and "successorship," were making strenuous efforts to get this same piece of financing for themselves.

On February 5, 1935, according to a memorandum entitled "Armstrong Cork Co." of A. M. White, Jr. of White Weld:

"I met with Al Gordon of Kidder Peabody today and it was agreed that Kidder Peabody and White, Weld would have 70% and 30% interests respectively on original terms in the above piece of business."

It is interesting to see the way this came about, as we hear so much about "successorships." It seems that Moore, a former vice president of the Guaranty Company, had become associated with Kidder Peabody, and Albert H. Gordon of Kidder Peabody testified on deposition that Moore, evidently seeking to take advantage of his former association with the Guaranty Company, which was a perfectly proper thing for him to do, tried to get the business of Armstrong Cork for the Kidder Peabody-White Weld nucleus group, "but he was unable to put us across."

The outcome was noted in a White Weld memorandum of June 25, 1935:

"Gordon of Kidder, Peabody told me yesterday that they had lost the lead in the above piece of business, and that E. B. Smith had landed it. Gordon stated that after a great deal of work K. P. had succeeded in obtaining a 16% interest for themselves, and that they had done everything possible to get us into the business, but did not succeed."

Another memorandum indicates, as we have already noted in connection with other group competition arrangements described in the earlier portions of this opinion, that the Kidder Peabody-White Weld "partnership" to go after this particular piece of Armstrong Cork business, had, only a short time previously, "appeared certain" of landing it.

When the issue came out there were only four participants, Edward B. Smith & Co. in first position had 40%, and Kuhn Loeb, Kidder Peabody and Lazard Freres, all in second position, with 20% apiece; and an Edward B. Smith & Co. memorandum of September 21, 1935, states that Lazard Freres, Kidder Peabody and Kuhn Loeb "were included in this business at the request of the company."

Government counsel assert that Kuhn Loeb "recognized" the claim of Edward B. Smith & Co. that it had "inherited" the Armstrong Cork business from the Guaranty. But, piecing all the documents together, it seems much more reasonable to infer that at least Kuhn Loeb and Kidder Peabody, and possibly Lazard Freres and others, competed for the managership, and, having failed to obtain it, Kuhn Loeb and Kidder Pea-

body were satisfied to settle for participations. Indeed, they did quite well, with 20% apiece, as above stated.

Thus we see the sort of competition for managerships and participations which has been going on for years in the investment banking business. Each firm follows its own policies and its own techniques. The "show window" policy of Kuhn Loeb, with all its carefully planned and intricate maneuvers, finds no counterpart in the policies of any of the other defendant firms.

But there is one further document relating to the 1935 issue which stands alone, without attendant circumstances or explanation of any kind. It is a private wire telegram from R. Cheston, Jr., a Philadelphia partner of Edward B. Smith & Co., to Cutler in the New York office, dated June 28, 1935, only a few days before the $9,000,000 issue of debentures came out. It reads:

"Don't forget we owe Brown Harriman real consideration when as and if we wholesale the Armstrong Cork debentures on account of their attitude that we inherited the business."

Perhaps someone in the Philadelphia office of Edward B. Smith & Co. was trying to get some credit for relaying a garbled version of some conversation, direct or reported, with someone in Brown Harriman. But there is no basis in the record for any speculation on the subject. In any event, Brown Harriman did not become a participant in the forthcoming financing, and we are told nothing more about the matter.

The subsequent financing, however, shows that the competitive efforts of Kidder Peabody in connection with the 1935 issue were ultimately rewarded, as is so often the case.

Gordon of Kidder Peabody explains how Kidder Peabody became co-manager of the July 10, 1937, issue of $9,068,-000 of common stock as follows:

"In 1937 we again attempted to obtain the business. We submitted a proposition to the company that was superior to the proposition submitted by E. B. Smith & Company.

"E. B. Smith & Company was successful in gaining their way back into the business and we became a joint manager.

"Since that time whenever there was an issue in prospect we have done everything that we could to obtain the leadership of the business. We have submitted proposals and we have talked to the company industriously to advance our cause."

This 1937 issue was brought out under the co-managership of Edward B. Smith & Co., Kidder Peabody and Mellon Securities. Edward B. Smith & Co. is having difficulty holding on to the business. Not only have both Kidder Peabody and Mellon Securities elbowed their way in, but there are now five underwriters, all in first position at 20% each, and Edward B. Smith & Co. has been forced to give up half of the 40% participation it held in the 1935 issue. How Mellon Securities succeeded in obtaining a co-managership does not appear; but one would suppose that, if a conspiracy were in operation, Kuhn Loeb, Lehman Brothers, Kidder Peabody, White Weld and Mellon Securities, which is also claimed as a co-conspirator by government counsel, should all have "deferred" throughout to Edward B. Smith & Co. as the "traditional banker" because it was "successor" to the Guaranty.

A $16,596,000 issue of cumulative preferred stock came out on September 13, 1945 co-managed again by Smith Barney (Edward B. Smith & Co. in the meantime having merged with C. D. Barney & Co.), Kidder Peabody and Mellon. The efforts of Mellon Securities to improve its position and its disappointment at being unable to do so are related in a Mellon Securities inter-office memorandum, dated June 1, 1945, by Charles W. Kennard, who describes a conversation which took place on May 29, 1945, between himself and Warnock, one of the Armstrong Cork executives. It

is worth reading as it reflects a good deal of the sort of thing described in this opinion. It follows:

"Mr. Warnock then said that upon his return to Lancaster the previous week after visiting with the two other co-managers and myself, he had delved into the history of the Company's financing. He found that the individual who had had the longest personal association with the Company was F. L. Moore of Kidder, Peabody & Co. He added that, furthermore, Moore had remained in closest contact with the Company over the years since the last financing and had been most helpful to them. In view of this, if there were any special perquisites attached to the financing, he thought it would be only fair if they went to Kidder, Peabody & Co. However, the longest association with an organization was with that of Smith, Barney & Co. with whom was the organization that handled the financing when done by the Guaranty Company. The record showed that the financing had been well handled by this organization. Taking into account all the circumstances Mr. Warnock said that he had made the following determination. The three firms, Mellon Securities Corporation, Smith, Barney & Co. and Kidder, Peabody & Co. would be true co-managers in every meaning of that word although in the previous financing this had not been the case. The three co-managers were to sit down together and select the members of the underwriting syndicate and each member would be entitled to invite one-third of these members into the account. On the general set up of the deal and on the preparation of the various papers, etc., each of the co-managers would have an equal voice. However, it was still necessary for one firm to act generally as clearing house and to run the books in the sense of handling the mechanics of the deal.

He had decided that Smith, Barney & Co. should continue to do this and that the three firms should appear in the same order as in the previous financing. I thanked Mr. Warnock, but said that of course I could not help being a little disappointed. I had hoped that in view of the Pennsylvania nature of the deal, the Company's Pittsburgh relationship and the position of Mr. Prentis on the Board of the Union Trust, we would be selected to handle the books and act as clearing house. Mr. Warnock said that he understood how I felt, but that under his proposal nobody would lose face and there would be no hurt feelings. He thought that this was of substantial benefit to the Company. I told him that I would like to discuss his proposal with my associates and would get in touch with him in the near future."

### Bethlehem Steel

Government counsel have blown hot and cold on the series of post-Securities Act issues of Bethlehem Steel; but they came back to this issuer in the connecting statements. As usual, a phrase here or there seems to help plaintiff's case, but the documents and deposition testimony taken as a whole show vigorous competition at variance with the rules of the supposed conspiracy. We shall see how the Kuhn Loeb "show window" fits in.

During the pre-Securities Act period the Guaranty Company or the Guaranty Trust Company of New York had been identified with Bethlehem financing since 1917, and for the last four issues, 1926–1929, only the Guaranty Company is known to have been in privity of contract with the issuer. As "I suppose this was the biggest account we had," Swan testified that he got right after the business even before June 16, 1934, the Glass-Steagall Act deadline. After some conversations with the executives and on June 12, 1934, Swan organized a nucleus group to handle Bethlehem busi-

ness, consisting of Edward B. Smith & Co., Brown Harriman, First Boston and J. & W. Seligman, all of which firms then included persons who had been associated with Swan in handling Bethlehem business at the Guaranty. Government counsel claim that it was at this conference that Swan invented the "successorship" term of the conspiracy; but I place no stock in that.

The group worked for some time shaping up the issue but ran into difficulty over the price. The figure they suggested was not acceptable to Eugene Grace, president of Bethlehem, who went to Elisha Walker of Kuhn Loeb. Then followed a variation of the usual Kuhn Loeb formula, and Grace solemnly assured Walker "that there was a complete cessation of conversations with Edward B. Smith & Co.," after which Kuhn Loeb made some changes in the set-up of the issue and was able to meet Grace's price.

The flexibility of the Kuhn Loeb "show window" policy is worthy of note. It can be manipulated *ad infinitum*, depending upon the exigencies of the particular occasion, and fits in well with an assumed attitude of standoffishness. That the whole affair is competitive rather than the contrary is plain. Where the business is highly desirable and the opportunity to get it seemingly promising, as in the first stage of the negotiation with the representatives of the Commonwealth of Australia, the very minimum compliance with the "show window" policy is suggested: "are they entirely free from commitments, expressed or implied, towards other bankers." As such commitments are seldom made, an affirmative answer would be easy to give. Where the business is not of high quality, as with Bulgaria, only a "definite agreement for a term of years" will suffice. One is tempted to surmise that sometimes the executives of issuers may not regard some of these requests for assurances too seriously.

As far as I can make out, the relationship between Grace and the Edward B. Smith & Co. people remained satisfactory and even friendly; the only disagreement was on the subject of price. In any event, Grace seems to have made no objection to taking the Swan group into the syndicate, which came out under the co-management of Kuhn Loeb and Edward B. Smith & Co., with participations of 22.36 apiece, followed by Brown Harriman in second position with 18.18, First Boston in third position with 12.-09, and J. & W. Seligman in fourth position with 7.45. The concluding negotiations were all done with Kuhn Loeb, however, and Swan felt that he had lost the business.

As is so often the case, however, the aftermath is interesting. A memorandum of Burnett Walker of Edward B. Smith & Co., dated May 22, 1935, notes an arrangement with Kuhn Loeb which contemplated co-managership by the two firms, with agreement on certain details, and concludes "the present arrangement as to negotiations, syndication, appearance and inclusion of our associates is to be a precedent for future Bethlehem Steel business." The $55,000,000 issue which is the subject of the above discussion came out on July 2, 1935.

On August 17, 1936, or over a year later, according to another memorandum by Walker, after much fussing over using the Kuhn Loeb form and type in the advertising, it seemed as though the two firms were about to "get the Bethlehem Steel business set down into a mold." But they were both counting their chickens before they were hatched, as another Burnett Walker memorandum of August 27, 1936, just ten days later, noted an entirely new agreement by which the business was to be split three ways between Kuhn Loeb, Edward B. Smith & Co. and Mellon Securities Corporation. The way Mellon Securities had worked its way in is explained in a memorandum by Denton of that firm, dated August 31, 1936. It reads:

"Recently we learned that this Company proposed to issue the above bonds, and that the group would be headed by Kuhn Loeb and Edward B. Smith & Co., jointly, as

was done in the issue of July, 1935. The matter was immediately taken up with Mr. Grace and Mr. McMath of the Company; and with their assistance, we were able to convince Kuhn Loeb and EBS that we should have a large place in the financing."

But Mellon Securities was an alleged co-conspirator and had no right to be interfering with "satisfactory relations" of "traditional bankers."

On September 14, 1936, another $55,-000,000 issue of Bethlehem came out with equal participations to Kuhn Loeb, Edward B. Smith and Mellon Securities, all in first position. Later issues in 1937, 1939, 1940 and 1945, were all co-managed by Kuhn Loeb, Edward B. Smith & Co., Smith Barney (Edward B. Smith & Co. having in this period merged with C. D. Barney & Co.) and Mellon Securities. By the time the 1946 and 1949 issues came out Mellon Securities had merged with First Boston, but in some way the Mellon Securities co-managership was lost, and Kuhn Loeb and Smith Barney remained as sole co-managers, despite the fact that the position of Mellon Securities as "traditional banker" should have gone to its "successor," First Boston.

### R. H. Macy & Co.

Two memoranda in May 1935 show the "show window" policy of Kuhn Loeb in full operation. The first of these is dated May 10, 1935, and is by Felix M. Warburg, a Kuhn Loeb partner, at whose home Macy's Percy Straus had dined the evening before the memorandum was dictated. Straus had indicated that Macy's "had given a declaration of independence as far as bankers are concerned." Warburg noted that he "was glad to learn of it" and

"that, while we were not in a position to go after business which belonged to somebody else, if in connection with their refinancing we could be of any service to them we would be glad to be called in."

The last paragraph of the memorandum is the most significant:

"I would not be surprised if he would approach us about this soon."

Warburg's surmise was correct. On May 13th John M. Schiff of Kuhn Loeb had luncheon at Macy's with Jack Straus, Paul Hollister and Beardsley Ruml, their Treasurer. Straus asked Schiff to step into his office and asked if Warburg "had spoken to me about their finances." The reply was that Warburg had done so, "but, as Lehman Bros. had sold their last issue, we felt that they would probably like to continue that relationship." Straus replied "that they considered they had no bankers" and that, as a matter of fact, he had four or five propositions on his desk at that moment from as many different bankers. Then followed the usual Kuhn Loeb talk about not entering into any competitive situation because there had already been "too much chiseling and stealing business in Wall Street and that we did not countenance such practices." The memorandum continues, "However, if they decided they wished to form a banking connection with us, we would be pleased to listen to him but the suggestion would have to come from them, as we did not wish to put ourselves in the position of soliciting business." There was also some further conversation about the desirability of "a continuing relationship."

It seems not improbable that this type of approach, especially in 1935, would be more likely to result in business with Macy's than a display of eagerness to enter into negotiations at once.

### Crucible Steel

A Buttenwieser memorandum of May 22, 1936 reports a conversation with Wilson and Trost of Stein Bros. & Boyce, intermediaries, who were seeking to interest Kuhn Loeb in some financing of Crucible Steel, and states that Wilson was well acquainted with Wilkinson, Chairman of Crucible Steel. Buttenwieser consulted the manuals, noticed that Chase Harris Forbes and Mellon

National Bank had offered an issue of bonds which was to be refunded through the financing mentioned by Wilson and Trost, and he informed these intermediaries that he doubted that Kuhn Loeb would be interested if First Boston, as "successor" to Chase Harris Forbes, and Mellon Securities Company, as "representative of the Mellon interests," considered this their business. The matter was later discussed over the telephone with Addinsell of First Boston, who advised that "they had had conferences with officials of the Crucible Company through certain officers of the Chase National Bank, with whom the Crucible carries an active account, all with a view to discussing the financing in question, and that they considered themselves in close contact with this business." Accordingly, Wilson and Trost were informed that Kuhn Loeb would not consider the matter further. It is possible that, as suggested by counsel for Kuhn Loeb, the commanding position of Kuhn Loeb in the management of financings of many leading steel companies in large amounts, made it the better part of wisdom not to take the risk of a rebuff.

### General Cable

There are two phases of the General Cable situation, reflected in documents introduced against Kuhn Loeb, one in 1940 and another in 1946. The 1946 incident is especially significant as it indicates what had happened to the Kuhn Loeb "show window" policy in the interval between 1933 and 1946, despite the testimony of John M. Schiff, above referred to, to the effect that the firm policy at the time of his deposition just before the trial started was the same as it was in 1933, when Otto H. Kahn gave his testimony before the Subcommittee of the Senate Committee on Banking and Currency.

The first is a memorandum dated April 25, 1940, by Strauss of Kuhn Loeb. Smith Barney had prepared a plan for General Cable, apparently upon a fee basis, although it is not clear whether the fee was to be absolute or contingent, and this had been done without consulting Kuhn Loeb. The memorandum indicates a protest by Kuhn Loeb based upon the fact that in 1936 there had been, according to the Kuhn Loeb claim, a joint arrangement between the two firms that they should go after the business of General Cable together. There was evidently some misunderstanding about the making of this original arrangement.

The portion of the memorandum stressed against Kuhn Loeb is the part at the end, where Kuhn Loeb in effect states that, if the situation had been reversed and they had been asked to work out a plan, "we should have considered ourselves obligated to discuss it with Smith Barney & Co." When originally offered it was contended by counsel for the government that this indicated a state of mind on the part of Kuhn Loeb to the effect that if the situation had been reversed Kuhn Loeb would not have competed without getting some sort of "permission" from another co-conspirator. Strangely enough, the same document is referred to in the connecting statements as evidencing a "talking" between the co-conspirators Smith Barney and Kuhn Loeb, "about the obligations which one banker owes to another under the code and nothing else."

It had nothing to do with any "code", but expressed views quite natural to a "partner," who had entered into an arrangement to go after a particular piece of business, when he learned that the other "partner" had sought to get the business for himself.

But when we come to glance at the background, it will be found that the transaction reflected in the document is inconsistent with plaintiff's theory of deferring to a "traditional banker." For the "traditional banker" quite plainly was Dillon Read. There had been four issues in the period from November, 1927, through February, 1928, all of which were handled by Dillon Read and Kissell Kinnicutt. If Kuhn Loeb and Smith Barney, or in 1936 Edward B. Smith & Co., formed a group to go after

the business of General Cable, this would seem clearly to have been in derogation of the "traditional banker rights" of Dillon Read, nor does there seem to have been any lack of "satisfactory relations" between General Cable and Dillon Read, as, six months after the date of the memorandum under discussion, the company made a private placement through Dillon Read as agent.

The 1946 situation is also, as we shall see, not only totally at variance with plaintiff's theory of the "rights" of "traditional bankers," but it shows Kuhn Loeb getting right down into the arena and fighting in the open for a piece of business, even though there was a prospect of not getting it and, as the event proved, Kuhn Loeb did not get it.

Whatever dispute had existed earlier between Kuhn Loeb and Edward B. Smith & Co. had not lasted long, as we now find Kuhn Loeb and Smith Barney working together, and trying to get leadership of a General Cable issue which came out under the management of Blyth on June 11, 1946. The memorandum dated January 29, 1946, is a lengthy one by Buttenwieser of Kuhn Loeb. Blyth, who should have been deferring to Dillon Read as the "traditional banker," had been working on a plan for submission to General Cable and had been careless enough to give an outline of the plan to the Wall Street Journal, which published it on January 10, 1946. Using their personal relations with Roger Straus, president of American Smelting and Refining Company, the parent company of General Cable, there were conversations supposed to lead up to the preparation of a competing Kuhn Loeb-Smith Barney plan, which it was hoped might be more acceptable to the company than the Blyth plan.

Evidently Strauss of Kuhn Loeb called up Blyth to get information, as is so often the purpose of these telephone calls, and Mitchell of Blyth, at once perceiving that Blyth was faced with some competition, which might get the business away from them, went immediately over to the Kuhn Loeb office where he had a talk with Strauss. Buttenwieser's memorandum states:

"As I understand it, Mitchell's visit was prompted by LLS telephoning him to discuss the matter in order to learn just how far advanced Blyths were in the picture."

Mitchell's purpose in calling upon Strauss was the purely competitive one of trying to make it clear to Strauss that Kuhn Loeb and Smith Barney had no chance to get the business and had better quit, because

"he felt that Blyth had the matter quite well in hand, that they had expended much thought and work on formulating the plan which they had presented to the Company, and, as he put it, that they felt that any effort on our part to formulate a plan would only 'muddy the waters.' "

The expression "muddy the waters" is the part of the memorandum relied upon by counsel for the government.

But the reaction of Strauss was quite different from his earlier reaction when a similar dispute arose between him and Swan over Armstrong Cork. Then the "show window" policy was in full force and effect and Strauss followed a cautious course. In 1946, however, he fought the matter out to the bitter end. He thought he had made it "crystal clear to Mr. Mitchell" that the position of Kuhn Loeb and Smith Barney was a strong one, because they had either alone or with Smith Barney "sponsored many offerings of securities for the Smelting Company" and "there was every propriety in our interesting ourselves in the financing of a company in which the Smelting Company had so large an interest as it has in General Cable."

As a matter of fact, this argument had little weight. Although Kuhn Loeb had brought out an American Smelting issue in 1922, another in 1923 with Guaranty and Bankers, and a third in 1930 with Bankers, Guaranty and Chase, the 1932 issue was brought out through Hallgarten, Halsey Stuart and Edward B. Smith

& Co. There were also other intervening issues, and the fact was that Kuhn Loeb had not managed any American Smelting securities for ten years, and four such issues had intervened.

The upshot of the conversation with Mitchell on January 10, 1946, was that things had evidently not been made "crystal clear" to Mitchell, who proceeded to go ahead with the Blyth negotiations. And the same memorandum discloses that Kuhn Loeb also proceeded, with undiminished vigor, to try to sell its plan to General Cable. The matter was taken up with John Loeb of Carl M. Loeb, Rhoades & Co. and it turned out that this firm was actively working on the situation with Mitchell, and they joined in the chorus about "butting in." But Strauss went ahead, nevertheless, talked the matter over again with Roger Straus, showed Straus the Kuhn Loeb-Smith Barney plan and was told by him "not to discuss the matter with any other firm." This led to an embarrassing situation at a luncheon engagement, which had previously been made with John Loeb, at which Strauss tried to avoid discussing the Kuhn Loeb-Smith Barney plan. He finally gave some of the details, but not enough to indicate the full scope of the proposed plan. In any event, on the date of the memorandum, January 29, 1946, Straus informed Strauss that "he and his associates had come to the conclusion that they preferred the Blyth plan." Even this did not cause Strauss to desist, as the memorandum indicates that he pursued the matter further.

This is supposed to help plaintiff's case because counsel for the government infer that there must have been a "satisfactory relationship" with Blyth or Blyth would not have been so far advanced in the negotiations; and that this in turn would indicate that the pre-existing "satisfactory relationship" with Dillon Read had deteriorated. But this is all speculation, in the absence of proof. The significant fact is that Blyth was competing, and not deferring to Dillon Read, the "traditional banker"; and both Kuhn Loeb and Smith Barney, far from deferring to either Dillon Read or Blyth, continued competing for the business to the end. The talk about "muddying the waters" was no more than a competitive effort by Mitchell to get Kuhn Loeb and Smith Barney out of the picture.

I find that Kuhn Loeb at no time "adhered" to any "practice" of "traditional banker," nor was Kuhn Loeb at any time a party to any conspiracy or agreement on "successorships," nor to any "code" having such or any similar provisions.

## 3. Smith Barney (Edward B. Smith & Co.)

Many issuer situations have already been discussed, including Armstrong Cork,[1] Bethlehem Steel,[2] the alleged "caretaker" situations,[3] General Cable,[4] and Sears Roebuck,[5] all of which concern Edward B. Smith & Co., and the competitive pattern of Swan and his associates has definitely emerged.

### What Is Now Taking Shape Is Not a Static "Mosaic" of Conspiracy but a Constantly Changing Panorama of Competition Among the Seventeen Defendant Firms

The "mosaic" is definitely taking on form and substance; but its character is far different from what was predicted with such confidence by government counsel in their Trial Brief on the Facts and in their openings. In fact it is not a "mosaic" at all, but rather a panorama of competitive effort, in which each defendant firm plays its several part; but the policies are constantly shifting and changing as the years go by, and the impact of political events and social changes is felt. That is why it seems so futile to be threshing over the old straw

1. See supra, p. 760 ff.
2. See supra, p. 765 ff.
3. See supra, p. 752.
4. See supra, p. 768.
5. See supra, p. 719 ff.

of 1934–1936, or almost twenty years ago. Probably the Otto H. Kahn "show window" policy is now as defunct as the dinosaurs; certainly Smith Barney has long since ceased to study over the available material concerning issuers served by the Guaranty. But we proceed.

We find Swan, in 1934, in charge at Edward B. Smith & Co.; with the large accession of officers and employees from the Guaranty, the staff of the firm had about doubled; and hustling about for business was the order of the day. That Swan's competitive policy was aggressive appears conclusively from the very numerous status book entries in evidence; and it is equally clear that the bulk of the competitive effort, but by no means all of it, was immediately expended upon the business of issuers whose financings had been handled at the Guaranty, by the very men who had just joined Edward B. Smith & Co. That Swan should make every effort to establish the firm as the "successor" to this business, previously done at the Guaranty, seems explainable on the face of the matter. It is significant that the "claims" to this Guaranty business were vigorously opposed by other defendant firms, as we have seen and shall see again. There was no conspiratorial plan about it, nor any "invention" by Swan of a "term" of any conspiracy about "successorships." That he also entertained ideas about the desirability of continuing relationships with issuers is simply part of the man's personal point of view. He tells us again and again that he did not believe in wasting his time and the resources of the firm going after business which would almost certainly elude his grasp; but he also felt that continuing relationships with issuers were good for the issuers, as well as for investment bankers and the public in general. This was no conspiratorial camouflage.

In order to get the discovery proceedings started in a proper way, and as part of the administration of the whole complicated and unwieldy mass which made up the case as a whole, I personally presided over the taking of his deposition; and it is only fair to record the fact that he made a very favorable impression upon me. One of the phases of his testimony which helped me to form this impression, was his statement that the position his firm had in a particular financing was not so important to him as the money they made out of the transaction. In other words, he was in business for profit and not for prestige.

That there was no "deferring" to "traditional bankers" by Edward B. Smith & Co., and later by Smith Barney, under the guidance of Swan, will sufficiently appear from the discussion of particular issuer situations, when the documents concerning them are all read together. No further reference will be made here to those already commented on or mentioned later on in this opinion. Each of the documents referred to by government counsel, in the connecting statement against Smith Barney, will now be discussed.

### Wilson & Co.

Chronologically, this is the first general issuer situation relied upon by government counsel against Smith Barney. The background shows an issue of $2,500,000 6% Notes in 1927 and a $3,000,000 issue of First Mortgage 6s in 1921, brought out by Guaranty, Hallgarten, Blair, Chase Securities and certain Chicago banks, the latter having minor positions. The outcome of the competition which we are about to consider was a $20,000,000 issue of 4% First Mortgage Bonds, which came out on July 30, 1935, under the joint managership of Field Glore and Edward B. Smith & Co. This was the result of a general scramble for the managership. According to a letter from James D. Cooney, a company adviser to Thomas E. Wilson, president of the company, dated May 23, 1935, the firms competing for the business included Kuhn Loeb, Edward B. Smith & Co., Speyer & Co., Field Glore, Lazard, Hallgarten, Hornblower & Weeks, White Weld and Lee Higginson.

Government counsel, endeavoring to support its "traditional banker" and "successorships" claims, rely upon a statement in a memorandum by Addinsell of First Boston dated May 16, 1935, stating that he had given a favorable response to Swan the day before, when asked by Swan whether he would join Edward B. Smith & Co. "in reconstituting the old group," whereas the memorandum indicated that some time previously, in response to an inquiry from Miles Warner of Byllesby, First Boston had told Warner that "we would not want to be drawn into competition for the business."

There appears to have been no good reason why Addinsell should think that Byllesby would have been in a position successfully to compete for the business. On the other hand, Swan and his associates in Edward B. Smith & Co. were close to Wilson & Company because of their prior association with the Guaranty, and it must have seemed probable to Addinsell that the reconstitution of the old group would work out well, as it subsequently did.

Swan testified:

"* * * Wilson & Company at some time, and I am not clear in my mind at what time, went through a reorganization. In connection with that reorganization I became very close to Wilson & Company. I was either a member of the reorganization committee or a member of one of the protective committees, or I was connected with it in an official capacity. I became very close to Wilson & Company. When various members of the Guaranty Company joined Edward B. Smith & Company, one of the first efforts I made was to try to get Wilson & Company's business, and we did. We realized that it was a highly competitive situation, that there would be many other people trying to get this business, just as we were, and we went after it in the strongest way we possibly could. I was a great friend of, I think, of Mr. Thomas Wilson's, and I made all the effort I could to get this business * *"

Swan also testified:

"We used, in trying to get business, we used every resource we could. When we left the Guaranty Co. and went into Edward B. Smith & Company, we went out into a cold world. We had taken on great responsibilities, and we made a great campaign all over this United States to get our names before people who would know who we were and what we were trying to do, and what our capital was, and who the firm was composed of, and we went after every piece of business that we could, and we used such approaches as we could use. Amongst other approaches that we used, naturally we used as an approach to Wilson & Co., we used not only my acquaintance with Mr. Wilson, but we used our friends in the Guaranty Trust Company to see if they would not tell Wilson & Company that we were, in this new connection, competent to do this business."

The Edward B. Smith & Co. status book entries indicate vigorous efforts beginning as early as September 11, 1934, by the Edward B. Smith & Co. people to get the business; and these entries indicate the way in which the old group was reconstituted.

Swan testifies further:

"Yes, I do know what is meant by the old group. The old group was the group that handled Wilson & Company business with Guaranty Company: Chase Securities Company, Blair & Company, Hallgarten & Company. The Guaranty Company had gone out of business and certain individuals had gone into Edward B. Smith & Company and they wanted to try and get this Wilson business. They thought that if they got together with the same individuals, the same personalities, that had been in the previous business they would stand a better chance of

getting this business. Now, Addinsell was in The First Boston Corporation, I think, by this time, but Chase Securities Company had ceased to exist. But he was known, well known and liked by the Wilson people. I think I may say I was well known and liked by the Wilson people. The Hallgarten people were well known and liked by the Wilson people. So that we tried to get together a group of people that would be persona grata to Wilson & Company and that Wilson & Company would decide should be the people who would handle this business, and we added to that group Glore, Forgan & Company because, from our point of view, from a competitive point of view, we wanted to have a Chicago house in the group with us, and we thought they would add strength to our efforts to get this business."

M. L. Freeman again appears, this time advising White Weld; and White Weld evidently made some progress, as its name is included in the list submitted by Cooney to Wilson, as above indicated.

In the end, the decision was made by the executives of the issuer. The same letter from Cooney to Wilson above referred to states that Buethe, one of the executives, and Freeman (Halstead G. Freeman, a banker advising the company, who later, and on July 6, 1935, became a partner of Field Glore) "definitely recommend that the two houses should be picked out of the last above named three firms, namely, E. B. Smith & Co., Speyer & Co. and Field Glore & Co." Wilson's cable in reply reads:

"Cooney: Letter 23rd—would use two houses number four and selection between two, three, one—according present attitude favorable trade—because of present borrowings am leaning toward all bonds Sailing Thursday Both fine—"

This meant that Wilson was selecting Field Glore as his number one choice,

and the company officials evidently agreed that the other co-manager should be Edward B. Smith & Co. One of the status book entries notes that Buethe called Swan on June 6, 1935 advising of the decision "to put the matter in our hands jointly with Field Glore."

Thus, there appears to have been competition for leadership of the issue by a number of the defendant firms, in derogation of the alleged "traditional banker" and "successorships" terms of the conspiracy; and the outcome in no sense reflects any "recognition" of the "successorship" of Edward B. Smith & Co. by First Boston, Field Glore, or anyone else.

That the competition for underwriting positions was equally keen appears from a memorandum by J. J. Buckley of Edward B. Smith & Co., dated September 9, 1935, which tells the whole story, from the time of a preliminary meeting in the Chicago office of Field Glore on June 10, 1935, down to the time the issue came out. Company officials and advisers joined in the discussions; Buethe "specifically excluded White Weld by name," for reasons which we must assume were satisfactory to him, and which went to the merits; and the final list showed Edward B. Smith & Co. and Field Glore, the co-managers, in first position, with $4,500,000 each; Kuhn Loeb in a "non-appearing" position, with $2,000,000; Speyer, First Boston and Hallgarten in second position, with $1,800,000 apiece; followed by Goldman Sachs, Bancamerica-Blair, Lazard, Hornblower & Weeks and Lee Higginson, all in third position, with $720,000 each.

### Rochester Gas & Electric

A series of documents introduced by government counsel are claimed to have some significance in connection with the "traditional banker" and "successorship" charges, against Smith Barney, First Boston, White Weld and Harris Hall. In my opinion, the whole Rochester Gas & Electric situation has received much more attention in the case than it de-

serves. While the documents, in the aggregate, do not give us as clear a view of the negotiations from beginning to end as we find in many of the others, which have already been discussed, there is sufficient to indicate that there was no "adherence" to any "practice" of "traditional banker," nor to any "term" of an agreement relative to "successorships."

In the pre-Securities Act period, the last financing for the company had been an issue of bonds offered on August 18, 1932, with Chase Harris Forbes and Guaranty as the only underwriters in privity of contract with the issuer. Accordingly, as the leading personnel of these two firms had gone over to First Boston and Edward B. Smith & Co. after the effective date of the Glass-Steagall Act, the Edward B. Smith & Co. status book entries show First Boston and Edward B. Smith & Co. joining together as early as October 3, 1934, to go after any business of Rochester Gas & Electric which might eventuate. Looking ahead, we find that the negotiations, which are about to be related, were ineffectual, as the next issue of the company was $4,000,000 of 4% General Mortgage Bonds issued in December 1935, without using the services of any investment banker. Later on, there were two simultaneous issues of preferred stock brought out on September 29, 1936, under the leadership of First Boston; one of these First Boston underwrote alone, and in the other Edward B. Smith & Co. had an equal participation but was not a co-manager.

The first development in 1934, which is stressed by government counsel, was a call on First Boston by Miller of White Weld in which he stated that he had discussed the possibility of refunding an issue of 5½s with an issue of $4,000,000 4% Bonds. He added, and this is the part especially relied on:

"He was advised [by the president of Rochester Gas & Electric] that the Company had no obligation to do business with any of the banking firms which handled the Company's financing in the past and that the possibility of refunding the 5½s was very interesting."

None of the documents disclose the reason for Miller's communicating with First Boston; nor does it appear that the statement, which had evidently been made by the president of Rochester Gas & Electric to Miller, was in response to any request for such an "assurance" by Miller. The White Weld background makes it seem improbable that the statement was other than volunteered by the president of the company.

The reaction of government counsel to this initial competitive effort by White Weld is interesting. By the terms of the alleged conspiracy White Weld should not have been competing, but should rather have deferred to First Boston and Edward B. Smith & Co. as the "successors" to the "traditional bankers." I inquired as to whether or not the statement by the president of Rochester Gas & Electric indicated that the "satisfactory relation" between the company and its bankers had ceased to exist, as the question of whether or not later developments would fit into the alleged conspiratorial pattern, depended somewhat upon the existence or non-existence of a "satisfactory relation." The answer by government counsel, however, was "yes and no," and he added "There is some doubt * * * as to whether White Weld's information was correct or not."

The conversation at First Boston occurred on November 30, 1934.

As often happens when an investment banker sees a chance that a competitor will get business that he is after, we find an immdiate reaction on the part of First Boston and Edward B. Smith & Co. Their most likely contact with the company was through a director, Raymond N. Ball, president of Lincoln-Alliance Bank and Trust Co. of Rochester, to whom letters were sent urging the "claims" of First Boston and Edward B. Smith & Co. on the grounds that "it was * * * felt that the directors of the Corporation would recognize a

moral obligation to continue the mutually satisfactory relationship which has been enjoyed over such a long period of years"; and there are further statements to the effect that First Boston was "the successor to the business of Harris, Forbes & Company" and that Edward B. Smith & Co. "as a practical matter has succeeded to the business of the Guaranty Company of New York." I interpret this as no more than a legitimate attempt on the part of First Boston and Edward B. Smith & Co. to go after business which they had agreed to seek together, and to advance such arguments as they could, based upon their prior relationship with the business. That the "claim" is addressed to the issuer is perhaps of some significance; and the fact that, according to another memorandum, First Boston and Edward B. Smith & Co. planned to inform White Weld that they considered Rochester Gas & Electric to be their business and were writing to Ball about it, seems no more than a competitive maneuver to get rid of White Weld, if they could.

Before a reply was received from Ball, and sometime between December 3rd and about December 11th, there was a conversation between Addinsell of First Boston and Cliff Miller of White Weld. The subject of the discussion had to do with what participation would be given to White Weld if First Boston and Edward B. Smith & Co. got the business. No conclusion was arrived at, but the tenor of a memorandum by Webb Wilson of Edward B. Smith & Co. is that "Addinsell and Walker decided that they would rather lose this business than open the doors for White Weld just because they had talked to the President who said his Company had no commitment to bankers."

This leads up to the concluding portion of the same Webb Wilson memorandum, which is strongly relied upon by government counsel. It follows:

"Shortly after Addinsell had talked with Cliff Miller, Addinsell discussed the matter with Ben Clark and Faris Russell of White Weld, who apparently had not previously understood the historical basis for First Boston and ourselves feeling that Rochester Gas & Electric financing should be our business. When that historical basis was explained to them, Clark and Russell agreed with Addinsell that White Weld obviously had no basis for feeling that they were entitled to be invited into the account."

If this refers to giving White Weld a participation, which in my view is the only interpretation consistent with the attendant circumstances and the balance of the memorandum, the document is without significance, as this interpretation will not support an inference that White Weld agreed to or thereafter did cease to compete for the managership. This was also the view of government counsel when the matter was first discussed in the connecting statements. Later on, however, a different view was taken, and counsel stated "we at least lean to the view that this language probably concerns managership." With this I disagree.

There is no evidence as to what White Weld did or did not do thereafter.

While all this was going on, one of the Edward B. Smith & Co. status book entries under date of August 22, 1935, states: "Blyth & Co. competing and Paterson has been to Rochester."

The final phase of the Rochester Gas & Electric situation is a Harris Hall letter addressed to Woods of First Boston on September 24, 1936, just before the 1936 issues came out, calling attention to "our joint interests in Rochester Gas and Electric Company business which goes back into the grass roots of both the utility company and the Harris Organization." While the letter speaks of seeking the aid of First Boston by trying to make sure that First Boston "felt that our interests had been protected," the letter does no more than advance a "claim" based on former association with the business. No participation was forthcoming, perhaps because of delay in sending the letter; but in the 1937

issue, co-managed by First Boston and Edward B. Smith & Co., Harris Hall is in second position with 13.33% participation with Goldman Sachs and Langley.

The net result of all the above is rather against than for plaintiff, as several defendant firms are competing for business which supposedly belonged to other defendant firms as "traditional bankers," on the basis of "successorship"; but the proof is so sketchy as to amount to comparatively little one way or another. I refer to it only because it has been emphasized again and again by government counsel in the connecting statements.

### A. E. Staley Manufacturing Co.

Three documents received against Smith Barney, and relating to the above issuer, are referred to in the connecting statement as some evidence of "adherence" by Smith Barney to the "practice" of "traditional banker" and "successorships"; and a few additional documents on "successorships" merely disclose Swan and those working with him, advancing every argument they can to capitalize on the former connection of Swan and his associates with issuers whose financings had been handled by the Guaranty.

In the pre-Security Act period Blair and Stifel Nicolaus had brought out a $6,000,000 issue of 6% First Mortgage Bonds in connection with which the company had signed an agreement, giving these two non-defendant firms "preferential rights" on future financing. The references in the status book entries such as, "Staley advises he had cleared that they are under no obligation to Stifel Nicholaus (*sic*) & Co.," and "he had advised old bankers that he was dealing elsewhere, but there was no evidence that old bankers were content with such an arrangement," and more to the same effect, have no reference to any suggestion emanating from Edward B. Smith & Co. or from First Boston, but reflect Staley's efforts, entirely on his own initiative, to extricate himself from a difficult situation; he having decided, again without receiving any suggestion

from anyone else, that he did not want to do business with his former bankers.

Accordingly the scene opens with Staley, through some contact at the Guaranty Trust Company of New York, meeting and conferring with Swan on May 13, 1936. He had a conference at the office of Edward B. Smith & Co. on the following day and talked with Swan, Cutler and Buckley, all of Edward B. Smith & Co., whom he informed that he had discussed the matter of financing with First Boston. Neither Edward B. Smith & Co. nor First Boston was willing to expend the necessary time and money connected with a study of the affairs of the company and the formulation of a plan, on the basis of competing with one another. The amount involved was relatively small. There was the difficulty of the "preferential rights" contract with Blair and Stifel Nicolaus and, as a purely business proposition, the decision, that Edward B. Smith & Co. and First Boston should work jointly on the matter, seems sensible, especially as the suggestion that they do so may have come from Staley.

In any event, the balance of the status book entries indicate prolonged negotiation and considerable work on the formulation of the plan and the preparation of the registration statement. Since this was the first post-Securities Act issue for this company, the work involved was necessarily much greater than it would have been had there been a previous issue registered under the Securities Act. After considerable hesitation and dickering, Blair and Stifel Nicolaus finally signed an agreement cancelling the "preferential rights" contract, and the issue came out on February 14, 1936 under the sole management of Edward B. Smith & Co. There were only four underwriters: Edward B. Smith & Co. in first position with $1,500,000; First Boston in second position with $1,100,000; and Bancamerica-Blair and Stifel Nicolaus with $700,000 apiece.

In 1940 there was a $1,700,000 private placement without the services of any investment banker; in 1941 Smith Barney

alone handled two simultaneous registered secondary issues of common and preferred stock; and there were two simultaneous offerings of preferred stock in 1946 brought out by First Boston and Smith Barney as co-managers.

In connection with this last issue, there is testimony by Gordon of Kidder Peabody that Kidder Peabody had solicited this business, and that in May 1945, Kidder Peabody submitted a competing plan for what turned out to be the 1946 issue, despite the fact that he knew that prior financing had been done by Edward B. Smith & Co. and First Boston.

### Aluminum, Koppers, Jones & Laughlin, Lone Star Gas, Gulf Oil

A memorandum of September 19, 1935 by Weisheit of Edward B. Smith & Co. reads:

"Mr. C. S. Cheston has asked that we do not pursue directly any Mellon business such as Aluminum, Koppers, Jones & Laughlin, Lone Star Gas, Gulf Oil, etc. as the Mellon Securities Company is planning to handle these accounts themselves and our contact work in such cases should be only with Mellon Securities Company through Mr. Cheston."

Evidently government counsel thought Cheston was connected with Mellon Securities, but the fact that he turned out to be a Philadelphia partner of Edward B. Smith & Co. and had no connection with Mellon Securities, did not deter government counsel from emphasizing this document in the connecting statement relative to Smith Barney, where the exhibit is cited as an example of refusal to compete "without clearance from the banker who had previously been financing" the issuer.

There could not be any "traditional banker" situation involved, as Mellon Securities was organized on February 11, 1931, and had no alleged "predecessor." It had never managed any financings for any of the companies referred to in the memorandum, and no theory is suggested which could make Mellon Securities the "traditional banker" of any of them.

From the static data Edward B. Smith & Co., as "successor" to the Guaranty, should have been the "traditional banker" for the Aluminum Company of America, Jones & Laughlin Steel Corporation and Lone Star Gas Corporation, and Blyth or Brown Harriman and not Mellon Securities should have been "traditional banker" for Gulf Oil.

The explanation very simply is that, against prospective competition from Mellon Securities, it was thought as a matter of business judgment that Edward B. Smith & Co. should attempt through the efforts of Cheston to get a participation rather than to seek the management of financing by these companies. The document has nothing to do with getting clearance from any "traditional banker."

### Southern Pacific

A series of four status book entries beginning July 17, 1935 and ending June 10, 1936, relating to Southern Pacific require no more than passing reference. Kuhn Loeb had been the only investment banker listed as in privity of contract with this issuer for five successive issues in the pre-Securities Act period.

Swan attended an executive committee meeting of the New York Botanical Association on July 17, 1935, where he met Henry De Forest. After the meeting "they discussed business to some extent and the matter of Southern Pacific financing came up." The entry of this date continues: " * * * Mr. De Forest said that the road was not considering any financing now, and went on to say that owing to the changes in the personnel of their old banking firm (KL & Co) he did not consider the railroad had any banking connection at present. This brings up a very interesting situation and one which should be followed carefully."

On the government's original "traditional banker" theory Swan should have deferred to Kuhn Loeb and kept away

from the business; on the revised theory of "satisfactory relations," it might be claimed that there was some basis for considering that there was no longer any "satisfactory relation" between Kuhn Loeb and Southern Pacific, in which event Swan would not be required by the terms of the alleged conspiracy to defer. Whether the situation be looked at from one angle or another, other documents in the case show that Edward B. Smith & Co. followed the Southern Pacific situation with great care, until a news item in the New York Times on June 4, 1936 announced that "a banking group, understood to be headed by Kuhn, Loeb & Co." was expected to handle a forthcoming issue of $50,000,000 to $60,000,000 notes of Southern Pacific.

Then comes the entry especially relied on, under the same date, June 4, 1936:

> "Spoke to JWC about rumored financing and he said in view of company's past relations with K. L. & Co. he did not think we could properly approach the company in spite of Mr. DeForest's statement above."

Six days later, on June 10, 1936, a $60,-000,000 issue of Southern Pacific bonds came out under the management of Kuhn Loeb, and Edward B. Smith & Co. did not even participate in the offering.

### Standard Oil of New Jersey

A letter from Land of Edward B. Smith & Co., dated November 6, 1936, to Gallegher of Standard Oil of New Jersey, has no background to support it and seems to be merely an angling for some natural gas secondaries. The sentence relied on is "I should like to add, however, that we do not wish to be construed as soliciting any business in which Morgan Stanley & Co. would be interested." Perhaps Land hoped that the letter might find its way to Morgan Stanley and help Edward B. Smith & Co. to improve its position in some of the participations in issues brought out by Morgan Stanley. There is no reason to doubt

that Land was interested in the secondaries; and the document would seem to lend little support to the "traditional banker" charge.

The contrast to the proof adduced against Kuhn Loeb is striking. As we proceed, we shall find that there is little or nothing of significance against the other defendants on the "traditional banker" issue.

I find that Smith Barney (Edward B. Smith & Co.) at no time "adhered" to any "practice" of "traditional banker," nor was Smith Barney (Edward B. Smith & Co.) a party to any conspiracy or agreement on "successorships," nor to any "code" having such or any similar provisions.

### 4. Lehman Brothers

From what we have already observed of the energetic competitive practices of Lehman Brothers in connection with the discussion of several issuer situations under directorships,[1] the paucity of evidence against that firm on the "traditional banker" and "successorships" phase of the case need cause no surprise.

The few documents referred to in the connecting statement by government counsel will be commented on in the order there presented.

### Crown Zellerbach

In the pre-Securities Act period Blyth had offered the five most recent public offerings of securities of Crown Willamette Paper Company, Zellerbach Corporation and Crown Zellerbach Corporation, all part of the same organization located on the West coast.

Lehman Brothers heard there was some financing under consideration, and decided to go after it, despite the fact that Blyth was the "traditional banker" and Charles R. Blyth was a director. Accordingly, M. F. Hellman, a Lehman Brothers employee, made the trip to San Francisco and obtained an introduction to J. D. Zellerbach, having been informed by Lipman, president of the Wells Fargo

---

[1] See supra, pp. 704 ff., 716 ff.; and also discussion of Shell Union Oil, under the subtitle of Dillon Read, infra, p. 800.

Bank, who was advising Hellman, to "go over and speak to Mr. Zellerbach, laying my cards on the table, and ask for his advice."

The report of this conversation, made by Hellman on July 22, 1935, affords government counsel a few short quotations on the subject of the submission of competing bids, but the net result is a fine piece of shrewd negotiation by both Hellman and Zellerbach, reminiscent of others previously discussed in this opinion. Zellerbach, on the one hand, very plainly stated that he and Mills, a member of the Finance Committee, "were the closest friends to Charles Blyth" but that "if we made the best proposition the Finance Committee would accept our proposition with the proviso that we agreed to take Blyth & Co. and some other firms into the deal." It was plain that there was no lack of "satisfactory relations" between Crown Zellerbach and Blyth.

The conversation covered quite a range of subjects, each negotiator sounding the other out. If Lehman Brothers made the lowest bid it would get the business; "Blyth could raise as much hell as he wanted and it would not do him any good"; Lehman Brothers had better not approach Blyth to make a joint proposition for, if Lehman Brothers felt it had to do that, "we might as well forget the whole thing." If Lehman Brothers did not make the best proposition, there was no assurance that it would even be taken into the deal, as Zellerbach could not "take care of all the banking houses who offered him some kind of a proposition which was not acceptable."

The upshot was that Hellman recommended that Lehman Brothers make a proposition. Two elaborate alternative plans were prepared and later submitted to Zellerbach by Hellman; and in connection with these the usual caution was observed as to exact prices, so that their plans might not be taken over by someone else, at what seemed a lower price, but which amounted to "the same basis as our original price."

After all this trouble Zellerbach was non-committal; and there was no Crown Zellerbach financing for another ten years.

Thus we find Lehman Brothers, in flat defiance of the alleged "practice" of "traditional banker," not only making the initial competitive approach, but persisting in the formulation and submission of elaborate plans, after being assured that the relations with Blyth were intimate and friendly.

### Giannini Interests

The claims advanced by government counsel based upon a letter of July 3, 1943, from Hammerslough of Lehman Brothers to Francis Callary of Consolidated Vultee Aircraft Corp. in California, are wholly unsupported by evidence and require no comment. There had evidently been some misunderstanding between Lehman Brothers and Eastman Dillon, the nature of which is not clear. In the absence of evidence of attendant circumstances, it is not possible to understand what the letter is about.

### The So-Called "Treaties" Between Lehman Brothers and Goldman Sachs

As background to the discussion of the claims of government counsel relative to a letter from Robert Lehman of Lehman Brothers to Thomas H. McInnerney of National Dairy Products Corporation, dated February 18, 1936, it seems necessary briefly to comment on the dispute between Lehman Brothers and Goldman Sachs which led up to the writing of that letter.

It will be recalled that, commencing with the underwriting of the United Cigar Manufacturers preferred and common stocks in June, 1906, Lehman Brothers conducted its business of heading security issues in an informal partnership with Goldman Sachs which lasted for nearly 20 years and was never reduced to writing.[1]

1. See supra, pp. 637, 638.

From 1906 to 1924, the two firms were, in effect, a single partnership as to the heading of security issues, and neither one had a separate business in the heading of security issues.[2] During the period 1906–1924, Lehman Brothers headed in partnership with Goldman Sachs 114 negotiated issues for 56 issuers.

In view of the very aggressive competitive policies of each of these firms, which we have already had occasion to observe, it was inevitable, or so at least it seems to me, that they should eventually come to a parting of the ways. Disputes gradually developed between the two firms over a division of the profits arising from financings which they handled together as partners. In one instance after another, work done by the partners or employees of one firm, either in getting or holding on to the business of a particular issuer, or in servicing the accounts, seemed greater than that done by the partners and employees of the other.

In any event, the storm clouds gradually gathered, and, as a result, after Lehman Brothers and Goldman Sachs had thus headed together 114 negotiated issues in their joint venture, sharing equally as partners in both risk obligation and profit participation, the two firms during the years 1925–1926 gradually worked apart, and during this period each firm headed new issues without the other.

The altered relationship of the two firms is reflected in two memoranda, dated October 26, 1925, and January 5, 1926, which, together with a later memorandum, dated June 30, 1938, were called "treaties" by government counsel. The first of these memoranda, dated October 26, 1925, described a conference between representatives of the two firms, and noted that "The conference throughout was marked by a temperate and amicable spirit." The 1925 and 1926 memoranda in essence recognized the dissolution of the partnership as to the business of new issuers, and provided for the relation of the firms to each other, as to the future business of those issuers whom they had served in the past as partners. As to the business of new issuers, each firm was henceforth free to pursue its own course independently of the other. With respect to any new financing that might arise in any company for which they had already in the past handled financing together as partners, the two firms were to operate on the same basis as before. The memorandum of January 5, 1926, made detailed provisions as to how the two firms would handle such financings in the future, and attached to the memorandum was a list of the issuers, segregated according to the firm which would handle the books if any such business arose. Sixty corporations, counting the separately named subsidiaries, were listed; 41 in connection with whose financings the books were to be handled in the office of Goldman Sachs, and 19 in connection with whose financings the books were to be handled in the office of Lehman Brothers.

While it is contended by government counsel that these memoranda represent "something superimposed on the general conspiracy," I find in them nothing to support this contention. They represent a serious effort on the part of both firms to compose their differences and to hold on to their business. It would unduly lengthen this opinion to attempt any detailed discussion of the various provisions of these so-called "treaties."

The enactment of the securities legislation in the years 1933–1934, resulted in vastly increased work and expense on the part of the managing underwriter in connection with the registration of securities to be publicly offered. Inevitably, the managing underwriter who handled the books on an issue came increasingly to regard any management fee as largely compensation for its own greatly

2. The only exceptions had been the four B. F. Goodrich Company issues of March 15, 1920, April, 1920, July 5, 1922, and December, 1922, all of which had been headed by Goldman Sachs with others, but without Lehman Brothers.

increased expenditure of time and money. The division of the management fees, which arose from financings headed by Lehman Brothers and Goldman Sachs, became a subject of controversy between these two firms. No provision for the division of management costs and fees had been made in the memoranda of October 26, 1925, and January 5, 1926. This led to an exchange of letters on February 6 and 7, 1936, discontinuing the arrangements for handling the old partnership accounts set out in the memoranda of October 26, 1925, and January 5, 1926. The separation between the two firms was now complete.

The discontinuance of these arrangements, which had previously governed the duties of each firm toward the other with respect to issuers whom they had served in the past as partners, gave rise to a bitter strife between the two firms, which, by involving the issuers, threatened the interests of both firms, made less effective the competition of each firm against the rest of the field, and resulted in the loss of considerable business.

A new memorandum, dated June 30, 1938, which took account of the problems arising out of the disputed management fees, was agreed on. Of the 60 corporations which were listed in the memorandum of January 5, 1926, only 42 appear in the memorandum of June 30, 1938, and no new companies are listed. The 42 companies are divided on the basis of the share which each of the two firms would have in the management fee, if they were able to obtain the management of new issues of the companies in the future. As before, the memorandum contemplated that future issues would be primarily handled in the office of one of the two firms, and the companies were listed under the name of the firm which would bear the burden of the work, if the financing was obtained. The memorandum contained many other detailed provisions governing the duties of each firm toward the other with respect to

future hoped-for issues of the 42 listed companies.

I find nothing in these agreements to support the government's claim of an over-all, integrated conspiracy and combination, as there is no evidence that any of the other defendant firms were parties to the arrangements between Lehman Brothers and Goldman Sachs, or that they knew of the existence of these memoranda. The complete independence of the issuer corporations from the two firms was expressly recognized by the two firms in the memoranda of January 5, 1926, and June 30, 1938; and, in fact, the issuer corporations were not, so far as I can see, restrained by virtue of the relationship between the two firms, in the selection of either investment bankers or methods of financing. Nor do the memoranda in any way support the existence of any alleged "code."

### National Dairy Products

During the interval of two years when the two firms went their several ways alone, Goldman Sachs succeeded in persuading National Dairy Products to come into the Goldman Sachs camp. The letter to McInnerney of February 18, 1936, above referred to, is reminiscent of the cries of anguish by Hancock of Lehman Brothers in 1937, which have already been noted in connection with Cluett Peabody.[1] Robert Lehman tenders his resignation as a director of National Dairy Products, and goes on to protest the action of the company in going along with Goldman Sachs, which firm is attacked vigorously on the ground of its "clear violation of a written agreement dated January 5, 1926," and he accuses the company of "taking sides in the dispute between Goldman Sachs & Co. and ourselves," and not acting "fairly," unless National Dairy Products decides to change its mind, despite the fact that Robert Lehman had already been told by McInnerney "that this matter has gone so far that it cannot be and should not be reopened."

1. See supra, p. 718.

Neither the letter nor the series of agreements between Lehman Brothers and Goldman Sachs, when read against the background of the other documents and the deposition testimony, demonstrate any "adherence" to the alleged "practice" of "traditional banker" or "successorships."

### Butler Bros., Associated Gas & Electric, Indianapolis Power & Light and Tidewater Associated Oil

Miscellaneous documents referring to the above-named issuers are described in the connecting statement against Lehman Brothers as evidencing additional "treaties," showing a disposition by Lehman Brothers "to combine rather than to compete." None of them, when read in context with other documents in evidence and with the testimony taken by deposition, support the charge that Lehman Brothers "adhered" to any "practice" of "traditional banker" or "successorships."

Three documents relative to Butler Bros. supply quotations such as "use your influence to make Cunningham [of Butler Bros.] stop shopping and concentrate negotiations with Lehman," and "have talked to Cunningham like a father about mistake in shopping his business." But no alleged "traditional banker" situation was involved. Lehman Brothers, together with Blyth and Laurence Stern, had formed a nucleus group to go after some Butler Bros. financing, and the telegram from Mitchell to Stevens, both of Blyth, on April 15, 1935, and Stevens' reply of the following day, with copies to Lehman Brothers, disclose competitive efforts to get Cunningham in to talk business. These efforts proved of no avail, as the group lost out.

A single Lehman Brothers memorandum of January 25, 1937, "with respect to all future financing for Associated Gas & Electric or its subsidiaries," is commented on, in complete disregard of the half dozen or so other documents and the deposition testimony of Gutman, which supply the background necessary to understand the subject matter of the memorandum. When viewed in that setting, it turns out that the wording of the memorandum was inadvertently misleading, as it was the understanding of First Boston that Lehman Brothers would come in as co-manager only if the company made a request that they do so "in the light of circumstances and conditions existing at the time." In other words, there was no such "treaty"; and, even if there had been, its contribution to the "traditional banker" phase of the case would seem to be minimal.

There are many documents in evidence relating to Indianapolis Power & Light. In my view of the case the position of government counsel is based upon a series of erroneous inferences from the documents and deposition evidence taken as a whole. Neither the single document relied upon in the connecting statement against Lehman Brothers, nor all the documents taken together, give support to the "traditional banker" charge. Under these circumstances I have decided to pass it over without extended comment.[1]

However, in connection with "successorships," government counsel assert that, when the 1938 issue of Indianapolis Power & Light was under consideration, Lehman Brothers, who succeeded in getting the leadership of the issue, "recognized" the "successorship" of Harris Hall to an alleged "historical position" of its "predecessor," N. W. Harris & Co. Harris Hall had competed for the managership of the 1938 issue and hoped to get a participation as an underwriter. After setting forth its "claim" in a previous letter, which was not offered, Edward B. Hall evidently thought up some additional arguments. Accordingly, on June 15, 1938, he wrote to Lehman Brothers and stated "I neglected to mention our historical connection with the financing of some of those properties." He went on to mention the fact that at the time of the formation of the Merchants Heat & Light Company in 1912

---

1. See infra, p. 783 ff.

"our house acted as its principal investment banker in connection with the purchase and distribution of its First Mortgage Bonds."

Lehman Brothers had never headed any previous issue of Indianapolis Power & Light securities, and from the mere fact that Harris Hall was given a small underwriting participation of 1.80% in the forthcoming issue, I do not see how I would be justified in finding that there was any "recognition" of "successorship." There is every reason to suppose that this belated and fanciful "claim" had nothing whatever to do with the matter, especially in view of the recent competition of Harris Hall for the managership of the issue.

The final document referred to in the connecting statement against Lehman Brothers is a memorandum of June 21, 1945, formalizing the mechanical procedures of Kuhn Loeb and Lehman Brothers, as to the position of the names in the advertising, the running of the books and similar matters in connection with future issues of Tidewater Associated Oil. The two firms had co-managed Tidewater Associated Oil financings in 1937, and four additional issues between August, 1940 and April, 1945. Perhaps government counsel had not noticed this.

This is the last time I shall note such odds and ends, although much of the evidence relied upon in support of plaintiff's case against the remaining defendant firms on the issues of "traditional banker" and "successorships" is of this general character.

I find that Lehman Brothers at no time "adhered" to any "practice" of "traditional banker," nor was Lehman Brothers a party to any conspiracy or agreement on "successorships," nor to any "code" having such or any similar provisions.

### 5. Glore Forgan

The competitive pattern of Glore Forgan throughout the entire period under examination in this case is clear. When Marshall Field III retired from the firm on July 6, 1935, and withdrew his capital and the prestige of his name, Glore Forgan virtually started business all over again. We have had some glimpses of Glore Forgan's competitive efforts, completely at variance with the alleged conspiratorial scheme, in the Wilson & Co. and Chicago Union Station issuer situations, which have already been commented on.[1] The record abounds with other instances, some of which will be hereinafter discussed, in connection with the case presented against other defendants.

It is worthy of note that of the large number of plaintiff's exhibits received in evidence, only 9 were offered against Glore Forgan. Five of these relate to Chicago Union Station; one is a purely formal exhibit received against several defendants, including Glore Forgan, "to show how records are kept" with reference to some phase of syndication; one is a letter from John F. Fennelly, one of the partners, to the SEC, in which he wrote, "I am opposed to the theory of compulsory competitive bidding, but it seems to me particularly unsound if the theory is applied to second-grade securities and equities"; and the last two concern Indianapolis Power & Light, previously discussed,[2] to which we shall now return.

### Indianapolis Power & Light

It will be recalled that on August 5, 1938, a $32,000,000 issue of First Mortgage Bonds came out under the sole management of Lehman Brothers. In 1937 and at least until some time in the early spring of 1938, when Charles True Adams was appointed trustee in reorganization of the parent company, Utilities Power & Light Co., negotiations for financings of Indianapolis Power & Light had been handled by its own executives. The last prior issue was one of $8,000,000 of Bonds in August, 1930, with Blyth and Chase Securities in privity of contract with the issuer. On

---

1. See supra, pp. 771, 740.

2. See supra, p. 782.

plaintiff's theory this would make Blyth and First Boston the "traditional bankers."

Glore Forgan seems to have paid no attention to the "traditional bankers," however, but competed in 1937 for the financing which, as it turned out, did not materialize until August 5, 1938. Glore Forgan learned from Pritchard, president of the company, that "Lehman Brothers had been awarded the leadership of this financing"; this was in July 1937, as indicated by another document after which Glore Forgan joined the Lehman Brothers group "for this specific piece of business." Having joined the group it seems to me that Glore Forgan was at least under a moral duty to stay with the group and not yield to any temptation to try thereafter to get the business for itself.

But government counsel think otherwise. There is a letter from Fennelly to Glore, dated May 24, 1938, which must refer to a time very shortly after Adams was appointed trustee in reorganization of Utilities Power & Light, stating that "some weeks ago" Adams had approached Glore Forgan and "he told us that he would like to have us head up the financing of Indianapolis Power & Light." In view of the prior commitment to Lehman Brothers, it is far from certain that Glore Forgan would have led the issue, even if they had followed up Adams' suggestion. In any event, I do not see how they could have done otherwise than say they were obligated to the Lehman Brothers' group, which is what they did. Despite all this, government counsel claim Glore Forgan "deferred" to Lehman Brothers. And the most curious part of all this is that the "traditional bankers" were Blyth and First Boston, who seem to have been totally ignored by both Glore Forgan and Lehman Brothers.

The same letter also indicates that "more recently," Adams suggested an attempt to make some joint managership arrangement with Lehman Brothers, and Fennelly seems to have toyed with the idea of making this proposition to Lehman Brothers, and if they refused, going after the business himself, after an interval. To his credit it may be said that he let this idea drop, and. Glore Forgan was one of the Lehman Brothers' underwriters, in second position with First Boston and Halsey Stuart, when the issue came out.

The record discloses no deferring by Glore Forgan to any other investment banking house, nor any suggestion that any other firm defer to it. Nor is there any substantial evidence to indicate that Glore Forgan "recognized" any other firm as "successor" to any of the institutions which had, prior to the effective date of the Glass-Steagall Act, engaged in investment banking and had later given it up.

No document offered against Glore Forgan contributes in the slightest degree to any "mosaic" of conspiratorial plans and operations; and it is difficult to understand why this Chicago firm was joined as a defendant in the case. As we proceed we shall find other defendants against whom there is also a conspicuous lack of evidence.

## 6. Kidder Peabody

The statement of the history and development of this firm in Part II of this opinion indicates that Kidder Peabody started from scratch in 1931, greatly expanded its personnel and facilities after the Glass-Steagall Act took effect, and, as the result of an aggressive competitive policy, which included efforts to obtain leadership, participations and even selling positions in every sort of investment banking business, large and small, including private placements and competitive bidding accounts in large volume, forged its way, strictly on the merits, from a minor position in 1931 to that of one of the country's leading underwriters, with many offices and a large staff, at the time of the filing of the complaint.

The record is replete with examples of competition by Kidder Peabody, during the entire period from its organization in 1931 down to the time the action was

commenced, all in derogation of the alleged "practice" of "traditional banker," and the existence of a "code" relative thereto. Some of the situations principally relied on by government counsel, but which in fact disprove the existence of the alleged conspiracy, have already been commented on, including Burlington Mills,[1] Wilson & Co., Staley,[2] and Armstrong Cork.[3]

Others referred to in the connecting statements and the briefs of government counsel as against Kidder Peabody, on the "traditional banker" and "successorships" issues, will now be discussed to the extent deemed necessary.

The "successorships" phase of the case has already been so fully developed that little need be added. After a few short references to certain documents received against Kidder Peabody, the subject will not be further commented on in the portion of this Part V of the opinion concerning other defendants. There was no joint action or agreement or concert of action by the seventeen defendant firms or any smaller group on the subject of "successorships." In the hustling for business, amidst the chaotic and confusing conditions which inevitably followed the Glass-Steagall Act, dislocated personnel, scattered here and there, in groups or individually, made desperate efforts to recapture or reestablish whatever relationship they had with business which they had personally conducted in the institutions where they had worked for years and from which they had been forcibly separated by the operation of the new law. These men had not merely been forced to live on short rations during the great depression; they were fighting for their very livelihood, and there were many who struggled in vain. As groups and as individuals they used every argument they could think of to hold on to business which they considered was theirs, in the same sense, and no other, as would have been the case of men who left a real estate or insurance office, which had been liquidated and closed, forcing them to seek employment elsewhere. The customers or clients or whatever they may be called were theirs because they as individuals had rendered the service upon which the relationship, which varied in the different situations, between the customer or client and the company where they had formerly been employed, was based. In some cases, such as Chase Harris Forbes and Harris Trust and Savings Bank, the nature of the arrangements made with First Boston and Harris Hall gave some plausibility to a "claim" of "successorship," but in no case was it seriously asserted that the relationship, which had formerly existed between the issuer and the banking institutions which managed its security issues, was something permanent and fixed, or which could be or was the subject of formal or informal transfer.

When the numerous documents bearing on the subject of "successorships" are viewed in the large, it will be found that most of them stress the fact that the individuals in their new employment have such knowledge of the affairs of the issuer, such experience in the distribution of its securities, and such skill and competence in the business, that they should be selected to manage or participate in new issues by the same company. It does not seem strange to me that the numerous arguments made on the subject should include such words as "successors," and "inheritance," even with respect to underwriting positions, because the element of service and familiarity with prior management or distribution problems is present alike in both.

Sometimes the "claims" are exaggerated. Whenever an erroneous statement finds its way, by accident, carelessness or design, into correspondence or office memoranda written by a partner, officer or employee of a defendant banking firm, this is taken by government counsel as positive fact, despite satisfactory and

1. See supra, p. 704 ff.

2. See supra, p. 776.

3. See supra, p. 760.

credible evidence to the contrary. There are several instances of this, and the subject comes up again in connection with a letter by Hovey to Baring Brothers of April 25, 1931, and another by G. Hermann Kinnicutt to Dillon Read on April 21, 1939, both men being, at the time of writing the letters, Kidder Peabody partners. They are cited by government counsel on the subject of "successorship" by "inheritance."

In Hovey's letter to Baring Brothers he states:

> ". . . We have been assured by Messrs. J. P. Morgan & Co. and other houses that we will receive the same participations which Kidder, Peabody & Co. have formerly enjoyed in the financing of such corporations as the American Telephone & Telegraph Co., New Haven Railroad, Boston & Maine Railroad, etc."

But no such assurances had been given, although perhaps Hovey hoped things would work out that way. The testimony of Gordon and Stanley on this subject is convincing and in accordance with the probabilities; and the participation in the Illinois Bell issue of 1935 was allotted to Kidder Peabody by Stanley strictly on the merits. The rather mild excerpt from Gordon's long letter to Western Cartridge Company on November 10, 1939, is of the same variety.

### Pennsylvania Power & Light

On August 9, 1939, a $95,000,000 issue of First Mortgage Bonds of Pennsylvania Power & Light was brought out under the joint management of Bonbright, Dillon Read, First Boston and Smith Barney. On October 28, 1936, some three years prior to the time the issue came out, Matthews heard a rumor about the proposed financing, and a Kidder Peabody office memorandum of that date indicates that Matthews thought that, despite the fact that Kidder Peabody had not participated in the original Pennsylvania Power & Light Bonds which came out in 1931, a "claim" might be made for the position that the Philadelphia National Company had in

the business "in view of the large number of holders of the bonds who are now customers of the Philadelphia office."

Matthews followed the matter up again later and another Kidder Peabody office memorandum of October 11, 1938, shows that Matthews had been in touch with Cheston of Smith Barney, and had been advised "that they would give Kidder Peabody definite consideration on the basis of this past participation when, as and if the business developed."

Finally, we come to the letter chiefly relied on by government counsel, which was written by G. Hermann Kinnicutt, a Kidder Peabody partner, to Dillon Read on April 21, 1939. In this letter, after referring to the fact that the Philadelphia National Company had been affected by the Glass-Steagall Act, the letter continues:

> "At that time, Kidder, Peabody & Co. took over the entire business of the Philadelphia National Company, 'lock stock and barrel,' including their offices, their entire personnel and all their accounts."

There is no evidence that any "accounts" were transferred, and I cannot believe that this statement is more than an inadvertence by Kinnicutt. The whole tenor of the letter indicates that the "claim" is being presented on the merits. It is true that "our past position in the business" is referred to, but the letter concludes:

> "Beyond all this, of course, is the fact that the Kidder, Peabody & Co. of today has made great strides in their distributing organization and I feel that in this particular issue, with our outlet in Pennsylvania, which is the logical market for bonds, we can make a very good showing."

When the issue came out the four managers were in first position with 5.67; Morgan Stanley, Harriman Ripley and Halsey Stuart were in second position with 4.86; Mellon in third position with 2.84; and Kidder Peabody together with Blyth, White Weld, Union Securities,

Langley and Shields in fourth position with 2.43. From what I have learned of the investment banking business and the activities of the various investment banking houses, during the almost three years of this trial, this is exactly where I should expect to find Kidder Peabody strictly on the merits.

The testimony of Gordon lends no support to the claim of counsel for the government that it was any part of his policy or "practice" to keep away from situations where there was a "satisfactory relation" between an issuer and an investment banker. Swan, who had much of his experience with the Guaranty, and who had retired from Smith Barney in 1943, personally felt that continuing relations between issuers and investment bankers were a good thing; but there is no trace of this in Gordon's testimony. The whole competitive behavior of Kidder Peabody from first to last belies any such notion. What Gordon testified was:

> "Do you go after every big account in the United States? A. We have neither the time nor the organization which can go after every big account in the United States. It is our policy to study the field to determine which industries are likely to be in need of funds, or which companies can advantageously refund their securities. Having made those studies, we then decide which companies we might be able to successfully solicit. We try to find weaknesses wherever we can. We go after those weaknesses to the best of our ability. If there is time left over from those situations, we get after other situations.

> "One cannot go to a company and say merely it would be nice if you did business with us. It is necessary to develop a program, and to present facts and figures that the company is interested in. The preparation of such facts and figures and terms, the development of terms— each situation is different—such development takes a great deal of time, and it would be impossible to solicit

every company in the United States. We advertise, we do everything we can to get business. In addition to that, we go after any piece of business we think we have much chance of getting."

The remaining miscellaneous documents used against Kidder Peabody merit no comment. They are all of the variety which have already been evaluated, in the light of the whole record.

I find that Kidder Peabody at no time "adhered" to any "practice" of "traditional banker," nor was Kidder Peabody a party to any conspiracy or agreement on "successorships," nor to any "code" having such or any similar terms.

## 7. Goldman Sachs

The evidence taken as a whole, much of which has already been the subject of extended comment, discloses Goldman Sachs pursuing throughout the entire period, from the turn of the century down to the date of the filing of the complaint, a competitive policy which was in every sense of the term aggressive. This firm was at no time a party to any scheme or plan involving deferring to any other investment banking house, or holding off because of "satisfactory relations" between an issuer and any of the defendant firms or any other firm named or not named as an alleged co-conspirator, nor to the "term" of any conspiracy or agreement on "successorships." On the contrary, there are indications that Goldman Sachs even transcended the bounds of reasonable competitive effort in its endeavor to get every piece of business it could possibly secure, within the limits of its personnel and its resources.

While it is claimed that the testimony of Bogert, of Eastman Dillon, about "upsetting the applecart" applies to all defendants, what he said on his deposition, which will be more closely examined when we come to Eastman Dillon, falls far short of proving any "adherence" by Goldman Sachs, or any of the other defendants, to the alleged "practice" of "traditional banker."

On this phase of the case the charge against Goldman Sachs, in view of the paucity of other evidence, rests solely upon documents which expose to our view a long series of conversations and negotiations relating to a security issue of Pillsbury Flour Mills. The other miscellaneous documents referred to by government counsel in the connecting statements and in the briefs require no discussion.

## Pillsbury

There are no less than 66 documents in evidence relating to Pillsbury. In substance the claim of government counsel is that White Weld "deferred" to Goldman Sachs as the "traditional banker" having "satisfactory relations" with this issuer, as a result of a "policing" operation by Goldman Sachs. This is alleged to be a "classic example" of what "the defendants" habitually do in carrying out the "terms" of the combination and conspiracy. What we shall find is competition by White Weld throughout; not, it is true, competition of the purely selfish variety, but competition in the setting of a close personal relationship, which made sincere helpfulness and the giving of sound advice considerations superior to that of gaining pecuniary advantages to the possible detriment of the interests of an intimate friend. That White Weld's competitive efforts were unavailing was due to unremitting, continuous and effective maneuvers, by Goldman Sachs and its "partner," Lane Piper & Jaffray (later Piper Jaffray & Hopwood) of Minneapolis, to hold on to the business. That the competitive efforts of these two firms were wholly unrestrained will soon appear. There is nothing in the Pillsbury documents which requires conspiracy to explain it; and, if the testimony of Harold B. Clark (described throughout · the case as "Ben") is to be credited, the documents describe a condition of affairs inconsistent with the existence of any conspiracy.

Goldman Sachs and Lane Piper & Jaffray had been in privity with Pillsbury in connection with the last pre-Securities Act financing of this company in 1927. Accordingly, when our story begins in 1934, these two firms were the "traditional bankers" on the plaintiff's theory; and the relationship was definitely "satisfactory," as each of these two firms had men on the Pillsbury board of directors and the evidence otherwise indicates that they were well entrenched. Throughout the discussion which followes it is important at all times to bear in mind that the issue around which the competitive efforts of the various firms revolve, and which from time to time seemed to be taking definite form, did not materialize until 1938, when it was sold as a private placement to the Equitable Life, with Goldman Sachs and Piper Jaffray & Hopwood getting the entire agency fee.

"Ben" Clark and John S. Pillsbury, the principal stockholder and chairman of the board of directors of Pillsbury, were close friends. How close the friendship was is indicated not only by the fact that Pillsbury wanted Clark to be trustee of a trust for his children, consulted him about schools for his boys, had his personal account, "a very valuable one," in the White Weld office, and sought advice from Clark on financial affairs "right up to the present date," but by the following incident which helped Clark, on the taking of his deposition, to fix the time when he and Pillsbury first met.

"It is over twenty years ago. It would be more than that. I tie it in with the Sunday evenings. All six kids were about knee high, and we would all go over and mother would play the piano and we would all sing, and now they are all fathers and mothers."

With knowledge of the prior financings by Goldman Sachs and Lane Piper & Jaffray and of the fact of the directorships, Clark, when Pillsbury asked him for advice as a banker concerning what should be done about refunding a $6,000,000 issue of 6% First Mortgage Bonds, decided to go after the managership for White Weld. The documents do not in-

dicate when the subject was first discussed between Pillsbury and Clark; but it seems likely that Pillsbury at first brought it up as a matter of personal advice. At least as early as January 8, 1935, the details were being talked of and whatever took place between Pillsbury and Clark was known to J. I. Beatty, the controller of the company, as a letter from Pillsbury to Clark of that date mentions the fact that, if Clark's reply "does not arrive before my departure, it will be referred to our controller, Mr. J. I. Beatty." On the following day Clark sent Pillsbury two copies of the White Weld refunding plan, which had been revised in the light of suggestions contained in the Pillsbury letter of January 8, 1935, with the hint that one copy be left "with your man to stew over," after which the matter can be further developed "with Mr. Wattles [a White Weld employee] who will be here all the time and available."

Subsequent memoranda show Wattles in contact with Harry H. Whiting, president of Pillsbury; and one of the significant features of the whole negotiation is that the White Weld activities were conducted under a promise of secrecy, exacted by Pillsbury from Clark. Of this there can be no doubt. The deposition testimony of Clark would indicate that Pillsbury was seeking independent help from his old friend and financial adviser. Clark testifies

> "* * * but my policy was to do everything John asked us to do with the hope we would build up a picture that John would feel so good and would show such advantages that he would say either 'Put in a bid' or 'Benny, I want you to do that business or a large proportion of it!' "

Neither Goldman Sachs nor Piper Jaffray & Hopwood (the firm name having been changed in the interval) had any suspicion of the White Weld activities. These two firms had been active in the matter since the preceding July, most of the activity revolving about efforts by Goldman Sachs to strengthen its posi-tion with Piper Jaffray & Hopwood, who were much closer to the executives and had enjoyed a long and continuous relationship with the company. By January, 1935, Goldman Sachs and Piper Jaffray & Hopwood were tied closely together; and they gave little thought to the possibility that any other competing house could dislodge them.

An interesting sidelight is provided by two letters from Beatty, one of January 14, 1935, to Bowers of Goldman Sachs, which tersely states that he has explained to Piper that the Goldman Sachs-Piper Jaffray & Hopwood program "does not appear to us to be favorable enough to justify the Company in undertaking to accomplish it;" and the other, of January 15, 1935, to Clark, which is cordial in tone, indicates that the White Weld plan "has been carefully studied and reviewed with a group of our executive officers," suggests a number of circumstances involving possible delay, and concludes by saying that the plan "has interested us" and that "any further ideas on this subject" will be appreciated.

Further elaborate details were submitted by White Weld, and we find a long letter of March 29, 1935, from Whiting to Clark which, after asking Clark to "please try to fix it so that they will not be talked about," gives Clark further information, including a decision against making a private placement with several insurance companies; but which mentions incidentally that "these ideas * * * have been similarly expressed to others who have suggested plans for refinancing." Somewhere around this time, and before the next development, which upset the plans of all concerned, Clark went to Europe.

Thus in the first stage of the Pillsbury incident White Weld, with full knowledge of the facts, and in the face of what must have seemed an almost impossible situation, had barged ahead, in complete disregard of any "practice" of "traditional banker," and was making surprising headway, all of which would have been difficult in the extreme had Goldman Sachs or Piper, Jaffray & Hop-

wood known what was going on. Far from seeking "clearance" from them, White Weld was doing exactly what the alleged conspiracy was supposed to be designed to prevent. No adequate explanation of this conduct of White Weld has ever been proffered by government counsel.

On April 4, 1935, in Clark's absence, Wattles "upset the applecart." Forgetful of or in ignorance of Clark's promise to Pillsbury, and thinking White Weld had the situation well in hand, Wattles went around to see Piper and told him, what was probably the fact, "that Mr. Clark had expressed to Mr. Whiting, Pres., that we wanted to ask Piper, Jaffray & Hopwood to join us in the business." Piper's reply to Wattles was non-committal; but his reaction was immediate and vigorous. A long letter to Bowers in New York is the result; and his version of the talk with Wattles differs considerably from Wattles' own memorandum on the subject. His inclination is to go around and have it out with Whiting at once, but he does not dare to act without advice from Bowers. He adds:

"Just what will develop in the way of competition on this business I do not know but I cannot believe the business could eventuate anywhere but with us. I am however somewhat disturbed by Whiting apparently keeping the door open of his own volition with White Weld."

Occasionally, when an investment banking firm in competition for the management of an issue finds that another firm may win out, we find a suggestion that the two work together as is sometimes done by real estate brokers with a deal in prospect. But in this situation Goldman Sachs must have thought of the lean years just behind them, and the losses connected with the Goldman Sachs Trading Corporation, and it decided to get everything for itself and Piper Jaffray & Hopwood, and to keep White Weld out of the deal at any cost, if it could. The inveterate zeal with which these two firms pursued their policy of depriving White Weld of any interest in the Pillsbury business will be developed in due course. It is another significant aspect of the Pillsbury incident, as the plaintiff's claim is that the seventeen defendant firms were acting together, in concert and conspiracy.

Not yet aware of the mistake he had made by calling on Piper, Wattles writes to Whiting on April 5, 1935, asking for additional information "prior to setting forth an exact proposal," and this letter perhaps furnishes the key to one of the later conversations. One of the questions put up to Whiting by Wattles is:

"(3) Whether you would wish to consider this business directly with us to a conclusion or prefer to put it on a competitive bidding basis. We, of course, feel that better results are obtained by negotiating business of this character to a conclusion with one banking house or group of houses and if a satisfactory proposal is not reached then undertaking the same proposal with another banking house. However, we are very desirous of doing this business with you and are ready to follow whatever procedure you may deem best."

This is precisely in accord with the testimony of Clark; if the White Weld shape-up of a plan looked good enough to the company officials Clark was willing to follow any course his friend John Pillsbury might suggest; he hoped White Weld might get the business in the usual way, but he was also willing to have the matter shopped around and take the chances that the White Weld price would be the most attractive. And it is also to be inferred that Clark would not complain or "raise hell," an expression we have found in other situations, if White Weld were left out entirely. The contrast between this attitude on the part of White Weld and that of Goldman Sachs and Piper Jaffray & Hopwood is striking.

The first salvo from the Goldman Sachs-Piper Jaffray & Hopwood batteries is fired on or just prior to April

10, 1935. "Ben" Clark is still away. Bowers has telephoned to Faris Russell of White Weld; a neat little sparring match ensued; we may suspect that Faris Russell's version, if we had it, would not quite match with that of Bowers, which is contained in his letter to Piper of April 10, 1935. Be that as it may, the gist of what Bowers had been trying to do is contained in the concluding paragraph of his letter to Piper, which reads:

"He and Benny Clark are friends of John. I told him, of course, John would talk with him, *as with everybody*, but that I was absolutely confident that you and we could hold the business and all that White, Weld would do would be to bother us and make us do the business on a closer basis than was fair; that if White, Weld, who claimed to be hightoned people, felt that that was a sound and fine action to take in competing with other friendly houses, members of whom were on the Board of Pillsbury, it would be a surprise to me. I tried to put a little shame into him, and to leave him with a feeling that his conscience would have to be his guide." (Emphasis by Bowers)

This is the old story of trying to frighten off a competitor by telling him that he has not got a chance of securing the business, and will only "muddy the waters," a competitive maneuver as old as the hills. We shall see more of this when Clark returns from Europe.

That Faris Russell was no amateur appears from a Bowers' office memorandum of April 12, 1935. He had been thinking the matter over and called Bowers back. Bearing in mind that neither Bowers nor Piper knew just what progress White Weld had made, and that this was quite apparent to Russell, we shall now see the return volley from the White Weld guns. Perhaps Bowers got some comfort from this, but it seems unlikely:

"Faris Russell called me up this morning to say he'd like to make it clear that White, Weld & Co. were not going to be interfering with us on the Pillsbury business if the Pillsbury people finally decided that we were the bankers they wished to use; that, of course, if the Pillsbury people thought they wanted different bankers and asked White, Weld & Co. to consider financing, naturally White, Weld would be glad to do it."

The stiletto in the remark that followed is thinly veiled.

"He further went on to state that he had told John Pillsbury—the whole thing with White, Weld undoubtedly arises with John—that if he, John, was considering cutting loose from us because of, as Russell put it, unpleasantness back in '29 and '30, he was making a mistake. Russell went on to say how he had told John Pillsbury that he considered our standing and management after Catchings' elimination just as high as anybody's. Russell said that when Ben Clark came back, he and Ben would like to get together with Walter, Sidney and me and talk things over and see if the two firms perhaps couldn't do a bit more business in the future, to mutual advantage, than had been done in the past.

"I am posting Harry Piper, and, although I think John may have had in his mind back in '30 and '31 a feeling that we were, if not down and out, considerably lowered in prestige, that has pretty well disappeared."

The reference is undoubtedly to something connected with the ill-fated Goldman Sachs Trading Corporation.

That Bowers was seriously disturbed is only too evident. And yet government counsel seem to regard what Russell said as some sort of a promise to hold off, which it definitely was not. This is confirmed by a letter from Clark to Whiting of May 8, 1935 expressing the continued interest of White Weld, Clark having returned from Europe, according to this letter, about April 28, 1935.

Then followed the crucial luncheon attended by Walter Sachs, Bowers, "Ben"

Clark and Russell on May 20, 1935, concerning which we have Bowers' office memorandum and the deposition testimony of Clark. After a certain amount of sparring around, concerning which Bowers does some speculating which seems to me to be of the wish-father-to-the-thought variety, the meat of Bowers' version is:

"Ben finally remarked—repeated this several times—that he would not compete for the business (early in the conversation he had stated that John or Harry Whiting had. written asking them to submit competing bids, which, of course, Ben said White, Weld would absolutely decline to do—against Piper, Jaffray & Hopwood and us, nor would he form a group to compete for the business; that, on the other hand, if a responsible official or officials of the company—John is Chairman of the Board—told them that the business was to be done and that the wish was White, Weld should be included, he would fight as hard as he could to be included. At the same time, he wouldn't blame us or criticize us if we endeavored to keep them out. We told him we certainly saw nothing to criticize in his attitude as finally expressed."

Supplementing this we have the deposition testimony of "Ben" Clark:

"Q. Just give us the substance of the conversation. A. I told Mr. Bowers, as I remember the conversation, that we would not compete— and by 'compete' I mean only one thing; put in a competitive bid for this particular issue which was being set up—unless we were asked to by John Pillsbury; but if we were asked to, John wanted us to, we would put in a bid for the whole thing or for any part of it and fight as hard as we could to get it.

"Q. What do you mean by 'competitive bid'? A. I mean if John asked us to put in a bid, we would put it in and he could judge it as against any other bid.

"Q. That is, in competition with any bid that might be put in by Goldman, Sachs & Co.? A. Any way he wanted it we would put it in."

I believe the testimony of Clark. He alone knew what had transpired between himself and Pillsbury; he alone knew that from the first his policy had been "to do everything John asked us to do." From Clark's standpoint he could talk all he wanted to about not competing and not submitting competitive bids, provided he always mentioned the important qualification that he would compete, and he would even submit a competitive bid, if a responsible officer of the company, such as John Pillsbury, asked him to. It was only natural that Bowers should give the conversation an interpretation favorable to his own hopes and desires. As no writing by Pillsbury or Whiting relative to the submission of competing bids has been unearthed, I conclude that the portion of Bowers' memorandum which mentions this is the result of some misunderstanding of what Clark said.

While government counsel insist that there was given at this luncheon meeting a definite and unqualified promise by White Weld not to compete further for the business, I find that no such assurance was given. Moreover, it seems reasonably plain that Bowers gave no such interpretation to the conversation, as Bowers' memorandum of May 20, 1935, concludes, "In the meantime, Harry and I are going to cultivate Whiting as best we can." Whatever Bowers may have thought Clark said, the net result was anxiety as to what the future course of White Weld would be.

As late as August 2, 1935, Bowers is still worried. His memorandum of that date tells of a very friendly talk with Whiting and all the main executive officers "on all sorts of subjects, including, in a general way, the financing," but notes that John Pillsbury "had to go away to a bank meeting before we got into details on financing." The memorandum continues:

"We discussed prices of various issues, spreads, and the entire talk was, as it were, 'in the family,' so that I really don't see how they could very well push us out of the picture if and when financing is done. They very well may, however, drive a pretty hard bargain with us."

Concerning the interval prior to November 20, 1935, the record is silent. I infer from the correspondence between "Ben" Clark and John Pillsbury in December that, prior to this exchange of letters, to be discussed in a moment, there had been significant personal conversations between these two men. I also infer from Bowers' letter of November 20, 1935, to Whiting, that Goldman Sachs and Piper Jaffray & Hopwood had been trying desperately to get White Weld out of the picture. Taking the evidence as a whole I conclude as matter of fact that White Weld did not stop competing after the luncheon meeting of May 20, 1935. That Goldman Sachs and Piper Jaffray & Hopwood were having serious difficulties holding on to the business is evident from the tone of Bowers' letter.

He tells Whiting, "I have thought a good deal about our talk on my last visit to Minneapolis." Plaintiff has not called Pillsbury or Whiting as witnesses, nor did it take any deposition of Bowers in the discovery proceedings. I can only infer that the conversation with Whiting had been disturbing to Bowers, as the whole tenor of the letter is a strong appeal to Whiting to continue negotiating with his firm and Piper Jaffray & Hopwood "until they [the executives of the company] are satisfied that a deal cannot be made on a proper basis." The two paragraphs principally relied on by plaintiff follow:

"I think perhaps we differ somewhat in our approach to the problem. From the background and experience which Harry and I have had, we know that, in accordance with sound usage and custom, where men who deal in investments are close to a company through previous business done and other long association, as is the case with Harry and me and your company, the executives of a company about to do financing take same up with those occupying the position similar to Harry's and mine, and follow the matter through along that line until they are satisfied that a deal cannot be made on a proper basis, and then, and only then, go outside.

"On the part of the bankers or dealers in securities, Harry and myself, for instance, there is, in such cases, a definite responsibility to serve the company in good times and bad, in easy situations and difficult ones. Of course, right now selling securities, particularly those of the primest quality, such as is the case in your company, is all 'beer and skittles.' I don't think, however, that in the comparatively rare and unusual cases where a company shifts about, using one banking house this time and another one another, there is, in the long run, anything gained, and, in fact, I am convinced that there is a definite loss. As a matter of fact, most of the leading and most reputable houses look at the question in the way I have outlined it, and, where there is a connection already existing, refuse to compete. In the case of your own company, a number of heads of first-class houses have specifically stated to us that this was their position."

What other pressures were brought to bear on the company officials by Bowers and Piper, before and after the sending of this letter, can only be surmised. These two men had been directors of the company for many years; and it was quite plain that Pillsbury could not at the time, or perhaps ever, conclude a negotiated underwritten deal with White Weld without a serious quarrel, which could do the company no good. The whole competitive pattern of Goldman Sachs and the letters of Piper Jaffray

& Hopwood indicate the lengths to which they might be expected to go.

We are not given the details of the conversations between John Pillsbury and "Ben" Clark during the ensuing fortnight, but on December 3, 1935, Clark writes to Pillsbury advising him to continue with Goldman Sachs and Piper Jaffray & Hopwood until such time as "you have found it impossible to agree with them on terms." He praises the fairmindedness of both firms, their high standing and the importance of continuity in banking relations, and concludes by stating, "I am sending copies of this letter to Harry Piper and Henry Bowers." Clark testified that he sent this letter, with copies to Piper and Bowers, to put Goldman Sachs and Piper Jaffray & Hopwood "on the spot to do a swell job for John Pillsbury." That it did put them on the spot is indicated in part by the long delay before any further developments took place, and partly by the enmity toward White Weld which we shall soon see take tangible form.

Clark's letter to Pillsbury of December 3, 1935, opens with a reference to "the talk you and I had in connection with the financing." Clark had been "mulling" it over in his mind. Pillsbury's response of December 5, 1935 is short and significant. He wrote:

"Your letter of the 3rd is at hand and carefully noted. Mr. Whiting has read it and we all thoroughly understand the situation and appreciate your advice."

Clark testified that his advice was sound and that if he had it to do over again he would take the same position. Under the circumstances I believe he was right.

That Bowers and Piper fully realized that they were "on the spot" is further indicated by a memorandum by Bowers on December 11–12, 1935. The executives now show a disposition to "negotiate with us to a definite conclusion without talking to all and sundry," as "we have all along insisted they should do," but

"The business will have to be done closely, but, if done, it seems to me we should be able to handle it." The concluding portion of the memorandum, "to be held strictly confidential," is even more significant. Piper has been lending valuable assistance in getting all the mills together to "prevent the terrible price cutting which was going on," Goldman Sachs has been helping "in getting proxies for their meeting," all of which "helps to give Harry Piper and me a better position on the bond negotiations," which are slowing up due to some trouble caused by the executives trying to handle some details with the SEC themselves instead of through Sullivan & Cromwell.

We hear nothing more of the matter for almost two years. But, apparently, White Weld has not yet been squeezed out. A letter of June 8, 1938, from Bowers to Piper refers to further talks with John Pillsbury. "As will develop below, I gathered that he had been talking with his friend Ben Clark, and Ben probably had put a lot of ideas in his head." What these ideas were is then disclosed:

"It seems that the Equitable holds the group insurance on the Company. Ben Clark was a friend of the President of the Equitable—that's Parkinson. Formerly, Ben and I were both directors of the Chase with him. And Parkinson wanted to meet John. John at once said he wished to make it clear that Ben was entirely out of this, and was simply doing this friendly service at Parkinson's request.

"John said he'd like to duck the interview with the Equitable President, but it seemed to him he couldn't do anything more than drop in to see him. He went on to imply, or, more than that, to state that he wouldn't think of doing anything more than explain to the Equitable President your position and my position on the board, the idea being that if they do anything, or could do anything with an insurance com-

pany, we should arrange it for the Company. He asked the direct question, how could it be worked out that a refunding be arranged with an insurance company or companies and you and I be taken care of."

Private placements had been the subject of prior discussions between Clark and Pillsbury, as noted above. The general statement concerning White Weld in Part II of this opinion shows that this was an area of activity in which White Weld was something of a specialist. Clark undoubtedly thought he had handled the whole matter so adroitly, in carrying out his policy, that the very course of events would make it highly improbable that White Weld could be excluded from the business. But Bowers' letter suggests that the pressure he and Piper had exerted on John Pillsbury was so great that Pillsbury even hesitated to talk with Clark's friend Parkinson, president of the Equitable, and had "asked the direct question, how could it be worked out that a refunding be arranged with an insurance company or companies and you and I be taken care of."

This presented no problem to Bowers and Piper. The conference with Parkinson took place, one of the White Weld men being present after arranging for the interview, and the bonds were privately placed with the Equitable. But the pressure upon John Pillsbury was such that, to the amazement and disappointment of "Ben" Clark, the agency transaction was consummated by Goldman Sachs and Piper Jaffray & Hopwood, who took the entire agency fee and White Weld got nothing for its pains.

A faint hint as to how all this had been accomplished is to be found in another letter from Bowers to Piper, of October 31, 1939. There had been some discussions of the possibility of some changes in the Pillsbury board of directors, which might involve the elimination of Piper and perhaps Bowers also. Bowers definitely wants to stay on, even if he could not always attend meetings in Minneapolis, "not only from my own personal point of view, but from the point of view of what seems best for the interests of G. S. & Co." Bowers then expresses the hope that they can both stay on, "where we can do some more good, constructive work."

It need cause us no surprise to find later that what had been done to White Weld in 1938 caused John Pillsbury many a twinge of conscience, nor that Bowers and Piper fully expected this. "Ben" Clark had evidently let the matter pass without a word of protest or complaint; and this must have troubled John Pillsbury all the more.

In any event, a new Pillsbury issue was coming up in August, 1944, and on this occasion Bowers writes to Piper's partner Jaffray. At all odds White Weld must be kept out, if possible. The part of the letter of August 9, 1944, which refers to this subject, follows:

"Incidentally, neither of us has said a word about White, Weld, and as Harry, I think, knows, Benny Clark used to be very close to John. It is possible from that that we might get almost a 'must' from John to include White, Weld in the underwriting. We have no idea of including them unless we absolutely had to."

But on August 14, 1944, they got the "must" from John Pillsbury, who wrote asking that White Weld, as one of two people "that have done a lot of favors for me in the investment business" be given a participation. He adds:

"You will remember that when the Equitable deal came up, Ben Clark sent one of his men with me to call on the president of the Equitable, and then *later* when it was explained they could not be in this picture, he certainly was pretty broad-minded, although he had every reason in the world of saying that he initiated this deal." (Emphasis that of John S. Pillsbury)

The word "later," underlined by Pillsbury in his letter, tells the story in a word. When "Ben" Clark arranged for the conference with Parkinson, which led

to the private placement with the Equitable, he naturally expected White Weld to get the business. He had never promised to defer to anyone, but had gone on competing to the end, in what he thought was the most effective way. It was only "later" that it was explained to him that White Weld "could not be in this picture."

This was no "policing" operation by Goldman Sachs and Piper Jaffray & Hopwood. It was downright competition of the most ruthless variety. But in the 1944 issue, as a result of the insistence of John Pillsbury, and not as a "pay-off" for "deferring," White Weld received a participation of 2000 shares in a 75,000 share offering.

### 8. White Weld

The few remaining scraps received in evidence against White Weld do not merit discussion in view of what has already been written. The Pillsbury story speaks for itself. Other competitive efforts by White Weld, completely at variance with the alleged conspiratorial scheme, have already been referred to. There are many others. I find that White Weld at no time "adhered" to any "practice" of "traditional banker," nor to a "term" of any conspiracy or agreement on "successorships."

### 9. Eastman Dillon

Having in the course of two and one-half years introduced only 13 documents against Eastman Dillon, none of which require comment, plaintiff's chief trial counsel prefaced his connecting statement against this firm with the remark

"You see, we found at the end of the case in chief, as I suppose all prosecutors do at the end of all cases, that there is quite a variance in the quantum of evidence that has been produced against different defendants, and in the case of Eastman Dillon the evidence that we want to rely on was very largely the deposition testimony of Henry L. Bogert, and that is primarily what I would like to discuss this morning."

During the second day of the taking of Bogert's deposition the questioning touched upon getting business away from other investment bankers, then veered away and returned again to the subject. Thus he testified that when Eastman Dillon "has a friendly and satisfactory relationship with its account" it unfortunately did not always continue to get the business; and, later, "we got all our accounts away from other people." Again, still later:

"Q. As a matter of your experience, Mr. Bogert, does Eastman, Dillon & Co. attempt to solicit the business of an issuer which is an account of another investment banker with which it has maintained satisfactory and friendly relationship? A. We have done so."

And he proceeds to give examples. The questioning goes off to other subjects for eight pages and then government counsel is back to the same old subject, but in a slightly different form, and he gets the answer which is supposed to prove that every defendant banking firm in the case "adheres" to the "practice" of "traditional banker."

"Q. Isn't it a fact, Mr. Bogert, that it is customary in the investment banking business for investment bankers not to solicit the business of issuers where there is a satisfactory relationship between that issuer and a banker who had already done business for it?

\* \* \* \*

"A. Courtesy generally requires that you conduct your business in a way so as not to make enemies, and if you think that a man, a firm, a friend of yours, is engaged in doing a piece of business, it is not quite the polite thing to muscle in and upset the applecart. I think that goes for a great many other businesses as well as the investment banking industry.

"Q. And that goes for the defendants in this case too, does it?

\* \* \* \*

"Q. The defendant bankers in this case? A. It goes for all of them, everybody."

The part of Bogert's deposition which precedes this, and that which follows, indicates plainly that the witness is not attempting to describe the "practices" of the various firms, where the house which brought out the last issue is known to have "satisfactory relations" with an issuer. There is no reference whatever to the bringing out of the last issue. Nor is he expressing views similar to those of Swan, who favored continuing relationships with issuers, but stressed the futility of wasting his time and money trying to get business which was beyond his reach.

This "burst of frankness," which is said to be so revealing, signifies no more than is said, and repeated later, that, in the opinion of the witness, when "a friend of yours is engaged in doing a piece of business," investment bankers, and those in other lines of business as well, do not generally "muscle in and upset the applecart." This gloss on human nature must be read against the background of the case as a whole, and the balance of Bogert's testimony.

I find that Eastman Dillon at no time "adhered" to any "practice" of "traditional banker," nor to a "term" of any conspiracy or agreement on "successorships," nor to any "code" having such or any similar provisions.

### 10. Drexel

While at no time indicating any willingness to consent to a dismissal against Drexel & Co., and save it the burden of going through a seemingly interminable trial, government counsel finally conceded that they relied on no evidence what-

ever against Drexel & Co. on any issue in the case, except that relating to the so-called price-fixing features of the syndicate system, which are common to the entire industry.

With respect to Drexel, I make the same finding as that in the case of those defendant firms previously discussed in connection with the "traditional banker" and "successorships" issues.

### 11. First Boston

The history and development of First Boston as set forth in Part II of this opinion, would lead us to expect to find most of the First Boston documents in the category of "successorships," and that is where they are. The officers made some use of the Harris Forbes name, which First Boston had legally taken over, and there were the same strenuous efforts to renew old personal contacts with issuers that we have already found in the case of Edward B. Smith & Co., only more so. The stipulated static data tell the story; there we find what each investment banking firm did with respect to every single security issue, whether or not it was part of a series brought out by the same banking firm, and we also find who the participants were, with their respective positions.

Against this solid background of indisputable facts, and the competitive pattern of First Boston already developed in the detailed discussion of the Bethlehem Steel,[1] Dominion of Canada,[2] Phillips Petroleum,[3] and Rochester Gas & Electric,[4] situations, together with those to come, Shell Union Oil,[5] discussed under the sub-title of Dillon Read, Pacific Gas & Electric,[6] discussed under the sub-title of Blyth, and the Scandinavian financings,[7] discussed under the sub-title of Harriman Ripley, it is of little significance that, in an endeavor to re-

1. See supra, p. 765.
2. See supra, p. 750.
3. See supra, p. 711.
4. See supra, p. 773.

5. See infra, p. 800.
6. See infra, p. 727 ff.
7. See infra, p. 814.

establish a personal relationship with Columbus Railway, Light & Power Co. and get the managership of a forthcoming issue for First Boston, Addinsell should report to Macomber on September 16, 1935:

"I also pointed out that we had adopted as a matter of policy the idea that we did not try to go after business that had banking relations even if they were inherited ones, but that, on the other hand, we were doing everything we could to retain the accounts that our antecedents had had and that we had an organization which was entirely competent to handle these matters."

We must remember that this was little more than a year after the effective date of the Glass-Steagall Act, and the investment banking business of the "antecedents" had been of very large proportions. Naturally the primary efforts of the new First Boston organization were directed into channels where they would likely be most productive. There is no mystery whatever about the matter; nor the slightest inconsistency with Addinsell's testimony that First Boston has had an "aggressive policy with regard to continuance of business and clients that we had in the past and development of new ones."

### Province of Cordoba, Androscoggin Electric Corp., and Central Maine Power

The other documents referred to by the government in the connecting statement on the "traditional banker" issue against First Boston are isolated and without circumstantial background. Despite the fact that one of them contains the phrase "walking on our grass" they seem to have little to do with any "traditional banker" situation, and each probably reflects competitive efforts of the sort that we have met before.

The evidence as a whole compels a finding that First Boston never deferred to any so-called "traditional banker," made no agreement with other firms as to conspiratorial "successorships," and

that it gave no adherence to any "practice" of "traditional banker" or "successorships," nor to the terms of any "code."

### 12. Dillon Read

In the case of each defendant firm the description of the history, development and general nature of the business of each, as set forth in Part II of this opinion, should be read together with what is here said about the documents, deposition testimony and static data which concerns the issues of "traditional banker" and "successorships." As against Dillon Read no deposition testimony was read, but the record sufficiently discloses that we are here dealing with an investment banking firm which holds a major position in the investment banking business. This has been true for many years; and we may expect to find those in charge of such a prominent and successful organization reluctant to chase after every will-o'-the-wisp or every piece of business that "they had the slightest chance of getting." The competitive policies of Dillon Read naturally differed markedly from those of Kidder Peabody, which started with little besides a name, and which went after practically every piece of business where they thought they might perhaps succeed in getting a managership or co-managership, to fall back if need be to a participation, large or small, or even to a selling position. Dillon Read was not particularly interested in participating in the underwritings of other firms and consequently developed no such intricate techniques as we have seen developed by other firms willing to take whatever they could get. Nor had Dillon Read felt that its particular brand of skill and ingenuity would flourish in such an atmosphere as we have found in Lehman Brothers and Goldman Sachs, which developed special service features to ferret out and even to create situations where financings could be effected, even though the management of the issuers had no financing in contemplation.

But once having decided that a piece of business was worth their while, we

shall. see Karl H. Behr, James V. Forrestal, Dean Mathey, William H. Draper, Jr., and Ralph Bollard, fighting for the business to the very end, without any thought or intimation of "deferring" to any other banker "traditional" or otherwise. The notion that they might "upset the applecart," if it had occurred to these men at all, would perhaps have been an additional inducement to go ahead. Moreover, there is nothing in the evidence against Dillon Read which even suggests the existence of any "code."

As one might expect, under these circumstances, there is no evidence against Dillon Read on "successorship," except documents of such trifling significance as to be de minimis.

On the subject of "traditional banker" we have a series of disconnected scraps, in addition to the Outlet Co.,[1] Beneficial Industrial Loan,[2] and Union Oil[3] situations, which have already been commented on under "directorships." Others not referred to in the final briefs or in the connecting statement against Dillon Read, have also been discussed, including Amerada Petroleum,[4] National Cash Register,[5] and Rheem.[6] Each and every one of these other miscellaneous documents reflects no more than the consideration of purely business factors which the Dillon Read executives mulled over before they decided that they did not wish to compete. Again and again we meet M. L. Freeman, the intermediary or finder. Pacific Gas & Electric will be treated later.[7]

### Scovill Manufacturing Co., Scripps, Porto Rican American Tobacco Co., Argentine Government, American Radiator and Grand Trunk Western

In three of these situations, Scovill and Scripps, brought in by Freeman, and Porto Rican American Tobacco Co.,

about which we know nothing but the fact that it never brought out any financing, so far as disclosed by the static data, the matters were discussed in the Dillon Read office and rejected, either without any statement of reasons or as "unwise" or "we would not be interested in this business." Had the conspiracy been in operation and had there been any "traditional banker," there would have been no occasion for discussion, the business would have been refused out of hand, even assuming there was any reasonable chance of getting it, and further assuming that Dillon Read considered it desirable business, neither of which appear. With respect to the Argentine Government and American Radiator there was little to suggest that the business could be got away from Morgan Stanley and much to indicate that it could not. Dillon Read showed interest in the Grand Trunk Western Railroad (of Canada) financing in February, 1930, and Waddell recommended to Forrestal, Bollard and Riter that a letter be written to Sir Henry Thornton, suggesting that the matter be discussed with him as soon as convenient; but we know nothing further.

### United Drug

A variety of miscellaneous documents introduced against Dillon Read and Kidder Peabody and some deposition testimony by Gordon, Forgan and Ripley, supplemented by documents introduced by Glore Forgan and Smith Barney, enable me to piece this situation together.

"Old" Kidder Peabody, together with Chase Securities, Bankers Trust, Shawmut and F. S. Moseley had offered the last pre-Securities Act issue in April, 1928. The next issue, which the various documents above referred to concern, was a simultaneous issue on August 5, 1943, of $20,000,000 Sinking Fund Debentures

---

1. See supra, p. 725.
2. See supra, p. 725.
3. See supra, p. 727.
4. See supra, p. 725.

5. See supra, p. 725.
6. See supra, p. 727.
7. See infra, p. 804 ff.

and $10,000,000 of Cumulative Preferred Stock, both managed by Smith Barney alone. According to the testimony of Gordon, Forgan and Ripley, each of the three firms, Kidder Peabody, Glore Forgan and Harriman Ripley, competed actively for the business but lost out to Smith Barney.

Freeman, who had some contact with Liggett, came to Dillon Read on December 9, 1936, but Behr told him "we might not want to be put in a position of negotiating with a client of Kidder Peabody." Freeman explained that Liggett had told him the United Drug had dealt through Windsor who had died and that United Drug "felt no obligation whatsoever to the new firm of Kidder Peabody." The upshot was that the Dillon Read people conferred together and decided to talk, not to Kidder Peabody, but to United Drug. The next memorandum of Behr is dated December 8, 1936, and indicates that Behr had discussed details of the proposed financing with Lewis J. Hunter, a director of United Drug who was handling its financial matters, but Behr came "to the conclusion that at the present time we could not work out a refunding of this issue to show any real savings to the United Drug." Hunter hoped Behr would call again when next in Boston, and promised to see Behr "and just chat about the matter" when Hunter came to New York. A further memorandum of December 29, 1936, tells us that Behr had told Hunter over the phone that he did not wish to go further if the company had notified Kidder Peabody that they would not discuss the matter elsewhere, but Hunter said that he no longer considered Kidder Peabody (the new firm) their bankers "although they would be very happy to do business with them or any other first class banking house."

Prior to all this, Hovey of Kidder Peabody had formed a nucleus group with First Boston to go after this same business, according to a letter from Hovey to Webster of Stone & Webster and Blodget, Inc., under date of September 9, 1936, and there was discussion with Hunter on September 12, 1936, relative to taking Field Glore into this group, which Hunter approved. The matter was further discussed between the Kidder Peabody partners at a luncheon meeting on November 24, 1936.

What all this adds up to is merely that Dillon Read, Kidder Peabody, First Boston and Field Glore were going after the business, despite the fact that on plaintiff's theory only Kidder Peabody, as "successor" to the "old" firm was the "traditional banker" by "inheritance," and they all lost out to Smith Barney who, as above stated, brought out the next two simultaneous issues of United Drug on August 5, 1943. It is interesting to note, however, that Dillon Read succeeded Smith Barney and was manager of the next issue in 1946.

### Shell Union Oil

The documents relating to Shell Union are numerous; pieced together they give a fairly complete picture of a series of negotiations relative to a number of Shell Union financings; and they affect Lehman Brothers, First Boston and Dillon Read.

Following their usual procedure, counsel for the government stressed, in their connecting statement against Dillon Read, a single document, which was an Addinsell memorandum of March 10, 1937, giving the substance of a luncheon conference with Mathey of Dillon Read. The part emphasized by counsel for the government reads:

"Having in mind the tremendous trading proclivities of the management and the experience with the debenture issue, Mr. Mathey is determined to avoid being crowded up by the company with regard to the terms of the setup and the price. He feels, especially in view of the fact that the Shell is not as favorably regarded as some of the other oil companies in spite of what he says is its better statistical position as compared, for example, with Texas and Tide Water, and in view

of his experience with the note issue, that it is absolutely essential to a successful offering that it be put out on an obviously attractive basis.

"He is sure that the company will be shocked at the proposal he has in mind making, and that their first impulse will be to try to go somewhere else. You will recall that the syndicate in the last issue was a pretty comprehensive one and he thinks that the only possible place they might go to is Kuhn Loeb, and there are probably reasons why they would not go even to them. He is anxious, however, to have his group present a solid front to the company and in effect, to agree that if the Shell Union does not trade with the Dillon Read-Hayden Stone-Lee Higginson group, the members of this group will not join any other bankers who may attempt to form a group to figure on the business. In view of the well-known trading proclivities of the Shell people, I have agreed in principle to Mr. Mathey's suggestion on the theory that if our large and strong group cannot get the business on terms that we feel attractive we will be better off to be out of the business."

As disclosed by other documents, the conversation was proper in every way, as First Boston was a member of a Dillon Read-Hayden Stone group, which had been formed at the suggestion of Shell Union, and which was competing for a preferred stock refunding financing which was later abandoned. Mathey was speaking as the spokesman or negotiator for Dillon Read, the group leader, as he testified before the TNEC; and Addinsell could have dropped out had he thought Mathey's suggestion not in the best interests of First Boston. The last previous issue was one of $60,000,000 Debentures offered by Dillon Read and Hayden Stone on March 10, 1936. This issue had not been successful.

The history of the competition for the various earlier issues, which forms the background to the Addinsell memorandum is revealing and significant, when the documents are considered in chronological sequence.

In the pre-Securities Act period Hayden Stone had offered a common stock issue as an underwritten offering to shareholders in 1922; but in most of the issues, including the last one of $50,000,000 Debentures in 1929, Lee Higginson was alone in privity with the issuer. The first post-Securities Act issue was a private placement of $9,000,000 of Serial Notes, with Hayden Stone, Kuhn Loeb, Lee Higginson and Edward B. Smith & Co. acting together as agents for the seller.

Lehman Brothers started competing for Shell Union business prior to June, 1935, when we find Lehman Brothers heading a group including Speyer and Salomon Bros. & Hutzler. On that date Lehman Brothers proposed to make an offer "which of course should be confidential and not to be disclosed to any competitive bankers" at a fixed price, and with a forfeiture of $100,000, if later not prepared to go ahead with the deal. We have already observed that market changes during any lag in time, between the naming of a price and the preparation of the details, make it impractical for a banker to make a firm proposal applicable to some uncertain future date. This forfeiture proposition of Lehman Brothers was not satisfactory to Shell Union, but the company expressed its willingness to receive a bid.

In July, 1935, Lehman Brothers said it would submit a bid, "providing we had your assurance that if our bid were more favorable to the company than that of any other bankers, the business would be given to us, and provided our bid were not used for the purpose of renegotiating with others." But this proposal was not acceptable.

There were then two other groups competing for the business, Dillon Read heading one group, and Hayden Stone-Lee Higginson the other. As early as December 11, 1935, First Boston was a

member of the Hayden Stone-Lee Higginson group. Various documents show Dillon Read in active competition at an early date.

Accordingly, the next proposition of Lehman Brothers was that the three groups submit bids, with the understanding that the leadership of the business was to go to the submitter of the best bid, the other two bidders each to be offered one-third participation in the business on equal terms. After some deliberating Shell Union finally, and on January 22, 1936, rejected the simultaneous bid suggestion and undertook discussions which resulted in an agreement that Dillon Read and Hayden Stone would proceed jointly. A confidential message from the Shell Union New York office to van Eck of Shell Union in London, on January 22, 1936, states almost in so many words that the two groups were brought together at the request of Shell Union.

The immediate result of the combination of the two groups was that on January 31, 1936, Egly of Dillon Read called Ford of First Boston, told him the groups had joined and asked him if First Boston would go along. Ford checked with Gernon of Hayden Stone, his previous team leader, verified the fact that the groups had joined, and then called Forrestal of Dillon Read and told him that First Boston would accept the proposal that it become a member of the newly formed group. Accordingly, when the $60,000,000 issue of Debentures was brought out by Dillon Read and Hayden Stone as co-managers on March 10, 1936, First Boston was a participant, in the amount of $3,600,000.

Two months later, Lehman Brothers, despite the fact that Dillon Read was the "traditional banker," on plaintiff's theory was still competing for the management of whatever new issues Shell Union might bring out. There was some Batavian Petroleum refunding to be done. The Shell Union setup was: Royal Dutch owned 60% of Batavian Petroleum, the other 40% was owned by Shell Transport and Trading; and Batavian Petroleum owned 64% of Shell Union. The competition by Lehman Brothers was vigorous but unavailing.

Then there came up the possible refinancing of Shell Union's outstanding $5\frac{1}{2}\%$ preferred stock, which brings us almost back to Addinsell's memorandum of March 10, 1937, which is where we started.

A cable of March 2, 1937, from Shell Union's London office to van der Woude in New York states:

"Our opinion is it would be a mistake to start bargaining with bankers and as in case of recent bond issue best course would be decide what are fair terms and then wait until bankers can meet them (fullstop)

Feel that Dillon Read Lehman Bros. certainly are entitled to participate even if you do not feel either should sponsor issue but we shall wait for your proposals"

There are other documents of March 5, 1937, and March 8, 1937, indicating further competitive maneuvers by Shell Union and Lehman Brothers.

Hence, when Matthey told Addinsell at their luncheon meeting on March 10, 1937, that he was anxious "to have his group present a solid front to the company," it was one "partner" talking to another, and what he proposed was no more than reasonable, as "the well-known trading proclivities of the Shell people" are clearly reflected in the documents in evidence in this case. Addinsell thought that First Boston would be better off out of the Shell Union business if not done on terms he believed attractive, and, in view of the unprofitable experience had with the last issue, I believe he was right. And so he agreed to go along with Mathey's suggestion.

In the meantime, according to a Lehman Brothers memorandum by Walter A. Weiss, an employee, the New Business Department had discussed the Shell Union financing, and Robert Lehman "thought we should call Forrestal at Dillon Read and tell him that we are going to try and get this business if we

can, since he paid us this same courtesy in the past." Probably the fact that Lehman Brothers was after the business and had been after it for some time, was no news to Forrestal. In any event, Lehman Brothers tried to get van der Woude to designate Lehman Brothers as co-manager; when this did not work, they got after Boyle in the London office; finally van der Woude confirmed the fact that he had been instructed to request Dillon Read to include Lehman Brothers as co-manager. This led to further suggestions back and forth. Dillon Read seemed to be on the way out; and, surprisingly enough, van der Woude cabled the London office on March 17, 1937, to the effect that, provided it is made clear that negotiations with Dillon Read have come to an end, "suggest we consider Kuhn Loeb/Lehman combination or Morgan Stanley as leaders." Whatever might become of Dillon Read, Lehman Brothers was still in. Even as van der Woude wrote van Eck on June 17, 1937, that economic conditions were such that it was inadvisable to offer Shell Union securities at that time, an optimistic memorandum by Weiss of Lehman Brothers, about a month later, expresses the opinion "that this deal is getting very close to being doable."

But the preferred stock financing never was done; the next financing was a private placement of $25,000,000 Serial Notes without the services of any investment banker; and Morgan Stanley managed the next three issues in 1939, 1941 and 1946.

The part played by Dillon Read in the Scandinavian financings will be discussed later,[1] but it will do no harm to mention here that Forrestal went after this business as hard as he could, and refused to be frightened off by the competitive maneuvers of other defendant firms. He gave in only when he was beaten and some of the others got the business.

The evidence as a whole compels a finding that Dillon Read never deferred to any so-called "traditional banker," made no agreement with other firms as to conspiratorial "successorships," and that it gave no adherence to any "practice" of "traditional banker" or "successorship," nor to the terms of any "code."

### 13. Blyth

The competitive pattern of Blyth has been gradually shaping up. It is partly disclosed in the discussion of Butler Brothers,[2] Pan American Airways,[3] and Anaconda.[4] But the chief reliance of government counsel is placed upon a long series of documents having to do with various financings of Pacific Gas & Electric, and a secondary relative to 700,000 shares of Pacific Gas & Electric common stock held by North American Company, all of which will now be closely examined. Plaintiff's claim is that the inferences to be drawn from the very numerous transactions reflected in these documents go far to establish government claims on the issues of "traditional banker," "successorships" and the "devices adopted by defendants to circumvent" regulations of the SEC relative to competitive bidding, against Blyth, Dillon Read, First Boston and Lehman Brothers, but especially against Blyth. It will soon appear, however, as it has already appeared upon a close scrutiny of so many other issuer situations, that, despite a few quotations of scraps taken from the documents here and there, the Pacific Gas & Electric negotiations show a healthy state of vigorous competition, quite at variance with any "practice" of "traditional banker" or conspiratorial "inheritance." As the Pacific Gas & Electric story cuts through the very center of the case, it will also serve as an introduction to Part VI of this opinion, which will presently bring us within sight of the end, under the title, "Alleged Conspiratorial Opposition of the Seventeen Defendant Banking Firms to 'Shopping Around,' and to the Campaign for Compulsory Public Sealed Bidding; and the Alleged Adoption of Devices to

---

1. See infra, p. 814.
2. See supra, p. 782.
3. See supra, p. 729.
4. See supra, p. 729.

Sabotage SEC Rule U–50 and Compulsory Public Sealed Bidding in General."

## Pacific Gas & Electric

Pacific Gas & Electric, the largest public utility on the West Coast, has since 1905 been a lighting and gas operating company in Northern and Central California, with its main offices in San Francisco. Over the years it acquired the plants of, or gained control of, several local light and gas utilities, but remained primarily an operating company in function and structure, with local interests and a preference for Californians on its board of directors.

In June, 1930, Pacific Gas & Electric made an arrangement with North American Company whereby Pacific Gas & Electric stock was traded to North American in exchange for the control of three local operating companies, including Great Western Power Company. From this latter concern came James Black, a vice-president of North American and a director of Pacific Gas & Electric, whose president was the redoubtable A. E. Hockenbeamer, described in many of the documents as "Hock." Shortly after Hockenbeamer died on November 11, 1935, Black became president of Pacific Gas & Electric. Harrison Williams was a dominant figure in North American.

During the pre-Securities Act period Blyth Witter, and later Blyth, was forging ahead as an investment banking firm especially interested in public utilities, and gradually developing an efficient sales and distributing organization in the California area. One of the prize plums was the financing of Pacific Gas & Electric. Hockenbeamer, at least later on, and probably at all times, was a believer in continuing relations between his company and the firm selected to manage its numerous financings, which necessarily had to fit into the elaborate and complex plans of the company for expansion. And so it was quite a feather in the cap of Blyth Witter when, in July 1919, it became the sole offeror of a $5,000,000 underwritten offering of Pacific Gas & Electric preferred stock. On a bidding basis Blyth Witter also won out against National City Company on the next issue, which was brought out as an underwritten public offering in May, 1920. To assist the firm in underwriting and distributing the issue, which Blyth Witter had already been selected to head, Blyth Witter teamed up with Continental & Commercial Trust & Savings Bank, and Halsey Stuart. Harold L. Stuart testified that the proposal was that if his firm joined, "the three of us would become the future bankers for Pacific Gas & Electric."

But the Fates ruled otherwise. Stanley Russell, a vice-president in the buying department of National City, got ahead of the rest, and in the balance of the pre-Securities Act period National City served Hockenbeamer to his satisfaction, and brought out all the remaining security issues of Pacific Gas & Electric, which were numerous.

## Competition for Leadership 1934–1936

After the effective date of the Glass-Steagall Act, there was a mightly struggle for the Pacific Gas & Electric business, and the principal contestants were precisely those one would expect to find in the arena, wholly apart from the existence of any conspiracy, and they acted in a manner not at all consistent with the conspiracy as charged. Naturally, the men who had been with the National City were on the job; Stanley Russell, with his long established personal relationship with Hockenbeamer, had gone to Lazard Freres and he seemed to have the best chance; but the greater part of the National City employees, including no doubt many who had worked on Pacific Gas & Electric business, had gone with Brown Harriman, and so we find Ripley after the business. Mitchell did not join Blyth until June 17, 1935, and it is clear that Blyth's efforts, which began some little time before February, 1935, were in no way based upon or connected with any claim by Blyth that it had "inherited" this business from National City. As a matter of fact,

Blyth at no time, before or after Mitchell joined the firm, claimed that they had "inherited" the Pacific Gas & Electric business. Despite the presence of Lazard and Brown Harriman, Blyth is in the melee fighting manfully; some of Blyth's arguments have great weight, others seem less cogent, but there is no doubt Blyth realized the man to beat was Russell.

A letter from Leib to Black on February 21, 1935, is relied on by government counsel simply because it contains the words "heirs," "historic" and "legacy," the use of which is supposed to indicate adherence to the conspiratorial scheme. But the letter as a whole will bear no such interpretation. Leib is not claiming that Blyth has inherited any "traditional banker" rights. How could he, as the "traditional banker" on plaintiff's theory must be Brown Harriman. Lazard Freres could have no conspiratorial rights, as that firm is described throughout as not a member of the combination. Leib is trying to refute the argument that he knows will be made by both Lazard and Brown Harriman that each ought to get the business because of the former association of their personnel with the Pacific Gas & Electric business, and the letter is replete with insinuations that there is no "heir."

In the very first paragraph Leib uses the word "heirs," with an entirely different meaning, not in the slightest helpful to plaintiff:

"As you know, Elsey and the American Trust would like to have us heirs to their sixteen percent interest in the Pacific Gas business. This, coupled with our historic connection with the business, would appear to entitle us to head this account * * *."

The American Trust had never brought out any Pacific Gas & Electric business; it could not be "traditional banker." The reference is to an underwriting participation had by American. Trust in prior issues, and this also is the sig-nificance of the reference to Blyth's "historic" connection, as Blyth or Blyth Witter had been a participant also. What this all adds up to is serious and effective competitive effort having nothing to do with any "traditional banker," nor to any "claim" by Blyth to "successorship" nor any "recognition" by Blyth of "successorship" in or by any other firm. Knowing that Elsey and Black were directors of Pacific Gas & Electric, Blyth had sought Elsey's assistance in the Blyth struggle for the managership. In prevailing upon the American Trust through Elsey, its president, to say it would like Blyth to be "heirs" to its sixteen percent participation, Blyth was merely using another argument to get the managership. As matters turned out later on, it is clear that obtaining the assistance of Black and Elsey was a master stroke; and the expression of confidence by American Trust, and Blyth's own historical position in the business, were indications that Blyth understood the background and had the necessary sales force and connections to do a good job of distribution.

Indeed, there is no need for speculation on the subject, as the letter to Black on its face goes directly to the merits:

"I believe that we represent the best balanced outfit in the syndicate. We have our own wire and private telephones to Boston—Philadelphia—Cleveland—Chicago—San Francisco—Los Angeles—Portland—Seattle. We use these wires and telephones exclusively. No one else is on them.

"We have nineteen offices, and we have one hundred and twenty-five salesmen.

"We have a large dealer following as we trade daily with most of the important dealers throughout the country.

"Our historic connection with Pacific Gas & Electric Company dates back many years, and we have not changed our identity throughout the past few years.

"I believe that Blyth & Co., Inc. should head this syndicate. We appear to be the logical selection from every standpoint."

Leib also sketches out two alternate plans, the first along the line of "giving no consideration to Hock's personal feelings for Stanley Russell," and the second based upon the "practicabilities" of the situation. Needless to say, in each plan Blyth is in first position as sole manager.

The Blyth competition made such progress that Hockenbeamer suggested the possibility of Lazard and Blyth handling the issue together as co-managers, according to a telegram from Leib to Charles R. Blyth on February 21, 1935; and at one time Blyth thought Russell had accepted this proposal. But it turned out that he had not, and, after a short period of uncertainty, Blyth was reluctantly forced to admit defeat. First Boston had been after the business too. Indeed, Addinsell had written directly to Hockenbeamer on the subject as early as August 3, 1934. And it is interesting to note in an inter-office communication by Woods, dated February 25, 1935, that First Boston knew before Blyth did that Lazard had won out.

Accordingly, Blyth lost the first engagement in the post-Securities Act period; and Lazard as sole manager brought out the $45,000,000 issue of First and Refunding Mortgage Bonds of Pacific Gas & Electric on March 28, 1935.

It is not necessary to follow so closely the competition for the next succeeding issue, $30,000,000 of additional First and Refunding Mortgage Bonds, which came out on June 26, 1935, under the co-managership of Blyth and Lazard. By this time Brown Harriman had been eliminated as a competitive factor, and First Boston had never been any better off than any one of the host of other investment banking houses going after this business. Thus Blyth by sheer tenacity and the use of arguments based on its increasingly important position as a Californian underwriter and distributor of securities, had strictly on the merits won the second engagement; and had won it while Hockbeamer was still alive and Mitchell not yet functioning. It will be recalled that he joined Blyth on June 17, 1935, and there is nothing in the record even to suggest that he had anything to do with the $30,000,000 issue just referred to. And the status quo was maintained throughout the year 1935, as a $20,000,000 issue of additional First and Refunding Mortgage Bonds was brought out by Blyth and Lazard as co-managers on September 25, 1935.

In the next few months, Hockenbeamer having died on November 11, 1935, to be succeeded by Black as president, Blyth's efforts were at last rewarded and Lazard was eliminated as a co-manager. On March 24, 1936, Blyth as sole manager brought out a $90,000,000 issue. This was partly due to some good work by Mitchell who sought aid from Harrison Williams, who "certainly had no leaning for Lazard."

The documents here furnish government counsel with a few more quotations, but they are as chaff in the wind when compared with the continuous and uninterrupted competitive efforts by Blyth in derogation of the terms of the alleged conspiracy. Charles R. Blyth writes Mitchell, "We might well break into some of Dillon's preserves there, in a way they couldn't criticise too severely." Mitchell writes Blyth that Williams had told him "that he is no more tied to Dillon Read & Co. for his financing than he is tied to us." When they are about to oust Lazard from its co-managership, Leib is worried lest they be criticised for "partner knifing" and "boring from within against a partner" and writes further "we are walking on dangerous grounds, and that much thought should be given to each step we take." But Mitchell testified on deposition, "It never bothered me for one minute." And he was right. Had Lazard and Blyth been operating together from the first on joint account, as might appear to be the fact to others in the investment banking indus-

try, who did not know the facts, criticism might well have been forthcoming and on such a state of facts it might perhaps have been justified. But Mitchell knew that the firms had been competing against one another for the management from the time of the elimination of National City by the operation of the Glass-Steagall Act, and that the co-managerships in connection with the last two issues gave rise to no fiduciary duties whatever. He knew these facts were easily demonstrable. It is just another instance of the personal reactions of different individuals to the same state of facts. Blyth was not "walking on dangerous grounds," even though Leib might have thought so; nor was there any sound basis for a "terrific yell" by Lazard and the making of a claim of "partner knifing."

It is a tedious but necessary task thus to review the contents of this prodigious record; but in no other way can light and air be permitted to enter and dispel the impression which might otherwise be created by the accumulation of such disconnected phrases as those just set forth. The very accumulation of them might well lead to the suspicion that where there is smoke there must be fire. Such a suspicion can be laid at rest only by a careful and persistent study, in the case of each document, of the context in its entirety, and the attendant circumstances whenever they are revealed in deposition testimony or in other documents in evidence. Thus, and thus only, can the true "mosaic" be put together.

In view of the fact that Pacific Gas & Electric had embarked upon a vast and continued program of expansion, requiring a long series of interrelated security issues, the suggestion that Blyth succeeded in maintaining its position as "the banker" for Pacific Gas & Electric for many years, due to the operation of the alleged conspiracy, is without evidence to support it. Blyth's position on the Pacific Coast and its fine record of performance seem to afford a much more natural and reasonable explanation; and the same is true with respect to the use of the same group of underwriters in one issue after another. Blyth was thoroughly familiar with the capital structure of Pacific Gas & Electric, had a splendid distribution record, worked well with the management in the shaping up of the various security issues, and had a complete understanding of its long range plans for future financings.

### The Alleged Overly-Large Syndicate Formed By Blyth in Connection with the $80,000,000 Issue of March 27, 1945

We now enter a phase of the long-drawn-out campaign of Halsey Stuart and others for compulsory public sealed bidding. In substance it will appear in the end that an underwriting group was formed by Blyth with the intention of offering a negotiated underwritten issue, with the cooperation and approval of Black, but the decision of the Supreme Court sustaining the ruling of the SEC that Pacific Gas & Electric was a subsidiary of North American, and hence subject to the provisions of the Public Utility Holding Company Act of 1935 and Rule U–50,[1] together with a ruling of the California Railroad Commission on the same day, March 12, 1945, that the issue should be sold at public sealed bidding, forced the abandonment of the plan of the management to offer an underwritten negotiated issue. When the bids were opened it was found that Blyth won, and the only other bidder, Halsey Stuart lost.

Plaintiff's claim with reference to alleged overly-large syndicates is succinct-

---

1. Pacific Gas & Electric Co. v. Securities and Exchange Commission, 324 U.S. 826, 65 S.Ct. 855, 89 L.Ed. 1394, rehearing denied 1945, 324 U.S. 890, 65 S.Ct. 1010, 89 L.Ed. 1437. For the prior course of this litigation, see Matter of Pacific Gas & Electric Company, 10 S.E.C. 39 (1941), order affirmed sub nom. Pacific Gas & Electric Co. v. Securities and Exchange Commission, 9 Cir., 1942, 127 F.2d 378, affirmed on rehearing, 1943, 139 F.2d 298.

ly stated in its Trial Brief on the Facts as follows:

"One of the devices used by defendant bankers to defeat the spirit, if not the letter, of statutes requiring compulsory competitive bidding in the merchandising of securities is the creation of syndicates which are larger in size and in underwriting strength than necessary to handle the particular issue involved. Such overly-large syndicates usually include not only a larger number of participants than necessary, but also a number of underwriters who, standing alone, are strong enough to handle the leadership of a syndicate. The net result of the formation of such an overly-large syndicate is that with most of the large and capable houses included in the syndicate there is little or no possibility of anyone else forming a syndicate from the remaining available underwriting strength to compete with the overly-large syndicate. Hence, the issuer is confronted with a single bid, that bid coming from the overly-large syndicate. In such a situation there is obviously no real competition and the mere observance of the forms of competitive bidding is camouflage and does not change the substantive non-competitive character of the transactions."

There are two items of background. One is a letter sent by Blyth on May 11, 1942, to 87 investment banking firms. We shall return to this later; it seems to have no connection with the $80,000,000 issue now under discussion. The other such item is the offer by Blyth on October 24, 1944, of a $115,000,000 negotiated underwritten issue, as part of the Pacific Gas & Electric refunding program. It is conceded by government counsel that this large issue "was not financed through a syndicate that was 'overly-large,'" despite the fact that there were 167 underwriters. It has significance only by way of comparison with the later $80,000,000 issue and because of certain telegrams by Eaton, making

extravagant charges of monopoly and conspiracy in connection with this particular issue, which government counsel do not appear to support. Otis & Co. was not one of the participating underwriters.

On November 18, 1944, Blyth informed Halsey Stuart that it was forming an underwriting group and invited that firm to join. Stuart's response was that he was going to ask permission to have the issue put up for bidding. Again and again Stuart approached Black on the subject, but Black refused to change his decision that the issue come out as a negotiated underwritten piece of financing. Stuart then sought the assistance of Leslie Fournier, assistant to the chairman of the SEC, got his bidding group together and appealed to the California Railroad Commission. Black was adamant, saying that he thought highly of Blyth and had always received the price he wanted from Blyth and did not desire that the issue be sold at public sealed bidding.

But the course of events favored Stuart, as above stated. Blyth then informed the members of its group that there would have to be a change over to public sealed bidding, and that any who wished to do so might drop out. Some of them did. The bids were then presented and Halsey Stuart lost. There is no basis here for a finding that Blyth had an overly-large syndicate, despite the fact that Stuart testified that his account was "weak." The Blyth syndicate was formed with the usual consideration for elements of underwriting and distributing strength relevant to a negotiated transaction, and no one could have foreseen what the Supreme Court or the California Railroad Commission would decide nor when a decision might be handed down by the Supreme Court. The very circumstance that the group was formed to offer a negotiated transaction, which might well have eventuated, goes far to dispel any notion that an overly-large number of underwriters were assembled for the purpose of sabotaging public sealed bidding.

That Blyth was using every legitimate and proper means to stay with Pacific Gas & Electric business provides no basis for criticism; nor is it to be wondered at that almost all of the underwriters remained in the Blyth syndicate, as Blyth's familiarity with Pacific Gas & Electric financings and plans for the future, as well as its intimate knowledge of the problems of distribution, would make it seem probable that Blyth would be in a better position to make the best and safest bid.

While Morgan Stanley had informed Mitchell on November 25, 1944, that it was not likely Morgan Stanley would go along if a court decision required public sealed bidding, the fact is that they did join the Blyth account.

Accordingly, I find that what was done by Blyth and those who joined its group as participating underwriters had no relation to any over-all, integrated combination and conspiracy, and that there was no effort or design to form an overly-large account. This conclusion is also supported by the testimony of Harold L. Stuart that there is no objective test known to him by which a judge or anyone else can tell whether or not an account is overly-large. The factors are too subjective and nebulous. We shall return again later to this testimony by Stuart.

**The Sale in 1945 of 700,000 Shares of Common Stock of Pacific Gas & Electric Held by North American**

The substance of plaintiff's charge here is that Blyth, Dillon Read and Lehman Brothers combined and conspired together with the intent and purpose of assisting Blyth to form a public sealed bidding account of such formidable proportions as to make the submission of a competing bid impractical, thus furthering the plans of Blyth to consolidate its position as alleged "traditional banker" and with the further intent and purpose of circumventing the operation of Rule U–50, all within the framework of the alleged integrated over-all conspiracy of the 17 defendant firms. While admitting that the ruling is not binding on this court, counsel for the government repeatedly stress the finding of the SEC, in a proceeding to obtain approval of the acceptance of the Blyth bid, which was the only one submitted, to the effect that "we are satisfied that competitive conditions were not maintained; on the contrary, effective competition was stifled or precluded." [1]

The various features of this alleged Blyth-Dillon Read-Lehman Brothers scheme are complicated and cover a period of several years; the "opinion and findings" of the SEC contain a number of demonstrable factual errors; the evidence before the SEC and the proofs before me are far from similar; and the whole incident is of no more than peripheral consequence, in view of the state of the evidence taken as a whole. While the actual decision of the SEC that "competitive conditions were not maintained" seems supported by substantial evidence, there is grave doubt that the dictum and supporting findings were warranted. For reasons which will presently appear, upon a review of the evidence before me on this issue, I disagree with the supplemental and unnecessary conclusions thus arrived at by the SEC, but merely find that the evidence in this record is insufficient to warrant findings similar to those made by the SEC.

Rule U–50 took effect May 7, 1941. For some time thereafter no one knew whether Pacific Gas & Electric would be held to be a subsidiary of North American under Section 11 of the Public Utility Holding Company Act of 1935; the SEC Trial Examiner had found in favor of Pacific Gas & Electric; the SEC ruled otherwise; the Ninth Circuit Court of Appeals sat en banc and affirmed, with two judges dissenting; and, finally, as we have already noticed, the Supreme Court affirmed on March 12, 1945, but

1. SEC Release 5870 Holding Company Act of 1935, June 18, 1945; 19 S.E.C. 529.

by an equally divided court, Mr. Justice Douglas not voting.[1]

Curiously enough, government counsel made no attempt to establish its charges against Blyth, Dillon Read and Lehman Brothers by calling any witnesses or by producing the full documentary record; they did not even offer evidence of the number of underwriters in the Blyth bidding account nor of their identity or underwriting strength. It was thought sufficient to rely upon a few documents and some deposition testimony of Mitchell, but I was asked again and again to read and carefully to study the SEC "opinion and findings"; and I did so.

The net result, without making a long story of it, may be summarized. The Blyth letter of May 11, 1942, to 87 investment banking firms, including those with underwriting positions in a $110,000,000 issue in March, 1941, "which failed to eventuate," merely informed those to whom the letter was sent that if "sizeable business" came along, "we would expect to form an account under our management and to invite you to participate." No commitment was requested, only an expression relative to commitments which might interfere. There is the usual reliance by government counsel on statements erroneously made. Mitchell later referred to this as a "standby account"; but it was not. That any plan to organize an overly-large syndicate to be made up years later was in the minds of the Blyth people when this letter went out seems most improbable. That Mitchell had been requested by Dillon Read in early May, 1942, to join a Dillon Read account for the possible sale of securities in the North American treasury, and that Mitchell had said Blyth would go along, except that it expected to form its own account on Pacific Gas & Electric, proves no agreement with Dillon Read to parcel out the securities of the "subsidiaries," even if a similar conversation was had between Dillon Read and First Boston

relative to Detroit Edison, and despite the fact that on May 9, 1942, Dillon Read started forming an account, which made no reference to securities of Pacific Gas & Electric and Detroit Edison. There is no evidence whatever of any conversations between Blyth and First Boston. Moreover, each firm was proceeding in a way which seems normal and proper; and the subsequent acts of Dillon Read belie the making of any deal or promise that it would not compete for Pacific Gas & Electric or Detroit Edison business. That Blyth, with its rich background of knowledge and experience, both with respect to the complicated financial structure and the difficult problem of distribution of Pacific Gas & Electric securities, should do everything possible to retain the position it had fought so hard to attain, is merely further evidence of healthy competition, and helps not one iota to sustain any part of the "triple concept."

True it is that an undated "compilation" from the files of Blyth describes Dillon Read and First Boston as having "accepted." But the letters from both firms, which are in evidence and before me, merely answered the question contained in the Blyth letter of May 11, 1942, and stated that they had "no commitments," and would be glad to hear further from Blyth in due course.

This step one is important. Statements in documents from the files of alleged co-conspirators are generally significant, when the statements are made contemporaneously with the events they describe; but they lose significance when other contemporary documents demonstrate their falsity or when they are merely misdescriptions of writings which read the same today as when they were composed. There is no proof here that Blyth, Dillon Read and First Boston made any agreement whatever; Blyth formed no standby account in May, 1942; and Lehman Brothers wrote a declination, indicating its intention to form a competing account, which it later did.

---

1. See footnote on p. 807, supra.

Almost three years elapse before we come to step two. The $115,000,000 negotiated underwritten issue, and the $80,000,000 issue which was offered at public sealed bidding, both of which have already been discussed, came out under Blyth management, on October 24, 1944 and March 27, 1945, respectively.

In the meantime, without taking the trouble to set forth the details, Blyth's public sealed bidding record was such as to make any charge that Blyth was attempting to sabotage public sealed bidding under Rule U–50, mere empty words, completely at variance with the indisputable facts.

In March, 1945, Fogarty, president of North American, knew that his Company's holdings of Pacific Gas & Electric common stock must be sold. No previous block of common stock of comparable size and dollar value had been disposed of pursuant to the mandate of the Public Utility Holding Company Act of 1935; and it is not strange that Fogarty preferred a negotiated underwritten transaction, and made application to the SEC for an exemption, which was denied. The events of March and April, 1945, developed quickly and followed one another in rapid succession. The first two public sealed bidding accounts to be formed were by Dillon Read and by a Lehman Brothers-Merrill Lynch Pierce Fenner & Beane combination. Both were natural under the circumstances, as Dillon Read had made no agreement, with Blyth or anyone else in 1942 or at any other time, not to bid for Pacific Gas & Electric securities, and Dillon Read had for years brought out an unbroken series of North American financings. Lehman Brothers may have had its eye on this block of stock all along, as it sent a "declination" at the time the Blyth letter of May 11, 1942, was received. I cannot believe that these two accounts were formed as part of a conspiracy with Blyth, going back to May, 1942.

The formation of the two public sealed bidding accounts just referred to seems to have caught Blyth almost unawares, and the telegram of April 9, 1945, which was sent to a number of the firms to whom the letter of May 11, 1942, had been sent, and also to the additional firms which had participated in the $115,000,000 issue of October 24, 1944, or 173 firms in all, was perhaps hastily composed; in any event, it furnishes government counsel with a slight amount of additional ammunition. It reads:

"With possibility North American may sell portion their holdings Pacific Gas & Electric common we remind you that in accordance with our letter May 11, 1942 we head an account for private negotiation or competitive bidding & consider you in our account. Please confirm."

The telegram is just a shade off-color. As there had been no standby account established in May, 1942, there is no reason apparent to me, for Blyth stating that it considered the firms to which the letter had been sent, "in our account." But this is of trivial significance, as many had doubtless written that they would go along; and the part of the telegram which reads "please confirm" indicates clearly that the 173 firms to which the telegram was sent were now being invited definitely to join the account, "for private negotiation or competitive bidding."

There is no evidence with respect to the replies received, nor, as above stated, is there any evidence of the number of firms which joined the account, or their names or identity or their underwriting strength. Such evidence might have been before the SEC, but it is not in the record here.

Dillon Read became discouraged and dissolved its account soon after it began to get the firms together; the Lehman Brothers-Merrill Lynch Pierce Fenner & Beane account was not abandoned until April 25, 1945, two weeks later. There is no justification on this record for a finding that the Dillon Read and Lehman Brothers-Merrill Lynch Pierce Fenner & Beane accounts were conspiratorially formed for the purpose of temporarily taking out of circulation some

firms which might form or join competing accounts, thus giving aid and comfort to Blyth's alleged "traditional banker" position.

Bearing in mind Eaton's reaction to the fact that his firm, Otis & Co., had not been given a participation in the $115,000,000 issue of October 24, 1944, it is not surprising that some ugly rumors were soon afloat to the effect that the Blyth account was so large that it was interfering with the formation of competing accounts. Whoever circulated the rumors did so with telling effect, as Blyth was promptly maneuvered into writing to the members of its account on May 3, 1945, that

"We understand statements have been made that our account is so complete in distributing ability that others have refrained from forming a competing account. This letter is to advise that any member of our account, including yourselves, is free to withdraw at this time and to form or to become a member of another account to bid, without prejudice on future business headed by us. From our standpoint a competing account will be welcome."

Perhaps it would have been more prudent not to send the letter; but Mitchell, while forthright, is not always prudent. He is not the type artfully to contrive as the chess player who is willing to take hours on end to outmaneuver an adversary. Mitchell's strength lies in barging in and having things out without too much fancy sparring; or at least such is the portrait of him which this record paints. In any event, I think the letter means just what it says, no more, no less.

We already know the sequel. The Blyth bid was the only one; the SEC rejected it; Blyth refused to bid again unless assured that there would be at least one more bid; Blyth and Dillon Read bid against one another, and Dillon Read won out.

Counsel for the firms included in the Pacific Gas & Electric charge of government counsel, relative to the 700,000

shares secondary offering of common stock just commented on, tell me that they had no intimation that there was any issue before the SEC of conspiracy to "stifle or preclude" competition, that the proceedings were in effect ex parte, as the only lawyers present were those designated by North American to represent the successful bidder should the bid be approved, and that I should give no consideration whatever to the "opinion and findings" of the SEC. I do not pass on these matters, as it is clear that nothing said or done by the SEC is binding on me here.

Before leaving the subject of overly-large public sealed bidding accounts, to which I shall not return, as the evidence does not justify further discussion of this particular part of the plaintiff's charge of an integrated, over-all combination and conspiracy, a final word should be added to pull the Pacific Gas & Electric series of financings together. If ever there was a situation in which a continuing relationship with an issuer had definite and substantial advantages to the issuer it is that of Pacific Gas & Electric. The background, including the state of war with Japan, the Central Valley Project, the Sacramento Condemnation proceedings, the Hetch-Hetchy Project, and serious and disturbing litigation, combined to present a problem of distribution which required delicate handling, and the exercise of sound judgment, by an investment banking firm thoroughly conversant with every phase of the numerous complications involved. It was natural under the circumstances for the management, and for the North American executives as well, to turn to Blyth; and it was equally natural for Blyth to use every competitive strategy at its disposal, to hold on to the Pacific Gas & Electric business, in negotiated underwritten, or public sealed bidding, or any other type of financing which might eventuate.

Moreover, as testified by Harold L. Stuart, an old hand at competitive bidding, when he explained to me that there was no objective test by which he or I

or anyone else could determine that an account was overly-large:

"Well, it depends on the issue and the market conditions. Looking at anybody else's group I am simply an outsider. I don't know anything about what happens in that group or what their other commitments are, or whether they think the bonds are hard to sell or easy to sell. I would not know anything about anybody else's syndicates, so if I don't know anything about the group I cannot judge whether at the time it was larger or smaller or the participations should be smaller."

Accordingly, I find that Blyth never deferred to any "traditional banker," made no agreement with other firms as to "successorships," and that it gave no adherence to any "practice" of "traditional banker" or "successorship," nor to the terms of any "code."

### 14. Harriman Ripley

The evidence relative to Harriman Ripley on the "traditional banker" and "successorships" issues requires little comment. Ripley's own testimony shows plainly that the firm made every effort within reason to get business, and that it succeeded in doing so, often in derogation of the terms of the alleged conspiracy. That it definitely solicited business generally is shown by its booklet "Capital for Industry," which was published and widely distributed in 1944, as a means of attracting new business, and was revised and republished in 1945. This booklet concludes:

"The Company is thus equipped to place mature judgment, specialized training and broad experience at the service of corporations and other issuers who desire its advice or assistance in obtaining equity capital or in borrowing funds secured by bonds or other obligations. Inquiries from such corporations or issuers are invited."

There is nothing in the evidence relating to Harriman Ripley which even remotely suggests any disposition not to "upset the applecart," and nothing to justify an inference that there was any "code." Not a single document emanating from the files of Harriman Ripley supplied any quotation applicable to the plaintiff's claim that it adhered to the alleged "practice" of "traditional banker."

On "successorships" we have the same effort we have found in the case of a few other defendants to cultivate relationships which individuals in the firm had previously formed with issuers, prior to the time they were forced out of their previous employment as a result of the Glass-Steagall Act.

In this connection, the letter from James H. Perkins, chairman of the board of directors of the National City Bank, to its shareholders, on June 4, 1934, is relevant. It concludes with the statement, "There will be no successor to the City Company." Concerning good will he remarks:

"Good-will is a nebulous thing. In so far as it is attached to the name of the City Company it cannot be realized on, because the continued use of the name would identify the user with the Bank and that cannot be permitted without control by the Bank, which is forbidden by law. In so far as it may be represented by personnel trained in the investment banking business, such personnel consists of free individuals whom the City Company is not in a position to deliver to a prospective purchaser."

Several issuer situations, involving Harriman Ripley, have already been discussed, including, National Cash Register,[1] Pacific Gas & Electric,[2] United Airlines,[3] and United Drug.[4] Other evidence discloses Harriman Ripley competing, in derogation of the "traditional banker" term of the alleged conspiracy,

1. See supra, p. 725.

2. See supra, p. 804 ff.

3. See supra, p. 713.

4. See supra, p. 799.

for the management of security issues of American Cyanamid, Bell Telephone of Canada, Firestone Tire & Rubber, Price Brothers, Shell Union Oil, and many others; and Ripley testified that when competing price offers are requested by an executive or financial officer of an issuer, "we give it to him," citing examples.

Only one additional issuer situation, relied upon by counsel for the government, will now be commented on briefly.

### Scandinavian Financings

The background takes us back to the old Kuhn Loeb "show window," which was in full display in 1929. Under no circumstances would Kuhn Loeb permit it to get around that they were interested in any competitive situation. The scene opens after White Weld, who had brought out a $6,000,000 issue of Norway Municipalities Bank financing in November, 1927, approached James P. Warburg of the International-Manhattan Co. about a prospective $25,000,000 issue. Warburg called on Schiff on May 21, 1929, to ascertain whether Kuhn Loeb would join the group. Buttenwieser's memorandum indicates that the Kuhn Loeb reaction was favorable, but on the understanding that the Kuhn Loeb name was not to be disclosed "unless the negotiations are on an exclusive basis." Warburg had already been advised that "our name was not to be disclosed in any competitive situation" until the competition was over and the group had won out. This is simply another variation of the "show window" policy in operation.

Accordingly, it seems quite in keeping with what we have already observed that the next document, in which the entire argument of government counsel on the Scandinavian Financings is rooted, turns out again to be a Kuhn Loeb memorandum, dated July 10, 1929. Warburg has again interviewed Schiff; White Weld has another proposal, this time with reference to a proposed issue of ten to twenty million dollars by the City of Oslo, Norway. The part relied on reads:

"Mr. Schiff advised Mr. Warburg that if cooperation of the International Manhattan Company and White Weld & Co. with us meant real stifling of competition so that this larger group could negotiate with the city on practically an exclusive or at least perferential basis, we would be pleased to have them join with us."

This is in no manner connected up with Harriman Ripley, nor does the evidence indicate that this Kuhn Loeb "show window" technique was even reported to White Weld. But it runs like a melody through the argument of government counsel concerning events in 1935 and 1945, as though it represented a policy somehow "inherited" by firms who, so far as appears in this record, knew nothing about the conversation in 1929, but who later formed groups to compete for various Scandinavian Financings. As far as I can make out there is no connection whatever between these 1929 conversations and the groups formed later.

On January 16, 1935, a memorandum of agreement between Brown Harriman, Edward B. Smith & Co., Kuhn Loeb, First Boston and White Weld, evidences the formation of an entirely new group to compete for Scandinavian Financings. In this way expenses connected with trips to Europe were shared and it was anticipated that the combined strength of such a group would make a favorable impression upon foreign ministers of finance. The agreement covered many details concerning management, participations, advertising, order of names, treatment of situations involving any "special relationship" or "extraordinary circumstances," the bringing in of "others either here or abroad," and having the negotiations conducted jointly by Brown Harriman and Edward B. Smith & Co. The essence of the agreement is in the following two paragraphs:

"In order to coordinate the studies involved in determining what, if any, Norwegian, Danish and/or Swedish business may be

done in this market in behalf of public or private obligors, Edward B. Smith & Co. and Brown Harriman & Co., Incorporated have agreed to assume the management of a group consisting of themselves, Kuhn Loeb & Co., The First Boston Corporation and White Weld & Co.

Consistent inquiries from abroad convey the desire, primarily on the part of Norwegian and Danish authorities, to arrange for a number of refunding transactions. The management above mentioned intends to make on behalf of the group a study on the ground at the earliest possible date and seek contact with their correspondents abroad, in the endeavor to ascertain whether such business could be done on practicable terms."

Blyth was taken into the group on January 20, 1936.

The competition which followed contributes in no small measure to the disproof of plaintiff's charges, despite the fact that most of the documents were placed in evidence by government counsel. There were three groups after the Scandinavian business. In addition to the Brown Harriman-Edward B. Smith & Co. group, which was made up of six of the defendant firms, as above stated, there were other groups headed by Dillon Read and Lazard, and each of these groups turned out to be a formidable and tenacious competitor. In the Dillon Read group was Lehman Brothers; and in the Lazard group we find Goldman Sachs, Kidder Peabody, Stone & Webster, Field Glore and Harris Hall. Here, indeed, is competition on a grand scale between the very firms which are supposed to have combined together in an over-all conspiracy "to stifle competition."

The Lazard group won two issues, and the Brown Harriman-Edward B. Smith & Co. group won two issues. In connection with the $17,000,000 20-year External Bond issue of Kingdom of Norway, offered on March 2, 1936, by the Lazard group, an effort was made, on the suggestion of the officials of the Enskilda Bank of Stockholm, to merge the Dillon Read and Brown Harriman-Edward B. Smith & Co. groups, but no merger could be effected.

In the years immediately prior to 1939, as international conditions rapidly deteriorated, there were many negotiations back and forth, some dissension within the groups, a disinclination to be drawn into the submission of competing price bids and so on. The documents furnish government counsel with occasional quotations, but the whole situation is replete with competition quite at variance with the supposed over-all integrated scheme set forth in the complaint.

In 1945, after the end of World War II, the old group was to some extent reconstituted, and Harriman Ripley, Smith Barney and Kuhn Loeb worked together, the three forming an account on August 21, 1945. They had some success, but were superseded by Morgan Stanley who, in derogation of the alleged "practice" of "traditional banker," where a "satisfactory relationship" existed, took the Danish Government business away, although the Harriman Ripley-Smith Barney group thought they were doing very nicely and had the situation well under control. Despite all this, the Danish loan finally failed to materialize, and Morgan Stanley wasted a fine piece of competitive effort.

In 1947 there was vigorous competition for a Norwegian bond issue. This time the successful account was co-managed by Kuhn Loeb, Harriman Ripley, Lazard and Smith Barney, each with a 10% participation; Blyth, Kidder Peabody, Drexel, Dominion Securities Corp., and Ladenburg Thalmann had 5% each, and White Weld and Hallgarten 4.25% each. Eastman Dillon and Morgan Stanley lost out.

I find that Harriman Ripley never deferred to any "traditional banker," nor requested any other firm to defer to it as "traditional banker"; that it made no agreement with other firms as to "suc-

cessorships," and that it gave no adherence to any "practice" of "traditional banker" or "successorship," nor to the terms of any "code."

### 15, 16 and 17. Stone & Webster, Harris Hall and Union Securities

Nothing of consequence was introduced against these three peripheral defendants. Only 13 documents were introduced against Stone & Webster during the entire trial, 10 against Harris Hall and 4 against Union Securities.

I find that neither Stone & Webster, Harris Hall nor Union Securities ever deferred to any "traditional banker," or requested any other firm to defer to it as "traditional banker"; and that neither of said firms made any agreement with other firms as to "successorships," nor gave adherence to any "practice" of "traditional banker" or "successorship," nor to the terms of any "code."

### PART VI

### Alleged Conspiratorial Opposition of the Seventeen Defendant Banking Firms to "Shopping Around," and to the Campaign for Compulsory Public Sealed Bidding; and the Alleged Adoption of Devices to Sabotage SEC Rule U-50 and Compulsory Public Sealed Bidding in General

There is considerable evidence in the record on this subject, which was in the beginning said to be an important part of the government case, as it was supposed to lend support to the "traditional banker" concept, and also to constitute substantial proof of the way in which the 17 defendant banking firms carried out some of the essential terms of the conspiratorial scheme.

The charge against "the defendants" on this phase of the case is comprehensive and has many aspects. Boiled down to essentials, government counsel undertook to prove: (1) that "the defendants" were opposed to public sealed bidding generally; (2) that they agreed "to prevent, restrain, minimize, and discredit the use of competitive bidding, private placements, agency purchases, and agency sales" by various means, and by "seeking to prevent the adoption by duly authorized Federal and State administrative agencies of rules and regulations requiring security issues to be sold at competitive bidding," and that they sought to "induce" and "coerce" issuers not to resort to competitive bidding, private placements or agency transactions; and (3) that "the defendants" further agreed to "eliminate and prevent" competition for security issues offered at competitive bidding and "to circumvent" or sabotage the regulatory orders of Federal and State administrative agencies requiring competitive bidding by "forming overly-large" public sealed bidding accounts, and by the elimination of potential competing accounts through the "device" of inducing leading investment bankers to join defendants' accounts by offering them substantially equal participations with that of the manager, and by reducing substantially or eliminating defendants' management fees.

As part of this phase of the over-all, integrated conspiracy and combination, "the defendants" are further charged with entering into an agreement to induce institutional investors to refrain from making bids for security issues offered at competitive public sealed bidding. This will be the subject of comment in Part VII of this opinion, relating to the so-called "Pink" agreement.

We need not tarry over the charge relating to private placements and agency transactions. This has been overwhelmingly disproved. Indeed, the effort to sustain this part of plaintiff's allegations was no more than perfunctory. The only firm thoroughly committed to opposition to private placements appears to be Halsey Stuart, which apparently would have most if not practically all security issues disposed of by public sealed bidding, a field in which Halsey Stuart, with its large capital, specialized pricing experience and know-

how, has met with such conspicuous success.

As with every other feature of this complicated case, we shall find that here again there was no joint action whatever by any conspiratorial combination. The views expressed by individuals connected with a few of the defendant firms, and the policies adopted by some of them, with respect to competitive bidding and "shopping around," are conceded to have been formed in good faith. It is not disputed that the views thus expressed were the genuine views of those who formulated them; nor is it claimed that they lack merit or were part of any artificial camouflage or pretense. Indeed, there is proof that these same views were shared by many non-defendant investment banking firms not named as co-conspirators, and by issuers and investors as well.

### General Views on Competitive Bidding and the Advantages to Issuers Arising Out of Continuing Banker Relationships

Fundamentally, the contentions of government counsel on this and other phases of the case stem from a misconception of the investment banking business. And yet the advantages to an issuer, which are incidents of a continuing relationship with a good investment banker, seem too obvious for comment. In every business the customer feels that there are cogent reasons why he should continue with the firm which has rendered good service in the past. But with a series of security issues, the saving in the time and labor of the officers and employees of an issuer, which would have to be spent in teaching a new investment banker the intricacies of the business, and the financial set up of the

company, are a matter of real consequence; and it must not be forgotten that many of the matters to be discussed are of such a character that company officials desire to have such conversations only with those whom they trust, and in whose integrity and competence they have complete confidence.

The views expressed by Harold Stanley in his memorandum of November 29, 1939, for submission to the TNEC, make sense to me; the wonder is, why did the TNEC fail to accept it and make it part of the record of their proceedings.[1] Whenever an investigating body, thought to have positive views on a subject, refuses to hear the other side, the effect may be, at least to some extent, to impair the validity of the very proceedings themselves. In view of the failure by plaintiff to produce in this adversary proceeding any convincing testimony of the domination of even a single issuer by any one, or all, or any combination of the defendant firms, it is interesting to read Stanley's denial of "banker domination," and his forthright challenge on the subject, which follow:

"One critic has recently gone so far as to say that, even though competitive bidding has some disadvantages, it should be made universal because it is the only way in which companies can be freed from 'banker domination.' Whatever may have been said pro and con about the existence of so-called 'banker domination' in the past, the truth is that it simply does not exist to-day, and any contention to the contrary must be based only on ignorance or wilful misinterpretation of the facts. Allegations of 'banker domination,' like those of the 'spider web' theory of control, have been repeated so

1. Numerous documents were placed in evidence in this case by government counsel, chiefly in the nature of compilations of statistical data, which had been prepared by some of the defendant firms at the request of and sent to Morgan Stanley. While it was claimed by government counsel that this indicated some monopoly power, it soon became evident that the information had been solicited in an endeavor to fulfill demands by the TNEC for this information, and that no inferences of conspiratorial combination or monopoly power were justified.

often and arbitrarily, and so fancifully, that they shape the thinking on economic questions of many well-meaning and intelligent citizens who have never stopped to analyze the matter or who have had little opportunity to form their own views about industry at first hand. For the most part such talk has been advanced by persons who have had no practical experience in banking or in industry and by persons intent on creating sentiment for the abolition of private enterprise."

Morgan Stanley and Kuhn Loeb had opposed competitive bidding for years and had refused to submit sealed bids, perhaps with some exceptions in the case of Kuhn Loeb; and representatives of each had insisted on the advantages which accrue to issuers from continuing banker relationships. As early as October 25, 1922, and long prior to the ruling with respect to equipment trust certificates, Kuhn Loeb had submitted a lengthy memorandum to the ICC on "The Marketing of American Railroad Securities," opposing compulsory public sealed bidding. Individuals connected with a few of the other defendant firms had expressed somewhat similar views. Edward B. Hall of Harris Hall took the same position in a speech he made as president of The Investment Bankers Association at the Bond Club of New York on April 21, 1937. This had nothing to do with any conspiracy.

Without attempting again to consider the evidence applicable to each of the 17 defendant firms, it will suffice to say, that as to some there is no proof in the record that they had formulated any policy or entertained any views on the subject, and as to others, the stipulated static data prove that they actively managed and participated in numerous public sealed bidding accounts, long before public sealed bidding was made compulsory as to certain types of securities of certain classes of issuers hereinafter referred to.

## The Eaton—Young—Halsey Stuart Campaign

The less said about the fight for compulsory public sealed bidding the better. It is an unsavory subject. Success, to the extent covered by SEC Rule U–50, effective May 7, 1941, concerning the securities of issuers affected by the Public Utility Holding Company Act of 1935, and by the ruling in Ex parte 158[1] by the ICC, effective July 1, 1944, relative to debt issues of railroad securities, came partly as the result of arguments addressed to the merits, but partly also, and in no small measure, as the result of a campaign of misrepresentation and pressure, political and otherwise, described by Young as "putting the heat on," in which revenge for real or fancied wrongs played no small part.

The idea perhaps originated with the loss of the Insull business by Halsey Stuart, which in the 1925–1931 period had amounted to the amazing total of $2,-250,000,000. Whether or not such was its origin, the campaign was in full swing shortly after the purchase by Halsey Stuart and Otis of a $30,000,000 issue of Chesapeake & Ohio Refunding and Improvement Mortgage Bonds on December 10, 1938. The ingenuity displayed by Eaton and Young, in outwitting Harold Stanley and Elisha Walker, deserves description, but I shall pass it by. Harold L. Stuart was unaware of much that was done, and later believed statements that Morgan Stanley and Kuhn Loeb had made a bid, whereas the proof before me establishes in the clearest possible manner that they did not.

Thereafter, in one financing after another, the pressure campaign of "putting the heat on," forced one issuer after another to resort to public sealed bidding, despite the wishes of the management to negotiate with Morgan Stanley. The difficulty was that there was no forum at which the misstatements of fact could be exposed, and the prospect of a public exchange of vituperation with Eaton and Young was far from alluring,

1. (1944) 257 ICC 129.

to say nothing of the distaste for threatened stockholders' suits, telegrams to political figures in high places, news releases and magazine articles.

It seems a pity that the whole subject could not have been threshed out in a manner more in keeping with its importance to our national economy, rather than in such an atmosphere of bitter invective. While there is doubtless much to be said on each side, and the subject is far more difficult and complicated than one unfamiliar with such matters would at first suppose, it is clear to me that it is no part of my function to pass on the merits of the controversy over competitive public sealed bidding; and I shall not do so.

Morgan Stanley and Kuhn Loeb lost a $12,000,000 issue of Cincinnati Union Terminal, which came out at public sealed bidding on February 14, 1939, after Eaton and Young had "put the heat on." Naturally, under the circumstances, Morgan Stanley and Kuhn Loeb, who were working together as a group, submitted no bid; to have done so would merely have played into the hands of their adversaries. But other defendant firms did submit bids. Lehman Brothers, with Eastman Dillon in its account, won. First Boston, whose account included Kidder Peabody, was second; and Halsey Stuart and Otis submitted the lowest bid.

Morgan Stanley commenced a particularly complicated negotiation with Terminal Railroad of St. Louis on February 9, 1939; there were frequent meetings with the Finance Committee and counsel, as a result of which the proposed issue was formulated and the various documents prepared. But nothing was of any avail against the hundreds of telegrams to directors, Interstate Commerce Commissioners, political figures, life insurance executives and the presidents of the 16 guarantor railroads. The old misrepresentations were renewed, press releases given to the Associated Press, Time Magazine and newspapers; and the management gave in.

The most curious feature of the whole affair is that it is supposed to be some proof of conspiracy, when it is shown not only that Morgan Stanley submitted no bid, but also that it politely refused to accept from the Terminal Railroad of St. Louis the compensation offered for its services rendered in formulating the plan and shaping up this complicated transaction. To have accepted compensation when none was legally due, would have furnished Eaton and Young with another weapon to use against Morgan Stanley in the next engagement, which followed shortly thereafter.

Had the offer been accepted, the amount of compensation paid would doubtless have been large, and perhaps government counsel expected this factor to affect my judgment. A judge, when on unfamiliar ground, must be careful not to infer wrongdoing simply because the figures in dollars are so much higher than he has been accustomed to deal with. When, in the early stages of the trial, evidence was offered of the commissions or fees paid to J. P. Morgan & Co. in connection with the Anglo-French Loan in 1915, without any proof of what had been done to warrant the payment of such amounts, I inquired of counsel for the government whether it was claimed that the amount was exorbitant, as one of the allegations of the complaint charged that an effect of the conspiracy was that exorbitant spreads had been foisted upon issuers. As soon as counsel for the government were informed that I would have to be guided by expert testimony on such a subject, of which I knew nothing, the matter was taken under advisement, and the charge of exorbitant spreads was later withdrawn.

Eaton, Young and Halsey Stuart pursued the same tactics in connection with other security issues in 1939, 1940, 1941 and 1943; but there is no occasion to follow the details.

As we shall see when we come to the informal conference at the SEC, attended by those invited to express their views relating to the then proposed Rule U–50,

Stanley and Stuart had a conversation just after the conclusion of one of the sessions, which Stuart describes in his testimony in this case, as follows:

"The Witness: I think I said to this effect: 'Can't you see by the attitude of the Commissioners that they are in favor of competitive bidding, because all you fellows that have been up there before them today, they have put you on the defensive?' and he said, 'No, I don't think so,' he said, 'I think we are going to beat it' I think that was it".

Stanley would not have felt so confident had he known that Stuart had, according to his testimony before me, been assiduously conferring with the SEC commissioners and members of the staff, over a long period of time, explaining the virtues and advantages of public sealed bidding. Stuart knew that his persistent and long continued efforts had succeeded in impressing the very men who, thereafter, were not convinced by the arguments made at the open hearing by Stanley and the other investment bankers, defendants, and nondefendants, and institutional investors, who were in attendance in response to the invitation to come and express their views.

It will serve no useful purpose to trace further the trail of the Eaton-Young-Halsey Stuart campaign, except to say that after their initial success before the SEC with Rule U–50, this combination redoubled their efforts until they were rewarded by the much more significant victory evidenced by the ICC ruling in 1944.[1]

## Responses to Requests from SEC to Express Views Relative to Proposed Rule U-50 and Further Amendments to Rule U-12F-2

On December 28, 1938, pursuant to authority found in the Public Utility Holding Company Act of 1935, the SEC promulgated Rule U–12F–2, effective March 1, 1939. It contains elaborate provisions, and was amended from time to time. We are concerned only with a reference therein to a requirement that, under certain states of fact, no payment of an underwriter's fee would be approved where "there is liable to be or to have been an absence of arm's-length bargaining with respect to the transaction." In the course of time various applications for exemption were made to the SEC, and these were occasionally granted on condition that there be "shopping around" among a number of investment banking houses, rather than a negotiation solely with the firm which had brought out prior issues. This proved in practice to be unsatisfactory to all concerned. Accordingly, on March 4, 1940, the Public Utilities Division of the SEC sent out form letters, enclosing a copy of Rule U–12F–2, stating "We are * * * willing to consider tech-

---

1. Certain comments in the ICC ruling in Ex parte 158, 257 ICC 129, 156, are of interest:

"While there is a growing tendency on the part of railroad management to exercise its choice of method in the marketing of securities, most of the railroads continue to market the bulk of their securities through private negotiation with Kuhn, Loeb & Company and Morgan Stanley & Company. While these firms get by far the larger part of railroad financing, no facts indicating that this is due to domination of the railroads or to any sinister relationship have been brought to our attention. In our 52nd annual report to Congress (1938) we called attention to the fact that banker influence on railroad managements had at times been marked, but not always bad, and that there was little evidence that it was dominant at that time, the great railroad banker being the Reconstruction Finance Corporation. No evidence of banker domination of the railroads has been shown in this proceeding. The record indicates that railroads have given and continue to give the bulk of their business to the two firms because of the quality of service rendered and because the railroads have seen no reason to make a change. Nor have proponents called to our attention any facts showing or tending to show that the bankers maintain their position in railroad financing by distribution of patronage, coercion of other investment bankers, or favoritism of such bankers because of interlocking relationships."

niques which may be less burdensome from the standpoint of the issuer and more effective from the standpoint of the Commission," in meeting the requirement of competitive conditions and arm's-length bargaining. The numerous investment bankers to whom this letter was sent were invited "to submit not later than March 18, 1940, a written memorandum," relative to a question asking for suggestions concerning methods which might be used to attain the desired end. The letter itself described "one method, in addition to the present 'affiliate' rule * * * has been a requirement of proof that the issuer has 'shopped around' among investment bankers for the most favorable terms." Another method is the possible "use of sealed bids." The letter adds, "There may well be others."

Incredible as it may seem, the written replies to this formal invitation by an administrative body of the United States Government, asking citizens to express their views on a subject which vitally concerned their property interests, were offered in evidence by government counsel as some proof of the existence of the conspiracy charged in the complaint, despite the fact that it is not questioned but that the views expressed were honestly held and were submitted in good faith.

Hall, of Harris Hall, wrote:

"We think that 'shopping around' for terms is a particularly unintelligent approach to the question which has been asked."

A long and well reasoned memorandum by Blyth has this to say:

"This suggestion ["shopping around"], if it is properly understood, ignores the realities involved in doing business and is an ineffectual and unnecessary procedure."

While many of the defendant firms submitted no memoranda, others pointed out that the naming a price "far in advance of the offering date leads to unrealistic price offers," and that one could not tell what was being "shopped around," as the issue might be in the formative stages of being shaped up. Certain deposition testimony on the subject is to the same effect, with greater detail.

My own conclusion is that the machinery of "shopping around," which favored the less scrupulous bargainer, had little to commend it.

The next step was another formal invitation to attend an open conference on January 27, 1941, at the SEC office in Washington, this time to express views concerning the contents of a Report of the Public Utility Division Staff, entitled "The Problem of Maintaining Arm's-Length Bargaining and Competitive Conditions in the Sale and Distribution of Securities of Registered Public Utility Holding Companies and their Subsidiaries," which made a strong plea for compulsory public sealed bidding, and at least to some extent must reflect the good work Stuart had been carrying on for some time with some of the commissioners and members of the staff, as he testified.

Some carefully prepared memoranda were submitted expressing various views. Dillon Read thought that the SEC "has become a strong advocate" and should defer action until the matter could be taken up at a public hearing "before committees of Congress." A committee report of the NASD to the Board of Governors, expressed the view that the proposed action "is a step toward the complete control by government of the private capital market." Significantly, on the conspiracy issue, this report was made by a committee composed of, Francis Kernan, Jr., of White Weld, the chairman, and William H. Brand, of the Securities Co. of Milwaukee, Sidney P. Clark of E. W. Clark & Co. of Philadelphia, Albert H. Gordon of Kidder Peabody and Ralph Hornblower of Hornblower & Weeks.

A large number of investment bankers, from defendant and non-defendant firms, representatives of insurance companies and others attended the hearing.

They were urged to make themselves comfortable, "unbutton their vests," "put their feet on the table," "and talk in the freest possible fashion." The commissioners who conducted the hearing would doubtless be as much surprised as I was, to learn that the sentiments thus frankly expressed, pursuant to formal invitation, constitute no small part of the evidence offered on this trial on the competitive bidding issue.

What witnesses before investigating bodies, administrative agencies or elsewhere, may say or do in carrying out an illegal scheme or conspiracy may of course be used, and should be part of the evidence proffered in a subsequent court proceeding, in which the existence of such illegal conspiracy is an issue. But here we are dealing with concededly honest expressions of opinion, in response to an invitation from public officials to state views on an important public question, with respect to which there was ample room for honest difference of opinion, on the merits. The witness or speaker, whether or not under oath, is placed in the position of remaining silent, telling the truth about his thoughts on the subject under consideration, or pretending to agree with what he thinks the public officials want him to say. If the exercise by American citizens of their constitutional rights in expressing their honest views on public questions vitally affecting their economic interests, can thus be used against them on a conspiracy charge in an anti-trust suit, whither are we bound? It is all well enough for government counsel to concede that the individuals in question had a right to express their views; the fact still remains that, if this procedure is to be consistently followed, many will hesitate to come before such public bodies and express views at variance with what is considered, perhaps erroneously, likely to be, or to become, the official policy. The purpose of free speech is to bring enlightenment and to insure our future welfare by forthright discussion of any and all matters affecting personal liberties and property rights. One of the surest ways to weaken and disintegrate these precious liberties, and to discourage communication between a citizen and his government, is to encourage such procedure as was here adopted in an attempt to bolster up a charge of conspiracy.

## Alleged Overly-Large Syndicates and Other "Devices" to Sabotage Public Sealed Bidding

While government counsel claim that there were other overly-large syndicates, the discussion of Pacific Gas & Electric [1] will suffice. In fact there were no such overly-large syndicates formed by any defendant or group of defendants.

The claim that participations were given equal to those of the manager, and that the management fees in public sealed bidding transactions were considerably less than those paid in negotiated transactions, and that these were "devices" adopted by "the defendants" in consummation of the alleged illegal enterprise, finds no other support than the misconception of the way investment bankers function, which has already been referred to. It will suffice to refer to what has already been written in Part I of this opinion.

But what about the plight of the little fellow? Unfortunately for him, the record shows that compulsory public sealed bidding has made the big firms bigger, and the little fellow is worse off than he was before. This was predicted by Stanley and by others; but to no avail. Government counsel claim that this has no relevance to the case, because the Sherman Act was never intended "to hold an umbrella" over the little fellow, or the inefficient, as a protection against competition by those more favored by nature or by circumstance. They are right about this.

In the final triennial, 1947–1949, Halsey Stuart ranked No. 1, with 36.60%

---

1. See supra, p. 804 ff.

of the dollar volume of public sealed bidding financing. The small spreads above referred to have reduced the participation of the smaller dealers and local investment bankers. Under present day conditions the public sealed bidding accounts provide few securities for the small dealers to sell.

The whole process of so regulating an industry that everyone will have a reasonable opportunity to secure his so-called "share of the business" is not as simple as it may appear to some, which is only to say that the approach to a solution of such a problem should not be by way of the courts, in a so-called conspiracy case, but within the framework of the constitution of a free people, entitled to have their voices heard.

## PART VII

**The "Insurance Agreement," Alleged to Have Been Made on December 5, 1941, and "Approved" on May 5, 1942**

▬ This subject is introduced by paragraph 44D(4) of the complaint which alleges:

"44. The conspiracy has consisted of a continuing agreement and concert of action among the defendants, the substantial terms of which have been that defendants:

\* \* \* \* \* \*

"D. Agree to eliminate and prevent competition for security issues offered at competitive bidding and to circumvent regulatory orders of Federal and State administrative agencies requiring competitive bidding in the sale of security issues, among other means—

\* \* \* \*

"(4) By inducing institutional investors to refrain from making bids for security issues offered at competitive bidding in return for the preferential allotment to such investors of substantial blocks of the securities purchased by defendant banking firms."

The "agreement" is alleged in great detail in paragraph 45C of the complaint as follows:

"45. During the period of time covered by this complaint, and for the purpose of forming and effectuating the conspiracy, the defendants, by agreement and concert of action, have done the things they agreed to do as hereinbefore alleged, and, among others, the following acts and things:

\* \* \* \* \* \*

"C. On or about December 5, 1941, at New York City, representatives of most of the defendant banking firms met with representatives of Metropolitan Life Insurance Company, The Prudential Insurance Company of America, The Equitable Life Assurance Society of the United States, New York Life Insurance Company, Mutual Life Insurance Company of New York, and Home Life Insurance Company, and entered into an agreement (herein referred to as the 'insurance agreement'). At New York City on May 5, 1942, at a subsequent meeting attended by representatives of most of the defendant banking firms and a larger number of life insurance companies (hereinafter referred to as the 'insurance companies'), the insurance agreement was approved and adopted by such representatives. The aforesaid meetings, and similar meetings, held during the months of October and November, 1941, were held at the invitation of the Superintendent of Insurance of the State of New York, which invitation has been induced by the defendants. Under the terms of the insurance agreement, the defendant banking firms and the insurance companies have concertedly done and now do, among other things, the following:

"(1) Defendant banking firms advise, influence, and induce issuers to set up their security issues to meet the requirements and preferences of

the insurance companies as to price, size of issue, type of security, yield, and other terms.

"(2) Defendant banking firms have retained for direct or group offering to the insurance companies approximately 50 percent of every issue in which such companies indicate an interest, and have determined the amount to be so offered to each of such companies by giving weight to two factors: first, the size of such companies, as determined by their assets, and second, in the case of refunding issues by giving weight to the amount of securities which any individual insurance company would lose through the retirement of the outstanding issue.

"(3) Defendant banking firms charge the insurance companies the full public offering price for all securities sold to them under the insurance agreement.

"(4) Defendant banking firms refrain from acting, and discourage other investment bankers from acting, as agent for institutional investors in agency purchases of securities.

"(5) The insurance companies, individually and collectively—

"a. Prepared and furnished to defendant banking firms a preferential list of 27 life insurance companies owning 87.8 percent of the total admitted assets of all life insurance companies in the United States, to which direct or group allotments under the insurance agreements are made by defendant banking firms.

"b. Refrain from bidding for the purchase of security issues offered for sale at competitive bidding.

"c. Discourage issuers from offering security issues for sale at competitive bidding, and support and cooperate with the defendant banking firms in opposing all extensions of the use of competitive bidding.

"d. Refrain from soliciting issuers to sell their security issues through private placement, and reduce substantially the volume of their security issue purchases through private placement.

"e. Refrain from making agency purchases of security issues.

"f. Reduce substantially their purchases of securities from investment bankers not parties to the insurance agreement.

"(6) A special committee composed of members named by the parties to the insurance agreement was organized and other persons were employed (a) to maintain liaison between defendant banking firms and the insurance companies, (b) to receive and investigate complaints against violators of the insurance agreement, and (c) to report the results of its investigations to the insurance agreement parties."

That an agreement so ambiguous and unworkable should have been entered into by the officials of leading life insurance companies and investment bankers of wide practical experience, at the invitation of the Superintendent of Insurance of the State of New York, seems improbable on the face of the charge as made. We shall find, despite the 79 documents introduced in evidence on this issue, that no competent evidence whatever was offered to prove that such an agreement was made; circumstantial inferences from some of the documents indicate that no agreement of any kind was made; and the stipulated static data indicate that the subsequent course of events followed no such pattern.

The situation presented is simple; and it becomes complicated only because counsel for the government refused to call any of the 40 or 50 people present at either or both of the conferences referred to, in spite of repeated assurances that witnesses would be called. The record shows that many if not all of them were alive and available. Instead, following the plan of a "documentary

case," the invitations to attend, the replies, and a host of miscellaneous papers were placed in evidence, no single one of which, or any number of them together, proved the making of an agreement, but indicated the contrary. Because of the absence of direct and competent proof, a finding that no such agreement was made would not be justified, and I shall do no more than record the failure of plaintiff to prove the making of the agreement as alleged.

On September 29, 1941, a $90,000,000 issue of American Telephone & Telegraph Debentures was bought in at public sealed bidding by three large life insurance companies, the Metropolitan, Mutual and New York Life, whose bid was higher than those submitted by a Morgan Stanley account, which came second, and by Halsey Stuart and Mellon Securities. Lehman Brothers, Glore Forgan and Eastman Dillon were in the Halsey Stuart account and several other defendant firms were in the Morgan Stanley account.

The first in the sequence of events which followed, according to the documents in evidence, was a telephone conversation on the morning of September 30, 1941, between New York State Superintendent of Insurance Louis H. Pink and Emmett F. Connely, then president of the Investment Bankers Association. There having been some comment in the newspapers, Connely apparently called Pink, and the conversation was followed by a letter from Connely asking for an expression of opinion as to whether or not the insurance companies were permitted by law to make such purchases. Upon investigation it was found that the insurance companies were clearly within their rights, and an opinion to that effect was rendered by Pink's counsel, and the correspondence was published in the press.

In his letter to Connely, dated November 7, 1941, Pink stated:

"Some objection has also been raised in the insurance field because the large life companies are able to combine and purchase practically all of the securities to the disadvantage of the small companies."

This is the first time that this question appears in any of the documents; and the record shows that, in the meantime, Pink had called a meeting of insurance company executives on October 15, 1941. No witness testified to what occurred at that meeting, nor do the documents contain any statement of who were present or what was said. Pink thereupon appointed a committee of insurance company officials, with James A. Fulton of the Home Life, one of the smaller companies, as chairman, to look into the matter; and it was conceded by government counsel, and it is the fact, that Superintendent Pink was vested with power by law to explore the problem thus presented. Pink called a meeting of this committee on November 25, 1941, and a meeting of the representatives of 31 or more insurance companies on November 26, 1941. Again the record gives no inkling of what occurred at either meeting.

The next move by Pink was a letter to various investment bankers and insurance company officials calling a meeting to he held at the offices of the New York State Insurance Department, in New York City, on December 5, 1941, "to talk over the problem of life insurance investments." Much time was consumed during the trial on the subject of who was present. As to all but a very few there was no doubt; but as to the others there is little to guide me, which is explainable, as the attack on Pearl Harbor came only two days later. If requested I shall make findings in accordance with comments on the record made by me as the various voluminous answers to interrogatories, and answers to demands for admissions were being offered in evidence and considered. Representatives of several non-defendant firms, including Halsey Stuart, and numerous executives of life insurance companies, including Beebe of the Mutual, Ecker of the Metropolitan, Stedman of the Prudential and Harrison of New

York Life, in addition to Fulton of the Home Life and Superintendent Pink, and others, were present. It is conceded that no representatives of Eastman Dillon, Glore Forgan, Harris Hall, Kidder Peabody, Lehman Brothers, Stone & Webster, White Weld or Union Securities attended any of the meetings or had anything whatever to do with the alleged "insurance agreement."

I find as a fact that none of the meetings were induced by "the defendants," as alleged in the complaint, or by any of them.

Again, the record is silent as to what was said at the meeting of December 5, 1941. Such meager references to this meeting as are found in the documents in evidence would indicate that no agreement whatever was made by or between any of the participants. Government counsel repeatedly assured me that witnesses would be called, but none was called, despite the fact that on November 20, 1951, I signed a subpoena *ad testificandum* addressed to Donald C. Slichter of the Northwestern Mutual. Government counsel finally decided not to call him or anyone else.

In the beginning, Fulton had requested Sidney Mitchell of Bonbright, an alleged co-conspirator, to work with his committee of insurance officials, so that the members of that committee might have an investment banker with whom to consult. At some time prior to May, 1942, Coggeshall of First Boston was requested by Fulton to take Mitchell's place, when Mitchell was called to Washington; and there are some letters passing thereafter between Coggeshall and Fulton.

Finally, Pink called another meeting for May 4, which was put over to May 5, 1942, and certain representatives of life insurance companies and defendant and non-defendant investment banking firms again conferred with Pink. We are not informed as to what took place.

After the meeting and on May 14, 1942, Fulton made an extensive report to Pink, copies of which were sent to those who attended the meetings; and there the matter ended. One of Pink's later letters states, "While no definite action has been taken, greater effort is being used by everyone to distribute such investments as are offered more equitably and more widely." Fulton's report contains this sentence:

"It should be emphasized that neither at this meeting [the first one with the insurance company officials] nor at any of the subsequent conferences which were held, were any agreements or understandings arrived at that would in the slightest degree restrict the freedom of action of anyone."

The fact that, after the meeting of May 5, 1942, Coggeshall sent out a list of life insurance companies, ranked by assets, which had been prepared by Mitchell of Bonbright, is of little significance, particularly as the stipulated static data indicate that life insurance companies continued to bid for security issues, and no pattern of uniform or consistent action on the part of investment bankers or life insurance companies followed in the wake of these meetings.

## PART VIII

### Conclusion

There are many features of this extraordinary and perhaps unparalleled case which have not been commented on; the issuer situations referred to run into the hundreds; and my effort to channel the proofs into an area composed of the security transactions of only 100 issuers, proved wholly futile. But it is believed that every significant feature of the case, and each of the principal contentions of government counsel, has been commented on sufficiently to disclose the state of the evidence and my findings of fact and legal conclusions relative thereto. And this has been done in so complete a manner that any errors on my part may readily be discovered.

## Administrative Features and Statistics of the Trial

My four pre-trial orders [1] indicate my efforts to clarify the issues and simplify the trial, to the extent that preliminary clarification and simplification were possible. This reduced discussion on the admissibility of evidence to a minimum. The system of marking exhibits demonstrated its usefulness in a variety of ways and worked well. My notes, made during the progress of the proceedings in open court, with elaborate cross-references, afforded a fairly complete and accurate digest of the evidence, documentary and testimonial, and served as a ready means of locating exhibits and eliminating futile discussion of what had taken place. The filing and cross-reference system installed in my chambers made the various original exhibits, charts and statistical tables, memoranda, and miscellaneous affidavits, motion papers, notices and lists, at all times available without delay. The direction that counsel for the government present plaintiff's evidence *seriatim*, according to an arrangement satisfactory to them, saved much confusion. The difficulties caused by thus dispersing the various excerpts from the deposition testimony, taken in the pre-trial discovery proceedings, were overcome by the presence of separate volumes containing the numerous depositions, which were thus at all times at hand, when I desired to read the deposition of any particular witness in sequence.

In many anti-trust cases thousands of documents, such as invoices or reports, may readily be tabulated and the net results observed without reading each exhibit. Here the mass of documents referred to innumerable conversations and transactions which could only be pieced together after a methodical reading of each, and the identification of the official positions and connections of those whose names appeared in the various letters, memoranda, diary entries, telegrams and reports. I could find no way to avoid this; and the numerous colloquies, which at first glance seem unduly to increase the size of the transcript, were the only means I could hit upon to make it possible for me intelligently to weigh and determine the probative value of the thousands of items of documentary evidence.

Nothing whatever was admitted "for what it was worth," and it is only fair to counsel for the government to say that nothing was offered on the basis of this vague formula. On the other hand, it must be frankly admitted, that in a complicated conspiracy case the presiding judge has little alternative to going along with counsel, when assured that the proffered evidence will be connected up later and will serve in the end to complete the "mosaic" of joint action and conspiracy. In my judgment, the only hope of cutting these conspiracy cases down to size, lies in the exercise of a sound discretion by the Department of Justice. The trial judge, desirous of doing full justice to all parties, can hardly lop off particular segments of the case at a time when it is impossible to be sure that they will or will not, in the end, fit together.

The connecting statements at the end of the government's case were indispensable. Without them I should have had no other alternative, as a practical matter, than to compel the defendant firms, perhaps with the exception of the peripheral ones, to go on with their defense; and this might well have, quite unnecessarily, prolonged the trial for another two years.

Plaintiff filed its 56-page complaint on October 30, 1947; answers of all defendants, denying the material allegations and totalling 213 pages, were filed on March 17, 1948. In the three years

1. Pre-trial Order No. 1, June 10, 1948 (not published); Pre-trial Order No. 2 and Opinion, May 25, 1950, 10 F.R.D. 240; Pre-trial Order No. 3 and Opinion, April 9, 1951, 11 F.R.D. 445; Pre-trial Order No. 4, August 18, 1951 (not published); Order Amending Pre-trial Order No. 3 and Opinion, December 9, 1952, 13 F.R.D. 300.

which elapsed prior to the opening of the trial itself a total of 28 days of pre-trial hearings were held, the transcript of which occupied 1709 printed pages.

The great quantity and variety of matters presented to the Court at these, extensive pre-trial hearings are generally described in the opinion filed with Pre-Trial Order No. 2 on May 25, 1950, 10 F.R.D. 240. In summary, counsel for the government took 21 separate depositions, at one of which the Court presided; these depositions were taken on 80 separate days from February 16, 1948 to May 22, 1950, and occupied 6,-848 printed pages of transcript. In addition during this period approximately 10,640 documents, consisting of some 43,252 pages, were submitted by counsel for the government to the defendants for authentication and were printed by the parties. There were also served and filed by the various parties some 26 separate demands for admissions and groups of interrogatories which, together with the 192 objections and responses thereto, totalled 3864 pages.

The trial itself opened on November 28, 1950, and continued for a total of 309 courtroom days, through May 19, 1953. The Court also held off-the-record "powwows" with all counsel on 25 separate days. The stenographic trial transcript constituted 23,962 printed pages, or between 5,000,000 and 6,000,000 words.

Some 4469 separate documents, totalling 20,474 pages, were included in the exhibits introduced in evidence or marked for identification (other than stipulated data). There were also introduced in evidence as "plaintiff's and defendants' exhibits" extraordinarily extensive and detailed stipulated statistical and other data constituting 10,168 sheets or pages. An additional 2967 pages of similar material were marked for identification. Thus all documents and stipulations introduced or marked at the trial came to a total of 33,609 pages, which, with the stenographic transcript, result in a trial record of some 57,571 pages in all.

After the filing of the complaint and prior to the submission of final briefs, the Court was required to consider some 196 pre-trial and interim motions, briefs and memoranda, as well as 376 separate charts and tables prepared from stipulated data by the various parties. This pre-trial and interim material came to a total of 3846 pages. In addition, final briefs and reply briefs of all parties amounted to a total of 3247 pages. A grand total of 597 separate motions, briefs, memoranda, charts and tables thus have been submitted to and considered by the Court, consisting of some 7093 pages.

Altogether there have been printed in connection with this litigation from start to finish approximately 100,000 pages of material, and the Court has been required to consider as well some 5000 additional pages of unprinted motions, affidavits, memoranda and similar matter.

### Summary, Rulings on Motions and Dismissal

The seventeen defendant firms have all done business in much the same way, as occurs in any industry. But each has followed its own course, formulated its own policies, and competed for business in the manner deemed by it to be most effective, in view of its history and background, its standing in the industry, its capital, relatively large or small, its own particular business affiliations and contacts, the capacities of its own officers or partners and its own personnel as individual human beings, and its own facilities for the distribution of securities. Some specialize in debt issues, some in flotations of common stocks; some depend especially upon participations and some do not. Obviously, each of them cannot compete for the management of every security issue. No one of them has enough trained men or sufficient capital even to compete for any great number of issues at the same time. To attempt to do so would result in complete failure.

Except for those instances where practically the entire industry developed a

functional device to enable its members to compete for the financings of issuers, as with the syndicate system, which has for many years been recognized as the American way of bringing out new issues of securities, or, the defendant firms or individual members thereof, with some exceptions, genuinely and in good faith held the same views, as in the case of the controversy over compulsory public sealed bidding by regulatory fiat, these seventeen defendant banking firms went their own several and separate ways. If they had in fact acted in combination or as a unit to divide the business among themselves, and to form a monopoly vis-a-vis the other firms in the industry, as alleged, the pattern of such combination, no matter how cleverly disguised or concealed, must surely have emerged, after such prolonged and continuous scrutiny as has gone on in this case for almost three years. But it did not.

Government counsel at no time disputed or sought to minimize the burden resting upon plaintiff to establish joint action by the defendant banking firms, consciously pursuing the alleged plan or scheme in concert. At no time was I urged by government counsel to find conspiracy, unless convinced that an actual conspiracy had been formed and was in operation. Accordingly, I have weighed the evidence in light of the conceptions of conspiracy urged by government counsel, and in terms of the doctrines of conspiracy laid down by the Supreme Court.[1]

▮ I have come to the settled conviction and accordingly find that no such combination, conspiracy and agreement as is alleged in the complaint, nor any part thereof, was ever made, entered into, conceived, constructed, continued or participated in by these defendants, or any of them.

Since there was no combination, the monopoly charges fall of their own weight.

Many findings of fact and conclusions of law are stated in this opinion. Within 60 days after the filing thereof, the parties may submit for my consideration further proposed findings of fact and conclusions of law, in accordance with this opinion and supplemental thereto.

The motions to connect, and further to amend the complaint, are denied; each of the several motions to dismiss the complaint is granted, and the complaint is dismissed as to each defendant on the merits and with prejudice.

## APPENDIX

### Summary Description of Statistical Compilations, Tables and Charts

Pre-Trial Order No. 1 made provision for the establishment of the accuracy of statistical compilations through consultation and agreement among counsel, in lieu of the tedious proof of statistical facts in the course of trial. When, in compliance with the Pre-Trial Order, government counsel submitted their proposed statistical charts and supporting source materials, counsel for the defendants counter-proposed the stipulation of a comprehensive body of basic data which might be drawn upon for the purposes of studies submitted by either side, and to this the government agreed. Accordingly, counsel for the defendants, assisted by a research staff under the direction of Dr. Bertrand Fox, Director of Research of the Graduate School of Business Administration of Harvard University, prepared a number of basic compilations of comprehensive information on security issue financing. These compilations, which were reconciled with the government's figures through the cooperative contributions of work by gov-

1. See, e. g., Interstate Circuit v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; United States v. Masonite Corp., 1942, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; American Tobacco Co. v. United States, 1946, 328 U.S. 781, 66 S. Ct. 1125, 90 L.Ed. 1575; United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260.

ernment counsel, were either put in evidence as joint exhibits of plaintiff and defendants or stipulated to be competent proof from which either side might make appropriate submissions, as follows:

(i) "Issue Registers." In view of the small volume of financing in the first year and one-half following the enactment of the Securities Act of 1933, the parties agreed upon the period January 1, 1935 to December 31, 1949 as an appropriate and convenient fifteen-year span for purposes of statistical analysis. Eleven compilations, called "Issue Registers," were prepared and received in evidence, which listed, by years and by categories as to size and character deemed appropriate for relevant analysis, 9,879 security issues publicly offered or privately placed in the United States during those fifteen years. These comprised new and secondary issues, underwritten and nonunderwritten, effected with or without the services of investment bankers, of domestic and foreign business corporations and foreign governments and revenue obligations of domestic governmental units. The security issues included were, generally, those of $100,000 and larger (although in some categories the issues listed were those of $1,000,000 and larger). For each of the 9,879 issues the "Issue Registers" set forth the date of the offering or placement, the name of the issuer, a fully identifying description of the issue as to kind of security, rate of interest or dividend, maturity, and the like, amount of the issue, the type of transaction and method of offering, and the names of the investment banking firms who acted as managers or agents.

There was thus presented a substantially complete survey of all security issue financing (other than of direct and general governmental and municipal obligations) in the United States in the post-Securities Act period.

(ii) "Issue Data Sheets." For all underwritten issues of $1,000,000 or larger of business corporations and foreign governments listed in the "Issue Regis-

ters" (except issues of domestic railroad equipment trust certificates), there were prepared and received in evidence "Issue Data Sheets" which set forth further information in extensive detail, including data on spreads, management fees, underwriting expenses, selling concessions, dealer sales, group sales, and the names and amounts and percentages of the underwriting participations of all of the underwriters of each issue.

(iii) "Public Sealed Bidding Sheets." For all issues offered at public sealed bidding during the same fifteen-year period, in the categories covered by the "Issue Data Sheets," information identifying the heads of bidding accounts and bids submitted, and the participation of defendant firms in various bidding accounts, whether or not successful, was compiled and received in evidence in "Public Sealed Bidding Sheets."

(iv) "Issuer Summaries." The defendants also prepared and submitted to the Court a two-volume compilation of security issues in the United States in the post-Securities Act period (July 26, 1933 to December 31, 1949). These volumes, filling in the gap between the passage of the Securities Act and the beginning date of the general statistical compilation and adding certain categories of issues not embraced within the "Issue Registers," organized basic information about all of the issues alphabetically by names of issuers, in order that the security issue financing history of any of some 4,000 issuers could be conveniently traced. This compilation was subsequently stipulated by government counsel to be complete and correct and was received in evidence as a joint exhibit of plaintiff and defendants.

(v) "Pre-Securities Act Issuer Summary Sheets" were prepared with respect to all of the known security issue financings, going back for many years prior to July 26, 1933, of (a) each issuer for which any defendant firm acted as manager or agent of an issue in the post-Securities Act period, and (b) each issuer concerning whose financings the

government had indicated by its answers to interrogatories that it would offer proof. The information here collected was in substantially the same categories covered by the "Issue Registers," but due to the absence of complete information in many cases the investment banking firms shown were those which could be ascertained to have acted as managers or agents or to have been in privity of contract with the issuer or to have been prominently identified with the offering of the issue in the offering circular. Since it could not be made statistically complete and comprehensive, this compilation was not offered in evidence as such, but was stipulated by the parties to be a competent pool of proof from which either side might make submissions. During the course of trial "Pre-Securities Act Issuer Summary Sheets" on the financings of 616 different issuers were put in evidence by the various parties.

Numerous analytical studies dealing with the stipulated security issue data for the fifteen-year period 1935–1949 were prepared by the defendants, with the assistance of Dr. Bertrand Fox, and were submitted to the Court, including principally the following:

(i) "Analysis of the Volume of Security Issues 1935–1949," a quantitative analysis, by charts and tables, of the data on the types of securities issued and the types of transactions used by various classes of issuers over the fifteen years.

(ii) "Tables M 1 through M 16: Investment Bankers as Managers or Agents," analyzing the data as to the dollar amount and the number of issues for which each of 40 to 50 investment banking firms (including each defendant firm) acted as manager or agent during the fifteen years. In addition to revealing the relative activity and performance of each of those firms by triennial periods, as well as for the fifteen years as a whole, this study examined the data by class of issuer, by size of issue and by type of transaction.

(iii) "Tables P 1 and P 2: Investment Bankers as Underwriters," analyzing the data as to the dollar amount and the number of underwriting participations of each of 75 investment banking firms (including each defendant firm) in all underwritten new and registered secondary issues of $1,000,000 and larger, by triennials and for the fifteen years, separately for negotiated issues and for public sealed bidding issues.

(iv) "Tables and Charts P 10 and P 11: Analysis of Alleged Reciprocity in Underwriting Participations," examining, on a number of alternative comparative bases, the alleged reciprocity in underwriting participations between each defendant in this action and each of 37 other investment banking firms (including each other defendant) both in dollar amount and number of underwriting participations and in terms of dollar volume of contemplated gross spread proportionate to participations, for negotiated issues and for negotiated issues and public sealed bidding issues combined.

(v) "Tables PSB 1, 2 and 3: Summary Record of Public Sealed Bidding Issues," analyzing the relationships between type, size and rating of issues at public sealed bidding, size of accounts formed to bid, and the number of bidding accounts, and examining these relationships in terms of all bidding accounts and of bidding accounts headed by or participated in by defendants.

(vi) "Record of Individual Firms as Head or Member of an Account in Public Sealed Bidding Issues, 1941–1949 (for each of the 17 defendant firms, for Mellon Securities Corp. and for Halsey Stuart)," analyzing the activity of the firms listed in accounts, both successful and unsuccessful, by types and grades of securities and by sizes of issues for each year.

In addition to these principal studies of security issue financing and investment banking activity, many other charts and tables submitted on behalf of all of the defendants or submitted

separately by some of them were studied and considered. These included analyses of the trends over the years of spreads and spread components (underwriting compensation, selling concessions and management fees) in relation to size, type and investment quality of securities, examination of the composition of and changes in the business done by various of the defendants, and studies of other matters bearing on the competitive positions and activities of investment banking firms.

Charts and tables submitted by plaintiff at various times during the presentation of the government's case dealt with, among other things, participations, "directorships," "historical position," management activities and management fees.